# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT CINCINNATI

RYAN K. WIDMER,                          :

                                                                Case No. 1:14-cv-303

         Petitioner,

         -vs-                                                   District Judge Timothy S. Black
                                                                Magistrate Judge Michael R. Merz

WARDEN, CORRECTIONAL
RECEPTION CENTER,

         Respondent.

                                                    :

# REPORT AND RECOMMENDATIONS

This is a habeas corpus action brought by Petitioner Ryan K. Widmer pursuant to

28 U.S.C. § 2254 seeking relief from his conviction for murder and his subsequent sentence of

fifteen years to life imprisonment.

Mr. Widmer is represented in this proceeding by counsel who has represented him

since May 6, 2009, during the litigation of his post-trial motions following his first trial (See

Respondent's Appendix ("App'x"), ECF No. 17-1, Exh. 44, PageID 605).  In addition, Mr.

Widmer's current counsel has represented Mr. Widmer in his appeals on a *pro bono* basis since

February, 2011(See ECF No. 2, PageID 169).

## Statement of Facts

The Ohio Court of Appeals for the Twelfth Appellate District described the facts

1

and circumstances leading to Mr. Widmer's indictment, trials, conviction, and adjudged sentence as follows:

[*P2] The record indicates that on Monday, August 11, 2008, at 10:49 p.m., Widmer called 911 for emergency assistance. The phone call lasted less than seven minutes. During the phone call, Widmer stated that his 24–year–old wife, Sarah Widmer, had fallen asleep in the bathtub at their home in Morrow, Ohio, and he thought she was dead. Widmer told the 911 dispatcher he had been downstairs watching TV, and when he came upstairs, he found Sarah lying face-down in the bathtub. He commented to the dispatcher that Sarah "falls asleep in the tub all the time."

[*P3] While on the telephone with the 911 dispatcher, Widmer drained the bathwater, removed Sarah from the bathtub, and proceeded to attempt CPR. Within six minutes of placing the 911 call, Deputy Steve Bishop with the Warren County Sheriff's Office arrived at the scene and found Sarah lying naked on the carpeted floor of the master bedroom. Sarah's body was warm and appeared to be dry, but her hair was wet. Widmer was also in the bedroom, dressed only in his boxer shorts. Bishop did not observe any trauma or injuries to Widmer.

[*P4] After determining Sarah did not have a pulse and was not breathing, Bishop began CPR. Bishop noticed that a pinkish-white, frothy discharge was coming out of Sarah's mouth and nose, and additional discharge occurred during chest compressions. Emergency personnel who later arrived at the scene also noticed a frothy discharge coming from Sarah's vaginal area.

[*P5] Paramedics and emergency medical technicians (EMTs) from the Hamilton Township Fire and Rescue Department and police officers from the Hamilton Township Police Department arrived shortly after Bishop. EMT Jeff Teague tried to open Sarah's airway and attempted to place a bag valve mask over her nose and mouth to provide concentrated oxygen. Teague struggled to keep the mask on Sarah as her head kept retracting down, making the mask pop off. Teague successfully adhered defibrillation pads to Sarah's body, one on her chest and the other on her back, and attempted to shock her heart back into rhythm, but she remained asystole.[FN1]

> FN1. Asystole was defined at trial by medical personnel as the absence of an electrical rhythm in the heart.

2

[*P6] Paramedic Jason Stevens made two attempts to intubate Sarah while in the master bedroom, but both attempts were unsuccessful. On his second attempt to intubate, Stevens had Teague perform the Sellick maneuver so that he could see Sarah's vocal cords and place the tube in Sarah's trachea.[FN2] After the second intubation attempt failed, the decision was made to place Sarah on a backboard and remove her from the home. Sarah's body was covered with a sheet and rolled out of the home into a waiting ambulance.

> FN2. According to Teague, "[t]he Sellick maneuver is pressure on a cartilage in your throat to allow * * * [for] multiple things. One to close off the actual throat to the stomach to keep from allowing vomit to come out and the other one is visualize the vocal cords."

[*P7] While the ambulance was stationary, Stevens attempted to establish an intravenous line (IV) in Sarah. After failing to find a vein in both her right arm and her left arm, Stevens was able to start an IV in the external jugular vein on the left side of Sarah's neck. EMT Derek K. Roat made two unsuccessful attempts to intubate Sarah, utilizing the Sellick maneuver on one of those attempts. While Sarah was being treated in the ambulance, Widmer talked briefly with law enforcement. Widmer admitted he consumed four beers earlier in the evening.

[*P8] Approximately ten minutes after Sarah was placed in the ambulance, the decision was made to transport her to the hospital. Widmer, visibly upset, rode along with the ambulance. While en route to the hospital, Roat made a fifth intubation attempt, which proved unsuccessful. When Sarah arrived at Bethesda Arrow Springs Hospital, she was not breathing and did not have a pulse. Dr. David Marcus, the treating emergency room physician, was able to intubate Sarah within 60 to 90 seconds of her arrival. While Sarah underwent treatment, a charting nurse attempted to gain information about Sarah from Widmer. Widmer told the charting nurse that he found Sarah in the bathtub, face-up, and not breathing.

[*P9] At 11:41 p.m., after nearly 20 minutes of treatment in the emergency room, Sarah was pronounced dead. Shortly thereafter, Doyle Burke, the chief investigator for the Warren County Coroner's Office, arrived at the hospital. Upon observing Sarah's

body, Burke noticed that Sarah's body appeared dry, but her hair was damp, there did not appear to be any pruning or wrinkling on her body, and she did not have any visible external injuries. When bagging Sarah's hands to preserve evidence, Burke noticed that Sarah's nails were well manicured and were not broken or chipped.

[*P10] While at the hospital, Widmer told Burke that he and Sarah were the only people in their home that night. Widmer stated that at about 10:00 p.m., while he was watching a football game on TV downstairs, Sarah said she was going to go upstairs to take a bath. At this point, Widmer interjected that he had been "afraid she may fall asleep in the tub." When Burke asked if Sarah had ever fallen asleep in the tub before, Widmer said no, she'd never fallen asleep in the tub before, but Sarah would fall asleep very easily. After relaying to Burke the events following his discovery of Sarah in the bathtub, Widmer consented to have police search his home.

[*P11] Detective Lieutenant Jeff Braley with the Hamilton Township Police Department arrived at the Widmers' home as the ambulance transporting Sarah to the hospital departed from the scene. Upon arriving, Braley was briefed by the officers who had initially responded and was given a tour of the home by Officer Quillian Short. During his tour of the home, Braley noticed that the bathroom floor and the items laying on the floor, including magazines, a bathmat, discarded clothing, and a brown towel, appeared dry. Braley also noticed that the tub itself was mostly dry, with the only observable water being droplets located right around the drain. Officer Short noticed water droplets around the drain and on the stopper, but found no evidence of water on the bathroom floor or anywhere else outside of the bathtub. Short also noticed that the majority of the Widmers' bath products were lined up along the edge of the tub, with the exception of a cup, a loofa, and a bottle of Dial soap, which were inside the bathtub.

[*P12] After receiving word of Widmer's consent to have the home searched, a more thorough investigation took place. Officers who secured the scene did not find any indication the house had been broken into. When investigating the downstairs, Short discovered that the TV on which Widmer claimed to have been watching a Cincinnati Bengals football game was actually set to a different program. The TV in the master bedroom, however, was set to the Cincinnati Bengals game.

[*P13] Braley examined the master bedroom and found blood stains on the carpet in the location where Sarah's head and vaginal area had

4

been laying. Braley took off his latex gloves and felt the carpet in the area between the blood stains to determine if the carpet contained any moisture. Braley found the carpet dry. He then took samples of the carpet from the area where the stains were. The samples were individually sealed in brown paper bags.

[*P14] Evidence was also collected from the bathroom, which included products lined up on the edge of the bathtub and the items inside the bathtub. The items found on the floor of the bathroom, including the magazines, bathmat, discarded clothing, and the brown towel, were recovered as evidence. Also recovered in the bathroom was a used Lysol wipe, which was taken into evidence.

[*P15] Additional areas of the Widmers' home were searched for evidence. Officers briefly looked through the laundry room, inside the washer and dryer, in the garage, and inside Sarah and Widmer's vehicles. The officers did not discover wet towels or anything else out of the ordinary during this brief search.

[*P16] The following day, Dr. Russell Uptegrove, the Warren County Coroner, performed Sarah's autopsy. Burke and Braley were present during the autopsy. Uptegrove determined that Sarah's death was caused by drowning. Uptegrove observed both external and internal injuries to Sarah's body. Externally, Sarah had faint bruising on the right-side of her forehead, a petechial hemorrhage on the inner surface of her eyelid, bruising on the left-side of her neck, a contusion on the back of her neck, an abrasion on her left armpit, and bruising and lacerations to her upper lip.[FN3] Internally, Sarah had significant, deep muscle hemorrhaging in the anterior of her neck and contusions to her scalp. Uptegrove took microscopic samples of Sarah's brain and heart for testing, but did not observe anything out of the ordinary when examining the organs. A toxicology report was ordered, but before the results of the report were received Uptegrove determined that the manner of Sarah's death was a homicide. In Uptegrove's opinion, the injuries Sarah sustained occurred before her death and were not consistent with injuries commonly resulting from CPR. Days later, the toxicology report was completed, and it indicated that Sarah did not have drugs or alcohol in her system at the time of her death.

> FN3. Uptegrove defined a petechial hemorrhage as a very small, red hemorrhage that occurs in the eye once a blood vessel has ruptured due to an increase in pressure.

[*P17] On August 15, 2008, two days after the initial autopsy by Uptegrove, a second autopsy was performed by Dr. Werner Spitz. Spitz, an expert in forensic pathology who was retained by the defense, agreed that the cause of Sarah's death was drowning. Spitz observed external injuries to the front of Sarah's neck, to her left and right arms near the crease of her elbow, to her upper lip, and to the nape of her neck. Internally, Spitz observed injuries to Sarah's scalp, a tear in her liver, and hemorrhaging to her neck. Spitz did not find any evidence of petechial hemorrhaging. Spitz was unable to determine whether Sarah's injuries, including the internal hemorrhaging to her neck, were caused by rigorous CPR or by some other means. For this reason, Spitz would not have ruled the manner of Sarah's death a homicide; rather, he would have ruled her death "undetermined."

[*P18] Widmer was arrested on a charge of aggravated murder on August 13, 2008. That same day, a warrant to search the Widmers' home was executed. While executing the warrant, Braley dusted the bathtub for fingerprints and found streak marks that he believed were made by human hands. The marks were located near the middle of the bathtub, on its far wall (or right-side wall). Once the marks were discovered, Braley contacted the Miami Valley Crime Lab (Miami Valley) to have the bathtub examined. Danny Harness, a latent print examiner with Miami Valley, responded to the scene. Using a superglue fuming process and reflected ultraviolet imaging, Harness observed fingermarks and smear marks on the bathtub. He was not, however, able to visualize any latent fingerprints of value on the bathtub. Nonetheless, the decision was made to remove the bathtub from the Widmers' home, and it was sent to Miami Valley for further processing. During his second examination of the bathtub, Harness used fingerprint powder and found fragmented prints on the bathtub. However, the prints lacked identifying characteristics and Harness deemed the prints to be of no comparison value.

[*P19] A few months later, William Hillard, a senior criminalist with the City of Cincinnati, was contacted by the Hamilton Township Police Department to examine the bathtub. Hillard found marks along the top of the tub and the side of the tub that indicated it had been wiped down, but he was unable to determine when the tub had been wiped down. Hilliard also found fingertip impressions on the tub. He was unable to make a positive identification as to who specifically left the fingertip markings, but he was able to determine that the markings were in a downward position and were made by a person of small stature, like a child, a female, or a small male.

6

Hillard also found a forearm impression on the bathtub and determined from the presence of hair follicles that the impression was made by an adult male. Hillard determined that this forearm impression overlaid circular marks made on the bathtub by bath product bottles. Hillard could not, however, determine when the forearm impression or fingertip markings were made on the bathtub.

[*P20] In addition to the bathtub, other evidence taken from the Widmers' home was sent to Miami Valley for testing. The Lysol wipe recovered from the bathroom tested negative for the presence of blood and semen. Water samples from the bathtub's drain and from the toilet tested negative for the presence of blood. The carpet samples taken from the master bedroom tested positive for blood but negative for semen. The carpet sample taken from the area where Sarah's head had been laying tested positive for human fecal matter. A carpet sample taken east of where Sarah's vaginal area had been laying also tested positive for human fecal matter, but the sample from where her vaginal area had laid did not contain human fecal matter. During testing of the carpet samples, it was discovered that one of the samples had been wet when it was packaged, and the moisture from the sample had soaked the bottom of the bag.

[*P21] Miami Valley also did DNA testing of samples taken from under Sarah's fingernails. The majority of the matter taken from underneath Sarah's fingernails contained her own DNA, but there was also an unknown female contributor's DNA present. An effort was made to identify the possible female contributor, but no match was found. Sarah's mother, a female police officer who responded to the Widmers' home on the night of Sarah's death, and nurses who treated Sarah at the hospital were excluded as possible matches.

[*P22] Widmer went to trial on the aggravated murder charge in March 2009. He was found guilty of murder, a lesser-included offense, and sentenced to 15 years to life in prison. On July 22, 2009, a new trial was granted after it was discovered that jury members, during their deliberation, had improperly discussed personal and external matters regarding the length of time it took them to dry after bathing. A second trial took place in May 2010. After the jury was unable to reach a verdict, a mistrial was declared. A third trial was scheduled for January 2011.

[*P23] Prior to the start of the third trial, Jennifer Crew, a resident of Iowa, contacted the Warren County Prosecutor's Office with additional information about Sarah's death. In September 2009, Crew watched a Dateline television episode featuring Sarah's death

and Widmer's subsequent arrest. After viewing the program, Crew visited a website that supported Widmer's innocence where she obtained information that allowed her to begin communicating with Widmer. The two began exchanging emails, phone calls, and text messages.

[*P24] Crew claimed that on October 26, 2009, at 11:06 p.m., she received a phone call from an upset and crying Widmer. Crew claimed Widmer admitted he killed Sarah, saying "I did it. I did it. I killed Sarah. I did it." According to Crew, Widmer told her that he and Sarah fought in their living room on the evening of Sarah's death about his pornography, cheating, drinking, and smoking. The argument continued upstairs in their bathroom, at which point Sarah declared that their marriage was over. Crew stated that Widmer told her things got physical between him and Sarah. Widmer allegedly told Sarah, "Nobody leaves me, nobody ever leaves me and I mean nobody," and then punched her in the chest, causing Sarah to fall backwards and hit her head. Widmer told Crew that he knelt down beside Sarah, "blacked out," and when he came to, Sarah was on the floor, not breathing with her hair wet.

[*P25] According to Crew, Widmer said that he "freaked out" because "he had done something that he shouldn't [have] done," and he started wiping up water that was on the bathroom floor with towels while thinking about how he could cover up Sarah's death. Crew stated that Widmer told her he then called 911, and when directed by the 911 dispatcher to give Sarah CPR, Widmer just breathed into the phone to make it sound like he was giving CPR. Widmer allegedly told Crew that he did not give Sarah CPR because he knew she was already dead since she had not been breathing for quite a while. Widmer also allegedly told Crew that when he was answering a nurse's questions at the hospital, he knew he "screwed up" because he told the nurse that he found Sarah face-up in the bathtub when he previously told the 911 dispatcher that Sarah was face-down in the bathtub.

[*P26] Crew claimed that she promised Widmer she would never tell anyone about his confession, and in response, Widmer stated, "I hope not because I wouldn't want you to be at where Sarah's at." Crew stated that she feared for her safety after that phone call. Crew claimed that to reassure Widmer that she would not turn him in or disclose the details of the October 26 phone call, she continued to have regular and repeated contact with him until late November 2009. In June 2010, after finding out that Widmer's second trial had ended in a mistrial, Crew contacted officials to report the details she

had learned about Sarah's death. Crew testified as to these details at Widmer's third trial. In an effort to discredit Crew's testimony, the defense presented information about Crew's former prescription drug addiction and her numerous convictions for misdemeanor theft.

[*P27] Widmer's third trial was held in January 2011. The third trial spanned four weeks and resulted in testimony from more than 40 individuals, including medical personnel who treated Sarah on the night of her death, police officers who investigated her death, and pathologists who conducted Sarah's autopsies. Because Widmer sought to introduce evidence that Sarah may have suffered from an unknown cardiovascular or neurological defect, which caused her to lose consciousness and drown in the bathtub, numerous medical experts were called by the defense to support Widmer's position and by the state to refute Widmer's defense. In support of his defense, Widmer also presented testimony from Sarah's co-workers and friends regarding Sarah's sleeping habits and physical health.

[*P28] Before her death, Sarah had been employed as a dental hygienist by a dental practice in Fort Thomas, Kentucky. Sarah's co-workers testified Sarah often slept in her car in the mornings before work, and she would take a nap in her car during her lunch break. Sarah's co-workers also testified that she had allergies, and she would sometimes complain of headaches or stomachaches. Dana Parker–Kist, Sarah's friend and former co-worker, testified that on at least one occasion Sarah's headache was so severe that it blurred her vision and required her to go into a dark room. Dr. Benjamin Mesmer, a dentist at the practice where Sarah worked, testified Sarah complained of a headache and stomachache on the day of her death.

[*P29] Friends of Sarah and Widmer testified that Sarah would fall asleep at "odd" times and places. Friends described instances where Sarah fell asleep while tailgating at Cincinnati Bengals football games, while watching a movie in the early evening, and while sitting in a bar at a table full of talking women. On some of these occasions, Sarah had been drinking alcohol before she fell asleep.

[*P30] Sarah's mother, Ruth Ann Stewart, testified at trial on behalf of the state. Stewart testified she and Sarah had a very close relationship, and they had spent nearly every Friday together since Sarah's father's death in March 2007. Stewart testified she had not noticed that Sarah slept a lot or at odd times. Stewart did recall Sarah complaining of headaches, but only when Sarah's sinuses

were acting up due to a change in the weather. Stewart testified that she talked to Sarah on the day of her death while Sarah was driving home from work, and Sarah did not tell her that she had a headache, stomachache, or was otherwise feeling ill.

[**P31**] Stewart also testified that Sarah's family did not have a medical history of seizures, heart disease, or cardiac problems. Stewart testified Sarah had never had a seizure or been diagnosed with epilepsy. Stewart described Sarah as healthy and active. As a baby, however, Sarah had a heart murmur and a cleft palate. Sarah's mother testified the cleft palate was corrected by surgery while Sarah was a child.

[**P32**] Medical records introduced at trial indicate that Sarah had been diagnosed in November 1984 with a functional heart murmur. Other than the November 1984 report and a dental record dated October 5, 2006, wherein Sarah indicated that as a child she had been told by a physician that she had a heart murmur, none of Sarah's other medical records mention a heart murmur. Sarah underwent a physical in June 2008, just a few months prior to her death, and the report from the physical did not indicate that Sarah suffered from a heart murmur or any other cardiac ailment. Further, this report did not indicate Sarah suffered from a neurological disease or defect.

[**P33**] Dr. Charles Jeffrey Lee, an expert in pathology, testified that a functional heart murmur is known as an "innocent heart murmur" that has to do with the "physiology of the body outside of the heart." Lee testified that this type of murmur, which is typically heard in infants, will usually disappear in a few months or a year. In Lee's opinion, Sarah's childhood functional heart murmur did not in any way contribute to her death. After reviewing Sarah's medical records and the autopsy records, Lee testified he did not find any evidence of a heart or brain disease or defect which caused or contributed to Sarah's death. Rather, Lee concurred with Uptegrove's conclusion, opining that Sarah's death was a homicide by drowning. Lee further testified that the injuries Sarah sustained, including the bruising to her neck, scalp, and forehead, were atypical to a drowning event and, in his opinion, were not attributable to medical intervention or the administration of CPR. Dr. William M. Rogers, an expert in emergency medicine, also testified that the bruising to the anterior of Sarah's neck was not consistent with the administration of CPR or intubation attempts.

[**P34**] Dr. Michael G. Balko, an expert in anatomical pathology,

10

forensic pathology, neuropathology, and cardiovascular pathology, testified that he concurred with Dr. Spitz's findings from the second autopsy.[FN4] Because he could not exclude rigorous CPR efforts as the cause of Sarah's injuries, Balko, like Spitz, would have declared the manner of Sarah's death "undetermined." Balko testified that in his opinion it was not possible to determine whether a neurological cause rendered Sarah unconscious and subsequently caused her to drown in the bathtub because Sarah's brain was not adequately sampled and tested during her autopsies. Balko further testified that the injuries Sarah sustained, especially the bruising around her neck, are consistent with injuries sustained from the resuscitative and intubation processes. Dr. Dave Smile, an expert in emergency medicine who characterized the resuscitation efforts on Sarah's behalf as exceptionally long and very difficult, testified that injuries to the neck, especially to the thyroid cartilage, vocal cords, and soft tissues along the trachea, are injuries commonly observed when the Sellick maneuver is utilized during difficult intubations. Smile also testified that the lacerations to Sarah's upper lip are consistent with injuries that commonly occur during difficult intubations.

> FN4. Dr. Spitz was unavailable to testify at the third trial due to an illness. The trial court permitted his testimony from the second trial to be read into evidence. Neither Widmer nor the state has appealed the trial court's decision to allow Spitz's testimony from the second trial.

[*P35] Dr. James Layne Moore, an expert in neurology, neurophysiology, and sleep medicine, testified that Sarah's medical records do not indicate Sarah suffered from a sleep disorder or a neurological disease or defect. Moore explained that hypoxia, meaning "low oxygen," causes people who are asleep to wake up when they are deprived of oxygen. Moore testified that even if an individual fell asleep in water, hypoxia would drive the individual to wake up and start breathing. For this reason, Moore testified, he did not believe Sarah fell asleep in the bathtub and then drowned. Moore further testified, given Sarah's medical records, he did not believe Sarah suffered a seizure while in the bathtub.

[*P36] Dr. Chandler A. Phillips, an expert in biomedical engineering, human factors engineering, and injury biomechanics, testified on behalf of the defense. Using measurements of Sarah's body, Widmer's body, the bathroom itself, and those fixtures within it, including the bathtub, Phillips reached the opinion that Widmer

11

did not forcibly drown Sarah in the bathtub. Phillips did not testify that there was insufficient space in the bathroom for Widmer to forcibly drown Sarah, but rather that the injuries Sarah sustained were not consistent with a forcible drowning in the bathroom. Phillips testified that with an anterior strangulation approach, or face-to-face approach, one would expect the victim to have injuries to the small bones in the neck, defense marks to the hands, and injuries to the feet from where the victim kicked the assailant in an effort to break free. With a posterior approach to strangulation, or a strangulation attempt from the rear, Phillips testified that one would expect to see bruising and injuries to the knees, thighs, and pelvis area of the victim. Phillips testified that these injuries were not observed during Sarah's autopsies, and therefore do not support a theory that Sarah was forcibly drowned in the bathroom.

[**P37**] Melissa Waller, a resident of Washington who befriended Widmer after watching the September 2009 Dateline episode, also testified at the third trial. The two communicated regularly by email, text messaging, and phone. Waller testified that on October 26, 2009, the same night Crew claimed Widmer called her to confess to killing Sarah, Waller had talked to Widmer on the phone for nearly two hours, until about 11:00 p.m. In direct contrast to Crew's testimony, Waller testified that Widmer was not intoxicated, emotionally distraught, or upset during their phone conversation.

[**P38**] After closing arguments, the trial court provided jury instructions for the offense of murder and the lesser-included offense of involuntary manslaughter predicated on the commission of a misdemeanor assault. The jury returned a guilty verdict on the murder charge, and Widmer was sentenced to serve 15 years to life in prison.

*State v. Widmer*, 2012-Ohio-4342, 2012 Ohio App. LEXIS 3801 at **1-24, 2012 WL 4350275 at *

1-8 (12th Dist. Sept. 24, 2012); see also ECF No. 17-1, Exh. 2, PageID 247-60.

## State Court Proceedings

On August 15, 2008, a Warren County grand jury indicted Mr. Widmer on one count of

aggravated murder in violation of Ohio Revised Code § 2903.01(A) (ECF No. 17-1, Exh. 3,

PageID 301-03).   During the next several months, the parties engaged in extensive pretrial motion practice. *Id.* at Exhs. 4-30, PageID 304-82.

Trial to a jury commenced on March 31, 2009 (ECF No. 21-2, PageID 2836-3824).   On April 2, 2009, the jury found Mr. Widmer not guilty of aggravated murder, but guilty of the lesser included offense of murder. *Id.* at PageID 3838-39; see also App'x, ECF No. 17-1, Exh. 33, PageID 387.   On April 3, 2009, the trial court sentenced Mr. Widmer "to serve a term of fifteen (15) years to life in prison with eligibility of parole after serving fifteen (15) years in prison, of which fifteen (15) years is a mandatory term …"   (App'x, ECF No. 17-1, Exh. 1, PageID 245-45)(emphasis omitted); ( Trial Transcript, herein after "Tr.," ECF No. 21-2, PageID 3840-41).

**O**n April 9, 2009, Mr. Widmer filed, a motion for acquittal and new trial alleging prosecutorial misconduct and insufficient evidence (App'x, ECF No. 17-1, Exh. 36, PageID 391-436).   He later supplemented the motion with a claim of juror misconduct. *Id.* at Exh. 37, PageID 437-81.

On May 20, 2009, the trial court denied Mr. Widmer's motion for acquittal and granted the state an extension to supplement its opposition to Mr. Widmer's juror misconduct allegation. *Id.* at Exh. 45, PageID 607-23. The parties litigated the juror misconduct issue. *Id.* at Exh.46, PageID 624-36; *Id.* at Exh. 47, PageID 637-66; *Id.* at Exh. 48, PageID 667-68; *Id.* at Exh. 49, PageID 669-94; *Id.* at Exh. 50, PageID 695-98; *Id.* at Exh. 51, PageID 699-707; *Id.* at Exh. 52, PageID 708-11; *Id.* at Exh. 53, PageID 712-17; *Id.* at Exh. 54, PageID 718-27.   On July 22, 2009, the trial court granted Mr. Widmer's motion for a new trial on the basis of juror misconduct.[1] *Id.* at Exh. 55, PageID 728-39.

---

1. The juror misconduct involved several jurors' personal experiments related to post-showering/bathing air-drying time, the results of which they shared with their fellow jurors during deliberations.

The State filed a motion to reconsider which the trial court denied. *Id.* at Exh. 56, PageID 740-50; *Id.* at Exh. 57, PageID 751.   The State then filed a motion to stay the trial court's new trial order and a notice of appeal and Mr. Widmer filed a notice of conditional cross-appeal. *Id.* at Exh. 58, PageID 752-53; *Id.* at Exh. 59, PageID 754-83; *Id.* at Exh. 60, PageID 784-86.   The trial court stated its new trial order on August 19, 2009. *Id.* at Exh. 61, PageID 787.

The State filed a motion to file a discretionary appeal in the Twelfth District Court of Appeals for Warren County which the court denied. *Id.* at Exh. 62, PageID 788-818; see also App'x ECF No.18-1, Exh. 64, PageID 869.

During the period of about March 17, 2010, through the May 12, 2010, the start of Mr. Widmer's second trial, the parties litigated an issue involving the prior employment records of Detective Jeff Braley (App'x, ECF No. 18-1, Exh. 66, PageID 871-875); see also *Id.* at Exh. 67 PageID 876-79; *Id.* at Exh. 68, PageID880-84; *Id.* at Exh. 69, Page ID 885; *Id.* at Exh. 70, PageID 886-905; *Id.* at Exh. 71, PageID 906-08.   Subsequently, the trial court granted Det. Braley's motion to quash Mr. Widmer's subpoenas for Det. Braley's Hamilton Township employment records. *Id.* at Exh. 75, PageID 941.

During that pre-trial period, the parties also litigated issues regarding Dr. Chandler A. Phillips', Michael J. Birchak's, and Dr. James Layne Moore's testimony, anticipated trial testimony as well as the 911 tapes, and seizure of the bathtub. *Id.* at Exh. 76, PageID 942-47; *Id.* at Exh. 77, PageID 948-53; *Id.* at Exh. 78, PageID 954-59; *Id.* at Exh. 79, PageID 960-64; *Id.*   at Exh. 80, PageID 965-89; *Id.* at Exh. 81, PageID 990-1028; *Id.* at Exh. 82, PageID 1029-35; *Id.* at Exh. 84, PageID 1037-40; *Id.* at Exh. 85, PageID 1041-48.   During the litigation of those issues, Mr. Widmer withdrew his motion to exclude Dr. Moore's testimony and the trial court denied Mr.

14

Widmer's motion to exclude the 911 tapes (*Id.* at Exh. 83, PageID 1036), and his motion to suppress seizure of the bathtub. *Id.* at Exh. 86, PageID 1049-50.

A second trial to a jury commenced on May 12, 2010  (Tr., ECF No. 21-7, PageID 4263-4335; ECF No. 21-8, PageID 4336-6860).   On June 1, 2010, the jurors advised the court that they had "decided that we cannot agree and that further deliberations will not serve a useful purpose." (Tr., ECF No. 21-8, PageID 6858.)   The trial court then declared a mistrial   (ECF No. 18, Exh. 91, PageID 1070).

On August 6, 2010, the trial court denied Mr. Widmer's motion for acquittal. *Id.* at Exh. 92, PageID 1071-95; *Id.* at Exh. 93, PageID 1096-1116; *Id.* at Exh. 94, PageID 1117-19.   On November 8, 2010, the court denied the State's motion for change of venue. *Id.* at Exh. 95, PageID 1120-1430; *Id.* at Exh. 96, PageID 1431-40; *Id.* at Exh. 98, PageID 1480.

Again, the parties engaged in extensive motion practice addressing such issues as exculpatory and impeaching evidence, review of the State's non-disclosure certification, providing Mr. Widmer with tissue slides, the use of medical records at trial, allowing confrontation of the lead investigator, excluding Dr. Jeffrey Lee's testimony, allowing impeachment of witnesses, and declaring Dr. Spitz unavailable. See *Id.* at Exhs. 99-100, PageID 1481 - 1497; App'x, ECF No.19-1, Exhs. 101-124, PageID 1517 - 1685.

Trial to a third jury commenced on January 12, 2011 (See Tr., ECF No. 21-12,   PageID 6930, *et seq*.)   On February 15, 2011, the jury returned a verdict finding Mr. Widmer guilty of one count of murder in violation of Ohio Revised Code § 2903.02(A) (Tr., ECF No. 21-17, PageID 9988; App'x, ECF No. 19-1, Exh. 126, PageID 697).   The court then sentenced Mr. Widmer to the term of imprisonment he is now serving   (App'x, ECF No. 17-1, Exh. 1, PageID 245-46; see also

App'x, ECF No. 21-17, PageID 9991).

Mr. Widmer filed a motion for a new trial on March 1, 2011, and a motion for judgment of acquittal on March 4 (App'x, ECF No. 19-1, Exh. 127, PageID 1698-1705; *Id.* at Exh. 128, PageID 1706-23) which the trial court denied after a hearing  (Tr., ECF No. 21-18, PageID 9994-1050; App'x, ECF No. 19-1, Exh. 133, PageID 1785-96).  On April 15, 2011, Mr. Widmer filed a motion to preserve evidence and for an *in camera* inspection of certain items related to whether a particular juror accessed any out-of-court sources regarding Mr. Widmer and/or his case (App'x, ECF No. 19-1, Exh. 134, PageID 1797-1800), which the court sustained "as to all biological samples or materials obtained from Sara[sic] Widmer and all physical evidence collected at the scene as set forth in items 1 and 2 of the motion" and overruled the remainder of Mr. Widmer's requests. *Id.* at Exh. 137, PageID 1820-21.

Mr. Widmer appealed, raising the following assignments of error:

FIRST ASSIGNMENT OF ERROR

Trial counsel provided ineffective assistance in violation of the Sixth and Fourteenth Amendments by failing to timely prosecute what would have been a meritorious motion to suppress the bathtub and all evidence related to said tub discovered following its unlawful seizure. The state unconstitutionally seized the bathtub pursuant to a search warrant which neither listed the bathtub as an item to be seized nor could be construed to validly include the bathtub under the overly broad "latent fingerprint" language.

SECOND ASSIGNMENT OF ERROR

Widmer was denied a fundamentally fair trial in violation of his due process rights through the admission of impermissible expert opinion testimony that: (1) reached beyond the expert's purported expertise; (2) lacked scientific foundation; and (3) was based on a methodology that has been proven unreliable. Accordingly, Widmer was also denied the right to adequately confront this evidence in

16

violation of his Sixth Amendment rights.

THIRD ASSIGNMENT OF ERROR

The trial court erred in violation of Widmer's Fifth, Sixth, and
Fourteenth Amendment rights by failing to properly instruct the jury
on all lesser-included offenses of murder reasonably adduced by the
evidence. Alternatively, defense counsel provided ineffective
assistance in violation of the Sixth and Fourteenth Amendments by
failing to ensure that the jury instruction properly conveyed the
applicable law.

FOURTH ASSIGNMENT OF ERROR

Due Process and Sixth Amendment violations occurred when the
trial court: (1) quashed the defense subpoenas seeking to further
investigate Lt. Braley's background following the May 5, 2010
hearing; and (2) denied the January 2011 defense motion requesting
permission to confront Lt. Braley during trial about his background.

FIFTH ASSIGNMENT OF ERROR

Widmer's conviction is based on insufficient evidence in violation
of his constitutional rights to due process and a fair trial. At most,
the state presented sufficient evidence to sustain a conviction of
involuntary manslaughter or reckless homicide.

SIXTH ASSIGNMENT OF ERROR

Widmer's conviction is against the manifest weight of the evidence.

(App'x, ECF No. 19-1, Exh. 139, PageID 1823-85.)   The court of appeals affirmed Mr. Widmer's

conviction and sentence. *Widmer*, *supra*, 2012-Ohio-4342; App'x, ECF No. 17-1, Exh. 2, PageID

247-60.

Mr. Widmer appealed further to the Ohio Supreme Court which declined to accept

jurisdiction. *State v. Widmer*, 134 Ohio St.3d 1468 (table), 983 N.E.2d 368 (table), 2013-Ohio-553

17

(Feb. 20, 2013); App'x, ECF No. 19-1, Exh. 146, PageID 2080.    Widmer also unsuccessfuly sought certiorari review in the United States Supreme Court.    *Widmer v. State*, ___ U.S. ___, 134 S.Ct. 105 (2013); App'x, ECF No. 20-1, Exh. 149, PageID 2185.

On October 12, 2011, Mr. Widmer filed a motion for leave to file another motion for a new trial and a motion for postconviction relief, a new trial, genetic DNA testing, for an evidentiary hearing, and a motion to compel production and release of Lt. Braley's and Dr. Uptegrove's grand jury testimony (App'x, ECF No. 20-1, Exhs. 149-51, PageID 2185-2223).    Mr. Widmer raised the following claims in his petition for postconviction relief:

I. Grounds for postconviction Relief: Constitutional Violations

1. Braley's Perjury on May 5, 2010 Violated the Strict Standard in *Napue v. Illinois* and Mandates Relief;

2. *Brady* and *Kyles v. Whitley* Violations Occurred When the State Failed to Disclose the Various Problems Surrounding Braley's Credibility, Entitling Widmer to Relief;

3. A *Brady/Kyles Violation* Occurred When the State Delayed Its Official DD&M Investigation of Braley Until One Day After Widmer Was Convicted;

4. A *Brady/Kyles* Violation Occurred (And is Still Occurring) When the State Failed to Disclose the Results of the Hamilton Township Trustees' 2010 Internal Investigation of Braley;

5. In The Alternative, Widmer Raises Ineffective Assistance of Trial Counsel for Failing to Raise the New Evidence About Braley If In Fact Such Evidence Was Disclosed to Defense Counsel Prior to of During Trial;

II. Postconviction Relief: Ineffective Assistance of Counsel for Failing to Seek Genetic DNA Testing of Sarah Widmer's Biological Remains;

III. Motion for New Trial Under Rule 33

18

…[T]he new evidence] offers Widmer two avenues of defense that were not available before: (1) the ability to effectively impeach Braley; and (2) the ability to mount a strong *Kyles v. Whitley*-type defense that the entire investigation and prosecution (from the collecting of fingerprints and other evidence, to the Coroner's decision, to the decision to charge him) were tainted and suspect due to Braley's penchant for fabricating facts to further his career….

(App'x, ECF No. 20-1, Exh. 151, PageID 2189, 2202-21.)   On January 17, 2012, the trial court denied Mr. Widmer's motions including his Motion for Postconviction Relief. *Id.* at Exh. 156, PageID 2288-2305.

Mr. Widmer appealed the trial court's denial of, *inter alia,* his Motion for   Postconviction Relief. *Id.* at Exh. 159, PageID 2309-27.   Mr. Widmer raised the following assignments of error in support of his appeal:

FIRST ASSIGNMENT OF ERROR

The trial court abused its discretion when it concluded: (1) that the State had no knowledge of material information that it withheld from the defense; and (2) that the withheld evidence pertained to a collateral matter about which Braley never testified falsely, thus even if disclosed, it would not have affected the outcome of Widmer's trial.

SECOND ASSIGNMENT OF ERROR

The trial court abused its discretion and ruled contrary to   clearly established U.S. Supreme Court precedent by: (1) concluding that Widmer's postconviction petition failed to point out material information known to the State that was withheld from the defense prior to or during trial; and (2) ignoring Widmer's due process and confrontation claims wherein he contends that, due to the State's failure to disclose the information about Braley contained in the DD&M Report, he was denied the ability to raise a *Kyles v. Whitley* defense at trial challenging the integrity of the State's investigation and confronting Braley about the information contained in the DD&M Report.

THIRD ASSIGNMENT OF ERROR

The trial court abused its discretion in failing to grant Widmer's postconviction request for genetic DNA testing of Sarah Widmer's biological remains to determine if she suffered from a genetic disorder. Such genetic testing is necessary to properly review the postconviction claim of ineffective assistance of trial counsel, because if testing demonstrated that Sarah suffered from a genetic disorder, then trial counsel provided ineffective assistance in violation of the Sixth and Fourteenth Amendments for failing to pursue what would have led to crucial, exculpatory evidence for the jury's review. But because the trial court denied Widmer's request for testing, it unreasonably foreclosed any possibility of evaluative whether trial counsel provided constitutionally deficient assistance in this regard.

FOURTH ASSIGNMENT OF ERROR

The trial court abused its discretion by denying Widmer access to the grand jury testimony of Braley and Uptegrove, or at a minimum conducting an in camera inspection of said testimony, when Widmer demonstrated a particularized need for access to the testimony for a review of: (1) whether Braley made any false statements to the grand jury which would support his *Brady*, *Kyles*, *and Napue* claims; and (2) whether the testimony of either witness reveals what information or the extent to which, Braley supplied information about the case to Uptegrove that he considered in his determination that Sarah Widmer drowned as a result of homicide. This error occurred in violation of Widmer's procedural and substantive due process rights under the U.S. Constitution and their related counterparts in the Ohio constitution, including meaningful access to the courts.

FIFTH ASSIGNMENT OF ERROR

The trial court abused its discretion in denying Widmer's October 12, 2011  postconviction petition without a hearing because the petition and material appended to it demonstrate a *prima facie* case of constitutional violations. This error occurred in violation of Widmer's procedural and substantive due process rights under U.S. Constitution and their related counterparts in the Ohio constitution, including meaningful access to the courts.

20

(App'x. ECF No. 20-1, Exh. 164, PageID 2341-2439.)   On January 14, 2013, the court of appeals affirmed the trial court's denial of, *inter alia,* Mr. Widmer's Motion for Postconviction Relief. *State v. Widmer*, 2013-Ohio-62, 2013 Ohio App. LEXIS 44, 2013 WL 142041 (12th Dist. Jan 14, 2013); see also App'x, ECF No. 20-1, Exh. 167, PageID 2550-2604; 2605.

Mr. Widmer appealed to the Ohio Supreme Court which again declined to accept jurisdiction. *State v. Widmer*, 135 Ohio St.3d 1448 (table), 2013-Ohio-2062 (2013); App'x, ECF No. 20-1, Exh. 171, PageID 2700.   The Supreme Court of the United States denied Mr. Widmer's second petition for a writ of certiorari. *Widmer v. Ohio*, ___ U.S. ___, 134 S.Ct. 480 (2013); App'x, ECF No. 20-1, Exh. 174, PageID 2782.


**Proceedings in this Court**

On February 20, 2014, Mr. Widmer filed his Petition under 28 U.S.C. § 2254 (ECF No. 1). After litigation on the proper venue for this case, the State filed the state court record (App'x, ECF Nos. 17, 18, 19. 20, and 21) and a Return of Writ (ECF No. 22).   Mr. Widmer filed a Reply (ECF No. 25) and the case was orally argued and is now ripe for decision on the merits.

Mr. Widmer pleads the following Grounds for Relief in his Petition:

> FIRST GROUND FOR RELIEF
>
> The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent concerning Widmer's constitutional rights to due process, a fair trial, and confrontation by permitting the admission of impermissible expert opinion testimony that: (1) reached beyond the expert's purported expertise; (2) lacked scientific foundation; and (3) was based on a methodology that has been proven unreliable.

## SECOND GROUND FOR RELIEF

The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent concerning Widmer's constitutional rights to be free from unlawful and unreasonable [sic] seizures of his real property by permitting the State to seize the bathtub from his house pursuant to a general "evidence or instrumentality of the crime" or "latent fingerprint" provision of a search warrant when the tub's significance was known to law enforcement at the time the search warrant is obtained and executed, yet the tub was not particularly described in the search warrant as an item to be seized. Seizure of real property is unreasonable under the Fourth Amendment without particularized, court-sanctioned authority.

## THIRD GROUND FOR RELIEF

Trial counsel provided ineffective assistance by failing to timely prosecute what would have been a successful motion to suppress the bathtub and all related evidence about said tub discovered following its unconstitutional seizure (including Bill Hilliard's "body part impression" analysis and testimony). In finding otherwise, the state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent concerning the effective assistance of counsel and the Fourth Amendment's "particularity" and "reasonableness" requirements.

## FOURTH GROUND FOR RELIEF

Widmer's conviction is based on insufficient evidence in violation of his constitutional rights to due process and a fair trial. At most, the state presented sufficient evidence to sustain a conviction of involuntary manslaughter or reckless homicide. The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent in finding that the state presented sufficient evidence to prove Widmer guilty of murder beyond a reasonable doubt.

## FIFTH GROUND FOR RELIEF

Widmer's conviction is against the manifest weight of evidence. The state courts unreasonably determined the facts and ruled

contrary to or unreasonably applied clearly established Supreme Court precedent in finding that the jury properly weighed the evidence and resolved conflicts in the evidence such that the State proved Widmer guilty of murder beyond a reasonable doubt.

## SIXTH GROUND FOR RELIEF

The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent by concluding: (1) that the State had no knowledge of material information that it withheld from the defense; and (2) that the withheld evidence pertained to a collateral matter about which Braley never testified falsely, thus even if disclosed, it would not have created prejudice or affected the outcome of Widmer's trial.

## SEVENTH GROUND FOR RELIEF

The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent by: (1) concluding that Widmer's postconviction petition failed to point out material information known to the State that was withheld from the defense prior to or during trial; and (2) denying Widmer's due process and confrontation claims wherein he contends that, due to the State's failure to disclose the information about Braley contained in the DD&M Report, he was denied the ability to raise a *Kyles v. Whitley* defense at trial challenging the integrity of the State's investigation and confronting Braley about the information contained in the DD&M Report.

## EIGHTH GROUND FOR RELIEF

The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent by concluding that no prejudice to Widmer resulted from the newly discovered evidence about Braley from the DD&M Report, and thus that the trial counsel provided constitutionally effective assistance despite failing to raise at trial the new evidence about Braley (if in fact such evidence was disclosed to counsel prior to or during trial).

23

NINTH GROUND FOR RELIEF

The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent by denying Widmer's postconviction request for genetic DNA testing of Sarah Widmer's biological remains to determine if she suffered from a genetic disorder, particularly when testing was necessary to fairly adjudicate Widmer's state postconviction claim of ineffective assistance of trial counsel for failure to pursue testing. Additionally, the state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent by concluding that genetic DNA test results suggesting that Sarah suffered from a genetic disorder that may have caused her to drown in the bathtub would not establish a reasonable probability of a different outcome at trial.

TENTH GROUND FOR RELIEF

The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent in *Strickland*, *Wiggins*, and *Chambers* by concluding that trial counsel rendered constitutionally effective assistance, despite failing to pursue genetic DNA testing, because, according to the state courts, test results suggesting that Sarah suffered from a genetic disorder that caused her to drown in the bathtub would not establish a reasonable probability of a different outcome at trial as necessary to establish prejudice under *Strickland.*

ELEVENTH GROUND FOR RELIEF

The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent by denying Widmer access to the grand jury testimony of Braley and Uptegrove, or at a minimum an in camera inspection of said testimony, when Widmer demonstrated a particularized need for access to the testimony for a review of: (1) whether Braley made any false statements to the grand jury which would support his *Brady*, *Kyles*, and *Napue* claims; and (2) whether the testimony of either witness reveals what information, or the extent to which, Braley supplied information about the case to Uptegrove that he considered in his determination that Sarah Widmer drowned as a result of homicide. This error occurred in violation of Widmer's procedural and substantive due process rights

24

under the U.S. Constitution including meaningful access to the courts.


TWELFTH GROUND FOR RELIEF

The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent by denying Widmer's October 12, 2011 postconviction petition without a hearing because the petition and material appended to it demonstrated a *prima facie* case of constitutional violations, thus warranting a hearing. This error occurred in violation of Widmer's procedural and substantive due process rights under U.S. Constitution including meaningful access to the courts.

(Petition, ECF No. 1, and Attachment 1, PageID 2-166).


**Standard of Review**

**I.    Antiterrorism and Effective Death Penalty Act of 1996**

The Antiterrorism and Effective Death Penalty Act of 1996, Pub.L.No. 104-132, 110 Stat. 1214 (Apr. 24, 1996)("AEDPA") applies to all habeas cases filed after April 24, 1996. *Ballinger v. Prelesnik*, 709 F.3d 558, 560 (6th Cir.), *cert. denied*, ___ U.S. ___, 133 S.Ct. 2866 (2013)*, citing Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).  Since Mr. Widmer filed his Petition well after the AEDPA's effective date, the amendments to 28 U.S.C. § 2254 embodied in the AEDPA are applicable to his Petition.

Title 28 U.S.C. § 2254, as amended by the AEDPA, provides:

…
(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an

25

> unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254; see also *Taylor v. Withrow*, 288 F.3d 846, 850 (6th Cir. 2002), quoting 28 U.S.C.

§ 2254(d).

> This standard requires the federal courts to give considerable deference to state-court decisions. *Herbert v. Billy,* 160 F.3d 1131, 1135 (6th Cir. 1998)("[the AEDPA] tells federal courts: Hands off, unless the judgment in place is based on an error grave enough to be called unreasonable.")(citation and quotation marks omitted).
>
> The first line of analysis under [the] AEDPA involves the consistency of the state-court decision with existing federal law. A state-court decision is considered "contrary to … clearly established Federal law" if it is "diametrically different, opposite in character or nature, or mutually opposed." *Williams v. Taylor,* 529 U.S. 362, 405 … (2000)(emphasis and quotation marks omitted.). Alternatively, to be found an "unreasonable application of … clearly established Federal law, "the state-court decision must be "objectively unreasonable" and not simply erroneous or incorrect. *Id.* at 409-11 … .
>
> The second line of analysis under [the] AEDPA concerns findings of fact made by the state courts. [The] AEDPA requires federal courts to accord a high degree of deference to such factual determinations. "A federal court is to apply a presumption of correctness to state court findings of fact for habeas corpus purposes unless clear and convincing evidence is offered to rebut this presumption. The [federal] court gives complete deference to the … state court's findings of fact supported by the evidence. *McAdoo v. Elo,* 365 F.3d 487, 493-94 (6th Cir. 2005)(citations omitted).

*Nields v. Bradshaw*, 482 F.3d 442, 449 (6th Cir. 2007), *cert. denied sub nom.*, *Nields v. Hudson*,

552 U.S. 1118 (2008).

> The "clear and convincing evidence" being offered to rebut the presumption of

correctness due a state court's factual findings refers to evidence found within the state court record. *See Cullen v. Pinholster*, 563 U.S. 170 (2011); *see also Bray v. Andrews*, 640 F.3d 731, 737 (6th Cir. 2011).   Moreover, federal courts are explicitly limited by the statutory language itself to evidence that was before the state court when 28 U.S.C. § 2254(d)(2) is applicable. *See Pinholster*, 556 U.S. at ___, 131 S.Ct. at 1400 n.7.

> [The AEDPA] standards apply to "any claim that was adjudicated on the merits in State Court proceedings." [citing 28 U.S.C. § 2254(d)]. By comparison, claims not "adjudicated on the merits by the state court are given plenary review by a federal habeas court, even where AEDPA otherwise applies. *See, e.g., Jackson v. Houk,* 687 F.3d 732, 731 (6th Cir. 2012); *see also, e.g., Wiggins v. Smith,* 539 U.S. 510, 534 … (2003). In past cases determining whether a claim was "adjudicated on the merits" sometimes proved difficult, whether because the state court issued summary denial, bereft of analysis *see Harrington v. Richter*, [562 U.S. 86, 98-99] ___ U.S. ___, 131 S.Ct. 770, 784 … (2011), because the state court explicitly addressed some of the federal claims presented but not others, *see Johnson v. Williams,* ___ U.S. ___, 133 S.Ct. 1088, 1093 … (2013), or because the state court confined its analysis to state-law authorities, *see Danner v. Motley,* 448 F3d 372, 376 (6th Cir. 2006).
>
> In cases where the state court relied solely upon state authority, we previously held that the federal claim was not adjudicated on the merits and considered the claim *de novo. See id.* (concluding that "[a]ny consideration of the Sixth Amendment contained within the state case law upon which the state courts relied is too attenuated to consider the Sixth Amendment claim to have been 'adjudicated on the merits'"). But the Supreme Court recently overruled our approach and held that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary. *Richter,* [562 U.S. at 98-99] 131 S.Ct. at 784-85. And this rule applies, whether the state court denied relief summarily, *see id.,* expressly addressed some of the claims but not the one advanced on federal habeas review, *see Johnson,* 133 S.Ct. at 1093, or confined its analysis to state-law authorities, *see Brown v. Bobby,* 656 F.3d 325, 329 (6th Cir. 2011) (holding that the state court's exclusive focus on Ohio's speedy-trial provisions in rejecting a federal speedy-trial claim failed to rebut the presumption of a merits

adjudication).

*Jackson v. Smith*, 745 F.3d 206, 209-10 (6th Cir.), *cert. denied sub nom.*, *Jackson v. Lazaroff*, ___

U.S. ___, 135 S.Ct. 118 (2014).

"Federal courts need not review every point of error raised by a *habeas*

petitioner." *Hoffner v. Bradshaw*, 622 F.3d 487, 495 (6th Cir. 2010), *cert. denied*, ___ U.S. ___,

131 S. Ct. 2117 (2011).

> When a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice … or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991). In this circuit, to determine whether a federal claim has been procedurally defaulted, we apply the three-prong test initially laid out in *Maupin v. Smith,* 785 F.2d 135 (6th Cir. 1986):

>> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule …. Second, the court must decide whether the state courts actually enforced the state procedural sanction…. Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim….

> *Jacobs v. Mohr,* 265 F.3d 407, 417 (6th Cir. 2001) (quoting *Maupin* [*v. Smith*]*,* 785 F.2d [135] at 138 [6[th] Cir. 1986]). If the state procedural rule was not complied with and that rule was an "adequate and independent" ground for default, we may still excuse the default if the petitioner can demonstrate "that there was 'cause' for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error." *Maupin,* 785 F.2d at 138.

*Hoffner*, 662 F.3d at 495.

Additionally, "[i]t is well-settled that 'federal courts do not have jurisdiction to

consider a claim in a *habeas* petition that was not 'fairly presented' to the state courts." *Jacobs v. Mohr*, 265 F.3d 407, 415 (6th Cir. 2001), *citing McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)(citation omitted). "A claim may only be considered 'fairly presented' if the petitioner asserted both the factual and legal basis for his claim to the state courts." *Jacobs*, *supra* (citation omitted).

For purposes of the AEDPA, the court reviews the last reasoned state court decision. *Cauthern v. Colson*, 736 F.3d 465, 473 (6th Cir. 2013)(citations omitted).

**Procedural Default**

The standard for evaluating a procedural default defense is as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 749 (1991); *see also Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000).   That is, a petitioner may not raise on federal habeas a federal constitutional right he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Engle v. Isaac*, 456 U.S. 107 (1982).   Absent cause and prejudice, a federal habeas petitioner who fails to comply with a state's rules of procedure waives his right to federal habeas corpus review. *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000); *Murray v. Carrier*, 477 U.S. 478 (1986); *Engle*, *supra*; *Wainright*, 433 U.S. at 87.

The Sixth Circuit Court of Appeals requires a four-part analysis when determining

whether a habeas claim is barred by procedural default. *Reynolds v. Berry*, 146 F.3d 345, 347-48

(6th Cir. 1998), *citing Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261

F.3d 594 (6th Cir. 2001), *cert. denied,* 534 U.S. 1147 (2002).

> First the court must determine that there is a state procedural rule
> that is applicable to the petitioner's claim and that the petitioner
> failed to comply with the rule.
> . . .
> Second, the court must decide whether the state courts actually
> enforced the state procedural sanction, citing *County Court of Ulster
> County v. Allen*, 442 U.S. 140, 149, 99 S.Ct. 2213, 60 L.Ed.2d 777
> (1979).
>
> Third, the court must decide whether the state procedural forfeiture
> is an "adequate and independent" state ground on which the state
> can rely to foreclose review of a federal constitutional claim. Once
> the court determines that a state procedural rule was not complied
> with and that the rule was an adequate and independent state
> ground, then the petitioner must demonstrate under *Sykes* that there
> was "cause" for him to not follow the procedural rule and that he
> was actually prejudiced by the alleged constitutional error.

*Maupin*, 785 F.2d at 138.

Additionally, it is well settled that "federal courts do not have jurisdiction to

consider a claim in a *habeas* petition that was not 'fairly presented' to the state courts." *Jacobs v.

Mohr*, 265 F.3d 407, 415 (6th Cir. 2001), *citing, McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir.

2000).  A claim may only be considered "fairly presented" if the petitioner asserted both the

factual and legal basis for his claim to the state courts. *Jacobs*, *supra* (citation omitted).

# Analysis

**FIRST GROUND FOR RELIEF**

In his First Ground for Relief, Mr. Widmer essentially challenges the admission of

all William Hillard's trial testimony regarding the "body part impressions" he found on the

bathtub.   Mr. Widmer's position is that the admission of Mr. Hillard's testimony violated Ohio R.

Evid. 702(C), the principles of *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579

(1993)] and its progeny, and his constitutional rights to confrontation, due process, and a fair trial

(Petition, ECF No. 1, PageID 56-76).   The Warden argues in his Answer/Return of Writ that the

state appellate court properly decided this claim and therefore this Court should reject it (ECF No.

22, PageID 10095-10105).   In his Traverse[2], Mr. Widmer essentially raises the same arguments

that he raised in his Petition (ECF No. 25, PageID 10196-10211).

Mr. Widmer raised this claim on direct appeal and the Twelfth District Court of

Appeals for Warren County rejected it as follows:

> [*P62] In his second assignment of error, Widmer argues that the
> trial court erred by allowing Hillard to testify about "body part
> impressions" found on the bathtub. Widmer challenges the
> admission of Hillard's testimony regarding: (1) the adult male
> forearm on the front interior wall of the bathtub; (2) the forearm
> impression "overlaying" circular marks made on the bathtub by bath
> product bottles; and (3) the fingertip marks that were in a
> "downward position" and were made by a person of small stature,
> like a child, a female, or small male. Widmer contends that the
> admission of such testimony was in violation of Evid. R. 702 and his
> Sixth Amendment rights. Specifically, Widmer argues that
> "Hillard's testimony runs afoul of due process and the Confrontation
> Clause" as Hillard was permitted to testify beyond his area of
> expertise and into a realm of body part impressions for which he has
> "no training or consistent, methodologically based, non-anecdotal
> experience" and his testimony was "not based on [a] scientifically
> valid methodology."

---

2 Mr. Widmer captions his reply as a "traverse," which was the customary caption for such documents prior to
adoption of the Rules Governing § 2254 Proceedings.

[**P63**] Prior to the commencement of the third trial, Widmer had filed a motion in limine seeking to limit Hillard's testimony by prohibiting him from testifying about the size and sex of the individuals who made the fingertip marks or the forearm impression. The motion in limine was not ruled on prior to trial and is therefore presumed to have been denied. *Choate v. Tranet, Inc.,* 12th Dist. No. CA2003–11–112, 2004-Ohio-3537, ¶ 60.  At trial, Hillard was offered as an expert in the areas of crime scene analysis, fingerprint analysis, and crime scene photography. Widmer did not seek to voir dire Hillard as to his qualifications as an expert in these fields. Rather, Hillard was admitted as an expert in the aforementioned areas without objection. Widmer did object, however, to Hillard's testimony that an adult male forearm impression was found on the bathtub, that this impression overlaid circular marks made on the bathtub by bath product bottles, and that the fingertip marks found in the bathtub were in a "downward position" and were made by a person of small stature, like a child, a female, or small male. Widmer's objections were overruled, and such testimony was deemed admissible by the trial court.

[**P64**] We begin our analysis by determining whether Hillard's testimony was properly admitted pursuant to Evid. R. 702.

A.  Evidence Rule 702

[**P65**] "The determination of the admissibility of expert testimony is within the discretion of the trial court, and its decision will not be disturbed absent an abuse of discretion." *State v. Blankenbury, 197 Ohio App.*3d 201, 2012-Ohio-1289, ¶ 107 (12th Dist.).   An abuse of discretion implies more than an error of law or judgment; it suggests that the trial court acted in an unreasonable, arbitrary, or unconscionable manner. *State v. Barnes,* 12th Dist. No. CA2010–06–009, 2001-Ohio-5226, ¶ 23. A trial court's admission of expert testimony is not an abuse of discretion where the testimony is relevant and the criteria of Evid. R. 702 are met. *Terry v. Caputo,* 115 Ohio St.3d 35, 2007-Ohio-5023, ¶ 23.

32

**[\*P66]** Evid. R. 702 provides that a witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *

**[\*P67]** With respect to Evid. R. 702, the trial court, as part of its gatekeeping function, must assess both the relevance of the expert's testimony and the reliability of the testimony prior to admitting such testimony into evidence. *Caputo* at ¶ 24. This gatekeeping obligation applies "not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumo Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167 (1999). To determine the reliability of testimony, the trial court may consider one or more of the specific factors mentioned in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579. 592-92, 113, S.Ct. 2786 (1993); *Kumho Tire Co.,* 526 U.S. at 141. The specific factors mentioned in *Daubert* include: (1) whether the theory or scientific technique has been tested; (2) whether the theory or technique has been subject to peer review or publication; (3) whether the method has a known potential rate of error; and (4) whether the theory has gained general acceptance in the scientific community. *Caputo,* 2007-Ohio-5023 at ¶ 25, citing *Daubert* at 593–594. While consideration of the *Daubert* factors is permitted, such consideration is not required to determine the reliability of the testimony. *Kumho Tire Co.,* at 141. Rather, the test of reliability is "flexible" and *Daubert's* list of specific factors neither necessarily nor exclusively apply to all experts or in every case. *Id.* The trial court is given "broad latitude" in determining reliability. *Id.*

[*P68] Hillard testified that he had been employed by the city of Cincinnati as a senior criminalist for five years. Prior to holding that position, he served as a police officer for 28 years. Hillard testified that he had been examining crime scenes and processing evidence for over 30 years. Some of the specific activities that he does as a criminalist include securing the scene, collecting evidence, and processing the evidence for fingerprints or any other forensic evidence. Hillard explained that most of his criminalist education and training has been through on-the-job training and from the FBI Academy in Florida. He has been trained specifically in crime scene photography, evidence collection, interpreting patterns of evidence, and the processing and analyzing of fingerprints. Hillard testified that he has responded to "thousands" of crime scenes over the years, many of which were homicide scenes. He further explained that for 10 to 15 percent of these crime scenes, he has analyzed impressions of body parts other than "fingers, hands and feet." Based on the foregoing, it is clear that Hillard's testimony related to matters beyond the knowledge of a lay person and that he was qualified as an expert in the areas of crime scene analysis, fingerprint analysis, and crime scene photography by his knowledge, education, and experience. *See* Evid. R. 702(A) and (B).

[*P69] The issue in this case, however, is whether Hillard went beyond his expertise when testifying about the fingertip marks and forearm impression found on the bathtub. Essentially Widmer attacks the reliability of Hillard's testimony. He contends that Hillard's testimony lacked a scientific foundation as it was based on the Bertillon system of using body measurements to identify individuals, which Hillard himself admitted is unreliable. The state contends that Hillard's testimony was permissible as it was not based on the Bertillon system but rather on the methodology underlying latent fingerprint analysis. The state further argues that Hillard was qualified to testify about the forearm impression and fingertip marks based on Hillard's "many years of experience" analyzing "other" body part impressions as he had done so in 10 to 15 percent of the thousands of crime scenes he had investigated.

34

[*P70] The Bertillon system is defined as "a system for the identification of persons by a physical description based on anthropometric measurements, standardized photographs, notation and classification of markings, color, bodily anomalies, thumb line impressions, and other data that has been largely superseded by fingerprinting." *Webster's Third New International Dictionary* 207 (1993).[FN7] At trial, Hillard testified that he was familiar with the Bertillon system of identification that was based on body measurements and that such method had been proven unreliable. Contrary to Widmer's argument, however, Hillard never testified that he relied on the Bertillon system in finding or identifying the forearm impression or fingertip marks on the bathtub. Rather, Hillard testified that a body part impression is made the same way a latent print is made, by touching an object and leaving a residue behind, and the impression can be discovered using a chemical or dusting powder. Specifically, Hillard testified as to this process as follows:

> FN7. Anthropometry is defined as "the science of measuring the human body and its parts and functional capacities [especially] as an aid to the study of human evolution and variation." *Webster's Third New International Dictionary* 93 (1993).

> [HILLARD]: Usually when we go process a crime scene, exactly what's documented, taking pictures and analyzing what we're going to do at the crime scene, when we dust an object we use dusting powder to try to bring out a fingerprint or any other material that might be on that surface that we're processing.

> With fingerprint powder it helps you see a latent print which normally can't be seen with the naked eye, latent means invisible and you use a chemical or dusting powder to bring out that fingerprint.

> [STATE]: And Mr. Hillard you used the term latent print. Can

you explain what latent print is in your line of work?

[HILLARD]: Latent print is usually a print that is invisible, is usually a print that is not visible to the naked eye, with the naked eye. You have to use some type of enhancing procedure.

[STATE]: And how is such a fingerprint formed, how is it made?

[HILLARD]: Yes. If you look at your fingers you have the friction skin ridges, and on these ridges you have pores and they sweat and whenever you touch something you leave a residue, a water residue and you touch something that leaves a latent print there.

[STATE]: Now for example you were talking about the fingerprints?

[HILLARD]: Yes.

[STATE]: Is that true of other parts of the body as well?

[HILLARD]: Yes. You have the same process with your feet also. You have the friction of your skin ridges on your feet.

[STATE]: And beyond the feet and the fingertips does the body in general produce those kinds of oils or things that would form impressions?

[HILLARD]: Yes. If you took the back of your hand and did the same thing you'd still have that impression. You'd dust it or anything you would have that impression as you dust it with a powder. And nonporous items gets treated with a chemical and you can develop that impression also.

[STATE]: And Mr. Hillard in your experience and you[r] years as a Criminalist, based on your training and experience, do you have any experience in interpreting impressions that are left, that

36

are formed that way other than fingerprints and the feet?

[HILLARD]: Yes.

[STATE]: Have you responded to crime scenes where you had to interpret impressions that were formed by other parts of the body besides the feet and hands?

[HILLARD]: Yes sir.

* * *

[STATE]: Have you received any specific training in how to interpret impressions other than fingerprints?

[HILLARD]: Again, this comes along with experience.

[**P71**] Hillard did not claim that there was a recognized scientific process establishing forearm comparison as a science. Rather than trying to identify Widmer or any other individual as the source of the forearm impression through comparison, Hillard limited his testimony to the identification of the impression as one made by an adult male. Hillard did not speculate as to who specifically left the forearm impression or when the impression had been left on the bathtub. Instead, Hillard testified only as to how such an impression was made, the identification of the impression by body part, and the general characteristics of the person who left the impression (an adult male). Given his experience in analyzing crime scenes and body part impressions, for which an understanding of the science behind the transfer and discovery of latent prints or impressions is required, Hillard was more than qualified to testify as to the existence of the forearm impression. Therefore, the trial court did not abuse its discretion in admitting such testimony into evidence.

[**P72**] Furthermore, we do not find that the court abused its discretion in allowing into evidence Hillard's testimony that the forearm impression overlaid circular marks left on the bathtub by

37

bath products. Hillard testified he has more than 30 years of experience observing crime scenes and interpreting patterns of evidence. Hillard was more than qualified to testify as to his observation that the forearm impression came second in time to the circular marks. If Widmer wanted to cast doubt on the accuracy of Hillard's observations, he had the opportunity to do so during cross-examination.

[*P73] Finally, we do not find the trial court abused its discretion in admitting Hillard's testimony about the fingertip marks found on the bathtub. Hillard testified that latent prints were discovered after dusting powder was used on the bathtub, but the prints lacked minutiae details and therefore could not be used to identify the source of the prints. Although the print lacked identifying characteristics or minutiae details, Hillard was able to determine that the print was left after someone pulled his or her fingers downward using just the fingertips.

> [HILLARD]: These impressions here are the ones I was looking at. It tells you they were fingerprints but I couldn't make a positive identification as to who they belonged to. I could just tell they were in the downward position.
>
> * * *
>
> These are the tips of the fingerprints right here and on the tips usually when you're pulling down on something you very seldom leave minutiae points there and those impressions [sic].

From his testimony, it is clear that Hillard did not rely on the Bertillon system to identify the source of the fingertip marks. Rather, Hillard utilized his training and experience in analyzing fingertip markings to determine that the markings were made by a "person of small stature, like a child, [a] female, or a small male." Although Hillard's training and experience allowed him to draw such an observation from the size and the shape of the markings, Hillard was explicit in stating that he could not identify the specific

individual who made the markings, that person's gender, or when the markings had been left on the bathtub. Hillard's testimony was therefore limited to those findings and observations he was qualified to make given his 30 years of experience in analyzing crime scenes, fingerprints, and body part impressions.

**[*P74]** For the aforementioned reasons, we do not find that the trial court abused its discretion in admitting Hillard's testimony about the forearm impression and fingertip markings. Hillard's testimony was relevant, reliable, and permissible pursuant to Evid. R. 702. Any questions or doubts Widmer had regarding the accuracy of Hillard's observations and testimony about the forearm impression and fingertip markings were capable of being addressed during cross-examination. Furthermore, we find that such questions about the accuracy or reliability of Hillard's testimony in this case go to the weight of the evidence rather than its admissibility.

B.  Due Process and the Confrontation Clause

**[*P75]** We further find that the admission of Hillard's testimony did not violate Widmer's due process rights or his constitutional rights under the Sixth Amendment.

**[*P76]** "The Sixth Amendment to the United States Constitution made applicable to the States via the Fourteenth Amendment['s] [due process clause] * * * provides that '[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him.'" *Melendez-Diaz v. Massachusetts,* 557 U.S. 305, 129 S.Ct. 2527, 2531 (2009). The Amendment guarantees a defendant the right to confront those who "bear testimony" against him. *Id.,* citing *Crawford v. Washington,* 451 U.S. 36, 51, 124 S.Ct. 1354 (2004).  "A witness's testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." *Id.,* citing *Crawford* at 54.

**[*P77]** In the present case, Hillard was called as an expert witness at

39

trial. His testimony about the forearm impression and fingertip markings he found on the bathtub were subject to cross-examination by Widmer. Widmer was given the express opportunity to challenge and cast doubt on Hillard's conclusions about the forearm impression and the fingertip marks. Accordingly, we do not find that Hillard's testimony was in violation of Widmer's Sixth Amendment right to confront those who bear witness against him.

[*P78] Widmer's second assignment of error is hereby overruled.

*Widmer*, 2012-Ohio-4342.

The Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005), *citing Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Mackey v. Warden*, 525 Fed. Appx. 357, 362, 2013 WL 1908890 at *5 (6th Cir.), *cert. denied,* ___ U.S. ___, 134 S.Ct. 438 (2013)(citation omitted). "The Due Process Clause, our decisions instruct, safeguards not the meticulous observance of state procedural prescriptions, but 'the fundamental elements of fairness in a criminal trial.'" *Rivera v. Illinois*, 556 U.S. 148, 158 (2009), *quoting Spencer v. Texas*, 385 U.S. 554, 563-64 (1967). "A mere error of state law is not a denial of due process." *Rivera*, 556 U.S. at 158, *quoting Engle v. Isaac*, 456 U.S. 107, 121, n. 21 (1982) and citing *Estelle*, 502 U.S. at 67. It follows, then, if a violation of a state's procedural prescription does result in the denial of fundamental fairness, such error may rise to the level of a constitutional violation. *See Coleman v. Mitchell*, 244 F.3d 533, 542-43 (6th Cir. 2001).

Federal habeas review of a state court evidentiary ruling is extremely limited. *Jordan v. Hurley*, 397 F.3d 360, 362 (6th Cir. 2005)(citation omitted). A state court's evidentiary ruling will rise to the level of a constitutional violation only where it violates a bedrock principle of justice so

as to deprive the defendant of a fundamentally fair trial. *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007). The United States Supreme Court has "very narrowly" defined the category of infractions that meets this standard. *Bey*, 500 F.3d at 522, *citing Dowling v. United States*, 493 U.S. 342, 352 (1990).

> Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation. We, therefore, have defined the category of infractions that violate "fundamental fairness" very narrowly. As we observed in [*United States v.*] *Lovasco,* [431 U.S. 783 (1977)], *supra,* at 790 …
>
>> "Judges are not free, in defining 'due process,' to impose on law enforcement officials [their] 'personal and private notions' of fairness and to 'disregard the limits that bind judges in their judicial function.' *Rochin v. California,* 342 U.S. 165, 170, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952) …. [They] are to determine only whether the action complained of … violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935), and which define 'the community's sense of fair play and decency[.]' *Rochin v. California,* [342 U.S. 165 (1952)], *supra,* at 173, 72 S.Ct. at 210."

*Dowling*, 493 U.S. at 352-53.

The admission of evidence violates due process only if there are no permissible inferences the jury may draw from the evidence. *See Webb v. Mitchell*, 586 F.3d 383, 397 (6th Cir. 2009), *cert. denied sub nom*, *Webb v. Bobby*, 559 U.S. 1076 (2010).

The thrust of Mr. Widmer's argument is that when he testified about the transfer and collection of latent body impressions (in the bathtub), Mr. Hillard went beyond the area of his purported expertise.

Mr. Hillard testified that he was employed by the City of Cincinnati as a Senior Criminalist, he had been a Senior Criminalist for five years, previously he was a Cincinnati police

officer for over twenty-eight years, after he retired in 2000, the City of Cincinnati hired him as a

Criminalist, and that he has "been in this business for 38 years." (Tr., ECF No. 21, Exh. 17,

PageID 8943-44.) Mr. Hillard testified further that part of his job is to respond to all major crime

scenes, process the scene for evidence, take pictures of the scene, collect evidence, and to process

the scene for fingerprints and any other forensic evidence that might be involved in the case. *Id.* at

PageID 8944. In addition, Mr. Hillard testified that "a lot" of his training has been on-the- job

training, he has also attended training at the F.B.I. Academy's school in Florida as well as at

various other schools throughout the United States, and that he has been involved in this sort of

education and training for approximately twenty years. *Id.* at PageID 8944-45. Mr. Hillard

reiterated that he has been specifically trained in crime scene photography, evidence collection,

fingerprint processing and analysis, and interpreting patterns of evidence. *Id.* at PageID 8945.

Mr. Hillard testified further that he had previously testified in court as an expert in the areas of

crime scene analysis, fingerprints, and "those sorts of things" and that the courts included those in

Hamilton, Warren, and Butler Counties, Ohio, as well as in a case in Kentucky. *Id.* at PageID 8946.

Further, Mr. Hillard testified that he has been involved on an average of a "couple hundred" crime

scenes and that he teaches crime scene photography and evidence techniques at the Cincinnati

Police Academy. *Id.* at PageID 8946-47.

       After hearing the foregoing testimony, and in the absence of an objection from Mr.

Widmer's counsel, the trial court granted the state's motion to have Mr. Hillard designated as an

expert in the areas of crime scene analysis, fingerprints, and crime scene photography. *Id.* at

PageID 8947.

       With respect to the transfer and collection of latent body impressions, Mr. Hillard testified

that beyond the fingers and feet, the body in general produces oils or things that would form

impressions and that he has had experience interpreting impressions that are formed by other than fingers and feet. *Id.* at PageID 8948-50. Mr. Hillard also testified that of the thousands of crime scenes to which he has responded, probably ten to fifteen percent involved the analysis of impressions of other body parts besides fingers, hands, and feet. *Id.* at PageID 8950-51.

Mr. Hillard then testified that there are limitations to his ability to analyze prints, that sometimes you can see an impression such as the impression of fingers on the bathtub in this case but that there were not enough minutiae points in the fingerprint itself to make a positive identification. *Id.* at PageID 8951. Mr. Hillard explained that his examination showed that there were fingerprint impressions on the side of the tub, that he could tell they were in the downward position but he could not make a positive identification as to whom the prints belonged although he determined that they were made by a person of small stature like a child, female, or a small male. *Id.* at Page ID 8954, 8956.

Subsequently, Mr. Hillard testified that upon further examination of the bathtub, he could see there was a forearm impression on the tub. *Id.*at PageID 8957. Mr. Hillard also testified that he could not date when the mark was made but that the forearm impression was made by an adult, that based on the hair follicle impressions it was made by a male, and that the forearm impression overlaid the circular marks that had apparently been made by bottles that had been removed. *Id.* at PageID 8958, 8960-62. Finally, Mr. Hillard testified that there were marks around the top of the tub that indicated somebody tried to wipe it down but that he could not say when that occurred. *Id.* at PageID 8963.

On cross-examination, Mr. Hillard testified that prior to the science of fingerprints progressing to where it is today, investigators used the Bertillon method of identification whereby an investigator measured the parts of a person's body—ears, arms, legs, physical anatomy—to

43

determine the source of impressions at a crime scene. *Id.* at PageID 8970-71. Mr. Hillard also testified that he agreed that the Bertillon method proved to be unreliable. *Id.* at PageID 8971.

First, at no time did Mr. Hillard attempt to identify the source of either the fingerprints or the forearm print. Secondly, Mr. Hillard did not claim that there was a recognized scientific process establishing forearm comparison. Rather, Mr. Hillard likened forearm impressions to impressions made by fingers and feet as well as other parts of the body. As reflected by the trial court designating him as an expert, Mr. Hillard's education, background, and many years of experience qualifies him to render an opinion on fingerprint collection and comparison as well as that related to forearm imprint which is essentially a cousin to fingerprint collection and comparison. Mr. Hillard never testified or even speculated as to who left either the fingerprints or forearm imprint but simply testified as to the general characteristics of the person who made the finger imprints and the person who made the forearm imprint.

Although Mr. Widmer seems to contend that Mr. Hillard based his testimony about the forearm impression on the Bertillon system of using body measurements to identify individuals, a methodology Mr. Hillard agreed had been proven to be unreliable, it is clear that Mr. Hillard did not. Rather, Mr. Hillard based his testimony about the forearm impression on the methodology that underlies the well-accepted and understood process of latent fingerprint analysis.

Mr. Widmer also essentially takes issue with Mr. Hillard's testimony on the basis that it does not meet the standard identified in *Daubert*, *supra*. The Sixth Circuit, however, has held that *Daubert* cannot provide a basis for habeas relief because *Daubert* concerns the Federal Rules of Evidence which are not relevant to a state criminal conviction. *Norris v. Schotten*, 146 F.3d 314, 335 (6th Cir.), *cert. denied*, 525 U.S. 935 (1998). In other words, *Daubert* is not a constitutional decision and does not impose any constitutional obligation on the States. *Jackson v. Warden*, No.

44

3:13-cv-347, 2014 WL 3899292 at *25 (S.D. Ohio Aug. 11, 2014)(Merz, M.J.), Supplemental Report and Recommendations adopted, 2014 WL 4704071 (S.D. Ohio Sept. 22, 2014)(Rose, J).

Mr. Widmer also argues in support of his First Ground for Relief that he was denied his constitutional right to confrontation. Mr. Widmer's position seems to be that his Sixth Amendment right to confrontation was violated because Mr. Hillard's testimony, which was the only unchallenged testimony against him, was based on matters outside his (Mr. Hillard's) area of expertise (Petition, ECF No. 1, PageID 73-75).[3]

The Sixth Amendment provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him…." U.S. Const. amend. VI. Incorporated through the Fourteenth Amendment, the Confrontation Clause applies with equal force to criminal prosecutions by the States. *Crawford v. Washington*, 541 U.S. 36, 42 (2004), *citing Pointer v. Texas*, 380 U.S. 400, 406 (1965). The Confrontation Clause protects criminal defendants in two ways: by granting "the right physically to face those who testify against him, and the right to conduct cross-examination." *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987)(citation omitted).

"[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose … infirmities [of a witness' testimony] through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." *Bugh v. Mitchell*, 329 F.3d 496, 506 (6th Cir.), *cert. denied sub nom*, *Bugh v. Bradshaw*, 540 U.S. 930 (2003), *quoting Delaware v. Fensterer*, 474 U.S. 15, 21-22 (1985). "[T]he traditional protections of the oath, cross-examination, and opportunity for the jury

---

3. It appears that Mr. Widmer may have abandoned this Sixth Amendment confrontation claim (Traverse, ECF No. 25, PageID 10196-10210). Out of an abundance of caution, however, the Court will address the Confrontation Clause issue.

to observe the witness' demeanor satisfy the constitutional requirements [of the Confrontation Clause]." *Bugh*, 329 F.3d at 508, *citing United States v. Owens*, 484 U.S. 554, 560 (1988).

The record reveals that Mr. Widmer's counsel had the opportunity to cross-examine and re-cross examine Mr. Hillard (Tr., ECF No. 21, Exh. 17, PageID 8965-81, 8984-85).  During those cross-examinations, Mr. Hillard admitted that at the time he examined the bathtub, he knew that the crime scene had been released, people had been in the house after that release, and that he did not know if any contamination of the scene or tub had occurred. *Id.* at PageID 8965-66.  Mr. Hillard also testified that he did not know anything about the environment in which the tub had been in terms of temperature and humidity. *Id.* at PageID 8967.  Mr. Widmer's counsel also cross-examined Mr. Hillard about fingerprint science and the presence of friction ridge detail on fingers, hands, palms, and feet and the absence of friction ridge detail on forearms. *Id.* at PageID 8970.  During that cross-examination, Mr. Hillard confirmed his prior testimony that he had received no formal training in forearm impression identification. *Id*.  Mr. Widmer's counsel cross-examined Mr. Hillard on the issues of people cleaning their bathtubs, the forearm overlay, the circular impressions on the top of the tub, and the fingertip impressions in the bathtub. *Id.* at PageID 8971-81.

It is clear that Mr. Widmer's counsel had a full and fair opportunity to probe and expose any infirmities in Mr. Hillard's testimony and then call to the jury's attention any reasons why it should give scant, if any, weight to his testimony.  Mr. Hillard was under oath and the jury had ample opportunity to observe his demeanor not only on direct examination, but more importantly, on cross-examination.  Stated differently, Mr. Widmer's Sixth Amendment Confrontation Clause rights were adequately protected.

To the extent that Mr. Widmer argues that his Confrontation Clause rights were violated

because Mr. Hillard's testimony went beyond the scope of his area of alleged expertise, the Court rejects that argument for the same reasons it rejected Mr. Widmer's basic argument that Mr. Hillard's testimony went beyond the scope of his area of alleged expertise. *See*, *supra.*

At this point, the Court notes that in his Traverse, Mr. Widmer argues for the first time that this Court should engage in a *de novo* review of his First Ground for Relief. See, *e.g.*, Traverse, ECF No. 25, PageID 10197; compare with Petition, ECF No. 1, PageID 56-76.  Mr. Widmer's position is that "the state court already properly determined that Hillard's testimony lacked scientific methodology" and "[t]herefore, this Court need not determine that issue and instead must determine only whether Hillard's testimony deprived [him] of a fair trial." (Traverse, ECF No. 25, PageID 10197.)

A district court may decline to review a claim a petitioner raises for the first time in his traverse or reply. *Jalowiec v. Bradshaw*, 657 F.3d 293, 312, (6th Cir. 2011) *cert. denied sub nom.*, *Jalowiec v. Robinson*, ___ U.S. ___. 133 S.Ct. 107 (2012)(citation omitted).  When a state court does not address a claim on the merits, AEDPA deference does not apply and the federal habeas court will address the claim *de novo. Bies v. Sheldon*, 775 F.3d 386, 395 (6th Cir. 2014)(citations omitted).

A review of the Ohio Court of Appeals' opinion makes it clear that the state court addressed in detail Mr. Widmer's claims related to Mr. Hillard's testimony. *See*, *e.g., Widmer*, 2012-Ohio-4342.  In addition, Mr. Widmer bases his argument on his erroneous claim that the state court determined that Mr. Hillard's testimony lacked scientific methodology.  As noted above, Mr. Hillard and the state court essentially agreed that the Bertillon system has been proven unreliable. *See*, *e.g.*, *Id.* at ¶¶ 70-71. .  More importantly, as also noted above, Mr. Hillard did not rely on the discredited Bertillon system in his analysis of the evidence.   Nevertheless, because he

47

raised it for the first time in his Reply and because the state court addressed Mr. Widmer's claim with respect to Mr. Hilliard's testimony, Mr. Widmer's *de novo* review argument should be rejected.

The state court's decision as to Mr. Widmer's claims related to Mr. Hillard's testimony as stated in his First Ground for Relief is not contrary to nor an unreasonable application of clearly established federal law. Therefore, Mr. Widmer's First Ground for Relief should be denied.

## SECOND GROUND FOR RELIEF

In his Second Ground for Relief, Mr. Widmer challenges the seizure of the bathtub which was involved with Ms. Widmer's murder (Petition, ECF No. 1, PageID 77-90). Mr. Widmer argues the state violated his Fourth Amendment right to be free from unreasonable searches when, he claims, it improperly seized the bathtub. The thrust of Mr. Widmer's argument is that the search warrant upon which the state relied when it seized the bathtub failed to satisfy the Fourth Amendment's "particularity" and "reasonableness" requirements.

The Warden argues first that Mr. Widmer's Second Ground is procedurally defaulted (Return of Writ, ECF No. 22, PageID 10105-09). Specifically, the Warden claims that Mr. Widmer did not fairly present or exhaust this claim in state court, that no state court remedies remain, and that Mr. Widmer has not established cause, actual prejudice, or fundamental unfairness that would warrant excusing his procedural default. *Id.* The Warden's second argument in opposition to Mr. Widmer's Second Ground for Relief is that pursuant to *Stone v. Powell*, 428 U.S. 465 (1976), Mr. Widmer's Fourth Amendment claim is not cognizable in this habeas proceeding. *Id.*

In his Traverse Mr. Widmer argues that, contrary to the Warden's position, his Second Ground for Relief is not procedurally defaulted, but rather, is properly before the Court (Traverse, ECF No. 25, PageID10211-30).  Specifically, Mr. Widmer seems to argue that he raised his "bathtub claim" as a stand-alone claim in violation of his Fourth and Fourteenth Amendment rights to be free from unlawful seizures and his Fifth, Sixth, and Fourteenth Amendment rights to confrontation, due process rights, a fair trial, and the effective assistance of counsel. *Id.*   In addition, Mr. Widmer argues that his claim falls outside *Stone*, *supra*, because it, "involves the violation of personal constitutional rights that rendered his verdict unworthy of confidence."   *Id.*

In *Good v. Berghuis*, 729 F.3d 636 (6th Cir. 2014)(2015), the Sixth Circuit wrote:

> *Stone v. Powell* in the main prohibits federal habeas corpus review of a state prisoner's Fourth Amendment claim. 428 U.S. 465, 486 … (1976). Two explanations supported the decision. One, the key purpose of federal habeas corpus is to free innocent prisoners. But whether an investigation violated the Fourth Amendment has no bearing on whether the defendant is guilty. *Id.* at 490. Two, exclusion is a prudential deterrent prescribed by the courts, not a personal right guaranteed by the Constitution. Any deterrence produced by an additional layer of habeas review is small, but the cost of undoing final convictions is great. *Id.* at 493.
>
> This prohibition on federal habeas review of exclusionary rule claims applies only to prisoners who received "the opportunity for full and fair consideration" of their claims in state court. *Id.* at 486. Good points out that the state never gave him an evidentiary hearing on his suppression motion. It follows, he says, that he did not get an "opportunity for full and fair consideration" of his Fourth Amendment claim and that he may raise the claim here.
>
> Just what kind of "opportunity" *Powell* contemplates has been the subject of debate. Our court has been of two (or three) minds about the point. In the first case, *Bradley v. Cowan,* the trial court "abruptly denied [the suppression motion] without hearing." 561 F.2d 1213, 1215 (6th Cir. 1977). The panel splintered over whether the state court satisfied the opportunity requirement with two of the three judges concluding that *Powell* precluded review. *See id*. at 1215, 1217 (Edwards, J.)(concluding that the lack of a state court

49

hearing makes federal collateral review available but finding any error harmless); *id.* at 1217-18 (Phillips, C.J.) (concluding that *Powell* precluded review); *id.* at 1218 (Weick, J.) (concluding that *Powell* precluded review and finding any error at any rate harmless). In *Moore v. Cowan,* reported in F.2d before *Bradley* but decided two days after it, the habeas corpus petitioner complained that instead of reviewing the merits of his Fourth Amendment claim, the state appellate court affirmed on harmless-error grounds. We rejected this argument, subscribing to what has become the majority rule in the circuits—that opportunity means opportunity—and concluding that the state court need do no more "than take cognizance of the constitutional claim and render a decision in light thereof." 560 F.2d 1298, 1302 (6th Cir. 1977). In *Riley v. Gray*, the state appellate court refused to consider the defendant's suppression appeal; it announced a novel procedural rule requiring the defendant to have affirmatively demonstrated his standing to challenge the search in the trial court record—a requirement that the defendant had not met. 674 F.2d 522, 527 (6th Cir. 1982).We held that this "unanticipated and unforeseeable" procedural rule deprived the defendant of a fair opportunity to present his claim to the appellate court. *Id.* at 526-27. But then we added the following unnecessary and unreasoned remark: "[Ohio's rules generally] provide an adequate procedural mechanism for the litigation of fourth-amendment claims because the state affords a litigant an opportunity to raise his claims *in a fact-finding hearing* and on direct appeal of an unfavorable decision." *Id.* at 526 (emphasis added). This statement was dictum; *Riley* is a case about the opportunity at the outset to put the claim before the court, not the subsequent opportunity to get an evidentiary hearing.

Most of the other federal appellate courts have focused on whether the state courts offered the prisoner a procedure for presenting the Fourth Amendment claim. *See, e.g., Capallan v. Riley,* 975 F.2d 67, 70 (2d Cir. 1992) ("[R]eview of fourth amendment claims in habeas petitions [may] be undertaken in only one of two instances: (a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism…."); *Marshall v. Hendricks,* 307 F.3d 36, 82 (3d Cir. 2002) ("[T]here may be instances in which a full and fair opportunity to litigate was denied to a habeas petitioner, but this is not one of them. This is not a case where a structural defect in the system itself prevented [the petitioner's] claim from being heard."); *Doleman v. Muncy,* 579 F.2d 1258, 1265 (4th Cir.1978) ("[ *Powell* asks only] whether … the petitioner was afforded an *opportunity* to

raise his Fourth Amendment claims under the then existing state practice."); *Willett v. Lockhart,* 37 F.3d 1265, 1273 (8th Cir.1994) (en banc) ("[A] Fourth Amendment claim is *Stone*-barred, and thus unreviewable by a federal habeas court, unless either the state provided no procedure by which the prisoner could raise his Fourth Amendment claim, or the prisoner was foreclosed from using that procedure....").

Some courts have focused on the adequacy of the procedure, sometimes even the application of the procedure, used by the court to resolve the claim. *See, e.g., Anderson v. Calderon,* 232 F.3d 1053, 1068 (9th Cir. 2000) ("[W]e are persuaded on these facts and circumstances that this kind of review falls short of the quality of litigation opportunity described in *Stone*."); *Gamble v. Oklahoma,* 583 F.2d 1161, 1165 (10th Cir.1978) ("'Opportunity for full and fair consideration' includes, but is not limited to, the procedural opportunity to raise or otherwise present a Fourth Amendment claim. It also includes [a] full and fair evidentiary hearing....") (footnote omitted); *Tukes v. Dugger,* 911 F.2d 508, 514 (11th Cir.1990) ("The trial court's failure to make explicit findings on matters essential to the fourth amendment issue, combined with the fact that the state appellate court issued only a summary affirmance, precludes a conclusion ... that ... [there is] a *Stone v. Powell* bar to our review of the claim.").

Consistent with *Moore* and with two of the three votes in *Bradley*, we made clear that the *Powell* "opportunity for full and fair consideration" means an available avenue for the prisoner to present his claim to the state courts, not an inquiry into the adequacy of the procedure actually used to resolve that particular claim. *First,* that is what *Powell* said: It focused on the *opportunity* for fair consideration presented by the state courts, not the procedure used in a given case to address the specific argument of a given defendant. In the absence of a sham proceeding, there is no need to ask whether the state court conducted an evidentiary hearing or to inquire otherwise into the rigor of the state judiciary's procedures for resolving the claim.

*Second,* this approach accords with traditional federalism and comity principles—considerations that animated *Stone v. Powell* in the first instance and considerations that take center stage whenever evaluating the scope of federal habeas corpus review. *See generally Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Looking into the adequacy of state opportunities to raise federal claims is a familiar exercise; hence the "adequate" in the

doctrine of independent and adequate procedural grounds. *See, e.g., Lee v. Kemna,* 534 U.S. 362, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002). But it would be an unusual intrusion for federal courts to second-guess state procedures for resolving motions once they have been presented. States are independent sovereigns, and the federal government generally speaking should respect their choices about how to adjudicate disputes.

All of that explains why *Powell* tells us not to "assume that there [is] a general lack of appropriate sensitivity to constitutional rights in the trial and appellate courts of the several States." 428 U.S. at 493 n. 35, 96 S.Ct. 3037. We must instead presume that, once a federal claim comes before a state court, the state judge will use a fair procedure to achieve a just resolution of the claim—resolving some motions with neither an evidentiary hearing nor an oral argument, some with an oral argument alone, some with both.

*Third,* a different conclusion would be impractical and in the end would raise more questions than answers. It is not feasible to prescribe a uniform set of procedures for every suppression dispute. Take the type of procedure demanded in this case: an evidentiary hearing. The exclusionary rule results in "tens of thousands of contested suppression motions each year," *McDonald v. City of Chicago,* —— U.S. ——, 130 S.Ct. 3020, 3047, 177 L.Ed.2d 894 (2010) (plurality opinion), and if every one of them prompted a full evidentiary hearing the wheels of justice would jam. Nor is it reasonable to think that an evidentiary hearing is warranted in every case. In some cases, the defendant will not allege a cognizable Fourth Amendment violation. In others, an exception to the exclusionary rule, say for inevitable discovery or for a good faith search, will plainly bring the evidence in. In others, the relevant facts already may be in the record, making an evidentiary hearing unnecessary. In still others, it will be obvious that the suppression motion is frivolous, or that it was made solely for the purpose of delaying the case. Just as the Supreme Court has presumed that a state appellate court normally will have a good reason to deny an appeal summarily, *see Harrington v. Richter,* —— U.S. ——, 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011), so too may we presume that a state trial court often will have a good reason to deny a suppression motion summarily.

*Fourth,* a contrary approach would collapse the hearing inquiry into the merits inquiry. The right to a hearing would turn on how strong the underlying exclusionary claim was, prompting an inquiry of the sort *Stone v. Powell* prohibited in order to determine whether *Stone*

52

> *v. Powell* applied. Our approach, and the majority rule, asks a more basic and readily administrable question: Did the state courts permit the defendant to raise the claim or not?
>
> Applying our test to Good's case is straightforward. Good could, indeed did, present his suppression motion to the state trial court, and the trial court rejected it. He presented it again to the state appellate court, and the appellate court rejected it once more. That suffices to preclude review of the claim through a habeas corpus petition under *Stone v. Powell*.

*Good*, 729 F.3d at 637-40.

With these principles in mind, this Court turns to the specific facts of Mr. Widmer's present claim.

A review of the record reveals that Mr. Widmer did not bring a Motion to Suppress during the proceedings related to his first trial (See App'x, ECF No. 17-1, Exh. 3-24, PageID 301-388). However, during the proceedings related to his second trial, Mr. Widmer did move to suppress the bathtub (App'x, ECF No. 18-1, Exh. 84, PageID 1037-40).   In that Motion Mr. Widmer claimed the seizure violated his rights under the Fourth and Fourteenth Amendments to the United States Constitution as well as parts of the Ohio State Constitution. *Id*. at PageID 1037.   The trial court denied his motion on the basis that "the motion has not been prosecuted in a timely fashion."(App'x, ECF No. 18-1, Exh. 86, PageID 1049-50.)   Finally, the record reveals that Mr. Widmer did not file a motion to suppress during the proceedings related to his third trial and final trial (See App'x, ECF No. 18-1, Exhs. 95-100, PageID 1120-1493; App'x, ECF No. 19-1, Exhs. 101-25, PageID 1517-1697).

Mr. Widmer had, within the meaning of *Stone* and *Good*, the "opportunity for full and fair consideration" of his claim that the bathtub should have been suppressed at trial.   That is clearly exhibited by the fact that he filed a motion to suppress during the proceedings related to his second

trial.   However, Mr. Widmer did not file a motion to suppress during the proceedings related to this third trial, the trial that is at issue in these habeas proceedings.   Mr. Widmer does not claim, nor is this Court aware of any, changes in Ohio law which occurred between his second trial held in May and June of 2010 and his third trial held in January and February of 2011, which would have deprived him of the opportunity for a full and fair consideration of his claim with respect to the bathtub.   Accordingly, Mr. Widmer's claim, even assuming that it is cognizable in habeas, *see*, *infra*, would be defaulted.

Even assuming that Mr. Widmer's Second Ground for Relief is not procedurally defaulted, *Stone* makes it clear that the claim is not cognizable in habeas.

As noted above, Mr. Widmer argues that his claim is "outside *Stone*" because it "involves the violation of personal constitutional rights that rendered his verdict unworthy of confidence."

The Sixth Circuit recently addressed this issue.

> Evidence that has been obtained in violation of the Fourth Amendment may be subject to exclusion at trial. As the Supreme Court has made clear, however, "[e]xclusion is not a "personal constitutional right", but is intended "to deter future Fourth Amendment violations." *Davis,* [___ U.S. ___, ___], 131 S.Ct. [2419,] at 2426 [2011]. Because "[e]xclusion exacts a heavy toll on both the judicial system and society at large," not all violations of the Fourth Amendment result in the exclusion of evidence. *Id.* at 2427. "[E]xclusion has always been our *last resort,* not our first impulse." *Herring v. United States,* 555 U.S. 135, 129 S.Ct. 695, 700, 172 L.Ed.2d 496 (2009) (internal citation and quotation marks omitted) (emphasis added). To assess whether exclusion is demanded, a "rigorous weighing of [ ] costs and deterrence benefits" is necessary. *Davis,* 131 S.Ct. 2427. In particular, because the extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct, the cost-benefit analysis should focus on the "flagrancy of the police misconduct" and on whether the police misconduct was "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring,* 129 S.Ct. at 701–02. When police act in good faith,

54

however, "conduct[ing] a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply." *Davis,* 131 S.Ct. at 2434.

*United States v. Fisher*, 745 F.3d 200, 204 (6th Cir.), *cert. denied*, ___ U.S. ___, 135 S.Ct. 676 (2014).

Mr. Widmer's claim with respect to the suppression of the bathtub is not cognizable in habeas.   Therefore, Mr. Widmer's Second Ground for Relief should be denied.


**THIRD GROUND FOR RELIEF**

In his Third Ground for Relief, Mr. Widmer alleges that his counsel was constitutionally ineffective because they failed to timely prosecute a motion to suppress with respect to the bathtub (Petition, ECF No. 1, PageID 90-95).

The Warden first argues in opposition to Mr. Widmer's Third Ground for Relief that Mr. Widmer's ineffective assistance of trial counsel claim has a "fundamental problem" in that his federal habeas attorney (and her husband) were co-counsel of record in his state court proceedings and this leaves his habeas counsel in the position of arguing her own ineffectiveness (Return of Writ, ECF No. 22, PageID 10110-11).   The Warden also argues that the state court's determination that Mr. Widmer's ineffective assistance claim is without merit was based on its objectively reasonable factual determinations and not contrary to or an unreasonable application of clearly established federal law. *Id.* at PageID 10111-20.

In his Traverse, Mr. Widmer does not specifically address the Warden's arguments, but relies instead on the arguments he raised in his Petition   (Traverse, ECF No. 25, PageID 10247).

Mr. Widmer raised this claim before the Twelfth District Court of Appeal which rejected it

as follows:

## II.   SUPPRESSION OF THE BATHTUB

[*P39] Assignment of Error No. 1:

[*P40] TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS BY FAILING TO TIMELY PROSECUTE WHAT WOULD HAVE BEEN A MERITORIOUS MOTION TO SUPPRESS THE BATHTUB AND ALL EVIDENCE RELATED TO SAID TUB DISCOVERED FOLLOWING ITS UNLAWFUL SEIZURE. THE STATE UNCONSTITUTIONALLY SEIZED THE BATHTUB PURSUANT TO A SEARCH WARRANT WHICH NEITHER LISTED THE BATHTUB AS AN ITEM TO BE SEIZED NOR COULD BE CONSTRUED TO VALIDLY INCLUDE THE BATHTUB UNDER THE OVERLY BROAD "LATENT FINGERPRINT" LANGUAGE.

[*P41] In his first assignment of error, Widmer argues his trial counsel provided ineffective assistance by failing to timely file and prosecute a motion to suppress the seizure of the bathtub. Widmer argues the seizure of the bathtub fell outside the scope of the search warrant as the bathtub was not particularly described within the warrant and did not fall within the scope of the search warrant's "latent fingerprints" provision. Widmer contends that had his trial counsel timely prosecuted a motion to suppress the bathtub, the bathtub and all evidence relating to it would have been excluded from trial. The state contends, however, that the bathtub was properly seized pursuant to the terms of the search warrant. Further, the state argues that defense counsel's failure to timely file or prosecute a motion to suppress the bathtub was part of the defense's trial strategy.

[*P42] To understand both Widmer's and the state's arguments, it is necessary to briefly discuss the history of the bathtub within the context of Widmer's three trials. The bathtub was seized as evidence pursuant to a search warrant executed on August 13, 2008, two days after the police were initially called to the scene. Widmer did not seek to suppress the bathtub prior to his first trial. On April 22, 2010, just days before Widmer's second trial was set to commence, Widmer filed a motion to suppress the bathtub. The trial court denied the motion on April 30, 2010, on the basis that it had not

been prosecuted in a timely fashion. In its decision, the trial court stated "an eleventh hour motion to suppress in regard to a matter well known to counsel for more than six months was not anticipated by the court." Widmer did not file a written motion to suppress the bathtub prior to the third trial. Rather, on February 1, 2011, during the fifth day of live testimony at the third trial, defense counsel objected to the admission of the bathtub as evidence. Defense counsel indicated the objection was in response to the trial court's April 30, 2010 ruling on the motion to suppress filed just prior to appellant's second trial.

> [DEFENSE COUNSEL]: I know it was ruled on at the time but I'm just preserving our object[ion] on the motion to suppress the tub.

> THE COURT: From the last trial?

> [DEFENSE COUNSEL]: Yes, just for the record.

The trial court overruled the objection and permitted the bathtub to be introduced into evidence.

**[\*P43]** To prevail on his ineffective assistance of counsel claim, Widmer must show (1) that his trial counsel's performance in failing to file a motion to suppress the bathtub fell below an objective standard of reasonableness and (2) that he was prejudiced as a result. *Strickland v. Washington,* 466 U.S. 668, 687-688, 693, 104 S.Ct. 2052 (1984). Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different. *Id.* at 694. "A defendant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other." *State v. Madrigal,* 87 Ohio St.3d 378, 389 (2000).

**[\*P44]** As an initial matter, we note that trial counsel's failure to file a motion to suppress evidence does not per se constitute ineffective assistance of counsel. *Id.; State v. Layne,* 12th Dist. No. CA2009–07–043, 2010-Ohio-2308, ¶ 46. The party asserting a claim of ineffective assistance of counsel for failure to file a motion to suppress must prove that there was a basis to suppress the evidence in question. *State v. Brown,* 115 Ohio St.3d 55, 2007-Ohio-4837, ¶ 65.

**[\*P45]** We begin our analysis by determining whether seizure of the bathtub was in violation of the Fourth Amendment. The Fourth Amendment to the United States Constitution protects against

unreasonable searches and seizures and provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The manifest purpose of the Fourth Amendment's particularity requirement is to prevent general searches. *Maryland v. Garrison,* 480 U.S. 79, 84, 107 S.Ct. 103 (1987). "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Id.* Where the items seized are evidence or instrumentalities of a crime, a court must determine whether the warrant could reasonably have described the items more precisely than it did. *State v. Benner,* 40 Ohio St.3d, 301, 307 (1988). A search warrant will be held sufficiently particular when it enables a searcher to reasonably ascertain and identify the things which are authorized to be seized. *State v. McCroy,* 6th Dist. Nos. WD–09–074 and WD-09-090, 2011-Ohio-546, ¶ 37; *United States v. Blakeney,* 942 F.2d 1001, 1026 (6th Cir. 1991).

**[\*P46]** The search warrant executed on August 13, 2008, authorized police to search the Widmers' residence for the following:

> [G]oods, chattels, or articles, and to retrieve any evidence of criminal activity which may be found, to wit: the wallet of Sarah A. Widmer (Deceased); calendars; computers; computer perherials [sic], including external hard drive(s), modums [sic], mediums for the electronic storage of data; caller ID(s); safe(s) and/or lock box(es); notes; medical records; pregnancy test; insurance papers; video and/or audio recording device(s); financial records, including credit card statements, certificate of deposit(s), checking account record(s), saving account record(s); birth control devices including pills and condoms; and latent fingerprints.

Officer Short's affidavit, which was attached and incorporated into

the search warrant, stated that he had been dispatched to the Widmers' home on a report of a drowning. The affidavit also stated that upon arrival at the home, Short was told by Widmer that Sarah had been in the bathtub 15 to 30 minutes before Widmer found her "under the water" and removed her from the bathtub. Short further averred that an autopsy had been completed, and, although the preliminary cause of Sarah's death was drowning, there were "other injuries found on the body that were inconsistant [sic] with the account reported to police by Ryan K. Widmer." Short then stated that "through his personal knowledge and training, and based upon the preliminary results of the autopsy, [he] believes there exists other evidence at the [Widmers'] residence. The recovery of this evidence is key to the investigation into the death of Sarah A. Widmer."

[*P47] On appeal, Widmer argues the "latent fingerprints" provision of the search warrant is overly broad in nature and does not authorize the seizure of the bathtub. Widmer contends the bathtub was an item officers knew existed prior to requesting the warrant to search the home, and, as such, should have been specifically listed in the warrant as an item to be searched and seized. He further argues the "latent fingerprints" provision of the warrant could not have authorized the seizure of the bathtub as the provision offered unbridled discretion to the officers executing the warrant and would have allowed officers to seize "literally every item in the house." Widmer also argues that even if the latent fingerprint provision is not overly broad, seizure of the bathtub pursuant to this provision was improper as an on-site inspection of the bathtub revealed that the bathtub did not contain latent prints of value. We find Widmer's arguments to be without merit.

A. Scope of the Warrant

[*P48] In the present case, the warrant specifically authorized officers to search for latent fingerprints and retrieve any evidence of criminal activity. Although the warrant did not specifically list the bathtub, this does not invalidate its seizure. The warrant still enabled the officers to reasonably ascertain and identify the things that were authorized to be seized by way of the attached affidavit. The information contained within the affidavit, which made reference to the bathtub numerous times, sufficiently constrained the officers' search, and any later seizure, to evidence related to a death by drowning. At the time the warrant was sought, the cause of Sarah's death was known. Statements made by Widmer indicated Sarah had drowned in the couple's bathtub. The latent fingerprints provision

did not allow officers to seize "literally every item in the house." Rather, it permitted only the seizure of goods, articles, or chattels that contained latent fingerprints *and* provided evidence of a crime, namely death by drowning. Common sense dictates that in an alleged bathtub drowning, valuable evidence, including latent fingerprints, can be obtained from a search of the bathroom and bathtub. Once the officers observed the fingermarks and smear marks on the bathtub, they were entitled to remove the tub from the home pursuant to the express terms of the search warrant. Seizure of the bathtub was therefore within the scope of the "latent fingerprints" provision.

**[\*P49]** Widmer, however, seeks to invalidate the search by arguing that at the time the bathtub was removed officers knew that the tub did not contain latent fingerprints because the latent print examiner conducted an on-site inspection and concluded there were no latent prints of value. Yet, as discussed in more detail below, the marks still had evidentiary value as it was possible that further analysis would allow for identification of the source of the marks or would explain how the events unfolded on the night of Sarah's death. Accordingly, seizure of the bathtub to allow further investigation of the marks in a laboratory was warranted.

**[\*P50]** We therefore find that the warrant provision allowing the search and seizure of those items containing "latent fingerprints" was not overly broad. We also find that seizure of the bathtub, as it originated out of a search for latent fingerprints, was authorized by the warrant.

B. Instrumentality of the Crime

**[\*P51]** In addition to finding seizure of the bathtub constitutional under the warrant's "latent fingerprints" provision, we also find that seizure of the bathtub was constitutional as the bathtub was an instrumentality of the crime.

**[\*P52]** "Evidence not specifically described in a search warrant may be validly seized if, based on evidence known to the officers, the seized items were closely related to the crime being investigated or were instrumentalities of the crime." *State v. Kobi,* 122 Ohio App.3d 160, 171 (6th Dist. 1997), citing *State v. McGettrick,* 40 Ohio App.3d. 25, 29 (8th Dist. 1988). *See also United States v. Wright,* 343 F.3d 849, 863 (6th Cir. 2003) (holding "evidence not described in a search warrant may be seized if it is reasonably related to the offense which formed the basis for the search");

60

*United States v. Korman,* 614 F.2d 541, 547 (6th Cir. 1980) (stating that evidence or instrumentalities of a crime may be seized even though not specifically listed in the search warrant).

[**P53**] At the time the fingermarks and smear marks were observed on the bathtub, the police were executing a valid search warrant. Once the marks were observed, officers had probable cause to associate the bathtub with Sarah's death. Although an on-site inspection of the bathtub did not reveal latent prints of comparison value, the bathtub still retained evidentiary value as it was the likely instrument of the drowning and held evidence closely related to Sarah's death.[FN5]    As Harness testified, latent prints are of comparison value only when the print has a "sufficient amount of class characteristics as well as individual characteristics that would enable [one] to ultimately identify that [print] to one person or another." While the on-site inspection of the bathtub did not reveal a sufficient amount of class or individual characteristics to identify who specifically left the markings, the fingermarks and smear marks did not become valueless. The markings retained evidentiary value because it was possible that further analysis of the marks would allow identification of the source of the marks or that additional evidence could be recovered once the bathtub was inspected in a crime laboratory.[FN6] Furthermore, removal of the bathtub was warranted as it was possible that further inspection of the item could explain how events unfolded on the night of Sarah's death and provide insight as to how the smear marks were made on the tub.

> FN5. In his reply brief, Widmer asks this court to find that the bathtub, as a fixture attached to the home, cannot be classified as an instrumentality of the crime. Widmer contends that items that may be seized as "instrumentalities of the crime" refer to the "papers and effects" clause of the Fourth Amendment and therefore include only personal property. Because a bathtub is a fixture, Widmer contends that the "house" clause of the Fourth Amendment governs, and the bathtub could not have been taken as an "instrumentality [of] the crime." Widmer's argument, however, ignores the unique circumstances of the present case. The cause of Sarah's death was drowning, and the instrument believed to have been used to cause her death was the bathtub. As such, by its very nature the bathtub became an instrument of the crime and subject to seizure.

> FN6. In fact, Harness testified that during his second examination of the bathtub, which took place in the crime lab after the bathtub had been removed from the home, he discovered additional fragmented prints on the bathtub that he had not observed during the on-site examination.

**[\*P54]** We find that the police had probable cause to associate the bathtub, and the markings found therein, as the instrument used to drown Sarah. Because the bathtub was believed to have been used to cause Sarah's death, the bathtub, by its very nature, became an instrument of the crime and subject to seizure. Accordingly, we find that the seizure of the bathtub was not in violation of the Fourth Amendment.

C. The Exclusionary Rule

**[\*P55]** Even if we had found the seizure of the bathtub outside the scope of the warrant or found that it was not an instrumentality of the crime, exclusion of the bathtub from evidence is not warranted under the facts of this case. The exclusionary rule is a "prudential doctrine" that was created by the United States Supreme Court to "compel respect for the constitutional guaranty" expressed in the Fourth Amendment. *Davis v. United States,* ___ U.S. ___, 131 S.Ct. 2419, 2426 (2011) citing *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437 (1960). The purpose of the exclusionary rule is to deter future Fourth Amendment violations. *Davis* at 2426. "Where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly * * * unwarranted.' " *Id.* at 2426–2427, quoting *United States v. Janis,* 428 U.S. 433, 454m 96 S.Ct. 3021 (1976). Because of the substantial social costs generated by the exclusionary rule, the deterrence benefits of suppression must outweigh its heavy costs. *Davis* at 2427.

> When the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. * * * But when the police act with an objectively "reasonable good-faith belief" that their conduct is lawful * * * or when their conduct involves only simply "isolated" negligence * * * the "deterrence rationale loses much of its force" and exclusion cannot "pay its way."

*Id.* at 2427–2428, quoting *United States v. Leon,* 468 U.S. 897,

62

908-909, 104 S.Ct. 3405 (1984) and *Herring v. United States,* 555 U.S. 135, 143-144, 129 S.Ct. 695 (2009).

[*P56] The exclusionary rule therefore applies, and evidence should be suppressed where:

> (1) the issuing judge was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth (2) the issuing judge wholly abandoned his judicial role, (3) an officer purports to rely upon a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or (4) depending upon the circumstances of the particular case, a warrant is so facially deficient, i.e., in [failing] to particularize the place or things to be searched or seized, that those executing the warrant cannot reasonably presume it to be valid.

*State v. Donihue,* 161 Ohio App.3d 731, 2005-Ohio-3223, ¶ 9 (12th Dist.), citing *State v. George*, 45 Ohio St.3d 325, 331 (1989).

[*P57] In the present case there is no evidence demonstrating that the police deliberately set out to seize the bathtub without setting it forth in the search warrant. Furthermore, there is no evidence demonstrating that the police acted with deliberate, reckless, or grossly negligent disregard for Widmer's Fourth Amendment rights when seizing the bathtub. Rather, the evidence produced at trial demonstrated that officers seized the bathtub in good faith reliance on the search warrant, removing the bathtub only after a search for latent fingerprints revealed the fingermarks and smear marks. Furthermore, as discussed above, the warrant was not facially deficient in describing the items to be seized. Therefore, exclusion of the bathtub from evidence would not yield any appreciable deterrence.

D. Effective Assistance of Trial Counsel

[*P58] As the bathtub was properly seized, we find that Widmer was not prejudiced by his trial counsel's decision not to file or timely prosecute a motion to suppress the bathtub from evidence. Accordingly, we find Widmer was not denied effective assistance of trial counsel.

[*P59] Widmer's first assignment of error is therefore overruled.

*Widmer*, 2012-Ohio-4342.

The standard of review of Mr. Widmer's ineffective assistance of trial counsel is "doubly deferential." *Burt v. Titlow*, ___ U.S. ___, ___, 134 S.Ct. 10, 13 (2013).   Mr. Widmer must show not only that his trial counsel's performance was deficient, but also that it prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).   An attorney's performance is deficient if it falls "below an objective standard of reasonableness." *Id.* at 688.   But "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and it is the petitioner's burden to show that this is not the case. *Id.* at 689.   Moreover, to demonstrate prejudice, the petitioner must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.   This, too, is a heavy burden, as counsel's deficiencies must have been "so serious as to deprive the defendant of a fair trial." *Id.* at 687.   Ultimately, a federal court cannot grant habeas relief on an ineffective assistance claim simply because it disagrees with the state court's analysis. "[T]he question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* at 697.   Of course, counsel is not required to raise meritless arguments to avoid providing constitutionally infirm assistance of counsel. *Ludwig v. United States*, 162 F.3d 456, 458 (6th Cir. 1998).

> General warrants are prohibited by the Fourth Amendment. *Andresen v. Maryland,* 427 U.S. 463, 479 (1976). "The Fourth Amendment requires warrants to 'particularly describ[e] the place to be searched, and the persons or things to be seized.'" *United States v. Blakeney,* 942 F.2d 1001, 1026 (6th Cir. 1991) (citing U.S. Const. amend. IV). "A general order to explore and rummage through a person's belonging[ ] is not permitted," rather "[t]he warrant must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." *Id.* (citations

and quotations omitted). "The degree of specificity required depends on the crime involved and the types of items sought." *Id.*

*United States v. Gardiner*, 463 F.3d. 445, 471 (6th Cir. 2006).

On August 12, 2008, police officer Quillan Short prepared a search warrant and affidavit for Mr. Widmer's residence (App'x, ECF No. 18-1, Exh. 84, PageID 1038).   At that time, Officer Short was engaged in the investigation of the death of Sarah Widmer. *Id.*   In the request for the warrant, Officer Short stated that it was necessary for law enforcement to enter Mr. Widmer's residence

> to diligently search for the said goods and chattels or articles and to retrieve any evidence of criminal activity which may be found, to wit: the wallet of Sarah A. Widmer (Deceased); calendars; computers; computer peripherals; including external hard drives, modems, mediums for the electronic storage of data; caller ID(s); safe(s) and/or lock boxes; notes; medical records; pregnancy test; insurance papers; video and/or audio recording device(s); financial records, including credit card statements, certificates of deposit(s), checking account records, saving account record(s); birth control devices including pills and condoms; and latent fingerprints.

*Id.*

Mr. Widmer does not dispute that during the execution of the search warrant, officers dusted the bathtub and found what appeared to be handprints on the inside of the tub (App'x, ECF No. 18-1, Exh. 85, PageID 1044).   In addition, Mr. Widmer does not dispute that when officers executed the warrant, they knew that police had been initially dispatched to the Widmer residence on the report of a drowning and that Mr. Widmer reported to those officers that he had found Sarah Widmer in the bathtub. *See Id.* at PageID 1047.

With these facts in mind, this Court concludes that the search warrant was sufficiently specific and that the police properly seized the bathtub.   First, the warrant permitted police to search for latent fingerprints.   As noted, when they dusted the bathtub, the police found what

appeared to be handprints on the inside of the tub.   At that point, the police could properly seize the bathtub under the "latent fingerprint" provision of the warrant.   Second, when they executed the warrant the police knew that Ms. Widmer's death involved a drowning.   That knowledge, coupled with the discovery of the latent handprints in the bathtub, provided a basis for the police to believe that the bathtub was closely related to the crime they were investigating; to wit, Sarah Widmer's death by drowning.   Because the search warrant was sufficiently specific and police properly seized the bathtub, a motion to suppress the bathtub would have been meritless. Accordingly, Mr. Widmer's trial counsel were not required to file a meritless motion to avoid providing constitutionally infirm assistance of counsel.

At this point, the Court notes, as the Warden pointed out, Mr. Widmer's counsel is arguably in the curious position of arguing her own ineffectiveness as Mr. Widmer's trial counsel. However, in view of the Court's resolution of Mr. Widmer's Third Ground for Relief on other grounds, issues raised as to this point need not be decided.

Accordingly, the state court's decision as to Mr. Widmer's claim for ineffective assistance of trial counsel is not contrary to nor an unreasonable application of clearly established federal law.   Therefore, Mr. Widmer's Third Ground for Relief should be denied.


**FOURTH AND FIFTH GROUNDS FOR RELIEF**

As the state court did, this Court will address Mr. Widmer's Fourth and Fifth Grounds for Relief together.

In support of his Fourth Ground for Relief, Mr. Widmer argues that after viewing the evidence in a light most favorable to the state and assuming all the state's witnesses testified truthfully, no rational trier of fact could have found that the state proved beyond a reasonable doubt

all of the essential elements of murder (Petition, ECF No. 1, PageID 95).   Mr. Widmer's position is that, at most, the state proved a lesser-included offense namely either reckless homicide or involuntary manslaughter predicated on the commission of an underlying felony (felonious assault or aggravated assault), or involuntary manslaughter predicated on the commission of an underlying misdemeanor (assault). *Id.* at PageID 95-6.

The Warden argues in opposition that the state court findings of fact are entitled to a presumption of correctness in this habeas proceeding, that to the extent that the state appellate court's decision relies on Ohio law, this Court is bound by that court's interpretation of state law, and that Mr. Widmer has not sufficiently rebutted the presumption of correctness to which the state court's factual findings are entitled (Return of Writ, ECF No. 22, PageID 10126-27).   The Warden notes that although the state appellate court did not specifically cite *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), the court applied an identical and correct review standard. *Id.* at PageID 10127.   Finally, the Warden argues that Mr. Widmer has not cited any federal authority to support his evidence sufficiency claim and therefore his alleged state law violations are not cognizable in this federal habeas proceeding. *Id.*

In his Traverse, Mr. Widmer does not specifically address the Warden's arguments, but relies instead on the arguments he raised in his Petition (Traverse, ECF No. 25, PageID 10247).

Mr. Widmer argues in support of his Fifth Ground that the jury "clearly lost its way in resolving conflicts of evidence and weighing reasonable inferences to be drawn from the record…" (Petition, ECF No. 1, PageID 99).   In further support of his Fifth Ground, Mr. Widmer relies primarily on the arguments he raised in support of his Fourth Ground, *supra. Id.*

The Warden argues in opposition that a "manifest weight of the evidence" claim is not

cognizable in federal habeas proceedings (Return of Writ, ECF No. 22, PageID 10128).

Mr. Widmer does not specifically address the Warden's arguments in his Traverse but again relies on the arguments he raised in his Petition   (Traverse, ECF No. 25, PageID 10247).

Mr. Widmer raised these claims on direct appeal and the court of appeals rejected them as follows:

[*P91] Assignment of Error No. 5:

[*P92] WIDMER'S CONVICTION IS BASED ON INSUFFICIENT EVIDENCE IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL. AT MOST, THE STATE PRESENTED SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION OF INVOLUNTARY MANSLAUGHTER OR RECKLESS HOMICIDE.

[*P93] Assignment of Error No. 6:

[*P94] WIDMER'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF EVIDENCE.

[*P95] In his fifth and sixth assignments of error, Widmer argues that his murder conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. Widmer contends the state failed to prove the necessary elements to sustain a murder conviction, and he argues that "[a]t most, the state proved a lesser-included offense of murder." Widmer specifically contends that Crew's testimony was the only evidence presented to establish his *mens rea* on the night of the crime, and her testimony did not demonstrate that he intended to kill Sarah. Rather, Widmer argues that, at best, Crew's testimony proves that he acted recklessly or knowingly in causing Sarah's death because "[i]f Crew's testimony is believed, [Widmer] submerged Sarah's head under water while blacked out."

[*P96] When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would support a conviction. *State v. Wilson,* 12th Dist. No. CA2006–01–

007, 2007-Ohio-2298. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."*State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

[*P97] A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett,* 12th Dist. No. CA2011–09–177, 2012-Ohio-2372, ¶14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham,* 12th Dist. No. CA2008–07–095, 2009-Ohio-2814, ¶ 66. In reviewing the evidence, an appellate court must be mindful that the jury, as the original trier of fact, was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg,* 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.). "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.,* citing *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997). Furthermore, "[a] unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required to reverse a judgment on the weight of the evidence in a jury trial." *Id.,* citing *Thompkins* at 389.

[*P98] "Because sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency." *State v. Hart,* 12th Dist. No. CA2011–03–008, 2012-Ohio-1896, ¶ 43, citing *Graham* at ¶ 67. Accordingly, a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency. *Id.*

[*P99] Widmer was convicted of murder in violation of R.C. 2903.02(A),  which provides that "[n]o person shall purposely cause the death of another." A person acts purposely "when it is his specific intention to cause a certain result." R.C. 2901.22(A). "A jury may infer an intent to kill where (1) the natural and probable consequence of a defendant's act is to produce death, and (2) all of the surrounding circumstances allow the conclusion that a defendant

had an intent to kill." *State v. McGraw,* 12th Dist. No. CA2009–10–020, 2010-Ohio-3949, ¶ 12, citing *State v. Locklear,* 10th Dist. No. 06AP–259, 2006-Ohio-5949, ¶ 15. Further, "[p]urpose or intent * * * may be established by circumstantial evidence." *McGraw* at ¶ 12. "[A] conviction based on purely circumstantial evidence is no less sound than one based on direct evidence." *State v. Curtis,* 12th Dist. No. CA2009–10–037, 2010-Ohio-4945, ¶ 22, citing *Michalic v. Cleveland Tankers, Ind.,* 364 U.S. 325, 330, 81 S.Ct. 6 (1960). "Circumstantial evidence and direct evidence have the same probative value, and in some instances, certain facts can only be established by circumstantial evidence." *Curtis* at ¶ 22, citing *State v. Mobus,* 12th Dist. No. CA2005–01–004, 2005-Ohio-6164, ¶ 51.

[*P100] After review of the record, we cannot say the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. The state presented testimony and evidence from which the jury could have found the essential elements of murder proven beyond a reasonable doubt.

[*P101] The state presented evidence that Sarah and Widmer were the only two individuals present in the Widmers' home on the night of Sarah's death. The state also presented evidence that Sarah died from a forcible drowning. Dr. Uptegrove testified that during Sarah's autopsy he observed contusions on Sarah's scalp and on the back of her neck, external bruising to her forehead and the left side of her neck, and significant internal bruising to the anterior of her neck. Uptegrove testified that Sarah's injuries were not consistent with or caused by medical intervention or the administration of CPR. Rather, Uptegrove believed the bruises to Sarah's neck were caused prior to her death and resulted from significant compressional force or a blunt force being applied to her neck. Dr. Lee, an expert in pathology, also testified that the injuries Sarah sustained to her neck, scalp, and forehead were atypical to a natural drowning event and were not attributable to medical intervention. Lee testified that the bruising around Sarah's neck was caused by blunt force injury or compressive force. From this testimony, the jury could have drawn a reasonable inference that the bruising around Sarah's neck occurred when Widmer used compressive force to hold Sarah's head underwater, thereby causing her death.

[*P102] To support his argument that he did not forcibly drown Sarah, Widmer presented evidence and testimony that the injuries Sarah sustained occurred during the resuscitative and intubation processes. Dr. Smile, an expert in emergency medicine, testified that injuries to the neck are commonly observed when the Sellick

70

maneuver is utilized during difficult intubations. Dr. Balko and Dr. Sptiz, expert pathologists, testified that they would have ruled Sarah's death "undetermined" rather than a "homicide" because they could not rule out prolonged and rigorous CPR as the cause of Sarah's injuries.

[*P103] In further support of his contention that Sarah did not die by a forcible drowning, Widmer argued Sarah either drowned after suffering a medical event caused by a previously unknown neurological or cardiovascular disease or defect or drowned after falling asleep in the bathtub. Widmer presented evidence that Sarah had a childhood heart murmur that had never been corrected by surgery. He also presented evidence that Sarah sometimes suffered severe stomachaches and headaches, and, on the day of her death, Sarah had complained to a co-worker that she had a headache and stomachache. Additionally, Widmer presented evidence that Sarah had been known to fall asleep at "odd" times and places, including at football tailgating events and in a bar at a table full of talking women.

[*P104] The state, however, presented evidence that cast doubt on Widmer's version of the events that led to Sarah's death. The state presented evidence that Widmer attempted to establish Sarah's death as an accidental drowning that occurred when she fell asleep in the bathtub. In his 911 phone call, Widmer told the dispatcher that Sarah "falls asleep in the tub all the time." In a statement made to Doyle Burke, the chief investigator for the Warren County Coroner's Office, Widmer said that when Sarah went upstairs to take a bath on the evening of her death, he had been "afraid she may fall asleep in the tub." Widmer then admitted to Burke that Sarah had never fallen asleep in the tub before. The jury was entitled to weigh this evidence in determining whether Sarah commonly fell asleep in the bathtub or whether Widmer made such statements in an effort to conceal his actions in forcibly drowning Sarah.

[*P105] The state also presented evidence which permitted the jury to determine whether it believed Widmer staged Sarah's death to look like an accidental drowning. In doing so, the jury was entitled to consider Widmer's inconsistent statements about how he discovered Sarah—face-down, as he told the 911 dispatcher, or face-up, as he told the emergency room charting nurse. The jury was also entitled to consider the testimony of emergency personnel who responded to the Widmers' home. Although Widmer's 911 phone call indicated Sarah had been found in a bathtub full of water, emergency personnel who responded to the scene within minutes of

71

the phone call testified that they found Sarah's body dry. These first responders also testified that the carpet in the master bedroom where Sarah had been lying was dry, except for the areas where the foamy, bloody discharge was observed. Officers who secured and investigated the scene testified that the bathroom floor and items lying on the bathroom floor were also dry. A used Lysol wipe had been discovered in the bathroom, and there was testimony from Hillard that the bathtub appeared to have been wiped down. There was also testimony from Crew that Widmer had admitted he had tried to "cover up" Sarah's death, and had wiped up the water on the bathroom floor with towels before placing the 911 call. From this evidence, the jury could have determined that Widmer staged Sarah's death to look like an accident rather than a forcible drowning.

[*P106] Although Widmer presented an alternative theory as to the manner of Sarah's death and provided contradicting medical testimony about the cause of Sarah's injuries, the jury was entitled to find the state's experts' testimony more credible. Not only did the state present expert testimony that Sarah's bruising was caused by compressive force, but the state also presented testimony that Sarah was a healthy 24–year–old woman who had never had a seizure or been diagnosed with epilepsy. The state further presented expert testimony that Sarah's childhood heart murmur was an "innocent heart murmur" that typically disappears on its own within a few months or a year of life. Experts testifying for the state also testified that there was no evidence of a cardiovascular or neurological disease or defect which caused or contributed to Sarah's death. Uptegrove testified he had not discovered anything out of the ordinary when examining Sarah's heart and brain. Further, Dr. Moore, an expert in neurology, neurophysiology, and sleep medicine, testified that individuals do not typically fall asleep and drown in bathtubs as hypoxia causes one to wake up and start breathing once the individual has been deprived of oxygen. Moore also testified that a person who experiences a seizure while seated in a bathtub would not "flip over" or fall face-down into the bathwater as the stiffening and shaking that occurs during a seizure prevents an individual from falling in that direction. Based on this testimony, the jury was entitled to find that Sarah's death was caused by a forcible drowning that occurred when Widmer used compressive force to hold Sarah's head underwater and not by some unknown and undiscovered medical event or the act of falling asleep in the bathtub.

[*P107] Furthermore, contrary to Widmer's argument, the state also

72

presented sufficient evidence to establish Widmer acted with purpose in killing Sarah. On behalf of the state, Crew testified that Widmer admitted to punching Sarah in the chest before blacking out, regaining consciousness, and finding Sarah on the floor, not breathing, with her hair wet. Crew further testified that prior to Sarah's death, Widmer had threatened Sarah that "[n]obody leaves me, nobody ever leaves me and I mean nobody." In determining what weight, if any, to give to Crew's testimony, the jury was permitted to reject those portions of her testimony that it did not find credible. *See In re S.C.T.,* 12th Dist. No. CA2004–04–095, 2005-Ohio-2498, ¶ 24 (finding jurors, as the trier of fact, are "free to believe all, part, or none of the testimony of each witness"). Given the evidence presented, the jury was entitled to reject Crew's testimony that Widmer "blacked out" and caused Sarah's death. Rather, the jury was entitled to believe that Widmer purposefully and forcibly held Sarah's head underwater as a means of killing her and preventing her from leaving him.

[*P108] As "[t]he law has long recognized * * * intent, lying as it does within the privacy of a person's own thoughts, is not susceptible of objective proof. The law recognizes that intent can be determined from the surrounding facts and circumstances, and persons are presumed to have intended the natural, reasonable and probable consequences of their voluntary acts." *State v. Gardner,* 74 Ohio St.3d 49, 60 (1995). Given the aforementioned facts and circumstances surrounding Sarah's death, the jury could have determined that Widmer purposefully drowned Sarah with the intent of causing her death.

[*P109] Based on the foregoing we find that there was credible evidence that Widmer purposely caused Sarah's death. The jury weighed the evidence and came to the conclusion, beyond a reasonable doubt, that Widmer was responsible for the murder of his wife. The jury chose to credit the witnesses presented by the state and believe the prosecution's version of events. The jury was in the best position to hear the witnesses speak and view their demeanor, and we find no indication that the jury lost its way or created a manifest miscarriage of justice in finding Widmer guilty of murder. Thus, Widmer's conviction is not against the manifest weight of the evidence. Having found Widmer's conviction was not against the manifest weight of the evidence, it follows that the evidence was sufficient to support the conviction.

[*P110] Widmer's fifth and sixth assignments of error are hereby

73

overruled.

*Widmer*, 2012-Ohio-4342.

With respect to Mr. Widmer's Fourth Ground for Relief, the Court notes that, with the exception of citing *Tibbs v. Florida*, 457 U.S. 31, 45 (1982) and *Jackson*, *supra*, for the federal standard for a sufficiency of the evidence claim, Mr. Widmer has based his substantive arguments entirely on state law (*See* Petition, ECF No. 1, PageID 95-98).   It is therefore, questionable at best as to whether Mr. Widmer has "federalized" his claim.   As previously and subsequently noted, federal habeas corpus is available only to correct federal constitutional violations. 28 U.S.C. § 2254.   Mr. Widmer's argument is, simply stated, that the state court erred in applying state law. That claim is not cognizable in habeas.   Nevertheless, giving Mr. Widmer the benefit of the doubt with respect to how he has couched his claim, this Court will address his claim.

In support of his Fourth and Fifth Grounds for Relief, Mr. Widmer essentially argues that his conviction is based on insufficient evidence (Fourth Ground) and against the manifest weight of the evidence (Fifth Ground) (Petition, ECF No. 1, PageID 95-100).   It appears that Mr. Widmer's position is that in considering the evidence, the jury, and then the state court of appeals, simply got it wrong. *Id.*

The Warden argues in opposition to Mr. Widmer's Fourth Ground that the state courts correctly determined that Mr. Widmer has failed to satisfy the "rational trier of fact" standard of *Jackson v. Virginia*, 443 U.S. 307 (1979) (Return of Writ, ECF No. 22, PageID 10120-29).   In opposition to Mr. Widmer's Fifth Ground, the Warden argues that a manifest weight of the evidence claim is not cognizable in habeas. *Id.*

In his Reply, Mr. Widmer does not specifically address the Warden's arguments but rather

74

relies on the arguments he has raised in his Petition (Traverse, ECF No. 25, PageID 10247).

An allegation that a verdict was entered upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson*, *supra.   Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. *Coleman v. Johnson*, 566 U.S. ___, ___, 132 S.Ct. 2060, 2062 (2012).

> The burden that Snyder must shoulder in demonstrating that his convictions were not supported by sufficient evidence is difficult: a conviction is supported by sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jakson v. Virginia,* 443 U.S. 307, 319 (1979). But because Snyder's claims arise in the context of a § 2254 petition, our analysis must be refracted through yet another filter of deference. *See Coleman v. Johnson,* 132 S.Ct. 2060, 2062 (2012) (per curiam); *Sanburn v. Parker,* 629 F.3d 554, 577 (6th Cir. 2010). We may grant relief on his claims only if the state court's adjudication of them was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). There is a difference between being wrong and being unreasonably wrong. *White v. Woodall,* 134 S.Ct. 1697, 1702 (2014); *Harrington v. Richter,* 562 U.S. 86, 102-03 (2011). To prevail under § 2254,    the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103; *Williams v. Bauman,* 759 F.3d 630, 635 (6th Cir. 2014).

*Snyder v. Marion Correctional Inst., Warden*, 608 Fed. Appx. 325, 327 (6th Cir. 2015).

As noted above, the evidence is to be viewed in the light most favorable to the prosecution. *See Jackson*, 443 U.S. at 319.   In addition, all reasonable inferences must be drawn in favor of the prosecution. *See Riley v. Berghuis*, 481 F.3d 315, 321 (6th Cir. 2007), *citing Jackson*, 443 U.S. at

319.   A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005)(citations omitted).

Mr. Widmer was convicted of murder in violation of Ohio Revised Code § 2903.02(A), which provides that "[n]o person shall purposely cause the death of another."   Under Ohio law, a person acts purposely "when it is his specific intention to cause a certain result." O.R.C. § 2901.22(A).

The state introduced evidence, and Mr. Widmer does not dispute, that only he and Sarah Widmer were present in their home on the evening that she died.   In addition, the state's evidence was sufficient to permit the jury to conclude that she died by forcible drowning.   Dr. Russell Uptegrove who performed the autopsy on Sarah Widmer, testified that her injuries were not consistent with or caused by medical intervention such as the performance or C.P.R. (Tr., ECF No. 21-2, PageID 3285-3397).   Dr. Uptgrove also testified that the bruises to Sarah's neck were caused *prior* to her death and were the result of significant compressional force or a blunt force that was applied to her neck. *Id.*   In addition, Dr. Jeffrey Lee, an expert in pathology testified that, although he did not participate in Ms. Widmer's autopsy, he reviewed the autopsy report and autopsy photographs, Sarah Widmer's emergency room record including the emergency medical technician run sheet from the night she died, her medical records dating back to when she was a teenager, and several statements written by police officers. *Id.* at PageID 3455-3522.   Dr. Lee testified that the injuries she sustained to her neck, scalp, and forehead were atypical to a natural drowning event and were not attributable to medical intervention. *Id.*   Dr. Lee testified further that the bruising around Sarah Widmer's neck was caused by blunt force injury or a compressive force. *Id.*

76

The state also introduced evidence of Mr. Widmer's conflicting statements to various individuals.   For example, when Mr. Widmer called 911, he told the dispatcher that Sarah "falls asleep in the tub all the time." (Tr., ECF No. 21-2, PageID 2865-75)(Testimony of dispatcher Ron Kronenberger).   Mr. Widmer told the chief investigator for the Warren County Coroner's Officer that on the night of her death, when Sarah went upstairs to take a bath, he was afraid that she would fall asleep in the tub. *Id.* at PageID 3153-3185 (Testimony of Doyle Burke).   However, Mr. Widmer also told the investigator that Sarah had never fallen asleep in the tub before. *Id.* Additionally, Mr. Widmer told the dispatcher that he had found Sarah in the tub face-down. *Id.* at PageID 2865-2875 (Kronenberger testimony). Yet he told the emergency room charting nurse that he had found Sarah in the tub face-up. *Id.* at PageID 3144-52 (Testimony of Amy Costello). Finally, Mr. Widmer told the dispatcher that he had found Sarah in a bathtub full of water.   *Id.* at PageID 2865-2875 (Kronenberger testimony).   But the first responders who arrived at the Widmer home within minutes of Mr. Widmer's 911 call testified that Sarah's body was dry, the carpet in the area where Sarah was laying was generally dry, and that items laying on the bathroom floor were dry. *Id.* at PageID 2875-2905 (Testimony of Deputy Sheriff Steve Bishop); *Id.* at PageID 2956-2983 (Testimony of Firefighter/EMT Jeff Teague); *Id.* at PageID 2984-3001 (Testimony of Hamilton Township Police Sergeant Lisa Elliott).

Mr. Widmer introduced evidence to support his theory that the injuries Sarah Widmer sustained occurred during the attempts to resuscitate her, including the attempts to intubate her. For example, Dr. David Smile, an expert in emergency medicine, testified that injuries to the neck are common when the Sellick maneuver is used during difficult intubations. *Id.* at PageID 3681-3723.   Dr. Werner Spitz, an expert in pathology who reviewed relevant documents, testified that he would have not ruled Sarah Widmer's death a "homicide" but rather "undetermined"

77

because he could not rule out prolonged and vigorous cardiopulmonary resuscitation as the cause of her injuries. *Id.* at PageID 3541-3605.  Dr. Michael Balko, also a pathologist, testified that he too would have classified the cause of Sarah Widmer's death as "undetermined" rather than a "homicide" for the same reasons Dr. Smile identified. *Id.* at PageID 3724-3760.

In support of his argument that Ms. Widmer died accidently when she fell asleep in the bathtub, Mr. Widmer introduced testimony that Sarah was known to fall asleep at "odd times" and places including while in the bathtub, in a bar filled with talking people, and at a tailgate party. *Id.* at PageID 3606-3615 (Testimony of Sarah Widmer's friend Katherine Cook); *Id.* at PageID 3663-3669 (Testimony of Mr. Widmer's friend Zachary Zoz).  In support of his argument that Sarah Widmer's drowning death was the result of a previously unknown medical condition Mr. Widmer introduced evidence that Sarah had frequently complained of headaches and stomachaches. See, *e.g., Id.* at PageID 3523-3534 (Testimony of Sarah Widmer's friend Amy Karabaic).

First, the Court notes that while the state court did not specifically cite *Jackson*, *supra*, it applied an identical standard.  Specifically, the state appellate court stated that after reviewing the evidence, it "could not say that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed." *Widmer*, 2012-Ohio-4342, ¶ 100. The state court then reviewed the evidence and concluded that the "state presented testimony and evidence from which the jury could have found the essential elements of murder proven beyond a reasonable doubt." *Id.* at ¶¶ 101-109.

In view of this Court's review of the above referenced testimony, it cannot say that the state court of appeals erred.   The state presented evidence that Ms. Widmer's injuries were caused by blunt or compressive force.   Although Mr. Widmer presented evidence in an effort to rebut that

78

testimony, the jury was entitled to find the state's evidence more credible.   Having determined that the state's evidence was more credible and considering that Mr. Widmer and Sarah Widmer were the only people in the Widmers' home the night of Sarah's death, the jury could properly conclude that Mr. Widmer applied that blunt or compressive force intentionally causing Sarah Widmer's death.   The jury was entitled to consider the state's evidence of the conflicting statements Mr. Widmer gave to people following Sarah Widmer's death as well as the evidence that simply did not support Mr. Widmer's version of what occurred the night of her death.

This Court concludes that after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, *supra.*   Therefore, the state court's decision is not contrary to nor an unreasonable application of clearly established law.   Accordingly, Mr. Widmer's Fourth Ground for Relief should be rejected.

In his Fifth Ground for Relief, Mr. Widmer claims that his conviction is against the manifest weight of the evidence.   As noted, the state court addressed this claim together with Mr. Widmer's insufficient evidence claim.

In Ohio, a claim that a verdict is against the manifest weight of the evidence requires the appellate court to act as a thirteenth juror and to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (Ct. App. Hamilton Cnty., 1983); *State v. Moore*, No. CA2014-10-121, 2015 WL 3824377 at *2 (Ct. App. Warren Cnty., June 22, 2015).   "Ohio's 'manifest weight of the evidence' doctrine is a state law issue." *Hill v. Sheldon*, No. 1:11-CV-02602, 2014 WL 796803 at

*2 (N.D. Ohio, Feb. 27, 2014), *citing Nash v. Eberlin*, 258 F. Appx 761 (6th Cir. 2007); *see also*,

*Ob'Saint v. Warden, Toledo Correctional Inst.*, 675 F. Supp. 2d 827, 832 (S.D.Ohio 2009).

> As this Court recently stated:

>> Federal habeas corpus is available only to correct federal constitutional violations. 28 U.S.C. § 2254(a); *Wilson v. Corcoran*, 562 U.S. 1 … (2010); *Lewis v. Jeffers*, 497 U.S. 764, 780 … (1990); *Smith v. Phillips,* 455 U.S. 209 … (1982); *Barclay v. Florida*, 463 U.S. 939 (1983). "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 67-68 … (1991), A weight of the evidence claim is not a federal constitutional claim. *Johnson v. Havener,* 534 F.2d 1232 (6th Cir. 1986).

>> Therefore, Davis' Second Ground for Relief [manifest weight of the evidence claim] should be dismissed for failure to state a claim upon which habeas corpus relief can be granted.

*Davis v. Warden, London Correctional Inst.*, No. 1:14-cv-244, 2015 WL 3466857 at *5 (S.D. Ohio

June 1, 2015)(Merz, M.J.), Report and Recommendations adopted, 2015 WL 4112140 (S.D. Ohio

July 7, 2015).

Mr. Widmer's Fifth Ground for Relief, his claim that the verdict is against the manifest

weight of the evidence, is not cognizable in habeas and should be dismissed.

## SIXTH AND SEVENTH GROUNDS FOR RELIEF

Mr. Widmer's Sixth and Seventh Grounds for Relief involve the background of Lt. Jeff

Braley, a detective lieutenant for the Hamilton Township Police Department who investigated

Sarah Widmer's death.

In support of his Sixth and Seventh Grounds for Relief, Mr. Widmer argues that the state courts: (1) ruled contrary to clearly established U.S. Supreme Court precedent in concluding that the prosecutor must have actual knowledge of false testimony or undisclosed information in order to meet the *Napue* [*v. Illinois*, 360 U.S. 264 (1959)] standard or result in a due process violation; (2) unreasonably determined the facts in concluding that Lt. Braley testified to a lack of memory in the May 5, 2010, hearing and did not make any false statements, especially in light of its own prior decision on this matter; and (3) unreasonably applied or ruled contrary to clearly established federal law and unreasonably determined the facts when it concluded that Lt. Braley's testimony in the May 5, 2010, hearing pertained to a collateral matter and thus, could not amount to perjury due to the lack of "materiality" (Petition, ECF No. 1, PageID 100-29).   Mr. Widmer also argues that the state failed to disclose the various problems surrounding Lt. Braley's credibility, delayed its official DD&M investigation, and failed to disclose the results of the Hamilton Township Trustees' 2010 internal investigation of Lt. Braley, each resulting in *Brady* [*v. Maryland*, 373 U.S. 8 (1963)] and *Kyles v. Whitley* [514 U.S. 419 (1995)] violations and entitling him to relief. *Id.* at PageID 130-37.

In opposition, the Warden argues that to the extent that the state appellate court's decision relies on Ohio law, this Court is bound by the Ohio court's interpretation of state law (Return of Writ, ECF No. 22, PageID 10161-62).   The Warden also argues that *Brady* and *Napue* and their progeny all require a showing that the disputed evidence, that is, the evidence related to Lt. Braley's background, was material to Mr. Widmer's guilt or innocence, a showing which Mr. Widmer failed to make. *Id.*   The Warden argues further that the absence during trial of the evidence about Lt. Braley's background does not cast doubt on Mr. Widmer's conviction. *Id.*

In his Traverse, Mr. Widmer essentially argues that the evidence about Lt. Braley's

background, particularly his alleged perjured testimony during the May, 2010, hearing with respect to the job application and his alleged history of lying about his background and qualifications, was relevant to the integrity of the investigation into Sarah Widmer's death (Traverse, ECF No. 25, PageID 10230-36). Mr. Widmer's position is that the state courts failed to apply the proper *Napue* standard and that he was prevented from presenting a compelling *Kyles*-themed defense questioning the integrity of the investigation into Sarah Widmer's death. *Id.*

Mr. Widmer raised the issue of Lt. Braley's background in his direct appeal and the state court addressed it as follows:

[*P111] Assignment of Error No. 4:

[*P112] DUE PROCESS AND SIXTH AMENDMENT VIOLATIONS OCCURRED WHEN THE TRIAL COURT: (1) QUASHED THE DEFENSE SUBPOENAS SEEKING TO FURTHER INVESTIGATE LT. BRALEY'S BACKGROUND FOLLOWING THE MAY 5, 2010 HEARING; AND (2) DENIED THE JANUARY 2011 DEFENSE MOTION REQUESTING PERMISSION TO CONFRONT LT. BRALEY DURING TRIAL ABOUT HIS BACKGROUND.

[*P113] In his fourth assignment of error, Widmer contends that the trial court erred when it quashed the defense's subpoenas seeking to obtain further information about Lieutenant Braley's education and employment background and denied the defense motion to confront Braley during trial about his background. Widmer asserts that the trial court's actions in quashing the subpoenas and precluding cross-examination about Braley's background effectively denied him his right to present a "*Kyles* defense." Widmer further contends that the trial court's actions denied him his Sixth Amendment right to meaningfully confront witnesses who testify against him.

[*P114] In *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555 (1995), the United States Supreme Court reversed a murder conviction upon discovering that the state had withheld evidence in violation of *Brady v. Maryland,* 373 U.S. 8, 87, 83 S.Ct. 1197 (1963). The evidence withheld by the state included, among other things, inconsistent eyewitness statements and inconsistent statements

82

made by an "associate" of the defendant who allegedly had knowledge of the crime and access to the location where items taken from the victim were found. The Supreme Court held that disclosure of the withheld evidence undermined confidence in the outcome of the trial court and therefore made a different result reasonably probable. *Kyles* at 441. In reaching this determination, the Supreme Court noted that the withheld evidence would have "raised opportunities to attack not only the probative value of crucial physical evidence and the circumstances in which it was found, but the thoroughness and even the good faith of the investigation." *Id.* at 445. Furthermore, the Supreme Court stated that the evidence withheld denied the defense the ability to "undermine the ostensible integrity of the [police] investigation" and "[lay] the foundation for a vigorous argument that the police had been guilty of negligence." *Id.* at 447–448.

[**\*P115**] Relying on the Supreme Court's decision in *Kyles,* Widmer argues that the trial court should not have quashed the subpoenas or denied him the right to question Braley about his background at trial because information may have come to light that would have allowed Widmer to attack the thoroughness and good faith of the police investigation into Sarah's death. Specifically, Widmer contends the information that Braley lied [about] on an application for employment with Hamilton Township could have been used not only to attack Braley's credibility, but also as a means of "insert[ing] Braley's dishonesty into the case to challenge the integrity of: (1) the processing and collecting of evidence * * * including the * * * tub; (2) the Coroner's conclusion, given Braley's attendance and participation in the autopsy; and (3) the decision to charge Widmer, in which Braley participated."

[**\*P116**] We begin our analysis by determining whether the trial court properly granted the motions to quash the subpoenas duces tecum.

A.  Motions to Quash the Subpoenas Duces Tecum

[**\*P117**] Sometime prior to March 2010, the defense obtained a copy of a Hamilton Township Division of Fire and Emergency Services application form that had purportedly been completed by Braley and placed in his personnel file. The application form was dated June 25, 1996. This application form allegedly contained information about Braley's education and former employment experiences. With respect to the education portion of the form, the application indicated that Braley had received a master's degree

after completing two years of schooling at Wright State University and two years of schooling at a college in Florida. With respect to the employment experience portion of the form, the application indicated that Braley had been previously employed by General Electric, the United States Postal Service, the Loveland Heights Church of Christ, and Tufts Schildmeyer Funeral Home. The form stated that Braley had performed engineering work for General Electric from 1985 to 1993, had worked with the U.S. Postal Service as a postal inspector from 1993 to October 1995, had served as a minster for the Loveland Heights Church of Christ since October 1990, and had served as the Director of Aftercare Programs at Tufts since January 1996.

[*P118] Believing that some of the information contained on the application form had been fabricated by Braley, Widmer served subpoenas duces tecum on General Electric, the U.S. Postal Service, and Hamilton Township to obtain information about Braley's employment experiences. Both the state and Braley filed motions to quash the subpoenas. The trial court held a hearing on the motions to quash on April 28, 2010, and May 5, 2010. Among those who testified at the hearing were Melissa Brock, the Human Resources Manager for Hamilton Township, Chief Frank Richardson and Detective Paul Bailey of the Hamilton Township Police Department, Richard Shipp, a forensic document examiner, and Braley.

[*P119] Brock testified that she is the current custodian of personnel files for Hamilton Township. She further explained that the police department's personnel records were previously maintained by the chief of police. Brock stated that Braley's personnel file contained an original application for employment dated June 25, 1996. However, Brock admitted that there was no record of Braley being associated with Hamilton Township in 1996. Rather, records indicated that Braley was "brought into the township" in May 1997 as a volunteer chaplain for the fire department. Brock could not tell who authored the June 25, 1996 application.

[*P120] Brock also testified that over the past few years she had received numerous requests for copies of Braley's personnel file. Among those individuals who had requested and received a copy of Braley's file was former police chief Gene Duvelius, who left the department in 2005.

[*P121] Chief Richardson testified that he took over as chief of

police in 2005. He stated that animosity existed between Duvelius and Braley because Braley had investigated allegations of wrongdoing involving Duvelius. Richardson testified that he was aware that Duvelius asked Detective Bailey to investigate Braley's background, specifically whether Braley had been honorably discharged from his service with the United States Air Force.

[*P122] Bailey admitted that Duvelius asked him to do "some background investigation" into Braley's past. Specifically, Duvelius asked Bailey to look into Braley's pre-employment application because he did not believe Braley's military, education, and previous employment experiences were accurately detailed. Bailey testified that his investigation led to information that Braley had been honorably discharged from the Air Force.

[*P123] Braley testified that he first learned of "the existence of Hamilton Township" in 1997, a year after the June 25, 1996 application had been completed, when he took an unpaid, volunteer position as a chaplain for the fire department. He testified that he did not fill out an application for this position. The first time he became aware of the disputed June 25, 1996 application was in October 2008. Braley testified that although the signature on the application looks similar to his own signature, he did not recall signing the form. Further, he did not recall "at all" filling out the application. Braley stated that the form contains some accurate and inaccurate information. Braley testified that he did not have a master's degree and never attended a college in Florida. Further, while he had worked for the U.S. Postal Service, he was only employed by them for a few weeks and only as a clerk, not as an inspector. Braley also testified that he had not worked as an engineer with General Electric, but rather "ran C & C Machinery for an engineering group."

[*P124] Braley testified that he was aware that former police chief Duvelius felt animosity towards him due to his role in getting Duvelius terminated from the police force. Braley stated that he was asked to investigate Duvelius, and this investigation ultimately led to a federal lawsuit against Duvelius. Braley further testified that the reason he did not seek to clear up the existence of the June 25, 1996 application after having learned of its existence in 2008 was because doing so would have required him to go before the Hamilton Township Board of Trustees. By this time, Duvelius had been elected as a trustee. Braley testified that he did not think he could go before the trustees and request that the application be removed from his record because Duvelius had made public statements about

85

having him fired.

[*P125] Finally, Braley testified that he had undergone background checks that he knew he had passed. Braley testified that he passed an 11–month background check to receive national security clearance to be hired by the FBI's Cincinnati Field Office's task force.

[*P126] Shipp, a forensic document examiner who was retained to do a handwriting comparison and analysis, testified that he had compared the June 25, 1996 application to "known documents" containing Braley's handwriting. These known documents included: a sheet of paper from 2010 that Braley had written and printed his name on numerous times; a 2005 Loveland income tax return signed by Braley; a sofa express invoice signed by Braley; Braley's W–4's from 2000 and 2004; performance reviews from 2005 and 2007 signed by Braley; and an April 2002 employment verification request signed by Braley. Shipp testified that although he was able to do a comparison with the June 25, 1996 application, he was not satisfied with the quantity and quality of the "known documents" that he had for comparison with the application because the "known documents" did not have like words and letter combinations. Nonetheless, Shipp was able to reach the "probable opinion that [Braley] signed [the application]." However, Shipp's opinion was inconclusive as to whether Braley printed the information contained within the application. He stated, "I wasn't satisfied with enough agreement or differences to identify or eliminate [Braley] as the printer of that document and that's why I say I'm inconclusive."

[*P127] After hearing the foregoing testimony, the trial court granted Braley's and the state's motions to quash Widmer's subpoenas duces tecum. In reaching its decision, the court stated the following:

> Okay. I'm going to issue my ruling without argument and that is I'm going to sustain the motion[s] to quash. I feel that the application we're talking about is, first of all, it's 14 years removed, at best. If this was a criminal felony we couldn't get into it being more than ten years.
>
> It seems unlikely looking at the application for employment * * * that somebody would enhance his application on a non paid position over what it would be in seeking employment for a paid position and just there are significant questions as to the veracity outside of the fact that we get into a battle as we have for a full day that would be misleading to the jury,

86

and the court would make a determination that any probative value would be outweighed by undue prejudice.

What was the oft to be explored and we would require the prohibited induction of astringent evidence under 608, so I would grant the motion[s] to quash the various subpoenas that have been issued in the case * * *.

**[\*P128]** Crim.R. 17(C) confers upon the trial court the discretion to quash or modify a subpoena, on motion of a party, if compliance would be "unreasonable or oppressive." *State v. Baker,* 12th Dist. No. CA2009–06–079, 2010-Ohio-1289, ¶ 15. A trial court's decision on a motion to quash is reviewed for an abuse of discretion. *Id.* As previously stated, an abuse of discretion implies more than an error of law or judgment; it suggests that the trial court acted in an unreasonable, arbitrary, or unconscionable manner. *State v. Barnes,* 2011-Ohio-5226 at ¶ 23.

**[\*P129]** Pursuant to Crim.R. 17(C), when deciding a motion to quash a subpoena duces tecum prior to trial, a trial court must hold an evidentiary hearing. *Baker* at ¶ 21, citing *In re Subpoena Duces Tecum Served Upon Atty. Potts,* 100 Ohio St.3d 97, 2003-Ohio-5234, ¶ 16. At the hearing, the burden is on the proponent of the subpoena to demonstrate that the subpoena is not unreasonable or oppressive. *In re Potts,* 2003-Ohio-2534 at ¶ 16. The proponent accomplishes this by showing:

(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

*Id.,* quoting *United States v. Nixon,* 418 U.S. 683, 699-700, 94 S.Ct. 3090 (1974).

**[\*P130]** After a careful review of the record, we find that the trial court did not abuse its discretion when it granted the motions to quash Widmer's subpoenas. Widmer failed to demonstrate that the subpoenas were not unreasonable or oppressive as he did not show that the information sought was relevant and evidentiary. Braley's testimony that he had been unaware of Hamilton Township's

existence until 1997 when he took an unpaid, volunteer position as chaplain without having filled out an employment application, Brock's testimony that there was no record of Braley being associated with the township in 1996, and Shipp's testimony that he could not determine whether Braley printed the information contained within the June 25, 1996 application support the trial court's decision to quash Widmer's subpoenas. The trial court's determination that the disputed application (1) contained information that was more than 14 years removed, (2) was of unknown and questionable origin, and (3) was unlikely to lead to admissible evidence given the trial court's discretion under Evid.R. 608 to limit character evidence that would mislead the jury or cause confusion of the issues, was supported by the evidence and testimony presented at the evidentiary hearing. We therefore affirm the trial court's decision to grant the motions to quash Widmer's subpoenas duces tecum.

B.  Motion to Allow Confrontation of Braley

[*P131] On January 11, 2011, Widmer filed a "Motion to Allow Confrontation of Lead Investigator" seeking the right to confront and cross-examine Braley at trial with the June 25, 1996 application form found in his Hamilton Township personnel file. In his motion, Widmer stated that the Ohio Bureau of Identification and Investigation (BCI) had analyzed and compared the writing and signature on the June 25, 1996 application (item # 1) with known writing samples from Braley (item # 2) and concluded that Braley was the author of the application. BCI's report specifically stated as follows:

> Comparison of the questioned writing in item # 1 with the samples in item # 2 revealed that the writer of item # 2 filled in the application and signed the letter in item # 1.

> Instrumental analysis of the documents in item # 1 did not reveal evidence of an alteration or the presence of more than one ink pen to fill in the application. A lack of evidence does not prove that only one ink pen was used or that no alterations could have occurred, only that there is no evidence of an alteration.[FN8]

> FN8. BCI's report was not provided to the trial court by Widmer or the state. However, both parties quoted identical language to the trial court regarding BCI's analysis of the

June 25, 1996 application. The language quoted in the body of our decision is the same language quoted by Widmer in his Motion to Allow Confrontation of Lead Investigator, by the state in its Memorandum in Opposition to Defendant's Motion to Allow Confrontation of Lead Investigator, and by the trial court in its January 21, 2011 Order denying Widmer's Motion to Allow Confrontation of Lead Investigator.

Relying on BCI's report, Widmer claimed that the June 25, 1996 application was authenticated as having been filled out by Braley and was therefore admissible as a specific instance of conduct demonstrating Braley's character for untruthfulness, pursuant to Evid.R. 608(B). [FN9]

> FN9. In his Motion to Allow Confrontation of the Lead Investigator, Widmer also argued that the June 25, 1996 application was admissible as a party-opponent admission under Evid.R. 801(D)(2)(b). Widmer did not advance this argument in the present appeal. Even if he had, we find *State v. Stacy,* 12th Dist. No. CA2006–02–021, 2007-Ohio-6744, to be controlling. An admission or statement by a law enforcement officer is not admissible against the prosecution as an admission of a party-opponent. *Id.* at ¶ 14.

[**P132**] The state filed a memorandum opposing Widmer's request to allow cross-examination of Braley with the June 25, 1996 application form on the basis that the disputed document was of questionable authenticity and was not clearly probative for truthfulness under Evid.R. 608(B). The trial court issued a decision on January 21, 2011, denying Widmer's Motion to Allow Confrontation of Lead Investigator. In reaching its decision, the trial court determined the authenticity of the document remained in dispute and the document could not be introduced into evidence because Evid.R. 608(B) prevents a party from introducing extrinsic evidence to impeach a witness on a collateral matter not material to any issue in the trial. The trial court also determined that permitting cross-examination about the application would "evolve into a trial within a trial—a parade of witnesses, exhibits and thirteen years of events to attack or bolster the witness and/or the veracity of the document." The trial court ultimately concluded that any probative value derived from questioning Braley about the June 25, 1996 application was substantially outweighed by the danger of misleading the jury or causing confusion of the issues.

**[\*P133]** Whether a defendant is permitted to question a witness about prior instances of conduct pursuant to Evid.R. 608(B) is a decision that rests in the sound discretion of the trial court, and it will not be reversed absent an abuse of discretion. *State v. Moshos,* 12th Dist. No. CA2009–06–008, 2010-Ohio_735, ¶18. *See also State v. Cassano,* 96 Ohio St.3d 94, 2002-Ohio-3751, ¶ 45 ("The admission or exclusion of relevant evidence rests within the sound discretion of the trial court").

**[\*P134]** Evid.R. 608(B) provides in relevant part:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness \* \* \* may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness \* \* \*.

Under this rule, particular instances of conduct, though not the subject of a criminal conviction, may be inquired into on cross-examination of a principal witness. *State v. Miller,* 12th Dist. No. CA97-10-050, 1998 WL 468802, \*3 (Aug. 10, 1008), citing *State v. Williams,* 1 Ohio App.3d 156, 157 (10th Dist. 1981). However, "because the potential for abuse is high, through unfair prejudice, confusion of the issues, and misleading of the jury, safeguards are erected in the form of requiring that the instances inquired into must be *clearly* probative of truthfulness or untruthfulness." (Emphasis sic.) *Williams* at 157. [FN10] "Evid.R. 608(B) \* \* \* protects a legitimate state interest in preventing criminal trials from bogging down in matters collateral to the crime with which the defendant was charged." *Moshos,* 2010-Ohio-735 at ¶ 18.

> FN10. We note that Evid.R. 608(B) is nearly identical to Fed.R.Evid. 608(b). However, unlike the federal rule, Ohio Evid.R. 608(B) contains the word "clearly." Therefore, Ohio Evid.R. 608(B) "requires a high degree of probative value of instances of prior conduct as to truthfulness or untruthfulness of the witness before the court, in the exercise of its discretion, will allow cross-examination as to such prior conduct for purposes of attacking the credibility of the witness." Evid.R. 608, Staff Notes.

90

[*P135] In this case, under the totality of the circumstances, we are unable to say that the trial court abused its discretion in precluding the defense from questioning Braley about the June 25, 1996 application. The testimony sought to be elicited concerned a disputed application completed more than 14 years before trial. In attempting to ascertain the veracity of the application, the trial court held a two-day evidentiary hearing where more than ten witnesses testified about their knowledge of the application or their knowledge of Braley's employment background. At the conclusion of this hearing, the authentic nature of the application and the author of the application were questions that remained at issue. The BCI report, which indicated "[a] lack of evidence does not prove that only one ink pen was used or that no alterations could have occurred, only that there is no evidence of an alteration," did not resolve these issues. Whether Braley authored the 14–year–old fabricated application was an issue collateral to Widmer's murder trial, and exploration of this issue was likely to "bog down" the criminal trial and lead to confusion of the jury and misleading of the jury. See Evid.R. 403(A). [FN11] We therefore find that the trial court did not abuse its discretion in denying Widmer's Motion to Allow Confrontation of Lead Investigator.

> FN11. Evid.R. 403(A) mandates exclusion of relevant evidence where "its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

[*P136] We also find Widmer's argument that the trial court's decision not to allow cross-examination of Braley about the June 25, 1996 application violated his Confrontation Clause rights under the Sixth Amendment to be without merit. Contrary to Widmer's claim, a trial court's decision to exclude evidence with minimal probative value under Evid.R. 608(B), such as the case here, does not violate a defendant's Sixth Amendment rights. *See State v. Boggs,* 63 Ohio St.3d 418, 422 (1995); *State v. Moshos,* 2010-Ohio-735, ¶ 20; *State v. Rainey,* 2nd Dist. No. 23070, 2009-Ohio-5873, ¶ 22.

[*P137] Finally, we find that the trial court's decisions to quash Widmer's subpoenas duces tecum and deny Widmer's Motion to Allow Confrontation of Lead Investigator did not prohibit Widmer from presenting a "*Kyles* defense." Widmer had the opportunity to challenge the integrity of the police officers' investigation of Sarah's death by cross-examining Braley and other testifying officers about the processing and collecting of evidence from the crime scene as well as their role, if any, in the decision to charge Widmer with the

crime. Further, Widmer had the opportunity to question all three individuals who were present at the time of Sarah's autopsy, Braley, Burke, and Uptegrove, about the coroner's conclusion that Sarah's death was a homicide. The trial court's decision precluding the defense from questioning Braley about his employment background did not prevent the defense from questioning witnesses about Braley's role or "participation in the autopsy."

[*P138] Widmer's fourth assignment of error is therefore overruled.

*Widmer*, 2012-Ohio-4342.

Mr. Widmer again raised the issue of Lt. Braley's background in his post conviction

petition and the state appellate court addressed his claim as follows:

[*P4] We begin by discussing Widmer's arguments pertaining to Lieutenant Jeffrey Braley. A brief overview of Braley's involvement in the case is helpful to our analysis.

### B. Braley's Involvement in the Widmer Investigation

[*P5] On August 11, 2008, Lieutenant Jeff Braley, an officer with the Hamilton Township Police Department, arrived at the Widmer home as the ambulance transporting Sarah Widmer to the hospital departed from the scene. Upon arriving, Braley was briefed by the officers who had initially responded, and was given a tour of the home by Officer Quillan Short. After the walk-through, Braley collected and processed evidence in the home alongside Officer Short.

[*P6] During the first trial, Braley testified on behalf of the prosecution regarding his participation in the investigation and the collection of evidence. However, following Widmer's conviction in June 2009, a new trial was granted after it was discovered that jury members improperly discussed matters regarding the length of time it took to dry after bathing.

[*P7] While preparing for the second trial, the defense obtained copies of a Hamilton Township employment application form dated June 25, 1996, and a resume letter, each bearing the signature "Jeffrey A. Braley." Believing that the documents contained some inconsistencies in Braley's credentials, the defense subpoenaed Braley's personnel files from his prior employers to confirm that the

92

information in the application and resume letter was accurate. At that time, the defense subpoenaed records from General Electric, the United States Postal Service, and Hamilton Township. Both Braley and the state moved to quash the subpoenas.

[*P8] On May 5, 2010, the trial court held a hearing on the motions to quash, at which time the defense confronted Braley on the employment application.[FN1]

> FN1. Widmer did not confront Braley with the resume letter during the hearing, and did not seek to do so in subsequent pretrial motions. However, because Widmer incorporates the resume letter into his first and second assignments of error, we will refer to the resume letter to the extent necessary to address his arguments.

[*P9] During the hearing, Braley testified that the June 25, 1996 date on the application was incorrect, because he did not learn of the "existence of Hamilton Township" until 1997, when he took an unpaid, volunteer position as chaplain for the township's fire department. Braley stated that he did not fill out an application for the position. Braley further testified that although the signature on the application looked similar to his own signature, he did not recall signing the form, and did not recall "at all" filling out the application.

[*P10] At that point, Braley examined the application and pointed out the mistakes in his credentials. First, Braley indicated that the "Education" section of the form incorrectly stated that he had a master's degree and that he had attended a college in Florida. Braley also explained that the application was incorrect as to his time spent working for the U.S. Postal Service. Rather than working as a postal inspector for two years, Braley clarified that he had only worked as a clerk for six to eight weeks. Braley also testified that he never worked as an engineer for General Electric, but rather "ran C & C Machinery for an engineering group."

[*P11] Following the hearing, the trial court granted Braley's and the state's motions to quash. The court reasoned that the authenticity of the employment application remained questionable, and that further inquiry into the matter would be misleading to the jury and would result in undue prejudice. *See* Crim.R. 17(C); Evid.R. 403(A) and 608(B). As a result, Widmer was denied all use of the application during the second trial.

[*P12] Following a mistrial, a third trial was scheduled for January 2011. Prior to that time, Widmer obtained a copy of a forensic analysis report performed on the employment application by the Ohio Bureau of Criminal Identification and Investigation (BCI report). The BCI report compared the application with known samples of Braley's handwriting and found,

> Comparison of the questioned writing in item # 1 with the samples in item # 2 revealed that the writer of item # 2 filled in the application and signed the letter in item # 1.

> Instrumental analysis of the documents in item # 1 did not reveal evidence of an alteration or the presence of more than one ink pen to fill in the application. A lack of evidence does not prove that only one ink pen was used or that no alterations could have occurred, only that there is no evidence of an alteration.

[*P13] As a result of this information, Widmer filed a "Motion to Allow Confrontation of Lead Investigator," seeking to confront Braley with the false statements in the application at the third trial. Widmer argued that he had the right to impeach Braley's credibility with the false application, as well as the right to present an alternate defense strategy focused on Braley's dishonesty during the investigation.

[*P14] On January 21, 2011, the trial court denied Widmer's motion. The court found that the authenticity of the application remained in dispute, because the BCI report could not rule out the possibility of an alteration. The court also found that Evid.R. 608(B) would forbid the use of extrinsic evidence during trial to impeach Braley on a "collateral matter," and that cross-examination on the application would simply evolve into an impermissible "trial within a trial * * *." The court concluded that Braley had testified at two prior trials and that Braley's activities during the investigation were well known to the defense and were open to verification.

[*P15] Following his conviction and direct appeal, Widmer moved for postconviction relief, arguing that since *Widmer I,* he had discovered additional evidence withheld by the state, which proved that Braley had, in fact, authored the employment application, and therefore committed perjury during the May 5, 2010 hearing when he denied completing the form. Widmer also claimed that he had since unearthed additional evidence of misconduct relevant to the case against him. The purportedly new evidence was contained in a

report prepared by the law firm of Donnellon, Donnellon & Miller (DD&M report). Widmer also submitted a "supplementary" affidavit prepared by Dennis Waller, an expert in police practices, which outlined the impact of Braley's alleged misconduct on the police investigation.

## C. The New Evidence

### 1. The DD&M Report

[*P16] On February 16, 2011, the day after Widmer's conviction, the Hamilton Township Trustees hired Douglas Miller with DD&M to investigate Braley's personnel files, including the 1996 employment application and the resume letter. Miller was also told to expand his investigation to Braley's entire employment history to find any additional evidence of misconduct. On June 1, 2011, Miller issued a report outlining his findings.

[*P17] Miller first compared the 1996 employment application bearing Braley's name to other applications in the township's files that also appeared to have been processed in the mid–1990s. After reviewing the applications and questioning various members of the township, Miller could find no evidence that the application, along with the resume letter, were "anything other than what they appear[ed] to be," and concluded that there was no evidence that the documents were created "at the time of the Widmer trials." Miller also spoke to former Police Chief Eugene Duvelius and former Fire Chief Goebel Williams about the application. Both men told Miller that no one at the township had relied on any information in the application in hiring Braley in the department.

[*P18] Miller next interviewed various members of the township's police department about Braley's conduct prior to becoming a police officer. In speaking with several officers, Miller learned that Braley had, in the past, stated that he was a member of the Special Forces unit in the military. Additionally, according to former Chief Duvelius, Braley's Special Forces experience earned him a lead position in the township's tactical police raid unit, "THOR," in 2002 or 2003. However, Miller discovered that Braley did not have any Special Forces experience, and that Braley actually began serving in THOR as a civilian, but was commissioned as a police officer prior to the disbanding of the unit. Miller concluded that while it was potentially risky to have a civilian in charge of THOR, Braley did not subject the township to any liability while serving in that capacity. When Miller ultimately spoke to Braley about the Special

95

Forces allegations, he denied ever telling such a story to his fellow officers.

[*P19] Pursuant to the township's request, Miller then summarized the impact of Braley's prior misconduct on his police career, stating,

> Both the incidents of the Application and Resume Letter along with the actions in acquiring the status of leader of the THOR team occurred somewhat in the past. It appears to be evident that any of those documents and actions have not had any particular impact on the Township. It does not appear that anyone at the Township ever relied on either the Application or Resume Letter in any hiring or promotional decisions regarding Lt. Braley. Neither did his status as leader of the THOR team subject the Township to any actual liability * * *. However, his denial of all these matters at the current time raises an issue for the Trustees' consideration of his honesty. * * * Again, a faulty memory on his part might be excusable given that the incidents occurred so long ago. However, Lt. Braley flatly states that he never made any statement that he was in the Special Forces. For these reasons, it appears to me that there is evidence for the Township to move forward with a pre-disciplinary hearing with regard to the Application and Resume Letter, the statements regarding his involvement in Special Forces while in the military, and his denial of those matters in the course of the investigation.

## C.  Waller Affidavit

[*P20] After receiving a copy of the DD&M report, Widmer hired Dennis Waller, an expert in police policy, procedure, and practice to render an opinion as to Braley's impact on the murder investigation and the prosecution of Widmer. In his report, Waller classified Braley as an "opportunist without substance in a police department without established standards, [who] * * * would not have obtained this particular position [as lieutenant] without the false statements that he made about his background."

[*P21] Waller then opined that Braley lied about his credentials to obtain a position where he could "exert undue influence and be perceived as having credibility far exceeding his actual expertise, education, and ability." Waller also found that Braley placed undue influence on the Warren County Coroner, Dr. Russell Uptegrove, to

make a finding that the cause of Sarah's death was a homicide. Toward the end of his affidavit, Waller added that "[a]n opportunist, such as Lt. Braley, could have, deliberately or inadvertently, created markings which could have inappropriately been given consideration in assessing a scene for evidence."

[*P22] Waller concluded,

> In order to make a proper decision in this case as to guilt, jurors would need to know about Braley's false statements, his lack of experience, and his lack of qualifications to properly understand how these factors likely tainted the entire investigation and prosecution in a "garbage in, garbage out" sequence. A person in law enforcement who made blatantly false and opportunistic statements in a manner consistent with what Braley did here, once it was known, would have serious credibility problems among personnel in law enforcement, the criminal justice system, and the Coroner's office.

[*P23] Assignment of Error No. 1:

[*P24] THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT CONCLUDED: (1) THAT THE STATE HAD NO KNOWLEDGE OF MATERIAL INFORMATION THAT IT WITHHELD FROM THE DEFENSE; AND (2) THAT THE WITHHELD EVIDENCE PERTAINED TO A COLLATERAL MATTER ABOUT WHICH BRALEY NEVER TESTIFIED FALSELY, THUS EVEN IF DISCLOSED, IT WOULD NOT HAVE AFFECTED THE OUTCOME OF WIDMER'S TRIAL.

[*P25] Assignment of Error No. 2:

[*P26] THE TRIAL COURT ABUSED ITS DISCRETION AND RULED CONTRARY TO CLEARLY ESTABLISHED U.S. SUPREME COURT PRECEDENT BY: (1) CONCLUDING THAT WIDMER'S POST–CONVICTION PETITION FAILED TO POINT OUT MATERIAL INFORMATION KNOWN TO THE STATE THAT WAS WITHHELD FROM THE DEFENSE PRIOR TO OR DURING TRIAL; AND (2) IGNORING WIDMER'S DUE PROCESS AND CONFRONTATION CLAIMS WHEREIN HE CONTENDS THAT, DUE TO THE STATE'S FAILURE TO DISCLOSE THE INFORMATION ABOUT BRALEY CONTAINED IN THE DD&M REPORT, HE WAS DENIED THE ABILITY TO RAISE A *KYLES V. WHITLEY*

97

DEFENSE AT TRIAL CHALLENGING THE INTEGRITY OF THE STATE'S INVESTIGATION AND CONFRONTING BRALEY ABOUT THE INFORMATION CONTAINED IN THE DD&M REPORT.

[*P27] For ease of analysis, we will combine Widmer's first and second assignments of error. Widmer argues that the trial court erroneously denied his petition for postconviction relief, where the state knowingly presented Braley's false testimony about the employment application in violation of *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173 (1959), and withheld exculpatory evidence and impeachment material contained in the DD&M report in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194 (1963).

## II. *NAPUE* AND *BRADY* ANALYSIS

### A. Standard of Review

[*P28] In reviewing an appeal of postconviction relief proceedings, this court applies an abuse of discretion standard. *State v. Wagers,* 12th Dist. No. CA2011–08–007, 2012–Ohio–2258, ¶ 15. A reviewing court should not overrule the trial court's findings on a petition for postconviction relief that is supported by competent and credible evidence. *State v. Gondor,* 112 Ohio St.3d 377, 2006–Ohio–6679, ¶ 58. "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Id.* at ¶ 60.

### B. General Principles

[*P29] The crux of Widmer's arguments begins with *Brady v. Maryland,* in which the Supreme Court of the United States held that due process requires the prosecution to provide the defense with any evidence favorable to the accused that is material either to guilt or punishment. *Brady,* 373 U.S. at 87–88.The Supreme Court subsequently held that the government's *Brady* obligation includes evidence affecting a government witness's credibility. *See Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763 (1972).

[*P30] The Supreme Court repeatedly has emphasized that,

> [t]he *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the

98

prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial * * *.

*United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375 (1985).

[*P31] Since establishing the *Brady* rule, the Court has adhered to its subsequent statement that "[t]here is no general constitutional right to discovery in a criminal case, and *Brady* did not create one * * *." *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837 (1977). In fact, the Court has explained that the basis for the *Brady* rule, "the Due Process Clause * * * has little to say regarding the amount of discovery which the parties must be afforded * * *."*Wardius v. Oregon,* 412 U.S. 470, 474, 93 S.Ct. 2208 (1973).

[*P32] Thus, the *Brady* doctrine, in its purest form, is the rule of law that the Due Process Clause is violated when the government achieves a conviction through the use of perjured testimony, *e.g., Napue,* or by withholding a confession of guilt by someone other than the accused, *e.g., Brady,* or by withholding evidence "so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce,"*e.g., United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392 (1976)."The doctrine evolved out of the tenet of constitutional law that it is fundamentally unfair for the government to obtain a conviction in such circumstances, regardless of whether the government suppressed the evidence knowingly or unknowingly." *United States v. Presser,* 844 F.2d 1275, 1281 (6th Cir.1988). However, "unless the omission deprived the defendant of a fair trial, there [is] no constitutional violation requiring that the verdict be set aside * * *."*Id.,* quoting *Agurs,* 427 U.S. at 108.

[*P33] Accordingly, the obligation *Brady* imposes on the government is "the obligation to turn over evidence in its possession that is *both* favorable to the accused and material to guilt or punishment." *Presser,* 844 F.2d at 1281 (emphasis sic.), quoting *Pennsylvania v. Ritchie,* 480 U.S. 39, 57, 107 S.Ct. 989 (1987). In a footnote to *Agurs,* the Supreme Court dismissed an argument that the definition of material evidence under the *Brady* rule should "focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial, rather than the materiality of the evidence to the issue of guilt or innocence." *Agurs,* 427 U.S. at 112, fn. 20.The Court stated,

[s]uch a standard would be unacceptable for determining the

materiality of what has been generally recognized as "*Brady* material" for two reasons. First, that standard would necessarily encompass incriminating evidence as well as exculpatory evidence, since knowledge of the prosecutor's entire case would always be useful in planning the defense. Second, such an approach would primarily involve an analysis of the adequacy of the notice given to the defendant by the State, and it has always been the Court's view that the notice component of due process refers to the charge rather than the evidentiary support for the charge.

*Id.*

[*P34] In the present appeal, Widmer claims that the state violated both *Brady* and *Napue* at his trial. Although the two claims are related, each claim is different and has its own materiality standard.

[*P35] Where there has been a suppression of favorable evidence in violation of *Brady,* the undisclosed evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley,* 473 U.S. at 682.

[*P36] A different and more defense-friendly materiality standard applies under *Napue.* In cases where the prosecutor knowingly uses perjured testimony, or fails to correct what he subsequently learns was perjury, the falsehood is deemed to be material "if there is any reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Agurs,* 427 U.S. at 103 (emphasis added.); *Napue,* 360 U.S. at 271.

[*P37] We will proceed with each of these claims in turn.

### C. *Napue v. Illinois*

[*P38] To establish a *Napue* claim, a defendant must show that: (1) the statement was actually false, (2) the statement was material, and (3) the prosecution knew it was false. *See, e.g., Coe v. Bell,* 161 F.3d 320, 343 (6th Cir.1998). "The burden is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." *Id. See also State v. Iacona,* 93 Ohio St.3d 83, 97 (2001). As discussed, a false statement is material under this standard, "'if the false testimony could * * * in any reasonable

likelihood have affected the judgment of the jury * * *.' " *Giglio,* 405 U.S. at 154, quoting *Napue,* 360 U.S. at 271.*See also Keenan v. Bagley,* 1:01 CV 2139, 2012 WL 1424751 (N.D.Ohio Apr. 24, 2012). Typically, false testimony or evidence introduced by a law enforcement officer is imputed to the state.[FN2] *See Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police").*See also Boyd v. French,* 147 F.3d 319, 329–330 (4th Cir.1998) ("knowingly false or misleading testimony by a law enforcement officer is imputed to the prosecution").

> FN2. Widmer argues that the trial court erred in refusing to impute knowledge of Braley's false testimony to the prosecution. It does not appear that the trial court specifically did or did not do so. Instead, the trial court focused on the fact that Widmer failed to provide any evidence of false testimony, which is a separate requirement under *Napue.* However, even if we were to agree with Widmer and impute knowledge to the state, we would still be required to find that he satisfied the remaining two *Napue* prongs before he would be entitled to relief. *See also Brady* analysis, *infra.*

## 1. False Testimony

[*P39] Here, Widmer claims that the evidence discovered since the May 5, 2010 hearing, namely, the BCI report and the DD&M report, demonstrates that Braley authored the 1996 employment application, and therefore committed perjury during the hearing when he "expressly and unambiguously disavowed" the application. We disagree.

[*P40] Even if we assume, for the sake of argument, that these documents conclusively establish that Braley authored the application, Widmer has not shown that Braley's testimony about the application qualifies as "actually false."[FN3] *See Coe,* 161 F.3d at 343; R.C. 2921.11(A). It is true that during the early stages of the May 5, 2010 hearing, Braley wavered between whether he actually completed the application and whether he simply could not "recall" doing so. However, Braley subsequently indicated that he could not recall "at all" filling out the application. Braley reiterated this point on cross-examination:

> FN3. In reality, it is questionable that the BCI report and the

101

DD&M report actually show that Braley authored the employment application. As we noted in *Widmer I,* the BCI report did not resolve the issues pertaining to the application's authenticity, and could not rule out the possibility of an alteration. The DD&M report also sheds very little light on these matters. First, Miller's finding that the application was not "anything other than what [it] appear[ed] to be" is vague and does not conclusively identify Braley as the author of the application. The same can be said for Miller's finding that there was no evidence that the application was created "at the time of the Widmer trials." This does not rule out other time periods between 1996 and 2009. Further, the fact that Braley may have denied filling out the application to Miller in 2011 does not show that Braley committed perjury during the May 5, 2010 hearing. Braley was not under oath when he spoke to Miller. Also, Miller's conclusion that Braley "testified under oath that he did not fill out the Application" is not a foregone conclusion, but simply another interpretation of the testimony at the May 5, 2010 hearing.

[DEFENSE]: And I find it here, you're asked about E–1 and we'll go with E–1, which is the three page application. You were asked did you fill out this application?

[BRALEY]: Yes sir, that's correct.

[DEFENSE]: And your answer was you don't recall filling it out?

[BRALEY]: I don't recall ever filling out an application, but I know I did not fill this out.

[DEFENSE]: So your testimony is not that you can't remember filling it out but you never filled it out?

[BRALEY]: No.

[DEFENSE]: And if you flip to Page 2, same question. You said you don't recall filling that out?

[BRALEY]: That is correct.

[DEFENSE]: And with respect to Page 3, same question. You don't recall filling that out?

102

[BRALEY]: That's correct.

[*P41] At most, Braley's testimony demonstrates some inconsistencies in the record. However, "mere inconsistencies in testimony do not establish the knowing use of false testimony by the prosecutor." *Monroe v. Smith,* 197 F.Supp.2d 753, 762 (E.D.Mich.2001), citing *United States v. Lochmondy,* 890 F.2d 817, 822 (6th Cir.1989).*See also Coe,* 161 F.3d at 343. Here, the passage of 14 years between Braley's alleged completion of the application and his testimony surely depleted Braley's memory on the issue to some extent. *See, e.g., Newsome v. Ryan,* S.D.Cal. No. 05CV1534IEG(RBB), 2007 WL 433282, * 26 (Jan. 24, 2007). Moreover, the fact "that a witness contradicts [himself] or changes [his] story also does not establish perjury."*Monroe* at 762. Upon review, we cannot say that the contradictions in Braley's testimony during the May 5, 2010 hearing amounted to perjury. [FN4]

> FN4. Widmer also claims that the trial court erred in deciding that "only false testimony before a jury can constitute material perjury under *Napue*." The trial court did no such thing. Instead, after addressing the truth or falsity of Braley's testimony during the May 5, 2010 hearing, the court made an additional finding that there was no evidence of perjury during trial.

## 2. Materiality

[*P42] Even if Braley's testimony can be construed as perjury, Widmer fails to demonstrate that the perjury was "material." As we noted, the standard for materiality under *Napue* is whether the false testimony could, in any reasonable likelihood, have affected the judgment of the jury. *Napue,* 360 U.S. at 271.Widmer claims that Braley's perjury was material as it related to his trial strategy and the impeachment of Braley. [FN5]

> FN5. Widmer also claims that Braley's perjury materially impacted the course of litigation, because it caused the trial court to: (1) quash his subpoenas for Braley's employment records, and (2) deny his motion to confront Braley with the application at the third trial. First, this argument is highly speculative and focuses on the trial court's judgment, rather than the jury's. Further, as we will discuss later, the information allegedly withheld as a result of Braley's alleged perjury is collateral to, and is not probative of, the issues at trial. As this was already the primary basis for the trial

court's decisions, there is no reasonable likelihood that the additional information could have changed the court's mind, or that the information would have added merit to Widmer's arguments before this court in *Widmer I. See Widmer I,* 2012-Ohio-4342 at ¶ 136.

### a. *Kyles* Defense Strategy

[*P43] Widmer first claims that Braley's perjury denied him of his right to present an alternate defense strategy, which he calls his "*Kyles v. Whitley* defense."

[*P44] In *Kyles,* the United States Supreme Court reversed a murder conviction upon discovering that the state had withheld evidence in violation of *Brady. Kyles,* 514 U.S. at 422. The evidence withheld by the state included, among other things, inconsistent eyewitness statements and inconsistent statements made by an "associate" of the defendant who allegedly had knowledge of the crime and access to the location where items taken from the victim were found. The Court held that the disclosure of the withheld evidence undermined confidence in the outcome of the trial and therefore made a different result reasonably probable. *Id.* at 441. In reaching this determination, the Court found that the withheld evidence would have "raised opportunities to attack not only the probative value of crucial physical evidence and the circumstances in which it was found, but the thoroughness and even the good faith of the investigation." *Id.* at 445. Furthermore, the Court stated that the evidence withheld denied the defense the ability to "undermine the ostensible integrity of the [police] investigation" and "[lay] the foundation for a vigorous argument that the police had been guilty of negligence." *Id.* at 447–448.

[*P45] Here, Widmer asserts that if Braley had admitted to falsifying the employment application during the May 5, 2010 hearing, the defense could have discovered the information in the DD&M report in time to prepare a *Kyles* defense, focusing on the impact of Braley's incompetence and dishonesty on the integrity of the investigation, specifically: (1) the processing and collecting of evidence, including the bathtub, (2) the decisions on what evidence not to collect, (3) the decision to charge Widmer, in which Braley allegedly participated, and (4) the coroner's conclusion, given Braley's attendance and alleged participation in the autopsy.

[*P46] Initially, we reiterate that the Supreme Court has rejected a standard of materiality that focuses on the accused's ability to

prepare for trial. *See Agurs,* 427 U.S. at 112, fn. 20. *See also State v. Brown,* 115 Ohio St.3d 55, 2007–Ohio–4837, ¶ 49 ("[a]s a rule, undisclosed evidence is not material simply because it may have helped the defendant to prepare for trial"); *Joseph v. Coyle,* 469 F.3d 441, 473, fn. 23 (6th Cir. 2006). The vast majority of Widmer's brief discusses how the perjury was material to his *Kyles* strategy and trial preparation, rather than his guilt or innocence. These arguments are not within the protected scope of *Napue* and *Brady.* However, in an abundance of caution, we will review Widmer's *Kyles* claim to the extent that it is properly viewed as a materiality argument, rather than an argument that another trial strategy might have fared better with the jury. *See United States v. Parks,* 30 Fed.Appx. 534 (6th Cir. 2002). *See also United States v. Angel,* 355 F.3d 462, 475 (6th Cir. 2004) (rejecting petitioner's claim that the alleged perjured testimony "could have affected the jury's verdict," where the testimony was presented to the grand jury but not offered at trial); *United States v. Harmon,* N.D.Cal. No. CR 08–00938 JW, 2011 WL 7937876 (Aug. 18, 2011) (declining to apply *Napue* to allegedly perjured testimony offered before a grand jury).

**[\*P47]** To analyze materiality under *Napue,* we must identify the body of evidence that Widmer argues was suppressed or made the subject of Braley's false testimony. *See Agurs,* 427 U.S. at 112; *United States v. McCarty,* 177 F.3d 978 (5th Cir. 1999). Widmer claims that the *Napue* error arises out of Braley's false testimony during the May 5, 2010 hearing that he did not fill out the 1996 employment application. Widmer claims that the new evidence in the BCI report and the DD&M report collectively demonstrates that Braley did, in fact, fill out the application. Widmer argues that the state capitalized on Braley's false testimony to conceal additional evidence of Braley's misconduct also revealed by the DD&M report, which Widmer could have used to substantiate his *Kyles* defense.

**[\*P48]** For ease of analysis, we will address the various portions Widmer's *Kyles* claim separately.

### (1) Braley's Qualifications as a Lieutenant Detective

**[\*P49]** While Braley's police qualifications are not an independent subsection of Widmer's *Kyles* argument, we find it prudent to address the issue separately, where Widmer continually asserts that knowledge by the jury that Braley lacked his stated credentials could have affected the jury's view of the "integrity" of the investigation and therefore the verdict. *Kyles,* 514 U.S. at 447–448;

*Napue,* 360 U.S. at 271.

[**\*50**] On numerous occasions throughout the appeal, Widmer argues that the information in the DD&M report shows that Braley lied during his career to obtain positions for which he was "grossly unqualified," including his position as lieutenant detective in the Hamilton Township Police Department. Widmer thus contends that with an inexperienced officer at the helm of the police department, the entire investigation into Sarah's death was ruined, or was at least negligently conducted.

[**\*P51**] In support of his claim, Widmer relies primarily on the Waller affidavit, which states that "[t]he positions held by Braley and his credibility, were in significant part due to how he presented his background and experience," and "[i]t would be highly unusual if not unheard of for someone with [Braley's] actual level of experience to be in a position of that nature."

[**\*P52**] Upon review, we find that Waller's affidavit simply recasts the information discovered by DD&M in a different light to allow Widmer to insert a disingenuous, last minute attack on Braley's police qualifications into this appeal. Waller's interpretation of the information is especially implausible, given his inability to identify which of Braley's specific activities were so egregious as to evince incompetence, as well as his failure to explain what an adequately trained police officer in Braley's position would have done.

[**\*P53**] Further, contrary to Waller's opinion, the DD&M report specifically found that none of Braley's superiors hired him based on the falsehoods in the employment application or the resume letter. Thus, it is clear that Braley's alleged misconduct, including falsifying the 1996 employment application, had no bearing on the issues of whether he was qualified to be a lieutenant detective and whether he was capable of properly handling the Widmer investigation.

[**\*P54**] Accordingly, insofar as Widmer claims that the newly discovered evidence on Braley's lack of certain credentials was material to discrediting the integrity of the investigation under a *Kyles* defense, this argument can be laid to rest. *See State v. Hollon,* 12th Dist. No. CA90–03–029, 1991 WL 7938, * 2 (Jan. 28, 1991).

## (2) The Collection and Processing of the Evidence

[**\*P55**] In his first true *Kyles* argument, Widmer claims that the state

knowingly suborned Braley's perjury to conceal the impact of Braley's fraudulence on the collection and processing of the evidence. This argument lacks merit.

[*P56] Upon review, there is simply no reasonable likelihood that the jury's view of the evidence was improperly skewed as a result of not knowing that Braley may have lied about some of his qualifications in the past. As discussed, any false credentials attributed to Braley had absolutely nothing to do with his position in the police department, let alone his involvement in the Widmer investigation or his access to the evidence. The impact of Braley's alleged perjury is even less significant in light of the abundance of testimony from other officers about the evidence. Further, even without the information in the DD&M report, the defense had ample opportunity to cross-examine Braley and other testifying officers about the orders that Braley gave at the scene, as well as his handling of the evidence. Similarly, nothing prevented Widmer from asking Braley additional questions about his actual training and experience in collecting evidence, dusting for fingerprints, and managing a crime scene investigation.

### (a) Processing the Evidence in the Bathtub

[*P57] As a sub-argument, Widmer claims that without the information in the DD&M report, the defense was unable to show that Braley should not have been trusted with the preservation of the bathtub during the investigation. Based on the findings in the DD&M report, Widmer now believes that Braley either: (1) inadvertently altered evidence in the tub, due to his lack of qualifications, or (2) purposefully contaminated the tub while it was in police custody, due to his tendency to "fabricate facts to advance his career * * *." We also reject this argument.

[*P58] As an initial matter, the jurors had already heard testimony from multiple witnesses that the evidence from the tub had changed while it was in police custody, and had apparently rejected the idea of police contamination.

[*P59] First, Danny Harness, a latent fingerprint examiner from the Miami Valley Regional Crime Lab, testified that when he processed the tub shortly after Sarah's death in August 2008, he used fingerprint testing methods that would have left a semi-permanent residue on the tub. Harness also stated that he could not find any fingerprints sufficient for a detailed analysis or comparison to known individuals.

[\*P60] The state's second fingerprint witness, William Hillard, testified that three months after Sarah's death, he was called to examine the tub at the Hamilton Township police station. When Hillard arrived at the police station, he explained that Braley took him to the evidence room to see the tub. After his initial examination, Hillard stated that he could not find any evidence that the tub had been processed several months earlier. Additionally, unlike Harness, Hillard found a fairly detailed set of fingerprints on the tub. Finally, Hillard testified that when he examined the tub at the police station for a second time, he observed additional dusting powder on the corners of the tub that he had not seen before. [FN6]

> FN6. In a lengthy, two page footnote, Widmer also argues that the DD&M information was critical to launching a successful attack on the admissibility of Hillard's testimony in *Widmer I,* based on a theory that Braley, a "serial liar," added fingerprints to the tub prior to Hillard's examination, and therefore manipulated Hillard's findings. *See* Evid.R. 702(C). However, we need not address this argument, because Widmer did not raise it in his postconviction petition before the trial court. *See State v. Houser,* 4th Dist. No. 03CA7, 2003–Ohio–6461, ¶ 13; *State v. Garrett,* 7th Dist. No. 06 BE 67, 2007–Ohio–7212, ¶ 8 ("in viewing the merits of an appellant's [postconviction relief] petition, the appellate court can only address those arguments presented to the trial court in the original petition; any new arguments cannot be considered for the first time on appeal"). *See also State v. Webb,* 2nd Dist. No. 06–CA–1694, 2007–Ohio–3446, ¶ 1; *State v. McNeill,* 137 Ohio App.3d 34, 44 (9th Dist.2000). In any event, Braley's alleged misconduct of falsifying the employment application and fabricating his credentials would not have been probative of the accuracy of Hillard's testimony, as this evidence remained completely unrelated to Braley's involvement in the investigation or his handling of the evidence.

[\*P61] From this testimony, Widmer could have asked Hillard whether, in his 20 years of experience, such changes in the condition of the tub were suspicious or out of the ordinary, but chose not to. Further, the jury could have easily speculated that police officers with access to the tub, including Braley, were responsible for the changes in its condition while it was in police custody. While it is not dispositive, we also note that the defense's unawareness of Braley's alleged falsehoods did not prevent it from raising

chain-of-custody issues with the witnesses. During trial, the defense asked both Harness and Hillard if they knew whether the tub was in proper police custody throughout the course of the investigation, and gave pointed questions highlighting the possibility of contamination for the jury.

[*P62] Upon review, we find that the state's alleged withholding of the information in the DD&M report did not impact the jury's impression of the reliability of the evidence against Widmer, including the bathtub. The undisclosed evidence in the DD&M report shows, at most, that Braley fabricated credentials for jobs ten to 14 years ago and that he later denied doing so. While disclosing this information may have embarrassed Braley as a high-ranking police officer, it was hardly material to the ultimate issue of whether the evidence was sufficient to prove that Widmer murdered Sarah. Once again, the Waller affidavit does not convince us otherwise. We have already found that Waller's opinions are disingenuous and are devoid of evidentiary value. Thus, it is not significant that Waller concluded that "[a]n opportunist, such as Lt. Braley, could have, deliberately or inadvertently, created markings which could have inappropriately been given consideration in assessing a scene for evidence." This is nothing more than conjecture, and it invades the province of the jury by essentially commenting on the credibility of Hillard's expert testimony as to the value of the fingerprints that he discovered on the bathtub. *See State v. Selvage,* 12th Dist. No. CA2011–08–058, 2012–Ohio–2149, ¶ 11 ("[a]cting as the trier of fact, the trial court is in the best position to resolve factual questions and evaluate witness credibility").[FN7]

> FN7. One of the most significant problems Widmer has had on this appeal was his lack of ability to connect the relationship between Braley's alleged misrepresentations and the reliability, weight, or quality of the evidence collected. During oral argument, we specifically asked Widmer's counsel whether there was actually "any evidence in the record indicating either directly or by inference that Mr. Braley * * * manufactured any evidence, [or] altered any evidence[.]" Widmer's counsel made the following representations to the court:
>
> > There is, your honor, I would point to the bathtub as the prime example of that. If you look at Volume 2 of the transcript at pages 152 and 153, you have Bill Hillard testifying. He testifies that the condition that he found the tub in, which was three months after the fact that it was

ripped out of the house, it was not in the same condition as Danny Harness, the Miami Valley Crime Lab rep, left it. Remember Danny Harness, the Miami Valley Crime Lab rep, processed the tub twice, once in the Widmer home and once after Braley [seized] it from the home in his laboratory. He did the superglue fuming method, he added a bunch of the black fingerprint powder to it. The superglue fuming method, remember, locks in that powder, there were photos that Danny Harness took. There were photos that Bill Hillard took. And Bill Hillard testified that the way that Danny Harness left this tub was not the way that he found it when he reviewed it and started processing it in the basement of the Hamilton Township Police Department, where Braley had it in his possession and control for three months. Now, look what happened as a result of the bathtub being used as evidence. Bill Hillard says, "oh, I see a forearm mark in there, I see a male forearm mark." Danny Harness didn't see anything like this.

This court is troubled by these representations made by Widmer's counsel. After reviewing the record, the only evidence of change that occurred to the bathtub according to Bill Hilliard was the presence of additional black powder. There was absolutely nothing in the record that remotely suggested that the bathtub was tampered with while in the custody of the police department. Widmer's counsel seemed to embellish the record in order to excite the passions of the media and public on this issue. Accordingly, we feel compelled to note that this almost crosses the line from permissible appellate advocacy to impermissible hyperbole that so distorts the evidence that it borders upon the absurd. However, we will give Widmer's counsel the benefit of the doubt but would caution Widmer's counsel in future when making such representations of the facts as an officer of the court.

[*P63] Lastly, we emphasize that the state's alleged nondisclosure did not prevent or deter Widmer from questioning Braley and other testifying officers about the handling and processing of the evidence from start to finish.

[*P64] Thus, we find that Braley's allegedly perjured testimony was not material to discrediting the evidence against Widmer.

110

### (3) What Evidence Not to Collect

[*P65] Next, Widmer argues that the state knowingly used Braley's perjury to conceal the fact that Braley was an "incompetent, serial liar," who likely hand-picked the evidence to support his biased belief that a homicide had occurred. This argument is also meritless.

[*P66] During trial, Braley admitted that he believed from very early on that Sarah did not die of natural causes. Now, according to Widmer, Braley must have only collected evidence that supported his "tunnel vision for homicide," and that it "remains unknown what other items were not collected due to their seemingly benign value in 'proving' a homicide."

[*P67] First, this argument is entirely too speculative to warrant much deliberation, and once again, we reject any notion that the undisclosed evidence against Braley reflects poorly upon the collection of the evidence. Further, Braley was not the only officer who collected evidence at the crime scene. The jury heard testimony from numerous officers, whose credibility was not even remotely suspect, and it is unreasonable to believe that the nondisclosure of Braley's past was the reason that the jury accepted those officers' responses. Moreover, Widmer had the opportunity at trial to question these other officers regarding their respective decision-making process in determining which evidence to collect at the scene of the crime.

[*P68] Thus, we find that this argument is insufficient to establish materiality under *Napue*.

### (4) The Decision to Charge Widmer

[*P69] Widmer next argues that the state used Braley's perjury to prevent the defense from exploring whether Braley's lack of real police experience impacted his communication with the prosecution. Based on what he knows now, Widmer believes that Braley made a "rush to judgment that a homicide had occurred" and shared this opinion with the prosecutor, who in turn relied on that information in deciding to charge Widmer with murder. We reject this argument, as well. As we have repeatedly stated, the undisclosed evidence in the DD&M report had nothing to do with Braley's involvement in the investigation, let alone his interaction with the prosecutor's office regarding this case.

### (5) The Coroner's Conclusion that a Homicide Occurred

111

[*P70] Here, Widmer argues that without the information in the DD&M report, the defense was unable to launch a full-scale attack on the medical determinations made by the Warren County Coroner, Dr. Russell Uptegrove. Widmer now believes that Braley capitalized on his perceived credibility as a lieutenant to sway Uptegrove's determination that Sarah's death was the result of a homicide.

[*P71] Once again, Widmer cites the Waller affidavit, wherein Waller opined "to a reasonable degree of professional certainty in the field of police practice" that,

> Dr. Uptegrove was unduly influenced by, and relied upon, representations made by Lt. Jeff Braley, who is not credible as a law enforcement officer, in making the determination in this case that the manner of death was by homicide. A medical determination that the manner of death was by homicide could very well unduly influence the decision of the prosecutors to initiate criminal charges and unduly influence jurors at a subsequent trial. Braley was simply not qualified to make determinations regarding this case and pass such opinions to Uptegrove. A coroner's opinion regarding cause of death is as reliable as the information provided to the coroner. If the information given to him is unreliable, then the opinion is unreliable in a "garbage in, garbage out" process.
>
> ***
>
> In order to make a proper decision in this case, jurors would need to know about Braley's false statements, his lack of experience, and his lack of qualifications to properly understand how these factors likely tainted the entire investigation and prosecution in a "garbage in, garbage out" sequence.

[*P72] As with Waller's other opinions, these statements lack any value in determining the issue of materiality under *Napue* .Instead, we agree with the trial court that Waller simply: (1) regurgitated Widmer's trial arguments regarding Uptegrove, (2) invaded the province of the jurors as to what they would "need to know" to make a determination of guilt, and (3) exceeded the scope of his expertise in police practices by comparing Uptegrove's medical opinions to "garbage." *See* Evid.R. 702(B); *State v. Davis,* 64 Ohio App.3d 334,

112

345 (12th Dist.1989).

**[\*P73]** At trial, both sides questioned Uptegrove about the steps he took during Sarah's autopsy, and asked Uptegrove what specific information he used in making his medical determinations. During cross-examination, Uptegrove testified that prior to performing Sarah's autopsy, he did not review Sarah's hospital records, medical history, toxicology report, or the paramedic's sheet. Uptegrove also testified that Braley was present for part of the autopsy, and agreed with the defense that he would consider statements from police officers and EMS personnel in rendering his decision. Uptegrove also admitted that during the autopsy, he told Braley that he was "leaning towards the possibility that this could be a homicide * * *."

**[\*P74]** The Waller affidavit cites this information as the basis for concluding that Braley "unduly influenced" Uptegrove's decision, because Braley's statements were essentially the only information, other than the autopsy, that Uptegrove had at the time he made this finding. However, Waller's conclusion is simply an extension of Widmer's argument that "Dr. Uptegrove admitted that he considered what Braley told him in ultimately concluding that a homicide had occurred." Moreover, both Widmer and Waller fail to acknowledge Uptegrove's testimony that he would *never* rule a homicide simply because a police officer told him to do so, and that in determining the manner of death, he would also consider "[t]he scene investigation, the statements or historical information from individuals involved with the case, [and] the individual's medical history * * *."

**[\*P75]** Further, while Braley did supply Uptegrove with information during the autopsy, other witnesses' testimony makes it very clear that Braley played a negligible role in the process. First, Doyle Burke, the chief investigator for the coroner's office, who was also present during the autopsy, testified that he did not see Braley participate in the autopsy "in any fashion." Uptegrove also testified that neither Braley nor Burke helped him "in any way."

**[\*P76]** Given this evidence, we reject Widmer's claim that the jury's view of Uptegrove's testimony was improperly skewed as a result of not knowing the information in the DD&M report. Even in the event that such information was disclosed during trial, the remaining testimony demonstrates that Uptegrove made his decisions on his own accord, without Braley's influence. *See Woods v. Booker,* 450 Fed.Appx. 480, 486 (6th Cir.2011).

113

### 6. *Kyles* Conclusion

[**\*P77**] In sum, we find that Widmer has failed to demonstrate that Braley's perjury was material because of how it prejudiced his ability to prepare a *Kyles* defense. There is no reasonable likelihood that knowledge by the jury that Braley lied about various credentials and whether he filled out the 1996 employment application could have affected its decision on the ultimate issue of whether Widmer was guilty of murdering Sarah. This conclusion is particularly compelling in light of the ample additional evidence supporting Widmer's guilt, as we thoroughly discussed in *Widmer I. See United States v. Robinson,* 627 F.3d 941, 953 (4th Cir.2010) ("[e]vidence regarding a few officers' unrelated misconduct could do little to damage the extensive physical and testimonial foundation of the case").

[**\*P78**] Thus, this portion of Widmer's first assignment of error is overruled. We now address the remaining portion of Widmer's *Napue* argument, which pertains to impeachment, rather than exculpatory evidence.

### a. Impeachment Evidence

[**\*P79**] Widmer also argues that Braley's perjury was material as it pertained to impeaching Braley on cross-examination.

[**\*P80**] We recognize that even if a witness's false testimony does not directly affect the issue of guilt, but rather only the credibility of the witness, its use might still constitute a denial of due process under *Napue. See Napue,* 360 U.S. at 269–270. However, we reject Widmer's claim, where there is no reasonable likelihood that the alleged impeachment evidence could have affected the judgment of the jury.

[**\*P81**] Evid.R. 608(B) permits cross-examination of specific instances of conduct that are probative of a witness's character for truthfulness or untruthfulness. The cross-examiner must take the witness's answers as given and cannot contradict a denial either by confronting the witness with extrinsic evidence or proving the matter with such evidence. *See United States v. Abel,* 469 U.S. 45, 55, 105 S.Ct. 465 (1984). However, "[a] witness may not be impeached by evidence that merely contradicts his testimony on a matter that is collateral and not material to any issue in the trial."*Byomin v. Alvis,* 169 Ohio St. 395, 396 (1959)."Evid.R. 608(B) * * * protects a legitimate state interest in preventing

114

criminal trials from bogging down in matters collateral to the crime with which the defendant was charged." *State v. Boggs,* 63 Ohio St.3d 418, 422–423 (1992).*See also Widmer I,* 2012–Ohio–4342 at ¶ 134 ("because the potential for abuse is high, through unfair prejudice, confusion of the issues, and misleading of the jury, safeguards are erected in the form of requiring that the instances inquired into must be *clearly* probative of truthfulness or untruthfulness") (Emphasis sic.); *State v. Rainey,* 2nd Dist. No. 23070, 2009–Ohio–5873, ¶ 20.

[**\*P82**] Here, we find that cross-examining Braley on the employment application and the other information in the DD&M report would have only created a dispute about purely collateral matters, *i.e.,* whether Braley fabricated various credentials over ten years ago for jobs unrelated to his position as lieutenant detective. Braley was not on trial for fraud or misconduct; Widmer was on trial for murder, and examining this part of Braley's past would only lead to surprise, jury confusion, and a waste of time, which are the very reasons for the rule against impeachment on collateral matters. *See* Evid.R. 608; *State v. Myers,* 9th Dist. C.A. No. 25737, 2012–Ohio–1820. *See also* Evid.R. 403.

[**\*P83**] Even if the information did not pertain to a collateral matter, there is no reasonable likelihood that impeaching Braley with the new evidence could have affected the jury's decision. In this regard, our facts are readily distinguishable from *Napue. See State v. Mills,* 12th Dist. No. CA99–11–198, 2001 WL 237096, * 9 (Mar. 12, 2001); *United States v. Stewart,* 323 F.Supp.2d 606, 620 (N.Y.S.2004).

[**\*P84**] In *Napue,* the prosecution's principal witness denied that he had received a promise of leniency in exchange for his testimony. Knowing this testimony to be false, the prosecutor did nothing to correct it. The Supreme Court characterized the witness's testimony, which comprised the bulk of the prosecution's evidence against the defendant, as "extremely important." *Napue,* 360 U.S. at 266. Thus, it reversed the defendant's conviction, reasoning that it would violate due process not to do so, where the prosecution's knowing use of false testimony bearing directly on the credibility of a key witness "may have had an effect on the outcome of the trial." *Id.* at 272.

[**\*P85**] Here, Braley's trial testimony cannot be described as extremely important, central, or material to the prosecution's case against Widmer. As the trial court noted, other witnesses

corroborated the important portions of Braley's testimony. Thus, the subject matter of Braley's testimony was hardly of the sort where his credibility "may well [have been] determinative of [Widmer's] guilt or innocence * * *." *Id.* at 269. Under these circumstances, we find that any impeachment value of the new information in the DD&M report was undermined by the other evidence in the record, thus it cannot be considered material impeachment evidence in the *Napue* sense. *See Hutchison v. Bell,* 303 F.3d 720, 745 (6th Cir.2002).

### 3. Imputed Knowledge of Perjured Testimony

[\*P86] The third and final prong of *Napue* requires a defendant to show that the state knew that the witness's testimony was false. As we mentioned briefly above, a police officer's knowledge about a case, including the truth or falsity of his testimony, is typically imputed to the state, but because Widmer has failed to satisfy at least one other *Napue* prong, we need not address this issue in depth. *See Kyles,* 514 U.S. at 437. However, as we discuss in detail under *Brady* below, we have serious doubts as to whether Braley's knowledge of the information in the DD&M report is imputable to the state.[FN8]

> FN8. According to Widmer, other individuals with knowledge attributable to the prosecution were aware of Braley's misconduct, thanks to an independent investigation of Braley by the Hamilton Township Board of Trustees in July 2010. Again, we need not decide whether this is actually the case, given Widmer's failure to establish materiality.

### 4. *Napue* Conclusion

[\*P87] Pursuant to the standards set forth in *Napue,* we find that there is no reasonable likelihood that the state's alleged use of Braley's pretrial perjury could have affected the jury's verdict. The subject matter of Braley's allegedly false testimony was neither exculpatory nor significantly impeaching, and outside of Braley's trial testimony, the jury still heard ample evidence of Widmer's guilt. *See Widmer I.* Accordingly, the trial court did not abuse its discretion in denying Widmer's request for postconviction relief on these grounds, and the court did not violate Widmer's due process and confrontation rights under *Napue* or *Kyles.*

[\*P88] Widmer's first assignment of error is overruled.

### D. *Brady v. Maryland*

**[\*P89]** In his second assignment of error, Widmer claims that regardless of whether Braley committed perjury, the prosecution violated *Brady v. Maryland* by failing to disclose the evidence in the DD& report, along with any other favorable evidence, prior to the third trial.

**[\*P90]** In *Brady,* the Supreme Court held that a criminal defendant's due process rights are violated if the prosecution suppresses evidence that is material to the defendant's guilt or punishment. *Brady,* 373 U.S. at 87. *See also Strickler v. Greene,* 527 U.S. 263, 119 S.Ct. 1936 (1999). The law in *Brady* applies regardless of whether the defendant has expressly requested such evidence and encompasses both exculpatory and impeachment evidence. *Strickler* at 280.

**[\*P91]** In order to establish a *Brady* violation, Widmer must show that: (1) the evidence at issue was favorable to him, either because it was exculpatory or because it was impeaching, (2) the evidence was suppressed by the state, either willfully or inadvertently, and (3) prejudice ensued. *Id.* at 281–282.

### 1.  Widmer's Requested Standard of Review

**[\*P92]** As an initial matter, Widmer asserts that the trial court wholly failed to address his *Brady* claims, and therefore asks us to review these arguments *de novo.* We decline to do so. Here, the trial court addressed all of the issues in Widmer's petition in an extremely thorough and well-reasoned opinion, and detailed the Supreme Court cases cited by Widmer, including *Brady,* as well as their application to this case. The court found that Widmer "failed to point to any information that was known by the State that was not turned over to him," and additionally found "no lack of confidence in the verdict." These are precisely the principles espoused by *Brady. See Strickler,* 527 U.S. at 289–290, quoting *Kyles,* 514 U.S. at 434 (under *Brady,* "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence"). Thus, we reject this argument and proceed with an abuse of discretion review. *See Wagers,* 2012–Ohio–2258 at ¶ 15.

### 2.  Favorable Evidence

[*P93] In terms of the first requirement of *Brady,* we have already found that the information on Braley is not exculpatory as to Widmer, and that it has very little impeachment value. However, for the sake of argument, we will treat the evidence as favorable to Widmer.

### 3. Suppression and Imputed Knowledge

[*P94] As to the suppression prong, we note that the state did not actually receive the DD&M report until after the third trial. *See Agurs,* 427 U.S. at 103; *Hicks v. Collins,* 384 F.3d 204 (6th Cir.2004) (no *Brady* violation where there was no evidence that the prosecution knew of the favorable exculpatory material prior to trial). However, Widmer argues that Braley's knowledge of the contents of the DD&M report was imputed to the state, because Braley was a "state agent" involved in the investigation. *See Strickler,* 527 U.S. at 289–281, quoting *Kyles,* 514 U.S. at 438 (the *Brady* rule encompasses evidence "known only to police investigators and not to the prosecutor").

[*P95] Initially, we agree with Widmer that *Brady's* requirements "do not stop at the prosecutor's door," and that the knowledge of those who are part of the investigative team is imputed to the prosecutor, regardless of the prosecutor's actual awareness. *Robinson,* 627 F.3d at 951, citing *Kyles,* 514 U.S. at 437. We also agree that police are treated as an arm of the prosecution for *Brady* purposes, and that their knowledge of the case should be imputed to the state. *Kyles* at 437 ("the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"). *But see Walker v. Lockhart,* 763 F.2d 942, 958 (8th Cir.1985) ("not all police knowledge should be imputed to the prosecution").

[*P96] Here, Widmer claims that because Braley had actual knowledge of his own misconduct as contained in the DD&M report, and because he was working on the state's behalf, the prosecution violated its constitutional duties to learn of the evidence and disclose it. However, we would be remiss to accept this argument without at least slight hesitation. It is one thing to require prosecutors to inquire into whether the police have discovered exculpatory or impeachment evidence during the course of their investigation. It is quite another to require them, "on pain of a possible retrial, to conduct disciplinary inquiries into the general conduct of every officer working the case." *Robinson,* 627 F.3d at 952. Here, Braley's alleged misconduct is so remote in time, and is

118

so unrelated to his role in the investigation and to the state's case against Widmer, that it is difficult to burden the prosecution with an obligation to discover this evidence.

[*P97] Yet, even if we assume, for the sake of this opinion only, that the doctrine of imputed knowledge extends this far, Widmer still fails to satisfy the materiality requirement of *Brady*. [FN9]

> FN9. Widmer also asserts that the state had knowledge of, and concealed, the results of a separate, internal investigation of Braley conducted by the Hamilton Township Trustees in July 2010. Widmer believes that the trustees' report contains information "identical" to the contents of the DD&M report, only that this time, the information was received from Braley under oath. However, because it is clear to us that *Brady* was not violated because of the lack of materiality, we need not address Widmer's contention that the state "suppressed" the trustees' report. *See United States v. Pelullo,* 399 F.3d 197, 217 (3rd Cir. 2005).

> As his final sub-argument, Widmer contends that the government purposefully delayed ordering the DD&M report until after Widmer's conviction in order to avoid learning information that may have undermined the prosecution's case. Again, we need not decide this issue, because Widmer still cannot establish materiality. That is, as discussed below, there is no reasonable probability that, had the evidence in the DD&M report come to light earlier, the result of Widmer's trial would have been different.

## 4. Prejudice/Materiality

[*P98] "Prejudice (or materiality) in the *Brady* context is a difficult test to meet * * *." *Montgomery v. Bobby,* 654 F.3d 668, 678 (6th Cir. 2011). Evidence is "material" within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *Bagley,* 473 U.S. at 682. *See also Strickler,* 527 U.S. at 281. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles,* 514 U.S. at 434. *Brady* materiality is not a strictly quantitative inquiry; "[r]ather, it is more of a qualitative inquiry in which a reviewing court must ask whether

119

the suppressed evidence casts sufficient doubt on a petitioner's conviction that it puts the case 'in a different light.'" *Smith v. Metrish,* 436 Fed.Appx. 554, 563 (6th Cir. 2011), quoting *Kyles* at 435. As we discussed earlier, the *Brady* materiality assessment is more stringent than the inquiry under *Napue.*

[*P99] Widmer's materiality arguments under *Brady* are similar to the ones that he raised under *Napue,* namely, that the nondisclosure of the facts contained in the DD&M report precluded him from preparing a *Kyles* defense, deprived him of critical impeachment evidence, and materially impacted the course of litigation. [FN10]

> FN10. For the same reasons as stated in footnote five, we reject Widmer's argument that disclosing the withheld information would have likely altered the course of litigation by prompting the trial court to grant his subpoena requests or sustain his Motion to Confront Lead Investigator.

[*P100] As to Widmer's *Kyles* claim, our focus under *Brady,* much like *Napue,* is not on the impact of the suppressed information on trial strategy, but whether the evidence was material either to guilt or punishment. *See Strickler,* 527 U .S. at 280; *Agurs,* 427 U.S. at 104, fn. 10. *See also United States v. Bencs,* 28 F.3d 555, 560 (6th Cir.1994) ("[m]ateriality pertains to the issue of guilt or innocence, and not to the defendant's ability to prepare for trial"). However, for the sake of completeness, we will address whether the alleged suppression denied Widmer a fair trial by precluding a challenge to the "integrity" of the investigation. *Kyles,* 514 U.S. at 447–448; *Agurs* at 108.*See also* Crim.R. 16(B).

[*P101] After a thorough review of the record below, we find that even if the allegedly suppressed evidence in the DD&M report could have helped the defense to cast some doubt on the police investigation under *Kyles,* it is not enough to establish materiality. *Id.* at 109–110 ("[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense"). As we discussed previously, even without this information, Widmer had the opportunity to cross-examine Braley and the numerous other witnesses about the investigation from start to finish. It is simply untenable to believe that the suppression was the reason for Widmer's scant questioning on this matter, or that disclosing Braley's alleged misconduct would have cast sufficient doubt in the jury's mind about the investigation so as to generate a reasonable probability of a different result. *Bagley,* 473

U.S. at 682.

[*P102] Moreover, the suppressed information was not material impeachment evidence. *See id.* at 676–677; *United States v. Jones,* 399 F.3d 640, 648 (6th Cir.2005). Generally, impeachment evidence constitutes *Brady* material when the evidence relates directly to a key witness's veracity on matters about which he or she has testified at trial. *See Giglio,* 405 U .S. at 154. However, as we discussed earlier, Braley was not a key witness, and the allegedly suppressed evidence pertained only to collateral matters that had nothing to do with Braley's trial testimony. *See, e.g., People v. Fernandez,* 249 A.D.2d 3, 5, 670 N.Y.S.2d 840 (1998) ("where the impeachment information has no bearing on defendant's guilt or innocence, such as where the prosecution witness's misconduct is completely unrelated to the trial at which he is testifying and [his] testimony is not crucial to the prosecution's case, its nondisclosure does not constitute a *Brady* violation"). Even if the new evidence was severely impeaching, the fact remains that Braley's credibility was not determinative of Widmer's guilt or innocence. Instead, Braley's testimony was simply cumulative to the considerable evidence bearing on Widmer's guilt, and there is no reasonable probability that impeaching Braley would have resulted in a different outcome. *See* Evid.R. 608(B); *Agurs,* 427 U.S. at 112; *Jones,* 399 F.3d at 648.

**5.  *Brady* Conclusion**

[*P103] In sum, even if we assume that the information on Braley should have been disclosed, when we review the record as a whole, we cannot conclude that our confidence in the verdict has been undermined. *See Bagley,* 473 U.S. at 682.In other words, there is not a reasonable probability that the outcome of Widmer's trial would have been different, had the evidence in the DD&M report been disclosed. *Id.* Accordingly, the trial court did not abuse its discretion in denying Widmer's request for postconviction relief under *Brady.*

*Widmer*, 2013-Ohio-62.

The state court's twenty-page description and analysis of Mr. Widmer's claims as to Lt. Braley make it clear that his claims revolve around two documents: (1) the June 25, 1996, application for employment and (2) the June 1, 2011, DD&M investigation report.  Additionally,

the state court's opinion points out that Mr. Widmer's claims are essentially that the trial court erred by denying his requests to obtain and/or use those documents for the purposes of: (1) impeaching Lt. Braley as to his background and education; (2) cross-examining Lt. Braley about any alleged falsification of the employment application; and (3) pointing out the flaws in the investigation of Sarah Widmer's death (Lt. Braley headed that investigation).

First, as the Warden has correctly argued, it is the obligation of the federal courts to accept as valid a state court's interpretation under state law of the statutes and rules of practice of that state. *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986)(citation omitted); (*See* Return of Writ, ECF No. 22, PageID 10161).   Indeed, as this Court noted when addressing Mr. Widmer's First Ground for Relief, *supra*, the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw*, 546 U.S. at 76, *citing Estelle*, 502 U.S. at 67-68; *see also Mackey*, 525 Fed. App'x. at 362.   This Court also noted that federal habeas review of a state court evidentiary ruling is extremely limited and that such evidentiary ruling will rise to the level of a constitutional violation only where it violates a bedrock principle of justice so as to deprive the defendant of a fundamentally fair trial. *Jordan*, 397 F.3d at 362; *Bey*, 500 F.3d at 519, 522.

In addressing Mr. Widmer's argument that the trial court erred when it denied its request to allow him to cross-examine Lt. Braley with respect to the June 25, 1996, application, the state appellate court determined that Ohio Evid.R. 608(B), "prevents a party from introducing extrinsic evidence to impeach a witness on a collateral matter not material to any issue in the trial;" and "protects a legitimate state interest in preventing criminal trials from bogging down in matters collateral to the crime with which the defendant was charged." *Widmer*, 2012 WL 4350275 at

122

*31-32; *see also* App'x, ECF No. 17, PageID 298-99.   The state court of appeals determined that

for purposes of Ohio Evid.R. 606(B), the authenticity of the June, 1996, application was in dispute,

that the document was not clearly probative for truthfulness, and that permitting Mr. Widmer to

cross-examine Lt. Braley about the application would bring forth "a parade of witnesses, exhibits

and thirteen years of events to attack or bolster the witness and/or the veracity of the document."

*Widmer*, 2012 WL 4350275 at *32; ECF No. 17, PageID 297-98.

The state court of appeals clearly based its confirmation of the trial court's denial of Mr.

Widmer's request to cross-examine Lt. Braley about the June, 1996, employment application on its

interpretation of state law, to wit: Ohio Evid.R. 606(B).   Accordingly, this Court, sitting in

habeas, is bound by that interpretation.

As noted above, however, Mr. Widmer also claims that the state court erred by precluding

him from cross-examining Lt. Braley about his background thereby effectively denying him (Mr.

Widmer) his right to present a "*Kyles* defense".

In *Kyles v. Whitley*, 514 U.S. 419 (1995), the United States Supreme Court reversed a

murder conviction upon discovering that the state had withheld evidence in violation of *Brady v.*

*Maryland*, 373 U.S. 83, 87 (1963).   The withheld evidence included, *inter alia*, inconsistent

eyewitness statements and inconsistent statements made by an "associate" of the defendant who

allegedly had knowledge of the crime and access to the location where items taken from the victim

were found. *Kyles*, 514 U.S. at 428.   The Court held that disclosure of the withheld evidence

undermined confidence in the outcome of the trial and therefore made a different result reasonably

probable. *Id.* at 441.   The Court noted that the withheld evidence would have "raised opportunities

to attack not only the probative value of crucial physical evidence and the circumstances in which

it was found, but the thoroughness and even the good faith of the investigation." *Id*. at 445.   The Court stated that the withholding of the evidence denied the defendant the ability to "undermine the ostensible integrity of the investigation" and "[lay] the foundation for a vigorous argument that the police had been guilty of negligence." *Id*. at 447-48.

Mr. Widmer's argument about a "*Kyles* defense" is that if he had been permitted to question Lt. Braley about his background thereby putting his credibility at issue, he (Mr. Widmer) would then have been able to challenge the integrity of the processing and collecting of evidence including the bathtub, the coroner's conclusion (in view of Lt. Braley's attendance at the autopsy), and the decision to charge Mr. Widmer (in which Lt. Braley participated).

With respect to the collection of evidence, including the bathtub, the record establishes that Mr. Widmer had the opportunity to cross-examine all of the individuals, including Lt. Braley, who participated in the investigation of Ms. Widmer' s murder and who testified at the trial.

Lt. Braley testified that he had been involved in law enforcement as a sworn police officer since 2003, that he had been employed with the Hamilton Township Police Department for a total of twelve years, and he had been the detective lieutenant with that department for four years   (Tr., ECF No. 21-2, PageID 3238-3261).   Lt. Braley stated that when he arrived at the Widmer home, the officers at the scene briefed him and expressed their suspicions to him.   He subsequently contacted Investigator Burke and then entered the home where Sarah Widmer's murder had taken place. *Id*.   He testified that the scene was exactly as the officers had described.   He further stated he had discussed with Officer Short the collection of evidence, that they had collected evidence from the master bedroom and bathroom, and that they examined the carpet in the master bedroom and took samples of it. *Id*.

Lt. Braley also testified that the next day, based on information he had gotten from Dr. Uptegrove, he believed that Sarah Widmer's death was a homicide so he returned to the Widmer home, examined the bathtub, dusted it for prints, and found markings he considered handprints being pulled down the side of the tub.     He felt that it was necessary to preserve the evidence so he contacted the Miami Valley Crime Lab and technicians from the lab came to the scene to help secure and preserve the prints. *Id*.   Lt. Braley testified that the tub was removed from the residence later in the day but that he was not present when the removal occurred. *Id*.   He testified further about the investigation he conducted including collecting cell phone records, examining traps in the sink drains, and collecting everything that was on the side of the bathtub. *Id*. Mr. Widmer cross-examined Lt. Braley about the investigation into Sarah Widmer's murder. *Id*. at 3261-3274.   At that time, Lt. Braley testified he did not consult with Dr. Uptegrove prior to Sarah Widmer's autopsy and that he met with Dr. Uptegrove later in the day, after the autopsy had been conducted. *Id*.

As noted above, Mr. Widmer had the opportunity to cross-examine several other witnesses who were involved in the gathering of evidence at the scene of Sarah Widmer's murder.

Warren County Deputy Sheriff Steve Bishop testified that he was the first emergency, law enforcement, or fire department responder to arrive at the Widmer's home after the call regarding Sarah Widmer's death was broadcast to emergency personnel (Tr., ECF No. 21-16, PageID 7538-7563).   The Deputy described the conditions of the scene which included the master bathroom, the house, as well as the appearance of Sarah Widmer's body. *Id*.   Mr. Widmer had the opportunity to, and in fact did, cross-examine and re-cross-examine Deputy Bishop. *Id*. at 7563-7579.

125

Firefighter/EMT-B Jeff Teague testified that he was with Mr. Stevens and that they were among the first responders at the Widmer home. *Id*. at 7580-7637. He testified about the condition of Sarah Widmer's body and described the scene where she was located. *Id*. Mr. Teague further described the emergency medical treatment he, Mr. Stevens, and other first responders gave to Sarah Widmer including the use of the Sellick maneuver and transporting Ms. Widmer to the hospital. *Id*. Mr. Widmer cross-examined and re-cross-examined Mr. Teague. *Id*. at 7638-7698.

Firefighter/paramedic Jason Stevens testified that he responded to the call about a possible drowning at the Widmer home. *Id*. at 7700-7739. He testified about the appearance of the scene as well as Sarah Widmer's body. *Id*. Mr. Stevens described the emergency measures he and his partner, Jeff Teague, had taken in their treatment of Ms. Widmer, which included two failed attempts to intubate her, once in which his partner used the Sellick maneuver. *Id*. He then testified about another paramedic Derek Roat's failed attempt to insert a tracheal tube into Sarah Widmer. *Id*. Mr. Stevens described the process of removing the victim's body from the home. *Id*. Mr. Widmer had the opportunity to, and did, cross-examine Mr. Stevens. *Id*. at 7740-7786.

Lisa Elliott, a road patrol sergeant with the Hamilton Township Police Department, testified that she responded to the call at the Widmer home and described what she observed when she arrived, which included the condition of Sarah Widmer's body, the treatment the EMTs/paramedics were administering, and the condition of the scene. *Id*. at 7791-7819. Sgt. Elliott also testified about the removal of Sarah Widmer's body from the house, the condition of the bathroom after first responders had removed the body, and the decision to call a detective, specifically Lt. Braley, to the scene because, in her opinion, things were "not adding up." *Id*. Sgt. Elliott further described her walk-through of the house and grounds and her observations thereof. *Id*. Mr. Widmer had the opportunity to, and did cross-examine Sgt. Elliott. *Id*. at 7819-7835.

126

Doyle Burke, Chief lnvestigator for the Warren County Coroner's Office, testified he was notified that a young female had been removed to Bethesda Arrow Springs Emergency Department. *Id*. at 7835-7861.    She was reported to have drowned in her bathtub, and he went to the hospital to investigate. *Id*.    Investigator Burke testified as to his observations of Sarah Widmer's body and that he considered her death suspicious. *Id*.   He further testified that he interviewed Mr. Widmer at the hospital and thought there were some "blaring discrepancies" in Mr. Widmer's answers to the investigator's questions. *Id*.   Mr. Widmer was given the opportunity to, and did cross-examine Investigator Burke. *Id*. at 7861-7898.

Russell Uptegrove testified that he had been a forensic pathologist at the Montgomery County Coroner's Office since 1999, and had been the Warren County Coroner since 2007.    He conducted Sarah Widmer's autopsy. *Id*. at 8021-8125.   Dr. Uptegrove stated that he became aware of Ms. Widmer when Investigator Burke called him when he (Burke) was en route to the hospital where she had been taken.   Dr. Uptegrove testified that he thought the story about her drowning in the bathtub was alarming as it is not something that routinely happens and he was suspicious as to what could have happened to cause the incident.   He advised Investigator Burke that he needed to get an accurate account of what happened. *Id*.   Dr. Uptegrove then testified at great length about Sarah Widmer's autopsy findings. *Id*.   He opined that the cause of her death was drowning.   He further testified that based on the autopsy findings, information he gathered from Ms. Widmer's family members and from individuals who were at the scene, information contained in her medical records, and information he got from his medical research, he concluded that the manner of her death was homicide. *Id*.   Dr. Uptegrove stated that Lt. Braley and Investigator Burke were present during Sarah Widmer's autopsy, though they did not participate.   He commented that it was not unusual for police officers to be present during an autopsy. *Id*.   Mr. Widmer then cross-examined

127

Dr. Uptegrove during which Dr. Uptegrove stated that he did not remember his dialog with Lt. Braley but that he recalled showing Lt. Braley and Investigator Burke some of the things he had found during the autopsy. *Id.* at 8125-8196. Dr. Uptegrove testified that he conducted Sarah Widmer's autopsy on August 12, 2008, and that after completing the procedure he was leaning towards the possibility that her death was a homicide. However, he did not make that final determination until days later. *Id.*

Mark Bedwell, a police officer with the Hamilton Township Police Department, testified that he was dispatched to the scene of Sarah Widmer's murder and was the last officer to arrive. *Id.* at 8406-8427. When he arrived at the scene emergency personnel were performing CPR on Ms. Widmer. *Id.* At that time he had a conversation with Mr. Widmer about the victim. *Id.* Officer Bedwell further testified about his observations of Sarah Widmer's body and his feeling that the scene was "strange" because although the incident allegedly involved a drowning, Sarah Widmer's body, as well as the surrounding areas, were dry. *Id.* Further he noted that there were items sitting on the edge of the bathtub which he thought should have been knocked to the floor if someone had removed another person from a bathtub. *Id.*

Officer Bedwell testified that he and other officers on the scene determined that they needed to secure what they felt at the time might be a possible crime scene. *Id.* They then called Lt. Braley to the scene. *Id.* Officer Bedwell stated that after Lt. Braley arrived on the scene, he (Officer Bedwell) and the other officers began to bag evidence and record its retrieval in an evidence log. *Id.* Mr. Widmer was given the chance to, and did in fact, cross-examine Officer Bedwell. *Id.* at 8427-8452.

Quillan Short, a road patrol officer with the Hamilton Township Police Department, testified he was dispatched to the Widmer home and that when he arrived there were already a

128

deputy and fire department life squad on scene.    *Id*. at 8525-8580.   Officer Short described the scene and the condition of Sarah Widmer's body. *Id*.   He testified that he and the other officers secured the scene and after Lt. Braley arrived, he and Lt. Braley did a "walk through" of the home and surrounding area.    In addition, he took pictures of the home including the scene where Sarah Widmer had been laying and recovered several items from the scene. *Id*.   Officer Short further testified that two days later, after obtaining a search warrant, he, Lt. Braley, and Lt. Carlton returned to the Widmer home and assisted in the recovery of additional evidence. *Id*.   Officer Short stated that at that time, Lt. Braley fingerprinted the bathtub and subsequently two people from the Miami Valley Crime Lab helped process the bathtub. *Id*.   Mr. Widmer was permitted to, and did, cross-examine Officer Short. *Id*. at 8580-8604.

As noted above, Mr. Widmer's non-state law argument is that the state prevented him from raising a "*Kyles* defense."   That is, if he had been permitted to question Lt. Braley about his background thereby putting his credibility at issue, he (Mr. Widmer) would then have been able to challenge the integrity of the investigation including: the collecting and processing of evidence (especially the bathtub); the coroner's conclusion that Sarah Widmer's death was a homicide; and the decision to charge Mr. Widmer.

First, as noted above, Mr. Widmer had the opportunity to cross-examine at length Lt. Braley, as well as all of the other officers who testified about the processing of the scene, the collection of evidence, as well as their roles, if any, in the decision to charge Mr. Widmer. Second, Mr. Widmer had the opportunity to cross-examine Dr. Uptegrove, (as well as Lt. Braley and Investigator Burke who were present during the autopsy), who testified extensively about what he found during Ms. Widmer's autopsy and about the basis of his conclusion that the manner of her death was homicide.   In other words, Mr. Widmer had every opportunity to challenge the

integrity of the police officers' investigation, Dr. Uptegrove's determination that the manner of Sarah Widmer's death was homicide, and the decision to charge Mr. Widmer with her murder.

The opportunity to impeach Lt. Braley with the 1996 application for employment and the information contained therein would have added nothing to Mr. Widmer's already present opportunities to cross-examine the witnesses on any subject relevant to the investigation. Mr. Widmer's "*Kyles* defense" claim fails.

Mr. Widmer makes similar arguments with respect to the June 1, 2011, DD&M report. He argues that the report establishes that Lt. Braley completed the 1996 application and further, it shows that during his career Lt. Braley lied about his background and experience in order to obtain positions for which he was not qualified. Mr. Widmer's position is that if he had access to that information, he could have impeached Lt. Braley and cast doubt on the integrity of the investigation. However, for the same reasons stated above with respect to the 1996 application, this Court concludes that at trial Mr. Widmer had the opportunity to cross-examine and impeach Lt. Braley as well as the other officials who participated in the investigation into Sarah Widmer's death and that having the information in the DD&M report would have not added anything to those opportunities.

The Court turns to Mr. Widmer's *Napue* claim.

Under *Napue*, a prosecutor "may not knowingly use false evidence, including false testimony, to obtain a tainted conviction regardless of whether the prosecutor solicits false evidence or ... allows false evidence to go uncorrected when it appears." *Napue*, 360 U.S. at 269.

> The knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *United States v. Bagley*, 473 U.S. 667, 678 ... (1985). In order to

> establish prosecutorial misconduct or denial of due process, the defendants must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. *United States v. O'Dell*, 805 F.2d 637, 641 (6th Cir. 1986), cert. denied, 484 U.S. 859 ... (1987). The burden is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony. *United States v. Griley*, 814 F.2d 697, 971 (4th Cir. 1987).

*United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989); Coe v. Bell, 161 F.3d 320, 343 (6th Cir. 1998), cert. denied, 528 U.S. 842 (1999).

Mr. Widmer's position is that the November 2010 BCI report and the June 1, 2011, DD&M report, discovered after the May 5, 2010, hearing on Lt. Braley's and the state's motions to quash subpoenas seeking Lt. Braley's employment records from General Electric, the United States Postal Service, and Hamilton Township, establish that Lt. Braley authored the June 23, 1996, Hamilton Township employment application form. He argues that this additional evidence establishes that at the May 2010 hearing when he denied completing the 1996 application, Lt. Braley committed perjury.

Mr. Widmer has not shown that Lt. Braley's testimony about the application qualifies as "actually false." At the May 5, 2010, hearing, Lt. Braley testified, *inter alia*, that he did not recall ever filling out the June 23, 1996, Hamilton Township employment application. He further stated that some of the information in the application was inaccurate and that he was not aware of Hamilton Township's existence until 1997(Tr., ECF No. 21-6, PageID 4219-4230). Lt. Braley testified on cross-examination that he did not recall filling out the application, he knew he had not filled out the June 1996 application, and that while the signature on the application looked like his, he had not signed the application. *Id.* at PageID 4244-46.

After carefully reviewing Lt. Braley's May 5, 2010, testimony, this Court concludes, as did the state court, that Lt. Braley's testimony demonstrates, at best, some inconsistencies in the record. Those inconsistencies can be easily attributed to the passing of almost fourteen years between the June 1996 date of the application and the May 2010 date of Lt. Braley's hearing testimony. Indeed, innocent misrecollection is not an uncommon experience. Mere inconsistencies in the record do not establish the knowing use of false testimony by the prosecutor. *See Lochmondy*, 890 F.2d at 822.

The entire thrust of Mr. Widmer's arguments related to his Sixth and Seventh Grounds for Relief is that if the jury had known that Lt. Braley had committed perjury and had lied about his background and experience, Mr. Widmer could have challenged and put into question the entire investigative process which ultimately resulted in his conviction and sentence. Mr. Widmer's position seems to be that if he had been able to cast doubt on the investigation through his impeachment of Lt. Braley, the jury would have reached a different conclusion; that is, it would have returned a verdict of not guilty. However, even if he had impeached Lt. Braley, there was an abundance of evidence from the other investigating officers about the evidence that the officers collected. *See supra*. In addition, the testimony from other witnesses, specifically, those not related to the investigation, more than supported the jury's verdict. *See* Fourth Ground for Relief, *supra*.

The state court's decisions as to Mr. Widmer's claims in his Sixth and Seventh Grounds for Relief are not contrary to nor an unreasonable application of clearly established federal law. Mr. Widmer's Sixth Ground for Relief and Seventh Ground for Relief are without merit and should be dismissed.

**EIGHTH GROUND FOR RELIEF**

In his Eighth Ground for Relief, Mr. Widmer argues that his trial counsel was constitutionally ineffective because, in the unlikely event that the state provided counsel with the information related to Lt. Braley, they failed to act on that information.

In opposition, the Warden argues first, that Mr. Widmer's Eighth Ground for Relief has the same problem as his Third Ground for Relief in that his habeas counsel represented him at trial and is therefore arguing her own ineffectiveness (Return of Writ, ECF No. 22, PageID 10164-10165). The Warden also argues that Mr. Widmer's ineffectiveness claim is without merit because he has failed to show that there was a reasonable probability that additional evidence pertaining to Lt. Braley would have changed the outcome of his trial or that he was actually prejudiced. *Id.*

In his Traverse, Mr. Widmer does not specifically address the Warden's arguments but instead relies on the arguments he raised in his Petition (ECF No. 25, PageID 10247).

First, the Court notes that Mr. Widmer's Eighth Ground for Relief is based on an assumption that the state provided his counsel with the additional evidence about Lt. Braley. Basing a habeas claim on an assumption would provide a basis for rejecting the claim. Nevertheless, out of an abundance of caution, the Court will address Mr. Widmer's claim.

In rejecting Mr. Widmer's Third Ground for Relief, this Court identified and discussed the standard for an ineffective assistance of counsel claim in a habeas action and that discussion is incorporated herein. *See supra*, *citing Strickland,* 466 U.S. 668.   This Court noted that a petitioner must establish that trial counsel's performance was deficient and also that it prejudiced his defense.

While discussing Mr. Widmer's Sixth and Seventh Grounds for Relief, this Court

determined that even if the jury had any of the information concerning Lt. Braley, including the DD&M report, the result of Mr. Widmer's trial would not have been different. Therefore, even assuming that his counsel had such information, Mr. Widmer has failed to establish that he was prejudiced by his trial counsels' failure to introduce any additional evidence about Lt. Braley.

Mr. Widmer's Eighth Ground for Relief is without merit and should be rejected.


## NINTH AND TENTH GROUNDS FOR RELIEF

Because the state postconviction appeals court addressed together Mr. Widmer's DNA testing claim and his ineffective assistance of counsel claim as to that DNA testing, this Court will do the same.

Mr. Widmer argues in support of his Ninth Ground for Relief that the trial court improperly denied his postconviction request for DNA testing of Sarah Widmer's remains (Petition, ECF No. 1, PageID 139-51). Mr. Widmer's position is that DNA testing could have established that Sarah Widmer suffered from Long QT Syndrome which could have caused her to drown in the bathtub. *Id.* He claims that the state court improperly concluded that he fell outside the statutory postconviction DNA testing scheme and that denying his request was a violation of his due process and equal protection rights. *Id.* In opposition, the Warden argues first that this issue is a question of state law and therefore outside the scope of this habeas proceeding (Return of Writ, ECF No. 22, PageID 10166-10176). The Warden also argues that Mr. Widmer does not have protectable due process rights with respect to the postconviction DNA testing process and that he has failed to establish an equal protection claim. *Id.* In reply, Mr. Widmer essentially repeats the arguments that he raised in his Petition (Traverse, ECF No. 25, PageID 10236-10245).

134

In his Tenth Ground for Relief, Mr. Widmer argues that his counsel was ineffective for failing to pursue DNA testing of Ms. Widmer's remains for the purpose of establishing that she suffered with a genetic disorder that caused her to drown in the bathtub (Petition, ECF No. 1, PageID 151-54).  His position is that such DNA testing would have established that Sarah Widmer suffered with Long QT Syndrome, a syndrome that causes sufferers to go unconscious and potentially drown in water.  Mr. Widmer claims that such evidence would have  changed the entire landscape of the evidence, would have raised reasonable doubt, and explained away every piece of evidence against him. *Id.* at PageID 153.

In opposition, the Warden includes his arguments that address Mr. Widmer's Tenth Ground for Relief with his arguments that address Mr. Widmer's Ninth Ground for Relief (Return of Writ, ECF No. 22, PageID 10166-10176).  Presumably, then, the Warden's position is that because Mr. Widmer's DNA testing claim is without merit, he fails to establish the prejudice prong under *Strickland v. Washington*, 466 U.S. 668 (1984).  In his Traverse, Mr. Widmer does not raise any new arguments, but relies instead on the arguments in his Petition (ECF No. 25, PageID 10247).

Mr. Widmer raised these issues in his appeal of the trial court's denial of his postconviction petition and the court of appeals addressed them as follows:

> [**\*P108**] Assignment of Error No. 3:
>
> [**\*P109**] THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO GRANT WIDMER'S POST–CONVICTION REQUEST FOR GENETIC DNA TESTING OF SARAH WIDMER'S BIOLOGICAL REMAINS TO DETERMINE IF SHE SUFFERED FROM A GENETIC DISORDER. SUCH GENETIC TESTING IS NECESSARY TO PROPERLY REVIEW THE POST–CONVICTION CLAIM OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL, BECAUSE IF TESTING

135

DEMONSTRATED THAT SARAH SUFFERED FROM A GENETIC DISORDER, THEN TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS FOR FAILING TO PURSUE WHAT WOULD HAVE LED TO CRUCIAL, EXCULPATORY EVIDENCE FOR THE JURY'S REVIEW. BUT BECAUSE THE TRIAL COURT DENIED WIDMER'S REQUEST FOR TESTING, IT UNREASONABLY FORECLOSED ANY POSSIBILITY OF EVALUATING WHETHER TRIAL COUNSEL PROVIDED CONSTITUTIONALLY DEFICIENT ASSISTANCE IN THIS REGARD.

**[\*P110] In his third assignment of error, Widmer argues that the trial court erroneously denied his application for DNA testing of Sarah's biological remains.**

### III. DNA TESTING

**A. Standard of Review**

[\*P111] We review the trial court's decision regarding the acceptance or denial of an offender's application for postconviction DNA testing for an abuse of discretion. *See, e.g., State v. Broadnax,* 2nd Dist. No. 24121, 2011–Ohio–2182, ¶ 14. An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Gondor,* 2006–Ohio–6679 at ¶ 60.

**B. Background**

[\*P112] In April 2011, Widmer filed a "Motion to Preserve Evidence," seeking to preserve Sarah Widmer's biological remains and all physical evidence collected from the crime scene pursuant to R.C. 2933.82. One month later, the trial court granted Widmer's motion. Subsequently, in his postconviction petition, Widmer requested that the court grant access to Sarah's biological remains for the purpose of DNA testing. Widmer argued that testing would determine whether Sarah suffered from a congenital heart defect called Long QT Syndrome, which may have caused her to drown.[11] Widmer also sought DNA testing to prove ineffective assistance of trial counsel, based on counsel's failure to seek DNA testing at the trial level. The trial court denied Widmer's request upon finding that his arguments were unfounded in the evidence.

FN11. According to an affidavit prepared by Widmer's

136

medical expert, Dr. Michael Gregory Balko, Long QT Syndrome is a "rare condition" in which patients are "at an increased risk for sudden cardiac death relative to the general population." According to Blako, a "curious association exists between drowning and the Long QT Syndrome."

[*P113] On appeal, Widmer argues that the trial court abused its discretion by denying his request for DNA testing. Widmer also challenges the constitutionality of Ohio's DNA testing scheme, arguing that it violates the Due Process Clauses and the Equal Protection Clauses of the Ohio and United States Constitutions.

### C. Ohio's DNA Testing Scheme

[*P114] Since 2003, Ohio law has provided specific procedures for postconviction DNA testing. *See* Am.Sub.S.B. No. 11; Am.Sub.S.B. No. 262; Am.Sub.S.B. No. 77. Currently, under R.C. 2953.71 through .81, eligible offenders may petition the trial court to order state funded DNA testing on biological material from their cases. R.C. 2953.72(C)(1) establishes criteria for preliminary eligibility, and R.C. 2953.74 outlines additional factors that must be satisfied before a trial court "may accept" an application for DNA testing. *See* R.C. 2953.74(B), (C).

[*P115] Under the current DNA testing scheme, offenders may apply to have their own DNA compared against biological evidence recovered from the victim or the crime scene, for the purpose of scientifically precluding the offender as a "contributor of biological material from the crime scene or victim in question * * * ." R.C. 2953.71(G). *See also* 2953.74(C). In essence, the DNA testing statutes provide an opportunity for the accused to establish that another individual committed the crime in question.

[*P116] Widmer concedes that he does not qualify under the statutes, because he has requested a test of Sarah's DNA, rather than his own, and he seeks to diagnose a genetic defect, rather than to exclude himself as a contributor of DNA at the crime scene. Nevertheless, he argues that he should not be precluded from postconviction DNA testing, where he has offered to pay for all DNA tests himself. For this reason and various policy-based reasons, Widmer argues that the trial court abused its discretion by denying his request for DNA testing.

### 1. R.C. 2933.82

[*P117] Widmer first argues that disallowing DNA testing in his case runs contrary to R.C. 2933.82, which was the basis for the trial court's decision to grant his Motion to Preserve Evidence. Under R.C. 2933.82, "governmental evidence-retention entit[ies]," including courts, must secure biological evidence in an "amount and manner sufficient to develop a DNA profile * * *." R.C. 2933.82(B)(3). In light of this statute, Widmer argues that the trial court "arbitrarily and unreasonably refused to permit [him] access to the *same evidence* for the *same purpose* as the trial court already granted the Preservation Order."(Emphasis sic.)

[*P118] The state responds that R.C. 2933.82 does not address whether a trial court should grant an application for DNA testing. We agree with the state. The Ohio legislature created an entirely different scheme in R.C. 2953.71 et seq. to address applications for DNA testing. Thus, we cannot say that the trial court acted unreasonably in the face of R.C. 2933.82 in denying Widmer's application for DNA testing.

**2. Outcome Determinative Results**

[*P119] As an alternate argument, Widmer claims that although he is ineligible for state funded DNA testing, his request for privately funded DNA testing could lead to "outcome determinative evidence" in accordance with the meaning of the term under R.C. 2953.71(L), which states,

> "Outcome Determinative" means that had the results of DNA testing of the subject offender been presented at the trial of the subject offender requesting DNA testing and been found relevant and admissible with respect to the felony offense for which the offender is an eligible offender and is requesting the DNA testing, and had those results been analyzed in the context of and upon consideration of all available admissible evidence related to the offender's case as described in division (D) of section 2953.74 of the Revised Code, there is a strong probability that no reasonable factfinder would have found the offender guilty of that offense or, if the offender was sentenced to death relative to that offense, would have found the offender guilty of the aggravating circumstance or circumstances the offender was found guilty of committing and that is or are the basis of that sentence of death.

[*P120] According to Widmer, testing Sarah's DNA could show that she suffered from Long QT Syndrome, which would have highlighted the possibility that she drowned as a result of natural causes. Widmer believes that if this evidence was admitted at trial, there is a "strong probability that no reasonable factfinder would have found [him] guilty" of murder. Thus, Widmer sees no reason that he should have been denied the opportunity to test Sarah's DNA.

[*P121] We recognize that Widmer has private funds for testing, and therefore he would not place a financial burden on the state by testing for the desired outcome. However, Widmer asks us to read the term "outcome determinative" in a much broader sense than clearly intended by the legislature. Widmer contends that R.C. 2953.71(L) "simply requires a helpful DNA test result that would raise reasonable doubt * * *." However, the legislature used far more specific language that limits testing to the "subject offender's" biological tissue and the biological material of unidentified prospective perpetrators. By all accounts, postconviction relief is a very narrow remedy, and a decision expanding both the scope and the core meaning of a statutory term is more properly left to the legislature. *See Dist. Attorney's Office for Third Judicial Dist. v. Osborne,* 557 U.S. 52, 68, 129 S .Ct. 2308 (2009); *State v. Steffen,* 70 Ohio St.3d 399, 410 (1994); *State ex rel. Nimberger v. Bushnell,* 95 Ohio St. 203, 214 (1917).

[*P122] Thus, we reject Widmer's second argument.

### 3. Resolving the Issues in Widmer's Postconviction Petition

[*P123] Widmer next contends that "Ohio's official interpretation of SB 77 makes clear that a court can order DNA testing outside of the statutes when: (1) the inmate has timely filed a post-conviction motion; and (2) the court would need the results of the DNA testing to fairly assess the merits of the post-conviction claim." Here, Widmer claims that without DNA testing, the trial court could not properly assess the merits of his ineffective assistance of counsel claim. According to Widmer, a finding that Sarah suffered from Long QT Syndrome would demonstrate ineffective assistance of trial counsel, where, but for counsel's failure to seek DNA testing at the trial level, the jury could have considered whether Sarah died of natural causes.

139

[*P124] In support of this proposition, Widmer cites Attorney General Opinion No.2005–009, wherein the Ohio Attorney General stated that "R.C. 2953.71–.81 and R.C. 2953.82 are not the exclusive means by which an inmate may obtain post-conviction DNA testing," and that "Sub. S.B. 11 does not prevent an inmate from obtaining DNA testing in a post-conviction judicial proceeding when such testing will assist a court in ruling on a post-conviction motion or petition."[sic] 2005 Ohio Atty.Gen.Ops. No.2005–009, at paragraph three of the syllabus, 11.

[*P125] Widmer relies on the advisory opinion to support his assertion that the trial court abused its discretion by ruling that "genetic testing [was] not necessary and not an aide to properly evaluating the ineffective assistance claim * * *." We disagree.

[*P126] First, Widmer fails to recognize that the Attorney General was interpreting former R.C. 2953.71 to 2953.82, which were enacted pursuant to Sub.S.B. 11, not Sub.S.B. 77, which now contains the language in R.C. 2953.84 that,

> The provisions of sections 2953.71 to 2953.81 of the Revised Code by which an offender may obtain postconviction DNA testing are not the exclusive means by which an inmate may obtain postconviction DNA testing, and the provisions of those sections do not limit or affect any other means by which an offender may obtain postconviction DNA testing.

[*P127] Further, the Attorney General did not address whether offenders could petition the court to test a victim's DNA, or whether the court should grant such a request. Instead, the Attorney General simply stated that there could be additional situations in which an inmate may successfully petition the trial court to order DNA testing. *Id.* at 14, fn. 26 ("a court may in certain instances, *but is not required to,* order DNA testing when considering a post-conviction petition for relief"). (Emphasis added.) *See also State v. Constant,* 11th Dist. No.2008–L–100, 2009–Ohio–3936 (finding that 2005 Ohio Atty.Gen.Ops. No.2005–009 was rendered "moot" as a result of statutory revisions since Sub.S.B. 11).

[*P128] Moreover, to accept Widmer's argument would result in the broadest interpretation of the statutes by any court to date. Widmer perceives the Attorney General's opinion as a go-ahead for courts to

140

order DNA testing on a *victim,* so long as the results of that test would help the court resolve an issue in a postconviction claim. However, as with Widmer's other suggested interpretations, he asks us to read into the statutes a remedy that the law fails to supply. For this court to extend the DNA testing statutes to include victims, or even to incorporate the language used by the Attorney General, would be, we think, tantamount to amending the statute by judicial interpretation, "thus violating the age old principle that the duty of courts is * * * to interpret the law and not to make law." *Bayer v. Am. Ship Bldg. Co.,* 79 Ohio App. 450, 455 (8th Dist.1946). "It is not our province to guess what the [l]egislature intended but rather to ascertain the intent of the language which it did adopt* * *."*Katz v. Dept. of Liquor Control of Ohio,* 166 Ohio St. 229, 232 (1957).

[**P129]** Here, the statutes do not embrace victims as the subjects of DNA testing, and we see no indication that this was a mere oversight by the legislature. We also do not read R.C. 2953.84 to be so expansive as to include testing on victims, particularly when this would require numerous other changes to the guidelines for application and testing set forth in R.C. 2953.71 through .81. *See Bushnell,* 95 Ohio St. at 214.The operation of a statute should not "be so enlarged as to embrace subjects not specifically enumerated * * * if the legislature desires to include certain persons who are not included within the terms of a statute, it should act and the statute should not be extended by judicial construction." 85 Ohio Jurisprudence 3d, Avoidance of Interpolation and the Like, Section 132 (2012). *See also Police & Firemen's Disability & Pension Fund v. Akron,* 149 Ohio App.3d 497, 2002–Ohio–4863, ¶ 14 (9th Dist.) ("[a] statute cannot be extended by construction to persons or things not falling within its terms, although they may appear to be within the reason and spirit of the statute").

[**P130]** Thus, we decline to adopt Widmer's interpretation of the DNA testing scheme, and we reject his idea that this case falls "squarely" within the scenario outlined by the Attorney General's opinion. *See In re Estate of Roberts,* 94 Ohio St.3d 311, 317 (2002) ("[t]here is no authority under any rule of statutory construction to add to, enlarge, supply, expand, extend or improve the provisions of the statute to meet a situation not provided for"). The DNA testing statutes, or any suggested interpretations thereof, do not support a finding of an abuse of discretion in this matter.

[**P131]** However, even if, strictly for the sake of this opinion, we consider Widmer's argument, we would still reject his claim that the

trial court erred by overruling his ineffective of counsel claim without resorting to DNA testing results.

[*P132] In a postconviction petition asserting ineffective assistance of counsel, the petitioner must first show that "his trial counsel's performance was deficient; and second, that the deficient performance prejudiced the defense to the point of depriving the appellant of a fair trial." *State v. Oberding,* 12th Dist. No. CA2011–09–101, 2012–Ohio–3047, ¶ 28, citing *Strickland,* 466 U.S. 668.*See also State v. Pankey,* 68 Ohio St.2d 58, 59 (1981). Regarding the first prong, a petitioner must demonstrate that his counsel's representation "fell below an objective standard of reasonableness." *Strickland* at 688. The second prong requires the petitioner to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697. "A defendant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other." *State v. Madrigal,* 87 Ohio St.3d 378, 389 (2000), citing *Strickland* at 697.

[*P133] A trial court's decision resolving a postconviction claim of ineffective assistance of counsel "will be upheld absent an abuse of discretion when the trial court's finding is supported by competent and credible evidence." *Gondor,* 2006–Ohio–6679 at ¶ 60.

[*P134] Here, Widmer fails to demonstrate an abuse of discretion by the trial court, where a showing that Sarah actually suffered from Long QT Syndrome was not necessary for determining whether Widmer suffered prejudice as a result of trial counsel's failure to seek DNA testing.[12]

> FN12. Widmer admits that it "may have been impossible for trial counsel to pursue [DNA testing] based on the technology available at the time." However, in order to analyze the prejudice prong of *Strickland*, we will assume, without finding that the appropriate DNA tests were available prior to or during the third trial.

[*P135] "A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland,* 466 U.S. at paragraph 2(b) of the syllabus. As the trial court noted here, even without DNA testing results, the jury heard, and presumably considered, expert testimony as to the possibility that Sarah suffered

142

from a sudden cardiac event, including Long QT Syndrome.[13] Widmer has failed to show that, but for trial counsel's failure to seek actual DNA testing, the jury's consideration of this matter would have been different. Given the amount of evidence in favor of Widmer's guilt, as well as the evidence already before the jury regarding Long QT Syndrome, Widmer has failed to demonstrate that counsel's failure to seek DNA testing deprived him of "a trial whose result is reliable." *Id.* at 687.

> FN13. Specifically, Widmer elicited testimony about Long QT Syndrome from Dr. Russel Uptegrove, Dr. Michael Gregory Balko, and Dr. William Rogers. For instance, on direct examination, Widmer specifically asked Balko whether, based on Sarah's clinical history and the autopsy, there was any evidence that she suffered from Long QT Syndrome, Balko responded affirmatively, and explained that Sarah exhibited several traits commonly associated with a specific strain of Long QT called Anderson Tawil Syndrome, including a cleft palate and headaches. In the context of Long QT Syndrome and other heart conditions, Rogers testified that some manifestations of sudden cardiac death would not be detectable in an autopsy, and that patients who never exhibited symptoms of a cardiac condition could still have one, and that it could cause them to drown. Widmer drew similar testimony about autopsies from Uptegrove on cross-examination.

[*P136] In sum, we reject Widmer's argument that the trial court abused its discretion by dismissing his ineffective assistance of counsel claim without ordering DNA testing on Sarah's biological remains.

### 4. Constitutionality

[*P137] Next, Widmer challenges the constitutionality of Ohio's DNA testing scheme on due process and equal protection grounds.

### a. Standard of Review

[*P138] We begin our discussion with the premise that all statutes are presumed constitutional. *State v. Thompkins,* 75 Ohio St.3d 558, 560 (1996). "The party challenging the statutes bears the burden of proving otherwise." *Id.* "Further, the legislation being questioned will not be invalidated unless the challenger establishes that it is unconstitutional beyond a reasonable doubt." *Id., citing Arnold v.*

143

*Cleveland,* 67 Ohio St.3d 35, 38–39 (1993).

### (1) Due Process

[*P139] Widmer first claims that the trial court's refusal to grant him access to Sarah's biological remains constitutes a violation of his substantive and procedural due process rights under the Ohio and United States Constitutions. Specifically, Widmer contends that it violates due process to prevent those who are willing to pay for DNA testing from accessing the state's evidence to test a victim's DNA for a genetic defect.

[*P140] As to Widmer's substantive due process claim, the Supreme Court of the United States has unambiguously concluded that there is no substantive due process right to obtain evidence for DNA testing in a postconviction setting. *See Osborne,* 557 U.S. at 68. Accordingly, Widmer fails to establish a substantive due process right to access Sarah's biological remains for DNA testing.

[*P141] Regarding Widmer's procedural due process claim, the Supreme Court mandates a two-step analysis: "We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke,* ___ U.S. ___, ___, 131 S.Ct. 859, 861 (2011). "A liberty interest may arise from the Constitution itself * * * or it may arise from an expectation or interest created by state laws or policies * * *." *Wilkinson v. Austin,* 545 U.S. 209, 221, 125 S.Ct. 2384 (2005).

[*P142] First, postconviction relief is strictly a statutory right, not a constitutional right. *See State v. McGuire,* 12th Dist. No. CA2000–10–011, 2001 WL 409424, * 8 (Apr. 23, 2001). Thus, we ask whether Ohio law recognizes the existence of a liberty interest in the postconviction DNA testing of a victim's biological remains. We find that it does not. As previously discussed, the plain language of the current DNA testing statutes does not include within their scope the testing of a victim's DNA. *See Doe v. Marlington Local Sch. Dist. Bd. of Edn.,* 122 Ohio St.3d 12, 2009–Ohio–1360, ¶ 29; *Katz,* 166 Ohio St. at 232; *Bushnell,* 95 Ohio St. at 214. Thus, because Widmer has no statutorily recognized liberty interest in accessing the state's evidence to test Sarah's DNA, he is not entitled to procedural due process. *See, e.g., Olim v. Wakinekona,* 461 U.S. 238, 103 S.Ct. 1741 (1983).

### (2) Equal Protection

[*P143] Widmer also claims that the trial court's application of R.C. 2953.71 et seq. violates his equal protection rights.

[*P144] The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides, "No State shall * * * deny to any person within its jurisdiction the equal protection of the laws." Ohio's Equal Protection Clause, Section 2, Article I of the Ohio Constitution, states, "All political power is inherent in the people. Government is instituted for their equal protection and benefit * * *." These constitutional guarantees do not forbid classifications. "[They] simply keep[ ] governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Burnett v. Motorists Mut. Ins. Co.,* 118 Ohio St.3d 493, 2008–Ohio–2751, ¶ 30; *Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326 (1992). Thus, the comparison of only similarly situated persons or groups is integral to an equal protection analysis. *See, e.g., GTE N., Inc. v. Zaino,* 96 Ohio St.3d 9, 2002–Ohio–2984, ¶ 22.

[*P145] Here, Widmer's claim fails for the fundamental reason that he is not similarly situated to the offenders listed in R.C. 2953.71 et seq. so as to violate the guarantees of equal protection. There is a vast difference between offenders who seek to compare their own DNA against that of an unidentified prospective perpetrator, and those who wish to test a victim's DNA for, perhaps, an interminable array of ailments in the hopes of discovering some mitigating evidence. The concepts are so distinct as to be beyond comparison, and, quite simply, "there is no requirement of equal treatment between differently situated persons." *Home Depot U.S.A., Inc. v. Levin,* 121 Ohio St.3d 482, 2009–Ohio–1431, ¶ 19, citing *GTE* at 22 ("the Equal Protection Clause does not require things which are different in fact * * * to be treated in law as though they were the same").

[*P146] Accordingly, we find that Widmer's equal protection claim lacks merit.

### D. Conclusion

[*P147] Having considered and rejected all of Widmer's arguments regarding Ohio's postconviction DNA testing scheme, we overrule Widmer's third assignment of error.

*Widmer*, 2013-Ohio-62.

To the extent that Mr. Widmer challenges the state court's interpretation of the statutory postconviction DNA testing scheme on state law grounds, that claim is not cognizable in habeas. *Estelle*, 502 U.S. at 67-68.   The Court turns to Mr. Widmer's constitutional claims of due process and equal protection violations.

There is no substantive due process right to obtain evidence for postconviction DNA testing. *District Attorney's Office for Third Judicial District v. Osborne*, 557 U.S. 52, 68 (2009). Although *Osborne* was a Section 1983 matter as opposed to habeas, the Court's discussion of DNA testing *vis-à-vis* due process is persuasive:

> The Court of Appeals below relied only on procedural due process, but Osborne seeks to defend the judgment on the basis of substantive due process as well. He asks that we recognize a freestanding right to DNA evidence untethered from the liberty interests he hopes to vindicate with it. We reject the invitation and conclude, in the circumstances of this case, that there is no such substantive due process right. "As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). Osborne seeks access to state evidence so that he can apply new DNA-testing technology that might prove him innocent. There is no long history of such a right, and "[t]he mere novelty of such a claim is reason enough to doubt that 'substantive due process' sustains it." *Reno v. Flores,* 507 U.S. 292, 303, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993).
>
> And there are further reasons to doubt. The elected governments of the States are actively confronting the challenges DNA technology poses to our criminal justice systems and our traditional notions of finality, as well as the opportunities it affords. To suddenly constitutionalize this area would short-circuit what looks to be a prompt and considered legislative response. The first DNA testing statutes were passed in 1994 and 1997. Act of Aug. 2, 1994, ch. 737, 1994 N.Y. Laws 3709 (codified at N.Y.Crim. Proc. Law Ann. § 440.30(1–a) (West)); Act of May 9, 1997, Pub. Act No. 90–141, 1997 Ill. Laws 2461 (codified at 725 Ill. Comp. Stat., ch. 725, § 5/116-3 (a) (West)). In the past decade, 44 States and the Federal

146

Government have followed suit, reflecting the increased availability of DNA testing. As noted, Alaska itself is considering such legislation. See *supra,* at 2316 – 2317. "By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore exercise the utmost care whenever we are asked to break new ground in this field." *Gluchsberg,* 521 U.S. at 720, 117 S.Ct. 2258 (internal quotation marks omitted). "[J]udicial imposition of a categorical remedy ... might pretermit other responsible solutions being considered in Congress and state legislatures." *Murray v. Giarratano,* 492 U.S. 1, 14, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989) (KENNEDY, J., concurring in judgment). If we extended substantive due process to this area, we would cast these statutes into constitutional doubt and be forced to take over the issue of DNA access ourselves. We are reluctant to enlist the Federal Judiciary in creating a new constitutional code of rules for handling DNA. [FN4]

> FN4. The dissent asserts that our position "resembles" Justice Harlan's dissent in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).    *Post,* at 2339, n. 10 (opinion of STEVENS, J.). *Miranda* devised rules to safeguard a constitutional right the Court had already recognized. Indeed, the underlying requirement at issue in that case that confessions be voluntary had "roots" going back centuries.   *Dickerson v. United States,* 530 U.S. 428, 432-433, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). In contrast, the asserted right to access DNA evidence is unrooted in history or tradition, and would thrust the Federal Judiciary into an area previously left to state courts and legislatures.

Establishing a freestanding right to access DNA evidence for testing would force us to act as policymakers, and our substantive-due-process rulemaking authority would not only have to cover the right of access but a myriad of other issues. We would soon have to decide if there is a constitutional obligation to preserve forensic evidence that might later be tested. Cf. *Arizona v. Youngblood,* 488 U.S. 51, 56-58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).  If so, for how long? Would it be different for different types of evidence? Would the State also have some obligation to gather such evidence in the first place? How much, and when? No doubt there would be a miscellany of other minor directives. See, *e.g., Harvey v. Horan,* 285 F.3d 298, 300-301 (C.A.4 2002) (Wilkinson, C. J., concurring in denial of rehearing).

147

In this case, the evidence has already been gathered and preserved, but if we extend substantive due process to this area, these questions would be before us in short order, and it is hard to imagine what tools federal courts would use to answer them. At the end of the day, there is no reason to suppose that their answers to these questions would be any better than those of state courts and legislatures, and good reason to suspect the opposite. See *Collins, supra*, at 125, 113 S.Ct. 853; *Glucksberg, supra*, at 720, 117 S.Ct. 2258.

* * *

DNA evidence will undoubtedly lead to changes in the criminal justice system. It has done so already. The question is whether further change will primarily be made by legislative revision and judicial interpretation of the existing system, or whether the Federal Judiciary must leap ahead—revising (or even discarding) the system by creating a new constitutional right and taking over responsibility for refining it.

Federal courts should not presume that state criminal procedures will be inadequate to deal with technological change. The criminal justice system has historically accommodated new types of evidence, and is a time-tested means of carrying out society's interest in convicting the guilty while respecting individual rights. That system, like any human endeavor, cannot be perfect. DNA evidence shows that it has not been. But there is no basis for Osborne's approach of assuming that because DNA has shown that these procedures are not flawless, DNA evidence must be treated as categorically outside the process, rather than within it. That is precisely what his § 1983 suit seeks to do, and that is the contention we reject.

*Osborne*, 557 U.S. at 73-75; *see also Skinner v. Switzer*, 562 U.S. 521, 525 (2011); *In re: Smith*, 349 Fed. Appx. 12 at*4 (6th Cir. 2009); *Vinzant v. Lazaroff*, No. 3:04-cv-444, 2009 WL 2412023 at *5 (S.D.Ohio Aug. 4, 2009)(Merz, M.J.)(*citing Osborne, supra.*)

Based on the authority of *Osborne*, this Court concludes that Mr. Widmer's substantive due process claim is without merit.

As to Mr. Widmer's procedural due process claim, while *Osborne* rejected the extension of

substantive due process to the area of postconviction DNA testing claims, it also left slim room for success on a procedural due process claim. *Skinner*, 562 U.S. at 525, *citing Osborne*, 557 U.S. at 70, 72 (Scalia, J. concurring).

In a procedural due process claim, standard analysis proceeds in two steps: "We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient. *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011), *citing Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454 (1989).

A criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man. *Osborne*, 557 U.S. at 68. A state accordingly has more flexibility in deciding what procedures are needed in the context of postconviction relief." *Id.* When a state provides avenues for convicted defendants to seek relief, "due process does not 'dictate the exact form such assistance must assume.'" *Id.*, *citing Pennsylvania v. Findley*, 481 U.S. 551, 559 (1987). "Federal courts may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided." *Osborne*, 557 U.S. at 69. "Since 2003, Ohio law has provided specific procedures for postconviction DNA testing. Under Ohio Revised Code §§ 2953.71-2953.85, eligible offenders can request that the state perform DNA testing on biological material from their case." *Hartman v. Walsh*, No. 5:11-cv-01401, 2011 WL 5362123 at *3 (N.D. Ohio Nov. 2, 2011).

Currently, under Ohio Revised Code § 2953.71 through .81, eligible offenders may petition the trial court to order state funded DNA testing on biological material from their cases. Ohio Revised Code § 2953.72(C)(1) establishes criteria for preliminary eligibility, and Ohio

Revised Code § 2953.74 outlines additional factors that must be satisfied before a trial court "may accept" an application for DNA testing. *See* Ohio Revised Code § 2953.74(B), (C).   Additionally, offenders may apply to have their own DNA compared against biological evidence recovered from the victim or the crime scene, for the purpose of scientifically precluding the offender as a "contributor of biological material from the crime scene or victim in question * * * ." Ohio Revised Code § 2953.71(G); *see also* Ohio Revised Code § 2953.74(C).   In essence, the DNA testing statutes provide an opportunity for the accused to establish that another individual committed the crime in question.

It is clear that the language of Ohio's DNA testing statutes do not include within their scope the testing of a *victim's* DNA.   Accordingly, the DNA testing scheme does not create any liberty or property interest with respect to Mr. Widmer.   Stated differently, Mr. Widmer falls outside Ohio's DNA testing statutory scheme and therefore it cannot create for him any liberty or property interests.

Because the postconviction DNA statutory scheme does not create any liberty or property interests with respect to Mr. Widmer, it is unnecessary for the Court to reach the question of what process might be due Mr. Widmer.   Accordingly, Mr. Widmer's procedural due process claim with respect to postconviction DNA is without merit.

Mr. Widmer claims next that when it denied his request to test Sarah Widmer's DNA, the trial court violated his Fourteenth Amendment equal protection rights.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides, "No State shall…deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Am. XIV, § 1.   "Of course, most laws differentiate in some

fashion between classes of persons.   The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike. *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 … (1920)." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).   To succeed on an equal protection claim, one must first show that he or she was treated differently from others who were similarly situated. *See Mt. Wlliott Cemetery Ass'n v. City of Troy*, 171 F.3d 398, 406 (6th Cir. 1999).   "The threshold element of an equal protection claim is disparate treatment…." *Scarbrough v. Morgan Cnty. Bd. Of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006).

Mr. Widmer's equal protection claim is without merit because he is not similarly situated to any of the offenders identified in Ohio Revised Code § 2953.71, *et seq.*   Specifically, Ohio's postconviction DNA statutory scheme provides that offenders may apply to have their own DNA compared against biological evidence recovered from the victim or the crime scene for the purpose of scientifically precluding the offender as a "contributor of biological material from the crime scene or victim in question…." Ohio Revised Code § 2953.71(G); *see also* Ohio Revised Code § 2953.74(C).   In other words, the DNA statutory scheme provides an opportunity for the accused to establish that another individual committed the crime.   In contrast, Mr. Widmer would like to test Ms. Widmer's DNA for the purpose of determining whether she had a genetic disorder that arguably could have caused her to drown in the bathtub.   There is simply nothing similar between an offender wanting to test and compare DNA found on the victim or at the crime scene with the offender's own DNA so that the offender can establish that another individual committed the crime and the offender wanting to test the victim's DNA to attempt to establish that the victim may have suffered from a genetic disorder which could have caused the victim's death.

The state court's decision as to Mr. Widmer's claim related to the postconviction DNA testing issue is not contrary to nor an unreasonable application of clearly established federal law. Therefore, Mr. Widmer's Ninth Ground for Relief should be rejected.

As noted above, in his Tenth Ground for Relief, Mr. Widmer argues that his counsel was ineffective for failing to pursue DNA testing of Sarah Widmer's remains for the purpose of establishing that she suffered with a genetic disorder that caused her to drown in the bathtub.

First, to the extent that Mr. Widmer's DNA claim is without merit, counsel's failure to pursue a meritless claim does not fall below an objective standard of reasonableness.  Further, even assuming that counsel's failure to pursue the DNA testing claim did fall below an objective standard or reasonableness, Mr. Widmer has failed to establish the prejudice prong of *Strickland*.

Mr. Widmer's DNA claim revolves around his claim that Sarah Widmer suffered from Long QT Syndrome which he argues could have caused her to pass out and drown in the tub.   His position with respect to the DNA testing is that such a test would establish that she did suffer with that syndrome.   However, the record establishes that the jury had before it testimony from Drs. Uptegrove, Balko, and Rogers about Long QT Syndrome and its effects on individuals.

Dr. Uptegrove, the forensic pathologist at the Montgomery County Coroner's Office and the Warren County Coroner, testified that he knows what Long QT syndrome is, that along with other cardiac problems, the people who have the syndrome more often than not have prior history of fainting, racing heartbeat, as well as a positive family history for Long QT Syndrome (Tr., ECF N. 21-8, PageID 5239-5390).   Dr. Uptegrove also testified that more often than not individuals with Long QT Syndrome have a significant history of symptomatology before they just "drop dead." *Id*.   Dr. Uptegrove testified further that while it was possible for someone to have the

syndrome without any prior history, it was debatable as to whether it was likely. *Id.* Dr. Uptegrove also testified at great length about the genetic testing aspect of an autopsy including testing for Long QT Syndrome. *Id.*

Dr. Lee, the chief forensic pathologist and deputy coroner for Licking County, Ohio, testified that he was familiar with Long QT Syndrome and was aware that there is genetic testing available to determine if a person has the Syndrome. *Id.* at PageID 5550-5678. Dr. Lee also testified that he was aware that there are numerous different cardiac syndromes that can cause death, either directly or indirectly, and leave no trace in the autopsy which would give you a negative autopsy. *Id.*

Dr. David Smile, an emergency physician, testified that he was familiar with Long QT Syndrome and Short QT Syndrome, that they are conditions of an electrically unstable heart due to membrane problems, and that they cannot be diagnosed very easily using an EKG. *Id.* at PageID 6001-6193. Dr. Smile testified further about other electrically unstable heart conditions which could cause sudden death. *Id.*

The jury heard testimony from no fewer than three physicians with respect to the Long QT Syndrome and how it might affect an individual not the least of which would arguably cause sudden death. However, it is clear that the jury chose to reject that testimony. What the jury did do was to find that the evidence against Mr. Widmer established beyond a reasonable doubt that he was responsible for Sarah Widmer's bathtub death. The introduction of the testimony related to the Long QT Syndrome simply did not impress the jury. This Court cannot say that had counsel introduced DNA evidence that she suffered from Long QT Syndrome and that the condition *may* have caused her death, the result of the trial would have been different. Therefore, Mr. Widmer

153

has failed to establish the prejudice prong of *Strickland.*

Mr. Widmer's Tenth Ground for Relief is without merit and should be dismissed.


## ELEVENTH GROUND FOR RELIEF

In support of his Eleventh Ground for Relief, Mr. Widmer argues that the postconviction court arbitrarily and unreasonably abused its discretion in violation of his procedural and substantive due process rights and his rights under the Confrontation Clause when it denied his motion to compel disclosure of Lt. Braley's and Dr. Uptegrove's grand jury testimony   (Petition, ECF No. 1, PageID 155-61).   Mr. Widmer's position is that as a result of the postconviction court's denial of his motion, he was unable to discover further evidence of a *Brady/Kyles/Napue* violation, to use such evidence to further support his postconviction petition, and to meaningfully confront Lt. Braley and Dr. Uptegrove as well as the evidence against him. *Id.*

The Warden argues in opposition that to the extent that Mr. Widmer's claim is dependent upon state law, it is not cognizable in this habeas action (Return of Writ, ECF No. 22, PageID 10176-80).   The Warden also argues that while Mr. Widmer's claim concerns a state law issue, to the extent that his federal due process rights are implicated, the state court's determination is consistent with clearly established U.S. Supreme Court precedent that requires a criminal defendant to demonstrate a particularized need in order to be entitled to grand jury materials. *Id.*

Mr. Widmer does not specifically address the Warden's arguments in his Traverse, but instead relies on the arguments he has raised in his Petition (ECF No. 25, PageID 10247).

Mr. Widmer raised this claim in the appeal related to his postconviction petition and the appellate court addressed it as follows:

[**\*P150**] Widmer now argues that the trial court erred when it denied his request to review the grand jury testimony of Lieutenant Jeff Braley and Dr. Russell Uptegrove.[14] Widmer argues that the trial court denied him due process of law and his right to access the courts.

> FN14. The trial court did not specifically overrule Widmer's motion for the disclosure of grand jury testimony. However, it is well settled that "a motion that is still pending at the time of the final disposition of a case is presumed to have been denied, and the mere failure to rule is harmless error." *State v. Piesciuk,* 12th Dist. No. CA2007-04-086, 2008-Ohio-4054, ¶28, citing *State ex rel. Cassels v. Dayton City School Dist. Bd. Of Edn.,* 69 Ohio St.3d 223 (1994).

## IV. GRAND JURY TESTIMONY

### A.  Background

[**\*P151**] Along with his postconviction petition, Widmer filed a "Motion to Compel Grand Jury Testimony of Witnesses Braley and Uptegrove," or, in the alternative, requested that the trial court perform an in camera inspection of the testimony. Widmer believed that Braley and Uptegrove likely testified to additional information before the grand jury, which was relevant to the arguments in his postconviction petition.

### B.  Braley's and Uptegrove's Grand Jury Testimony

[**\*P152**] The disclosure of grand jury testimony is governed by Crim.R. 6(E), which provides that,

> [a] prosecuting attorney * * * may disclose matters occurring before the grand jury, other than deliberations of a grand jury or the vote of a grand juror, but may disclose matters only when so directed by the court preliminary to or in connection with a judicial proceeding, or when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury.

[**\*P153**] In *State v. Greer,* the Supreme Court of Ohio stated that grand jury proceedings are secret, and that a defendant has no right

to inspect grand jury transcripts either before or during trial unless the "ends of justice require it and there is a showing by the defense that a particularized need for the disclosure exists which outweighs the need for secrecy." *State v. Greer,* 66 Ohio St.2d 139 (1982), paragraph two of the syllabus. A particularized need is established when the circumstances reveal a probability that "the failure to disclose the testimony will deprive the defendant of a fair adjudication of the allegations placed in issue by the witness' trial testimony." *Id.* at paragraph three of the syllabus.

[*P154] The existence of a particularized need is a fact question to be determined by the trial judge, and the ultimate decision rests within the sound discretion of the court. *See Greer* at paragraphs one and three of the syllabus; Crim.R. 6(E). A decision denying the release of the grand jury transcript will not be reversed absent an abuse of discretion. *State v. Coley,* 93 Ohio St.3d 253, 261 (2001). An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Gondor,* 2006–Ohio–6679 at ¶ 60.

[*P155] Widmer first claims that an inspection of Braley's grand jury testimony was necessary to determine whether Braley made any false statements to the grand jury that would support his *Brady, Kyles,* and *Napue* claims. Widmer also believes that either Braley or Uptegrove testified before the grand jury as to Braley's involvement in the autopsy, and that this testimony was essential to determining whether Braley improperly influenced Uptegrove's homicide determination. Widmer submits that he had a reasonable basis for his suspicions based on the "newly discovered" evidence that Braley,

> (1) has committed perjury in this case; (2) fabricated his background, including experience in the Air Force Special Services, in order to enjoy a meteoric rise in the Hamilton Township Police Department (*e.g.,* appointment as director of the THOR Unit); (3) has a pattern of making false statements to advance his career; (4) was grossly unqualified to hold the position he held in this case according to the unrefuted opinion of a police practices expert attesting to national standards in the field; and (5) supplied information about the case to Uptegrove, which Uptegrove admitted he considered in issuing his decision that a homicide occurred. [sic]

[*P156] From this information, Widmer constructs a basis for his

156

suspicions that falls well short of meeting his burden for the grand jury disclosure that he seeks. First, Widmer's purported particularized need for Braley's testimony is riddled with unsupported assumptions that Braley acted in conformity with his alleged past falsehoods in testifying before the grand jury. Additionally, Widmer does not explain how the nondisclosure of Braley's grand jury testimony deprived him of a "fair adjudication of the allegations placed in issue" by Braley's testimony, when we have already established that none of the above factors impacted the investigation or the evidence against Widmer, which were the topics of Braley's testimony.

[*P157] Further, as seen by his trial testimony, Dr. Uptegrove relied primarily on medical factors in making his homicide determination, rather than Braley's input, and Widmer fails to set forth a basis for his belief that the grand jury heard differently.

[*P158] In sum, Widmer has failed to set forth a particularized need for the disclosure of Braley's or Uptegrove's grand jury testimony that outweighs the need for secrecy. Thus, we find that the trial court did not abuse its discretion in denying Widmer's request for the production of the grand jury transcripts, or an in camera inspection thereof.

[*P159] Widmer's fourth assignment of error is overruled.

*Widmer*, 2013-Ohio-62.

First, this Court notes that the arguments that Mr. Widmer raises in support of his Eleventh Ground for Relief are strikingly similar to those he presented in his brief in support of his appeal of the denial of his postconviction petition (Compare, Petition, ECF No. 1, PageID 155-61 with App'x, ECF No. 20-1, Exh. 165, PageID 2410-16). In both cases, Mr. Widmer superficially refers to his procedural and substantive due process rights as well as his rights under the Confrontation Clause. Yet in neither does he cite to federal law which supports his claims that his constitutional rights were violated.

Indeed, in support of his claims in both this Court, as well as the state postconviction

157

appellate court, Mr. Widmer relies on three (3) federal cases. Those cases are *Butterworth v. Smith*, 494 U.S. 624 (1990), *United States v. Procter & Gamble*, 356 U.S. 677 (1958), and *Craig v. Lima City Schools Bd. Of Educ.*, 384 F. Supp. 2d 1136 (N.D. Ohio 2004). *Butterworth* essentially stands for the proposition that the principle of grand jury secrecy is not absolute. In *Procter & Gamble* the Court recognized the five (5) major policy rationales for maintaining the secrecy of grand jury proceedings. Finally, *Craig* acknowledges first, that the principle of grand jury secrecy is not absolute and second, that under Ohio law a court may order the disclosure of grand jury evidence. None of these cases address the issues of due process or confrontation rights nor involve any constitutional analysis.

It is clear to this Court that Mr. Widmer's Eleventh Ground for Relief involves a state law claim and it is therefore not cognizable in this habeas action. Even assuming that Mr. Widmer has submitted some federal constitutional claim, this Court concludes that he has not shown that the state court's disposition of that claim was in any way contrary to or an unreasonable application of clearly established Supreme Court constitutional precedent.

Mr. Widmer's Eleventh Ground for Relief is without merit and should be rejected.


**TWELFTH GROUND FOR RELIEF**

In his Twelfth Ground for Relief, Mr. Widmer argues that the state postconviction court erred by denying his petition without a hearing. Essentially, Mr. Widmer's position is that by failing to hold a hearing on his claim about Lt. Braley and his DNA claim, error occurred in violation of his "procedural and substantive due process rights under the U.S. Constitution including meaningful access to the courts." (Petition, ECF No. 1, PageID 162-65.). Other than

generally citing to *Brady* and *Kyles*, *see* Sixth and Seventh Grounds for Relief, *supra*, Mr. Widmer relies on no federal law to support his argument. *Id.*

The Warden argues in opposition to Mr. Widmer's claim that the state court did not err by denying Mr. Widmer a hearing on his postconviction petition (Return of Writ, ECF No. 22, PageID 10180-10183). The Warden also argues that Mr. Widmer's claim is not properly before this Court because federal habeas corpus relief does not lie for errors of state law. *Id.* Finally, the Warden argues that a hearing in this Court is precluded by *Cullen v. Pinholster*, 563 U.S. 170 (2011).

Mr. Widmer does not raise any specific arguments in response to the Warden's arguments, but again relies entirely on the arguments he raised in his Petition (Traverse, ECF No. 25, PageID 10247).

First, to the extent that Mr. Widmer seeks to have a hearing in this Court, any such hearing is barred on the authority of *Cullen*, *supra*.

As noted, the thrust of Mr. Widmer's claim is that the state court improperly denied him an evidentiary hearing on his claims related to Lt. Braley and DNA.

The Sixth Circuit has held that errors in postconviction proceedings are outside the scope of federal habeas corpus review. *Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986). "Habeas corpus is not the proper means by which prisoners should challenge errors or deficiencies in state postconviction proceedings." *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001), *quoting Kirby*, 794 F.2d at 246. A ground for relief that challenges the correctness of a state judicial proceeding and does not dispute the detention itself is not cognizable in habeas. *See Kirby,* 794 F.2d at 247-48.

Mr. Widmer's claim that the state postconviction court erred by not holding a hearing is not cognizable in habeas and his Twelfth Ground for Relief should be rejected.

159

**Conclusion**

Based on the foregoing analysis, it is respectfully recommended that the Petition be DISMISSED WITH PREJUDICE. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth Circuit that any appeal would be objectively frivolous and therefore should not be permitted to proceed *in forma pauperis*.

February 2, 2017.

s/ *Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).