# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT CINCINNATI

RYAN K. WIDMER,

                 Petitioner,            :     Case No. 1:14-cv-303

    - vs -                              District Judge Timothy S. Black
                                         Magistrate Judge Michael R. Merz

WARDEN, Correctional Reception Center,

                                   :

                Respondent.

## SUPPLEMENTAL REPORT AND RECOMMENDATIONS

This habeas corpus case is before the Court on Petitioner's Objections (ECF No. 37) to the Magistrate Judge's Report and Recommendations[1] ("Report" ECF No. 35). As permitted by Fed. R. Civ. P. 72, the Warden has filed a Response to those Objections (ECF No. 39). District Judge Black has recommitted the case for reconsideration in light of the Objections and Response (ECF No. 38).[2]

**Standard of Review**

The Report was filed upon consideration of the Petition (ECF No. 1), the State Court

---

[1] Petitioner's counsel refers to this document as "The Magistrate's Report and Recommendations." She refers to the undersigned throughout the Objections as "Magistrate." The title of the office was changed by Congress in 1991 to "Magistrate Judge." Shortening the title to "Magistrate" is an unusual contraction. While the Supreme Court is sometimes spoken of colloquially as "the Supremes," one never hears a Circuit Judge referred to as a "Circuit" or a District Judge" referred to as a "District." Why then contract "Magistrate Judge" to "Magistrate"?

[2] Recommittal orders are an ordinary part of habeas corpus practice at the Dayton and Cincinnati locations of Court. Contrary to Petitioner's counsel's unwarranted statement to the press, they do not represent a District Judge's belief that "red flags were present in the Report and Recommendations." See Butler County Journal-News May 4, 2017, at www.journal-news.com, visited June 22, 2017.

Record ("SCR," ECF Nos. 17, 18, 19, 20, 21, and 30), the Return of Writ (ECF No. 22), the Reply (ECF No. 25), and oral argument (Tr. at ECF No. 31). 28 U.S.C. § 636(b)(1)(B) authorizes a District Judge to refer to a magistrate judge for hearing and submission of proposed findings of fact and recommendations for disposition "of applications for posttrial relief made by individuals convicted of criminal offenses. . . ." 28 U.S.C. § 636(b)(1)(C) provides that a party "may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Fed. R. Civ. P. 72(b) embodies the same procedure as the statute as far as prisoner petitions are concerned.

No evidentiary hearing was held in this matter. All proposed findings of fact in the Report are based on review of the State Court Record. Thus there are no demeanor-dependent credibility findings in the Report which would be subject to clearly erroneous review. Compare *United States v. Cofield*, 272 F.3d 1303 (11th Cir. 2001).

Failure to make objections to a specific point waives appeal on that point. *Alspaugh v. McConnell*, 643 F.3d 162, 166 (6th Cir. 2011); *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Mattox v. City of Forest Park*, 183 F.3d 515, 519 (6th Cir. 1999); *Thomas v. Arn*, 474 U.S. 140 (1985). A general objection has the same effect as a failure to file altogether. *Howard v. Sec. of HHS*, 932 F.2d 505 (6th Cir. 1991). The reason is that failure to focus the district court's attention on any specific issues makes the initial reference useless and undermines the purpose of the Magistrate's Act. *Howard*, 932 F.2d at 509.

# Analysis

Petitioner has filed seventeen separate objections, often with several subparts. The Objections will be dealt with seriatim. Because of the length of the Report and Objections, the state court statement of facts and the procedural history, already recited in the Report, are not repeated here.

**Objection 1: The Report and Recommendations grossly mischaracterized Widmer's Ground 1 resulting in a flawed and off-point analysis of the state expert's body part impression testimony and its impact on Widmer's trial.**

As pleaded, Widmer's First Ground for Relief reads:

> The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent concerning Widmer's constitutional rights to due process, a fair trial, and confrontation by permitting the admission of impermissible expert opinion testimony that: (1) reached beyond the expert's purported expertise; (2) lacked scientific foundation; and (3) was based on a methodology that has been proven unreliable.

(Petition, ECF No. 1-1, PageID 56.)

In his first objection, Widmer characterizes his First Ground for Relief as being that the body part impression testimony given by William Hillard at trial

> reached beyond the province of <u>all</u> legitimate evidence. No one – not Bill Hillard, not the modern-day Einstein of criminology, no human being – could reliably identify smudges [on a bathtub] as the impressions from specific body parts or assign gender (if the smudge is even from a human) or direction to those smudges.

(Objections, ECF No. 37, PageID 10660.)

On direct appeal to the Ohio Twelfth District Court of Appeals, Widmer's Second Assignment of Error read:

> WIDMER WAS DENIED A FUNDAMENTALLY FAIR TRIAL IN VIOLATION OF HIS DUE PROCESS RIGHTS THROUGH THE ADMISSION OF IMPERMISSIBLE EXPERT OPINION TESTIMONY THAT: (1) REACHED BEYOND THE EXPERT'S PURPORTED EXPERTISE; (2) LACKED SCIENTIFIC FOUNDATION; AND (3) WAS BASED ON A METHODOLOGY THAT HAS BEEN PROVEN UNRELIABLE. ACCORDINGLY, WIDMER WAS ALSO DENIED THE RIGHT TO ADEQUATELY CONFRONT THIS EVIDENCE IN VIOLATION OF THIS SIXTH AMENDMENT RIGHTS.

The Twelfth District decided this Assignment as follows:

> [*P62] In his second assignment of error, Widmer argues that the trial court erred by allowing Hillard to testify about "body part impressions" found on the bathtub. Widmer challenges the admission of Hillard's testimony regarding: (1) the adult male forearm on the front interior wall of the bathtub; (2) the forearm impression "overlaying" circular marks made on the bathtub by bath product bottles; and (3) the fingertip marks that were in a "downward position" and were made by a person of small stature, like a child, a female, or small male. Widmer contends that the admission of such testimony was in violation of Evid.R. 702 and his Sixth Amendment rights. Specifically, Widmer argues that "Hillard's testimony runs afoul of due process and the Confrontation Clause" as Hillard was permitted to testify beyond his area of expertise and into a realm of body part impressions for which he has "no training or consistent, methodologically based, non-anecdotal experience" and his testimony was "not based on [a] scientifically valid methodology."
>
> [*P63] Prior to the commencement of the third trial, Widmer had filed a motion in limine seeking to limit Hillard's testimony by prohibiting him from testifying about the size and sex of the individuals who made the fingertip marks or the forearm impression. The motion in limine was not ruled on prior to trial and is therefore presumed to have been denied. *Choate v. Tranet, Inc.*, 12th Dist. No. CA2003-11-112, 2004 Ohio 3537, ¶ 60. At trial, Hillard was offered as an expert in the areas of crime scene analysis, fingerprint analysis, and crime scene photography. Widmer did not seek to voir dire Hillard as to his qualifications as

an expert in these fields. Rather, Hillard was admitted as an expert in the aforementioned areas without objection. Widmer did object, however, to Hillard's testimony that an adult male forearm impression was found on the bathtub, that this impression overlaid circular marks made on the bathtub by bath product bottles, and that the fingertip marks found in the bathtub were in a "downward position" and were made by a person of small stature, like a child, a female, or small male. Widmer's objections were overruled, and such testimony was deemed admissible by the trial court.

**[*P64]** We begin our analysis by determining whether Hillard's testimony was properly admitted pursuant to Evid.R. 702.

A. Evidence Rule 702

**[*P65]** "The determination of the admissibility of expert testimony is within the discretion of the trial court, and its decision will not be disturbed absent an abuse of discretion." *State v. Blankenburg*, 197 Ohio App. 3d 201, 2012 Ohio 1289, ¶ 107, 966 N.E.2d 958 (12th Dist.). An abuse of discretion implies more than an error of law or judgment; it suggests that the trial court acted in an unreasonable, arbitrary, or unconscionable manner. *State v. Barnes*, 12th Dist. No. CA2010-06-009, 2011 Ohio 5226, ¶ 23. A trial court's admission of expert testimony is not an abuse of discretion where the testimony is relevant and the criteria of Evid.R. 702 are met. *Terry v. Caputo*, 115 Ohio St.3d 351, 2007 Ohio 5023, ¶ 23, 875 N.E.2d 72.

**[*P66]** Evid.R. 702 provides that a witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *

**[*P67]** With respect to Evid.R. 702, the trial court, as part of its gatekeeping function, must assess both the relevance of the

expert's testimony and the reliability of the testimony prior to admitting such testimony into evidence. *Caputo* at ¶ 24. This gatekeeping obligation applies "not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L. Ed. 2d 238 (1999). To determine the reliability of testimony, the trial court may consider one or more of the specific factors mentioned in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93, 113 S.Ct. 2786, 125 L. Ed. 2d 469 (1993). *Kumho Tire Co.*, 526 U.S. at 141. The specific factors mentioned in *Daubert* include: (1) whether the theory or scientific technique has been tested; (2) whether the theory or technique has been subject to peer review or publication; (3) whether the method has a known potential rate or error; and (4) whether the theory has gained general acceptance in the scientific community. *Caputo*, 115 Ohio St. 3d 351, 2007 Ohio 5023 at ¶ 25, 875 N.E.2d 72, citing *Daubert* at 593-594. While consideration of the *Daubert* factors is permitted, such consideration is not required to determine the reliability of the testimony. *Kumho Tire Co.*, at 141. Rather, the test of reliability is "flexible" and *Dauberts* list of specific factors neither necessarily nor exclusively apply to all experts or in every case. *Id.* The trial court is given "broad latitude" in determining reliability. *Id.*

[**P68**] Hillard testified that he had been employed by the city of Cincinnati as a senior criminalist for five years. Prior to holding that position, he served as a police officer for 28 years. Hillard testified that he had been examining crime scenes and processing evidence for over 30 years. Some of the specific activities that he does as a criminalist include securing the scene, collecting evidence, and processing the evidence for fingerprints or any other forensic evidence. Hillard explained that most of his criminalist education and training has been through on-the-job training and from the FBI Academy in Florida. He has been trained specifically in crime scene photography, evidence collection, interpreting patterns of evidence, and the processing and analyzing of fingerprints. Hillard testified that he has responded to "thousands" of crime scenes over the years, many of which were homicide scenes. He further explained that for 10 to 15 percent of these crime scenes, he has analyzed impressions of body parts other than "fingers, hands and feet." Based on the foregoing, it is clear that Hillard's testimony related to matters beyond the knowledge of a lay person and that he was qualified as an expert in the areas of crime scene analysis, fingerprint analysis, and crime scene

photography by his knowledge, education, and experience. *See* Evid.R. 702(A) and (B).

[*P69] The issue in this case, however, is whether Hillard went beyond his expertise when testifying about the fingertip marks and forearm impression found on the bathtub. Essentially Widmer attacks the reliability of Hillard's testimony. He contends that Hillard's testimony lacked a scientific foundation as it was based on the Bertillon system of using body measurements to identify individuals, which Hillard himself admitted is unreliable. The state contends that Hillard's testimony was permissible as it was not based on the Bertillon system but rather on the methodology underlying latent fingerprint analysis. The state further argues that Hillard was qualified to testify about the forearm impression and fingertip marks based on Hillard's "many years of experience" analyzing "other" body part impressions as he had done so in 10 to 15 percent of the thousands of crime scenes he had investigated.

[*P70] The Bertillon system is defined as "a system for the identification of persons by a physical description based on anthropometric measurements, standardized photographs, notation and classification of markings, color, bodily anomalies, thumb line impressions, and other data that has been largely superseded by fingerprinting." *Webster's Third New International Dictionary* 207 (1993). [FN 7 Anthropometry is defined as "the science of measuring the human body and its parts and functional capacities [especially] as an aid to the study of human evolution and variation." *Webster's Third New International Dictionary* 93 (1993).] At trial, Hillard testified that he was familiar with the Bertillon system of identification that was based on body measurements and that such method had been proven unreliable. Contrary to Widmer's argument, however, Hillard never testified that he relied on the Bertillon system in finding or identifying the forearm impression or fingertip marks on the bathtub. Rather, Hillard testified that a body part impression is made the same way a latent print is made, by touching an object and leaving a residue behind, and the impression can be discovered using a chemical or dusting powder. Specifically, Hillard testified as to this process as follows:

> [HILLARD]: Usually when we go process a crime scene, exactly what's documented, taking pictures and analyzing what we're going to do at the crime scene, when we dust an object we use dusting powder to try to bring out a fingerprint or any other material that might be on that surface that we're processing.

With fingerprint powder it helps you see a latent print which normally can't be seen with the naked eye, latent means invisible and you use a chemical or dusting powder to bring out that fingerprint.

[STATE]: And Mr. Hillard you used the term latent print. Can you explain what latent print is in your line of work?

[HILLARD]: Latent print is usually a print that is invisible, is usually a print that is not visible to the naked eye, with the naked eye. You have to use some type of enhancing procedure.

[STATE]: And how is such a fingerprint formed, how is it made?

[HILLARD]: Yes. If you look at your fingers you have the friction skin ridges, and on these ridges you have pores and they sweat and whenever you touch something you leave a residue, a water residue and you touch something that leaves a latent print there.

[STATE]: Now for example you were talking about the fingerprints?

[HILLARD]: Yes.

[STATE]: Is that true of other parts of the body as well?

[HILLARD]: Yes. You have the same process with your feet also. You have the friction of your skin ridges on your feet.

[STATE]: And beyond the feet and the fingertips does the body in general produce those kinds of oils or things that would form impressions?

[HILLARD]: Yes. If you took the back of your hand and did the same thing you'd still have that impression. You'd dust it or anything you would have that impression as you dust it with a powder. And nonporous items gets treated with a chemical and you can develop that impression also.

[STATE]: And Mr. Hillard in your experience and you[r] years as a Criminalist, based on your training and

experience, do you have any experience in interpreting impressions that are left, that are formed that way other than fingerprints and the feet?

[HILLARD]: Yes.

[STATE]: Have you responded to crime scenes where you had to interpret impressions that were formed by other parts of the body besides the feet and hands?

[HILLARD]: Yes sir.

* * *

[STATE]: Have you received any specific training in how to interpret impressions other than fingerprints?

[HILLARD]: Again, this comes along with experience.

[*P71] Hillard did not claim that there was a recognized scientific process establishing forearm comparison as a science. Rather than trying to identify Widmer or any other individual as the source of the forearm impression through comparison, Hillard limited his testimony to the identification of the impression as one made by an adult male. Hillard did not speculate as to who specifically left the forearm impression or when the impression had been left on the bathtub. Instead, Hillard testified only as to how such an impression was made, the identification of the impression by body part, and the general characteristics of the person who left the impression (an adult male). Given his experience in analyzing crime scenes and body part impressions, for which an understanding of the science behind the transfer and discovery of latent prints or impressions is required, Hillard was more than qualified to testify as to the existence of the forearm impression. Therefore, the trial court did not abuse its discretion in admitting such testimony into evidence.

[*P72] Furthermore, we do not find that the court abused its discretion in allowing into evidence Hillard's testimony that the forearm impression overlaid circular marks left on the bathtub by bath products. Hillard testified he has more than 30 years of experience observing crime scenes and interpreting patterns of evidence. Hillard was more than qualified to testify as to his observation that the forearm impression came second in time to the circular marks. If Widmer wanted to cast doubt on the accuracy of Hillard's observations, he had the opportunity to do so during

cross-examination.

[*P73] Finally, we do not find the trial court abused its discretion in admitting Hillard's testimony about the fingertip marks found on the bathtub. Hillard testified that latent prints were discovered after dusting powder was used on the bathtub, but the prints lacked minutiae details and therefore could not be used to identify the source of the prints. Although the print lacked identifying characteristics or minutiae details, Hillard was able to determine that the print was left after someone pulled his or her fingers downward using just the fingertips.

> [HILLARD]: These impressions here are the ones I was looking at. It tells you they were fingerprints but I couldn't make a positive identification as to who they belonged to. I could just tell they were in the downward position.
>
> * * *
>
> These are the tips of the fingerprints right here and on the tips usually when you're pulling down on something you very seldom leave minutiae points there and those impressions [sic].

From his testimony, it is clear that Hillard did not rely on the Bertillon system to identify the source of the fingertip marks. Rather, Hillard utilized his training and experience in analyzing fingertip markings to determine that the markings were made by a "person of small stature, like a child, [a] female, or a small male." Although Hillard's training and experience allowed him to draw such an observation from the size and the shape of the markings, Hillard was explicit in stating that he could not identify the specific individual who made the markings, that person's gender, or when the markings had been left on the bathtub. Hillard's testimony was therefore limited to those findings and observations he was qualified to make given his 30 years of experience in analyzing crime scenes, fingerprints, and body part impressions.

[*P74] For the aforementioned reasons, we do not find that the trial court abused its discretion in admitting Hillard's testimony about the forearm impression and fingertip markings. Hillard's testimony was relevant, reliable, and permissible pursuant to Evid.R. 702. Any questions or doubts Widmer had regarding the accuracy of Hillard's observations and testimony about the forearm impression and fingertip markings were capable of being addressed

during cross-examination. Furthermore, we find that such questions about the accuracy or reliability of Hillard's testimony in this case go to the weight of the evidence rather than its admissibility.

B. Due Process and the Confrontation Clause

[*P75] We further find that the admission of Hillard's testimony did not violate Widmer's due process rights or his constitutional rights under the Sixth Amendment.

[*P76] "The Sixth Amendment to the United States Constitution made applicable to the States via the Fourteenth Amendments [due process clause] * * * provides that '[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him.'" *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 2531, 174 L. Ed. 2d 314 (2009). The Amendment guarantees a defendant the right to confront those who "bear testimony" against him. *Id., citing Crawford v. Washington*, 541 U.S. 36, 51, 124 S.Ct. 1354, 158 L. Ed. 2d 177 (2004). "A witness's testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." *Id.*, citing *Crawford* at 54.

[*P77] In the present case, Hillard was called as an expert witness at trial. His testimony about the forearm impression and fingertip markings he found on the bathtub were subject to cross-examination by Widmer. Widmer was given the express opportunity to challenge and cast doubt on Hillard's conclusions about the forearm impression and the fingertip marks. Accordingly, we do not find that Hillard's testimony was in violation of Widmer's Sixth Amendment right to confront those who bear witness against him.

[*P78] Widmer's second assignment of error is hereby overruled.

*State v. Widmer*, 2012-Ohio-4342, 2012 Ohio App. LEXIS 3801 (12th Dist. Sep. 24, 2012)("*Widmer I*").

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision

is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 785 (2011); *Brown v. Payton*, 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor*, 529 U.S. 362, 379 (2000).

Widmer seems to acknowledge this point of law in the way he pleads his First Ground for Relief: he asserts the state court's decision[3] is contrary to or an unreasonable application of Supreme Court precedent. However, Objection 1 cites only the following Supreme Court precedent for the propositions noted:

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997), cited at PageID 10663 for the proposition that "personal observations are insufficient to establish reliability."

*Chambers v. Mississippi*, 410 U.S. 284 (1973), cited at PageID 10671 for the proposition that "trial errors must not 'defeat the ends of justice' or otherwise deprive a defendant of his right to a fair trial."

The gravamen of the First Objection is that Hillard's testimony had no scientific basis and its admission therefore deprived Widmer of due process, a fair trial, and his right to confront his accusers. There is no United States Supreme Court precedent holding that admission of testimony without a scientific basis deprives a state court defendant of any one of those rights. *Joiner* is not a constitutional case at all. Applying the standard first enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court held in *Joiner* that a federal district court's admission or exclusion of proposed expert testimony should be reviewed for abuse of discretion.

*Chambers* held that it was a denial of due process for Mississippi to enforce the common

---

[3] The cited Twelfth District decision is the last reasoned state court decision on the merits of this claim and is thus the decision this Court must measure against 28 U.S.C. § 2254(d)(1). Y*lst v. Nunnemaker*, 501 U.S. 797 (1991).

law vouching rule as to a person Chambers called to the stand who admitted the murder for which Chambers was on trial, then repudiated his confession. Justice Powell noted that the vouching rule had been severely criticized by leading evidence experts McCormick, Morgan, and Wigmore and rejected altogether in the then-pending Federal Rules of Evidence. 410 U.S. at 297, n. 8 and 9. While *Chambers* is constitutional precedent, it does not hold that evidence without a scientific basis is constitutionally inadamissible.

Federal habeas corpus is available only to correct federal constitutional violations. 28 U.S.C. § 2254(a); *Wilson v. Corcoran*, 562 U.S. 1 (2010); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Smith v. Phillips*, 455 U.S. 209 (1982); *Barclay v. Florida*, 463 U.S. 939 (1983). "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

The Supreme Court itself has recently said

> AEDPA's standard is intentionally "' "difficult to meet." '" *White v. Woodall*, 572 U. S. ___, ___, 134 S. Ct. 1697, 1702, 188 L. Ed. 2d 698, 704 (2014) (quoting *Metrish v. Lancaster*, 569 U. S. ___, ___, 133 S. Ct. 1781, 1786, 185 L. Ed. 2d 988, 996 (2013)). We have explained that "'clearly established Federal law' for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." *White*, 572 U. S., at ___, 134 S. Ct. 1697, 1702, 188 L. Ed. 2d 698, 704 (some internal quotation marks omitted). "And an 'unreasonable application of' those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." Id., at ___, 134 S. Ct. 1697, 1702, 188 L. Ed. 2d 698, 704 (same). To satisfy this high bar, a habeas petitioner is required to "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U. S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

*Woods v. Donald*, 575 U.S. ___, 135 S. Ct. 1372, *; 191 L. Ed. 2d 464 (2015)(per curiam GVR), reversing *Donald v. Rapelje*, 580 Fed. Appx. 277 (6th Cir. 2014). Followed in *Virginia v. LeBlanc*, 582 U.S. ___, 198 L. Ed. 2d 186 (June 12, 2017)(GVR).

Because there is no Supreme Court constitutional precedent commanding that expert testimony must be scientifically based, much of Widmer's first objection is beside the point. For example, he notes that the Supreme Court cited the National Academy of Sciences Report, Strengthening Forensic Science in the United States: A Path Forward (2010) in *Melendez-Dias v. Massachusetts*, 557 U.S. 305 (2009). Justice Scalia did indeed cite the National Academy Report to show that much forensic analysis is done by laboratories administered by law enforcement agencies and therefore the Confrontation Clause importantly applies to reports from those laboratories. But *Melendez-Diaz* did not adopt the constitutional principle for which Widmer contends, to wit, that expert testimony in a criminal trial must be shown to have a scientific basis.

Hillard's testimony did not purport to have a scientific basis. Rather, he was permitted to testify as an expert based on his many years of experience in crime scene analysis. *State v. Widmer*, *supra*, at ¶ 72. Widmer objects that "expertise obtained through on-the-job experience still must have a scientific underpinning." (Objections, ECF No. 37, PageID 10663.) He offers no citation of authority for that proposition. In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court recognized that the *Daubert* gatekeeping rule is applicable to all expert testimony under Fed. R. Evid. 702, but also that expert testimony can come from someone who has "technical or other specialized knowledge."

Widmer compares Hillard's testimony to "an opinion based on astrology or reading tea leaves" and to "tarot card read[ing]" (Objections, ECF No. 37, PageID 10662-63). However, he

offers no scientific basis for those comparisons. Presumably a good deal of science could be cited to show that astrology and tea-leaf and tarot card reading do not produce reliable evidence. If ever presented with the case, the Supreme Court would presumably hold that a criminal conviction based on those "methods" would violate due process. But where is the scientific disproof of the method Hillard used?

Widmer's Objection 1 does not show that the Twelfth District's decision on Hillard's testimony is contrary to nor an objectively unreasonable application of Supreme Court precedent. Since that is the test he must meet, his first objection should be overruled.

**Objection 2. The Report and Recommendations erroneously finds that the state expert's body part impression testimony was based on the same methodology as latent fingerprint analysis, and that body part impression analysis is "a cousin to fingerprint collection and comparison."**

(Objections, ECF No. 37, PageID 10673.) The observations objected to are not essential to the analysis of Ground One and are hereby withdrawn.

**Objection 3. The Report and Recommendations erroneously concluded that Hillard's education background, and experience qualified him to render an expert opinion concerning the supposed forearm impression and other body part impression evidence.**

*Id.* at PageID 10676.

Despite devoting three pages of argument to this Objection, Widmer nowhere cites any place in the Report where the Magistrate Judge supposedly stated this conclusion. It was not, of course, the place of the Report to determine whether Hillard was properly qualified as an expert. That task was performed by the Warren County Court of Common Pleas. On appeal the Twelfth District determined this decision was not an abuse of discretion under Ohio R. Evid. 702 and that the trial court did not violate Widmer's constitutional rights to due process, a fair trial, and to

confront his accusers. The Report's function was to determine whether the Twelfth District's decision was contrary to or an objectively unreasonable application of Supreme Court precedent. The Report should not be read as making a de novo determination that Hillard was qualified as an expert.

**Objection 4: The Report & Recommendations erroneously failed to consider Widmer's due process claim in Ground 1 concluding that Widmer raised it for the first time in his Traverse. However, the record clearly shows that: (1) the state appellate court failed to address the due process claim presented in Ground 1, thus warranting this Court's de novo review; (2) Widmer explicitly raised the Ground 1 due process issue in great detail in all state court appeals as well as in his habeas petition; and (3) the discussion in Widmer's Traverse about *de novo* review of this claim was a direct response to the Warden's assertion that the state court ruled on the due process issue thereby warranting AEDPA deference.**

(Objections, ECF No. 37, PageID 10678.)

As he pled his First Ground for Relief, Widmer seemed to be claiming that admitting Hillard's testimony violated his "constitutional rights to due process, a fair trial, and confrontation. . . ." (Petition, ECF No. 1, PageID 56.) In his Fourth Objections, he criticizes the Report for (1) concluding the Twelfth District addressed the due process claim and (2) declining to undertake de novo review of the due process claim because "Widmer supposedly raised it for the first time in his Reply/Traverse." (Objections, ECF No. 37, PageID 10678, citing Report, ECF No. 35, at PageID 10530.)

To show that he raised his claim in "great detail" on appeal, he refers this Court to his appellate brief (ECF No. 37, PageID 10680, citing ECF No. 19-1, PageID 1849-1866). At that point in the Brief, Widmer argues his Second Assignment of Error presented five issues for review. The first two claim Hillard's testimony violates due process, Ohio R. Evid. 702, and

*Daubert*. The third claimed Hillard's testimony was unreliable. The fourth asserted Hillard's testimony made the trial fundamentally unfair. The fifth asserted Hillard's testimony violated the Due Process and Confrontation Clauses.

The Twelfth District's decision on the Second Assignment of Error is set forth at length above at pages four to twelve. The Twelfth District separated its analysis into parts relating to Ohio Evidence Rule 702 (¶¶ 65-74) and what it labeled as "Due Process and the Confrontation Clause (¶¶ 75-78). Most of the analysis is devoted to the confrontation issue, but the court did expressly conclude Widmer's due process rights were not violated, having discussed at great length the Hillard testimony.

In the Return of Writ, the Warden claimed this decision on due process was entitled to AEDPA deference (Return, ECF No. 22, PageID 10103). In his Reply, Widmer asserted "the state court completely neglected this analysis and did not speak on the subject whatsoever." (ECF No. 25, PageID 10196.)

The Twelfth District obviously did speak, albeit in conclusory fashion and after discussing the Hillard testimony at great length.[4] The Sixth Circuit has recently held AEDPA deference is required when a federal claim is raised even if the state court discusses only state law:

> *[Harrington v.]Richter* and *[Early v.] Packer* appear to require AEDPA deference where a federal issue has been raised but the state court has denied the claim with a discussion solely of state law. See *Childers v. Floyd,* 642 F.3d 953, 968-69 (11th Cir. 2011). The Supreme Court has recently granted certiorari in a case that may definitively resolve this issue. See *Cavazos v. Williams*, 132 S. Ct. 1088, 181 L. Ed. 2d 806 (2012).

*Moreland v. Bradshaw*, 699 F.3d 908, 931 (6th Cir. 2012); *Werth v. Bell*, 692 F.3d 486, 493 (6th

---

[4] Widmer may have invited conflation of the issues by conflating due process, Evid. R. 702, and *Daubert* in his Issues Presented for Review.

Cir. 2012). When a federal claim is fairly presented but not addressed, "a federal habeas court must *presume* that the federal claim was adjudicated on the merits. . ." *Ross v. Pineda*, 549 Fed. Appx. 444, 448 (6th Cir. 2013), *quoting Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013). Based on this authority, the Magistrate Judge concludes again that the Twelfth District's decision on the due process issues included in Ground One is entitled to AEDPA deference.

**Objection 5: The Report and Recommendations incorrectly claims to be bound by the state evidentiary rules relied on by the state courts to bar defense counsel from fully crossexamining Braley. However, Widmer's constitutional claims concerning Braley (raised in Grounds 6 and 7) trump the state evidentiary rules and resulted in a fundamentally unfair trial.**

**Objection 6: The Report and Recommendations: (1) applied the wrong materiality standard per *Napue* concerning whether Braley's testimony in the May 5 hearing concerned a collateral matter; and (2) erroneously accepted the state court's conclusions that Braley did not testify falsely in the May 5 hearing.**

Objections 5 and 6 are presented and argued together (ECF No. 37, PageID 10681-93). They relate to the Report's recommended disposition of Grounds for Relief Six and Seven which read:

> **SIXTH GROUND FOR RELIEF:**
>
> The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent by concluding: (1) that the State had no knowledge of material information that it withheld from the defense; and (2) that the withheld evidence pertained to a collateral matter about which Braley never testified falsely, thus even if disclosed, it would not have created prejudice or affected the outcome of Widmer's trial.
>
> **SEVENTH GROUND FOR RELIEF:**
>
> The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent by: (1) concluding that Widmer's post-conviction

18

> petition failed to point out material information known to the State that was withheld from the defense prior to or during trial; and (2) denying Widmer's due process and confrontation claims wherein he contends that, due to the State's failure to disclose the information about Braley contained in the DD&M Report, he was denied the ability to raise a *Kyles v. Whitley* defense at trial challenging the integrity of the State's investigation and confronting Braley about the information contained in the DD&M Report.

(Petition, ECF No. 1-1, PageID 100, 130.)

The Report noted that both the Sixth and Seventh Grounds for Relief "involve[d] the background of Lt. Jeff Braley, a detective lieutenant in the Hamilton Township Police Department who investigated Sarah Widmer's death." (Report, ECF No. 35, PageID 10562.) The Report noted that issues about Lt. Braley's background had been raised as the Fourth Assignment of Error on direct appeal and quoted verbatim eleven pages from the Twelfth District's decision of that assignment of error (ECF No. 35, PageID 10564-74, quoting *Widmer I* ¶¶ 111-138). The Report noted that these issues were again raised on appeal from denial of his petition for post-conviction relief (ECF No. 35, PageID 10574-10603, quoting *State v. Widmer*, 2013-Ohio-62, ¶¶ 4-103, 2013 Ohio App. LEXIS 44, (12th Dist., Jan 14, 2013),)("*Widmer II*")).

The Report concluded that the Twelfth District based its affirmance of the trial court's denial of Widmer's request to cross-examine Braley about his 1996 employment application on Ohio law, to wit, Ohio R. Evid. 608(B) and that this Court, sitting in habeas, was bound by that interpretation (ECF No. 35, PageID 10605). Widmer objects that "a federal court sitting in habeas is <u>not</u> bound by a state court's determination when the ruling ultimately deprives a defendant of a fundamentally fair trial." (Objections, ECF No. 37, PageID 10681-82, citing *Chambers v. Mississippi*, 410 U.S. 284 (1973)). As discussed above, what the Supreme Court did in *Chambers* was to hold that the usual common-law rule against impeaching one's own

witness could not constitutionally be applied when it prevented cross-examination of an essentially hostile witness, as in that case. The Supreme Court did not conclude that Mississippi misunderstood the vouching rule, which would have been a failure to defer to a state supreme court's interpretation of its own law. Rather it held that applying the vouching rule would deprive Chambers of a fair trial, in violation of the Constitution. All the Report does on this point is to hold that this Court is bound to accept the Twelfth District's interpretation of Evid. R. 608(B) as a correct statement of Ohio law, not that Ohio evidence law can displace[5] the Constitution. Objection 5 is not well taken because the Report did not claim this Court was "bound" to accept the Twelfth District's evidentiary ruling as conclusive on the constitutional questions raised.

Objection 6 asserts the Report (1) applied the wrong materiality standard about whether Braley's testimony during a May 5, 2010, hearing concerned a "collateral" matter and (2) erroneously accepted the state court's finding that Braley did not testify falsely in that hearing (ECF No. 37, PageID 10681). Widmer asserts the state courts treated Braley's honesty in the 1996 application and the May 5th hearing as collateral to Widmer's guilt or innocence and therefore not material when their materiality should have been measured against the questions at issue in the May 5 hearing itself (PageID 10683). Ultimately this prevented Widmer from using a trial strategy of "impugning the credibility of the entire investigation n of Sarah's death. . . .," a so-called *Kyles v. Whitely* defense.[6] *Id.* Widmer argues this is both contrary to and an unreasonable application of *Napue v. Illinois*, 360 U.S. 264 (1959).

---

[5] The work of Ronald Dworkin would have made the use of the word "trump" appropriate here. However, given that that is the last name of the current President of the United States, the Magistrate Judge forebears using the word in this context for fear of misinterpretation.

[6] 514 U.S. 419 (1995). The theory apparently is that if Braley's credibility could be effectively destroyed, this would undermine the credibility of the entire prosecution. The Report summarizes the *Kyles* defense in a similar way (ECF No. 35, PageID 10606, 10611).

Having quoted both Twelfth District decisions at length and noting their content, the Report eventually concluded that the state court decisions were entitled to AEDPA deference (ECF No. 35, PageID 10614).

Widmer first objects that both the Twelfth District and this Court wrongly concluded Braley's false testimony was a collateral matter by applying the wrong materiality standard (Objections, ECF No. 37, PageID 10684). Widmer's argument as the Court understands it is that Braley testified falsely at the May 5, 2010, hearing and his testimony was material to the outcome of that hearing. Therefore, the false testimony was about a material matter and Braley could have been prosecuted for perjury for that testimony under Ohio Revised Code § 2921.11(A).

The trial court made the relevant determinations in the course of deciding to quash multiple subpoenas Widmer had issued to various of Braley's former employers which was done after the May 5, 2010, hearing. The Twelfth District understood it was part of Widmer's strategy to go on the offensive with a *Kyles v. Whitely* defense. *See*, *e.g.*, *Widmer II* at ¶ 115.

> [*P130] After a careful review of the record, we find that the trial court did not abuse its discretion when it granted the motions to quash Widmer's subpoenas. Widmer failed to demonstrate that the subpoenas were not unreasonable or oppressive as he did not show that the information sought was relevant and evidentiary. Braley's testimony that he had been unaware of Hamilton Township's existence until 1997 when he took an unpaid, volunteer position as chaplain without having filled out an employment application, Brock's testimony that there was no record of Braley being associated with the township in 1996, and Shipp's testimony that he could not determine whether Braley printed the information contained within the June 25, 1996 application support the trial court's decision to quash Widmer's subpoenas. The trial court's determination that the disputed application (1) contained information that was more than 14 years removed, (2) was of unknown and questionable origin, and (3) was unlikely to lead to admissible evidence given the trial court's discretion under Evid.R. 608 to limit character evidence that would mislead the jury or

> cause confusion of the issues, was supported by the evidence and
> testimony presented at the evidentiary hearing. We therefore affirm
> the trial court's decision to grant the motions to quash Widmer's
> subpoenas duces tecum.

*Id.*

As this Court reads the Twelfth District's decision on this point, it is that whether or not

Braley testified falsely on May 5, 2010, or in his 1996 employment application was properly

excluded under Ohio R. Evid. 608(B) because it was likely to mislead the jury or cause

confusion of the issues. That is not an objectively unreasonable application of *Kyles*. Of course

whether or not Braley was testifying falsely was material to the issue in the May 5 hearing, but

that does not automatically make it admissible in Widmer's trial for murder of his wife.

**Objection 7: The Report and Recommendations' conclusion that Widmer was able to cross-examine law enforcement about the investigation even without the information in the DD&M Report misses the point of how the suppression of this information impacted defense strategy according to trial counsel's undisputed affidavit in the record.**

(Objections, ECF No. 37, PageID 10693.)

The issues raised by this Objection do not require analysis beyond what is contained in

the Report.

**Objection 8: The Report and Recommendations misinterprets *Osborne* regarding Widmer's procedural due process claim. Ohio's post-conviction relief procedure is fundamentally inadequate to vindicate Widmer's substantive rights at issue; thus *Osborne* mandates the release of the biological samples in question for DNA and genetic testing.**

**Objection 9: Regarding Grounds 9 and 10, the Report and Recommendations incorrectly concludes that evidence demonstrating that Sarah suffered from Long QT syndrome (which could result from the DNA testing Widmer has requested) is equivalent to speculation that Sarah may have had the condition. As a result, the Report and Recommendations also incorrectly concludes that the testing Widmer requested would not**

**have impacted the outcome of his trial and that his trial counsel did not provide constitutionally ineffective assistance per *Strickland*.**

(Objections, ECF No. 37, PageID 10698.)

These Objections relate to the Report's recommended disposition of Widmer's claims relating to DNA testing of biological remains of Sarah Widmer. Those claims were raised in the Ninth and Tenth Grounds for Relief, which read as follows:

### Ninth Ground for Relief

The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent by denying Widmer's post-conviction request for genetic DNA testing of Sarah Widmer's biological remains to determine if she suffered from a genetic disorder, particularly when testing was necessary to fairly adjudicate Widmer's state post-conviction claim of ineffective assistance of trial counsel for failure to pursue testing. Additionally, the state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent by concluding that genetic DNA test results suggesting that Sarah suffered from a genetic disorder that may have caused her to drown in the bathtub would not establish a reasonable probability of a different outcome at trial.

(Petition, ECF No. 1-1, PageID 139.)

### Tenth Ground for Relief

The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent in *Strickland, Wiggins,* and *Chambers* by concluding that trial counsel rendered constitutionally effective assistance, despite failing to pursue genetic DNA testing, because, according to the state courts, test results suggesting that Sarah suffered from a genetic disorder that caused her to drown in the bathtub would not establish a reasonable probability of a different outcome at trial as necessary to establish prejudice under Strickland.

*Id.* at PageID 151.

Essentially, the claims are that the state courts unconstitutionally denied post-conviction

DNA testing of Sarah Widmer's remains to determine whether she suffered from Long QT syndrome and that trial counsel was ineffective for not having sought this testing pre-trial. The Report analyzed these claims as having been raised on post-conviction appeal in the Third Assignment of Error and quoted at length the Twelfth District's disposition of that Assignment, and concluded these Grounds for Relief were without merit (Report, ECF No. 35, PageID 10616-10636).

Widmer first objects that the Constitution requires the States to provide, post-trial, "an adequate procedural mechanism" to vindicate what the Objections characterize as Widmer's "substantive[7] rights at stake," claiming that this is clearly established by *District Attorney for Third Judicial District v. Osborne*, 557 U.S. 52 (2009). Widmer's claim is that, without the genetic testing that could have proved Sarah Widmer could have drowned, he could not raise a reasonable doubt about his guilt and he could not show ineffective assistance of trial counsel for failure to request that genetic testing (Objections, ECF No. 37, PageID 10701).

The Twelfth District considered Widmer's post-trial DNA claims at length. *Widmer II* at ¶¶ 108-147. In addition to a claim about interpreting Ohio's post-trial DNA testing statute, it also considered his due process and equal protection claims. *Id.* at ¶¶ 137-46. Thus the issue on habeas is whether that decision is contrary to or an objectively unreasonable application of clearly established Supreme Court precedent. The Objections do not dispute the Twelfth District's substantive due process ruling; its equal protection ruling is dealt with *infra* at Objection 10. Rather, the Objections focus solely on the procedural due process claim. The gist

---

[7] The Objections then list these supposed substantive rights as the rights to the effective assistance of counsel, to confront the state's evidence, to present a defense, and to equal protection, if not a right to prove his innocence through evidence tending toward the fact that no crime occurred." (ECF No. 37, PageID 10699.) The first three of these are procedural rights related to criminal trials under the Sixth Amendment. While the right to equal protection of the laws is substantive, this Court is unaware of any procedural right, post-trial, to prove that a crime was not committed.

of the argument is that *Osborne*, *supra*, holds that "a [criminal] defendant must have an adequate process to access DNA evidence to vindicate a recognized substantive right." (ECF No. 37, PageID 10699.)

In *Osborne*, the defendant had been convicted of kidnapping, assault, and sexual assault. What Chief Justice Roberts described as a "relatively inexact form of DNA testing" had been used on semen found in a condom at the crime scene and linked Osborne to the crime. In postconviction he sought access to the semen sample to have the "more discriminating restriction-fragment-length-polymorphism (RFLP) DNA testing" done during or before trial. 557 U.S. at 58.[8] Osborne brought an action under 42 U.S.C. § 1983 to obtain access to the sample to subject it to "short-tandem-repeat DNA testing," which the Chief Justice noted was "extremely discriminating and is 'rapidly becoming the standard.'" *Id.* at 60, n. 3, quoting Future of Forensic Testing at 18.

The Supreme Court held that Osborne had established neither a substantive nor a procedural due process right of access to the evidence. As to the procedural due process claim, it held that Osborne had not established that Alaska's post-conviction process deprived him of a liberty interest without due process:

> [T]he question is whether consideration of Osborne's claim within the framework of the State's procedures for postconviction relief "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," or "transgresses any recognized principle of fundamental fairness in operation." *Medina* v. *California*, 505 U.S. 437, 446, 448, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992) (internal quotation marks omitted); see *Herrera, supra*, at 407-408, 113 S. Ct. 853, 122 L. Ed. 2d 203 (applying *Medina* to postconviction relief for actual innocence); *Finley, supra*, at 556, 107 S. Ct. 1990, 95 L. Ed. 2d 539 (postconviction relief procedures are constitutional if they "compor[t] with fundamental fairness"). Federal courts may upset

---

[8] Chief Justice Roberts reports that Osborne had asked his lawyer to have the RFLP testing done and the lawyer had declined because he believed more accurate testing would be damaging to the defense.

> a State's postconviction relief procedures only if they are
> fundamentally inadequate to vindicate the substantive rights
> provided.

*Id.* at 69.  The Twelfth District in this case performed precisely the analysis the Supreme Court requires in deciding constitutional due process claims.  As the Supreme Court noted in *Osborne*, the federal courts "must first examine this asserted liberty interest to determine what process (if any) is due. *See Board of Regents of State Colleges v. Roth, 408 U.S. 564, 570-571 (1972); Olim v. Wakinekona, 461 U.S. 238, 250-251 (1983).*" *Id.* at 67.  The Twelfth District determined that Ohio law did not recognize a liberty interest in postconviction testing of a victim's remains. *Widmer II* at ¶ 142.  That is a finding of state law which is preclusive of Widmer's procedural due process claim because without a state-recognized liberty interest, there is no procedural due process claim.

Regarding Widmer's Tenth Ground for Relief for ineffective assistance of trial counsel, the Twelfth District also considered this constitutional claim and upheld its denial in postconviction, concluding from the record that Widmer had and used a number of avenues to introduce the idea of sudden cardiac arrest as a result of Long QT syndrome to the jury. *See Widmer II* at ¶¶134-136.  This is not a case where trial counsel was unaware of a possible defense and failed to pursue it.  Instead, he was able to elicit relevant testimony from three different expert witnesses that Sarah Widmer had exhibited symptoms consistent with that genetic syndrome, that death from this cause would not be detectable on autopsy, and that the syndrome can cause people who have it to drown. *Widmer II*, ¶ 135, at n. 13.  Assuming as argued by Widmer that the testing he proposed to have done would definitively show, one way or the other, whether Sarah suffered from the syndrome, his trial counsel could well have been in the same position as the trial attorney in *Osborne*, i.e., not seeking the more definitive test

because the expert testimony without the test would be better at raising a reasonable doubt. Sarah was never diagnosed with the syndrome. If the test had been done and had come back negative, trial counsel would have lost the entire possibility of arguing that alternative cause of death. Sometimes it is better not to know the results of the testing. The Twelfth District cites its own prior case of *State v. McGuire*, 2001 Ohio App. LEXIS 1826 (12th Dist. Apr 23, 2001). When McGuire obtained DNA testing during habeas proceedings in this Court, it confirmed his identity as a contributor to the sperm found in the victim's rectum and McGuire was executed in January 2014.

The Twelfth District's decision on the ineffective assistance of trial counsel claim for not obtaining Long QT genetic testing pretrial is not an objectively unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984), or *Wiggins v. Smith*, 539 U.S. 510 (2003).

**Objection 10: In evaluating Widmer's equal protection claim, the Report and Recommendations incorrectly concludes that Widmer is not similarly situated to the individuals in [sic] which the Report and Recommendations finds to fall within Ohio's DNA testing scheme.**

Widmer's claim under the Equal Protection Clause is also made in his Ninth Ground for Relief.[9] The Twelfth District decided that claim on the merits, concluding Widmer was not similarly situated to the persons who come within Ohio's post-conviction DNA statute. *Widmer II* at ¶¶143-46. The Report endorsed that conclusion (ECF No. 35, PageID 10632-10634).

The Twelfth District found:

> There is a vast difference between offenders who seek to compare their own DNA against that of an unidentified prospective perpetrator, and those who wish to test a victim's DNA for, perhaps, an interminable array of ailments in the hopes of

---

[9] The text of the Ninth Ground does not mention equal protection, but Widmer's equal protection claims were argued under that Ground and decided by the Twelfth District under the parallel assignment of error.

> discovering some mitigating evidence. The concepts are so
> distinct as to be beyond comparison. . . .

*Widmer II* at ¶ 145.

Widmer first objects that a victim's DNA is tested every time rape kit DNA is analyzed (Objections, ECF No. 37, PageID 10706). That is true but irrelevant. A rape victim's DNA is not profiled to exclude some genetic ailment which might make it appear as if she had been raped when she had not. The Ohio statute does not draw distinction between victims and perpetrators. Rather, as interpreted here by the Twelfth District, it authorizes testing to determine identity and not for other purposes. The question under the Equal Protection Clause must then be whether there is any rational basis for distinguishing testing for identification purposes and testing for other purposes. The Equal Protection Clause commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. The Supreme Court has stated that this language "embodies the general rule that States must treat like cases alike but may treat unlike cases accordingly." *Vacco v. Quill*, 521 U.S. 793, 799 (1997). The states cannot make distinctions which either burden a fundamental right, target a suspect class, or intentionally treat one differently from others similarly situated without any rational basis for the difference. *Id.; Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam); *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005). Although it is not stated in the Twelfth District's opinion, the Report notes the rational basis for the distinction (Report, ECF No. 35, PageID 10633). DNA testing to confirm or disconfirm the identity of a perpetrator has proven its extraordinary value to society, even post-trial. See Convicting the Innocent: Where Criminal Prosecutions Go Wrong – Brandon L. Garrett. Its worth in exonerating defendants on the basis of proving that victims of their crimes of conviction

actually died of natural causes is, so far as this Court is aware, completely speculative. It was

not irrational for the General Assembly to authorize one and not the other.

**Objection 11: It is well-established in the record that Widmer's federal habeas counsel (undersigned counsel) never acted as Widmer's state trial counsel. Therefore, Widmer is eligible to raise ineffective assistance of trial counsel claims both as stand alone claims and to satisfy the cause and prejudice standard to excuse any procedural defaults that this Court may find to exist. The Report and Recommendations is incorrect to make any use of this false point concerning counsel's representation.**

(Objections, ECF No. 37, PageID 10709.)

To the extent that the Report may appear to adopt the Warden's argument that Widmer's

present counsel is foreclosed from raising ineffective assistance claims because she began

representing Widmer after his first trial, the Report is in error and the Objection is well-taken.

**Objection 12: The Report and Recommendations misstates the facts concerning evidence purportedly found in the bathtub, which obfuscates the Report's assessment of: (1) whether the search warrant was sufficiently specific; and (2) Widmer's ineffective assistance of trial counsel claim regarding the seizure of the bathtub and its use in evidence. (Ground 3).**

(Objections, ECF No. 37, PageID 10711.)

Upon review the Magistrate Judge concludes this Objection need not be treated apart

from the Second Ground for Relief.

**Objection 13: The Report and Recommendations incorrectly concludes that Widmer's bathtub seizure argument is procedurally defaulted and/or not cognizable before this Court. To the contrary, Widmer's claim is not procedurally defaulted because: (1) Widmer raised his Fourth Amendment claim as a stand-alone claim, not just as a subclaim of ineffective assistance of trial counsel; and (2) the state appellate court did not enforce any procedural bars against Widmer's bathtub seizure issue, but rather addressed the Fourth Amendment claim on the merits. Additionally, Ground 2 is not barred by *Stone v. Powell* because: (1) it involves questions about the integrity of evidence and the judicial proceedings; and (2) it implicates Widmer's personal constitutional rights.**

**For these reasons, the Report and Recommendations should have addressed Ground 2 on the merits and concluded that the state court ruled contrary to or unreasonably applied Supreme Court precedent concerning the particularity and reasonableness requirements of the Fourth Amendment and law enforcement's good faith in seizing the bathtub.**

(Objections, ECF No. 37, PageID 10714.)

> This Objection relates to Widmer's Second Ground for Relief which reads as follows:

>> The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent concerning Widmer's constitutional rights to be free from unlawful and unreasonably [sic] seizures of his real property by permitting the State to seize the bathtub from his house pursuant to a general "evidence or instrumentality of the crime" or "latent fingerprint" provision of a search warrant when the tub's significance was known to law enforcement at the time the search warrant is obtained and executed, yet the tub was not particularly described in the search warrant as an item to be seized. Seizure of real property is unreasonable under the Fourth Amendment without particularized, court-sanctioned authority.

(Petition, ECF No. 1-1, PageID 77.)


**Procedural Default**


The Report concluded this Second Ground for Relief was procedurally defaulted because Widmer never filed a motion to suppress the bathtub prior to the third trial, the trial that produced the conviction before this Court (Report, ECF No. 35, PageID 10535-36). Widmer objects to this conclusion,[10] asserting that he pled the bathtub seizure as a "stand-alone claim" the Twelfth District addressed the claim on the merits (Objections, ECF No. 37, PageID 10714).

The record shows that Widmer made his claims on appeal related to the bathtub seizure

---

[10] Widmer labels this section of his Objections "Widmer's Fourth Amendment claim is properly exhausted." (Objections, ECF No. 37, PageID 10714.) However, it is the procedural default doctrine that is in issue. The Warden does not assert lack of exhaustion of available state court remedies.

all as part of Assignment of Error No. 1:

> TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS BY FAILING TO TIMELY PROSECUTE WHAT WOULD HAVE BEEN A MERITORIOUS MOTION TO SUPPRESS THE BATHTUB AND ALL EVIDENCE RELATED TO SAID TUB DISCOVERED FOLLOWING ITS UNLAWFUL SEIZURE. THE STATE UNCONSTITUTIONALLY SEIZED THE BATHTUB PURSUANT TO A SEARCH WARRANT WHICH NEITHER LISTED THE BATHTUB AS AN ITEM TO BE SEIZED NOR COULD BE CONSTRUED TO VALIDLY INCLUDE THE BATHTUB UNDER THE OVERLY BROAD "LATENT FINGERPRINT" LANGUAGE.

*Widmer I* at ¶ 40. Widmer is correct that the Twelfth District never decided he had procedurally defaulted his bathtub seizure claim. Rather, it treated that claim as a necessary predicate to this ineffective assistance of trial counsel claim. Finding the seizure was constitutional, it found his attorney had not performed deficiently in failing to move to suppress. *Id.* at ¶¶ 41-59. Therefore Widmer's objection that his Fourth Amendment claim regarding seizure of the bathtub is not procedurally defaulted it well taken and the portion of the Report recommending that this claim is procedurally defaulted is withdrawn (See Report, ECF No. 35, PageID 10536).


### *Stone v. Powell* Preclusion


Aside from procedural default, the Report concluded that Widmer's Fourth Amendment claims were barred from merits review (Report, ECF No. 35, PageID 10530-37, relying on *Stone v. Powell*, 428 U.S. 465 (1976), and its progeny in the Sixth Circuit, *Good v. Berghuis*, 729 F.3d 636 (6th Cir. 2013)(Sutton, J.)).

Widmer objects that, per *Good*, "Fourth Amendment claims are barred only when the prisoner's Fourth Amendment claim is solely rooted in exclusionary rule principles."

(Objections, ECF No. 37, PageID 10718.)  This position substantially overreads *Good*.  In the passage cited, Judge Sutton recited the explanations supporting *Stone*, to wit, that Fourth Amendment violations are collateral to the guilt or innocence of a defendant and "exclusion is a prudential deterrent, not a personal right guaranteed by the Constitution." 729 F.3d at 637.

Widmer claims, however, that when the evidence sought to be excluded goes to "the integrity of the evidence and judicial proceedings . . . and/or when the petitioner's personal constitutional rights are at stake," *Stone* does not preclude habeas review (Objections, ECF No. 37, PageID 10719, citing *Stone*, 428 U.S. at 493).  In other words, Widmer asserts that when a habeas petitioner's Fourth Amendment claims are outside the rationale of the exclusionary rule, *Stone* does not preclude habeas review.  With respect, that is not what *Stone* says.  The Court did not limit its preclusion rule to cases where the rationale for adopting that rule was plainly satisfied.  Instead, it held:  "In sum, we conclude that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. at 494.

To read the *Stone* decision as allowing Fourth Amendment claims in habeas wherever the petitioner could show that, apart from the introduction of the evidence at trial, his "personal constitutional rights [were] at stake," would completely gut the rule.  If a defendant's personal constitutional rights have not been somehow invaded in making the seizure, he would not have standing to complain of the violation.  More generally, if a rule can be avoided by showing that its application in a particular instance is not supported by the supposed rationale of the rule, it hardly counts as a rule at all.  Finally, Widmer cites no federal court as adopting his reading of *Stone*.

In addition to suggesting this novel exception to *Stone v. Powell*, Widmer asserts his Fourth Amendment claims come within the *Stone* exception for claims not fully and fairly adjudicated in the state courts (Objections, ECF No. 37, PageID 10724). He first asserts his claim was not fully and fairly adjudicated because his lawyer failed to file a motion to suppress before the third trial. *Id.* at PageID 10726. For the reasons given by the Twelfth District, that was not ineffective assistance of trial counsel because any such motion would not have been well taken.

He next claims he was denied a full and fair opportunity to have his Fourth Amendment claims adjudicated because of the Twelfth District's "refusal to consider or apply controlling Supreme Court precedent." (Objections, ECF No. 37, PageID 10726.) The Report, it is claimed "followed suit" *Id.* at PageID 10727.

Instead of arguing this Objection, Widmer purports to "incorporate by reference" sections of his Petition and Traverse, thus requiring the Court to turn from his ninety-two page Objections to his 150-page Petition and his fifty-eight page Reply to find out what Supreme Court precedent he claims the Report does not address. This is not good practice. Nothing in the Rules Governing § 2254 Cases remotely suggests that this is acceptable. Objections are required to be specific.

However, having turned as directed to the Petition and Traverse, the Court finds the argument that the Twelfth District "refused to properly or reasonably apply" the following Supreme Court precedent: *Marron v. United States*, 275 U.S. 192 (1927); *Coolidge v. New Hampshire*, 403 U.S. 443 (1971)(cited in the Petition); and *United States v. Leon*, 468 U.S. 897 (1984), and *Davis v. United States*, 564 U.S. 229 (2011)(cited in the Reply).

Whether or not the Twelfth District's application of Supreme Court precedent is

objectively reasonable is dealt with below in the merits section.  But Widmer cites no authority

for the proposition that if a state court decision on a Fourth Amendment issue does not satisfy 28

U.S.C. § 2254(d)(1), that fact eliminates the *Stone v. Powell* bar on habeas relief for Fourth

Amendment violations except *Abdul-Mateen v. Hofbauer*, 2000 U.S. App. LEXIS 11788 (6th Cir.

May 19, 2000).  Being unpublished, *Abdul-Mateen* is not binding precedent, but in any event it

denied rather than granting habeas review of a Fourth Amendment claim.  The language for

which Widmer cites *Abdul-Mateen* is quoted from *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir.

1982).  In *Riley* the Sixth Circuit expressly disclaimed that "egregious error" approach of the

Tenth Circuit in *Gamble v. Oklahoma*, 583 F.2d 1161 (10th Cir. 1978).  The *Riley* Court held

Ohio's mechanism for resolving Fourth Amendment claims was clearly adequate in the abstract.

However, it also noted that

> When a petitioner alleges egregious error in the application of
> fourth amendment principles, of a magnitude and nature similar to
> the state court error present in *Gamble*, however, a federal habeas
> court might be justified in concluding that an opportunity for a full
> and fair hearing had not been afforded the petitioner.

674 F.2d at 526.  The "egregious error" in *Gamble* had been in the state court's refusal to

consider Supreme Court precedent "almost directly in point." *Gamble*, 583 F.2d at 1164.

In this case, the Supreme Court precedent that Widmer says was not correctly applied is

nowhere near directly in point.  His Fourth Amendment claim relates to the seizure of the

bathtub which he claims was unconstitutional because it was real property protected by the

House provision of the Fourth Amendment and could not properly be characterized as an

instrumentality of the crime.  None of the four Supreme Court cases cited is anywhere near in

point.  *Coolidge* deals with searches conducted outside the judicial process; *Leon* and *Davis*

apply the so-called good faith exception to the exclusionary rule.  *Marron* upheld a seizure as

incident to a lawful arrest. Merits review of Widmer's bathtub seizure claim is barred by *Stone v. Powell*.

**Merits of the Bathtub Seizure Issues**

In the alternative, the claim that seizure of the bathtub was unconstitutional is without merit. The Twelfth District decided that claim as follows:

> [**\*P45**] We begin our analysis by determining whether seizure of the bathtub was in violation of the Fourth Amendment. The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures and provides:
>
> > The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
>
> The manifest purpose of the Fourth Amendment's particularity requirement is to prevent general searches. *Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L. Ed. 2d 72 (1987). "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Id.* Where the items seized are evidence or instrumentalities of a crime, a court must determine whether the warrant could reasonably have described the items more precisely than it did. *State v. Benner*, 40 Ohio St.3d 301, 307, 533 N.E.2d 701, 535 N.E.2d 315 (1988). A search warrant will be held sufficiently particular when it enables a searcher to reasonably ascertain and identify the things which are authorized to be seized. *State v. McCroy*, 6th Dist. Nos. WD-09-074 and WD-09-090, 2011 Ohio 546, ¶ 37; *United States v. Blakeney* 942 F.2d 1001, 1026 (6th Cir.1991).
>
> [**\*P46**] The search warrant executed on August 13, 2008,

authorized police to search the Widmers' residence for the following:

> [G]oods, chattels, or articles, and to retrieve any evidence of criminal activity which may be found, to wit: the wallet of Sarah A. Widmer (Deceased); calendars; computers; computer perherials [sic], including external hard drive(s), modums [sic], mediums for the electronic storage of data; caller ID(s); safe(s) and/or lock box(es); notes; medical records; pregnancy test; insurance papers; video and/or audio recording device(s); financial records, including credit card statements, certificate of deposit(s), checking account record(s), saving account record(s); birth control devices including pills and condoms; and latent fingerprints.

Officer Short's affidavit, which was attached and incorporated into the search warrant, stated that he had been dispatched to the Widmers' home on a report of a drowning. The affidavit also stated that upon arrival at the home, Short was told by Widmer that Sarah had been in the bathtub 15 to 30 minutes before Widmer found her "under the water" and removed her from the bathtub. Short further averred that an autopsy had been completed, and, although the preliminary cause of Sarah's death was drowning, there were "other injuries found on the body that were inconsistant [sic] with the account reported to police by Ryan K. Widmer." Short then stated that "through his personal knowledge and training, and based upon the preliminary results of the autopsy, [he] believes there exists other evidence at the [Widmers'] residence. The recovery of this evidence is key to the investigation into the death of Sarah A. Widmer."

[*P47] On appeal, Widmer argues the "latent fingerprints" provision of the search warrant is overly broad in nature and does not authorize the seizure of the bathtub. Widmer contends the bathtub was an item officers knew existed prior to requesting the warrant to search the home, and, as such, should have been specifically listed in the warrant as an item to be searched and seized. He further argues the "latent fingerprints" provision of the warrant could not have authorized the seizure of the bathtub as the provision offered unbridled discretion to the officers executing the warrant and would have allowed officers to seize "literally every item in the house." Widmer also argues that even if the latent fingerprint provision is not overly broad, seizure of the bathtub pursuant to this provision was improper as an on-site inspection of the bathtub revealed that the bathtub did not contain latent prints of

value. We find Widmer's arguments to be without merit.

## A. Scope of the Warrant

[*P48] In the present case, the warrant specifically authorized officers to search for latent fingerprints and retrieve any evidence of criminal activity. Although the warrant did not specifically list the bathtub, this does not invalidate its seizure. The warrant still enabled the officers to reasonably ascertain and identify the things that were authorized to be seized by way of the attached affidavit. The information contained within the affidavit, which made reference to the bathtub numerous times, sufficiently constrained the officers' search, and any later seizure, to evidence related to a death by drowning. At the time the warrant was sought, the cause of Sarah's death was known. Statements made by Widmer indicated Sarah had drowned in the couple's bathtub. The latent fingerprints provision did not allow officers to seize "literally every item in the house." Rather, it permitted only the seizure of goods, articles, or chattels that contained latent fingerprints *and* provided evidence of a crime, namely death by drowning. Common sense dictates that in an alleged bathtub drowning, valuable evidence, including latent fingerprints, can be obtained from a search of the bathroom and bathtub. Once the officers observed the fingermarks and smear marks on the bathtub, they were entitled to remove the tub from the home pursuant to the express terms of the search warrant. Seizure of the bathtub was therefore within the scope of the "latent fingerprints" provision.

[*P49] Widmer, however, seeks to invalidate the search by arguing that at the time the bathtub was removed officers knew that the tub did not contain latent fingerprints because the latent print examiner conducted an on-site inspection and concluded there were no latent prints of value. Yet, as discussed in more detail below, the marks still had evidentiary value as it was possible that further analysis would allow for identification of the source of the marks or would explain how the events unfolded on the night of Sarah's death. Accordingly, seizure of the bathtub to allow further investigation of the marks in a laboratory was warranted.

[*P50] We therefore find that the warrant provision allowing the search and seizure of those items containing "latent fingerprints" was not overly broad. We also find that seizure of the bathtub, as it originated out of a search for latent fingerprints, was authorized by the warrant.

## B. Instrumentality of the Crime

[*P51] In addition to finding seizure of the bathtub constitutional under the warrant's "latent fingerprints" provision, we also find that seizure of the bathtub was constitutional as the bathtub was an instrumentality of the crime.

[*P52] "Evidence not specifically described in a search warrant may be validly seized if, based on evidence known to the officers, the seized items were closely related to the crime being investigated or were instrumentalities of the crime." *State v. Kobi*, 122 Ohio App.3d 160, 171, 701 N.E.2d 420 (6th Dist.1997), citing *State v. McGettrick*, 40 Ohio App.3d 25, 29, 531 N.E.2d 755 (8th Dist.1988). *See also United States v. Wright*, 343 F.3d 849, 863 (6th Cir.2003) (holding "evidence not described in a search warrant may be seized if it is reasonably related to the offense which formed the basis for the search"); *United States v. Korman*, 614 F.2d 541, 547 (6th Cir.1980) (stating that evidence or instrumentalities of a crime may be seized even though not specifically listed in the search warrant).

[*P53] At the time the fingermarks and smear marks were observed on the bathtub, the police were executing a valid search warrant. Once the marks were observed, officers had probable cause to associate the bathtub with Sarah's death. Although an on-site inspection of the bathtub did not reveal latent prints of comparison value, the bathtub still retained evidentiary value as it was the likely instrument of the drowning and held evidence closely related to Sarah's death. [FN 5 In his reply brief, Widmer asks this court to find that the bathtub, as a fixture attached to the home, cannot be classified as an instrumentality of the crime. Widmer contends that items that may be seized as "instrumentalities of the crime" refer to the "papers and effects" clause of the Fourth Amendment and therefore include only personal property. Because a bathtub is a fixture, Widmer contends that the "house" clause of the Fourth Amendment governs. And the bathtub could not have been taken as an "instrumentality or [sic] the crime." Widmer's argument, however, ignores the unique circumstances of the present case. The cause of Sarah's death was drowning, and the instrument believed to have been used to cause her death was the bathtub. As such, by its very naturem the bathtubbecame an instrument of the crime and subject to seizure.] As Harness testified, latent prints are of comparison value only when the print has a "sufficient amount of class characteristics as well as individual characteristics that would enable [one] to ultimately identify that [print] to one person or another." While the on-site inspection of the bathtub did not reveal

a sufficient amount of class or individual characteristics to identify who specifically left the markings, the fingermarks and smear marks did not become valueless. The markings retained evidentiary value because it was possible that further analysis of the marks would allow identification of the source of the marks or that additional evidence could be recovered once the bathtub was inspected in a crime laboratory. [FN 6 In fact, Harness testified that during his second examination of the bathtub, which took place in the crime lab after the bathtub had been removed from the home, he discovered additional fragmented prints on the bathtub that he had not observed during the on-site examination.] Furthermore, removal of the bathtub was warranted as it was possible that further inspection of the item could explain how events unfolded on the night of Sarah's death and provide insight as to how the smear marks were made on the tub.

**[\*P54]** We find that the police had probable cause to associate the bathtub, and the markings found therein, as the instrument used to drown Sarah. Because the bathtub was believed to have been used to cause Sarah's death, the bathtub, by its very nature, became an instrument of the crime and subject to seizure. Accordingly, we find that the seizure of the bathtub was not in violation of the Fourth Amendment.

C. The Exclusionary Rule

**[\*P55]** Even if we had found the seizure of the bathtub outside the scope of the warrant or found that it was not an instrumentality of the crime, exclusion of the bathtub from evidence is not warranted under the facts of this case. The exclusionary rule is a "prudential doctrine" that was created by the United States Supreme Court to "compel respect for the constitutional guaranty" expressed in the Fourth Amendment. *Davis v. United States*, U.S. , 131 S.Ct. 2419, 2426, 180 L. Ed. 2d 285 (2011), citing *Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L. Ed. 2d 1669 (1960). The purpose of the exclusionary rule is to deter future Fourth Amendment violations. *Davis* at 2426. "Where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly \* \* \* unwarranted.'" *Id.* at 2426-2427, quoting *United States v. Janis*, 428 U.S. 433, 454, 96 S.Ct. 3021, 49 L. Ed. 2d 1046 (1976). Because of the substantial social costs generated by the exclusionary rule, the deterrence benefits of suppression must outweigh its heavy costs. *Davis* at 2427.

When the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment

rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. * * * But when the police act with an objectively "reasonable good-faith belief" that their conduct is lawful * * * or when their conduct involves only simply "isolated" negligence * * * the "deterrence rationale loses much of its force" and exclusion cannot "pay its way."

*Id.* at 2427-2428, quoting *United States v. Leon*, 468 U.S. 897, 908-909, 104 S.Ct. 3405, 82 L. Ed. 2d 677 (1984) and *Herring v. United States*, 555 U.S. 135, 143-144, 129 S.Ct. 695, 172 L. Ed. 2d 496 (2009).

[*P56] The exclusionary rule therefore applies, and evidence should be suppressed where:

(1) the issuing judge was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth (2) the issuing judge wholly abandoned his judicial role, (3) an officer purports to rely upon a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or (4) depending upon the circumstances of the particular case, a warrant is so facially deficient, i.e., in failing to particularize the place or things to be searched or seized, that those executing the warrant cannot reasonably presume it to be valid.

*State v. Dunihue*, 161 Ohio App. 3d 731, 2005 Ohio 3223, ¶ 9, 831 N.E.2d 1082 (12th Dist.), citing *State v. George*, 45 Ohio St.3d 325, 331, 544 N.E.2d 640 (1989).

[*P57] In the present case there is no evidence demonstrating that the police deliberately set out to seize the bathtub without setting it forth in the search warrant. Furthermore, there is no evidence demonstrating that the police acted with deliberate, reckless, or grossly negligent disregard for Widmer's Fourth Amendment rights when seizing the bathtub. Rather, the evidence produced at trial demonstrated that officers seized the bathtub in good faith reliance on the search warrant, removing the bathtub only after a search for latent fingerprints revealed the fingermarks and smear marks. Furthermore, as discussed above, the warrant was not facially deficient in describing the items to be seized. Therefore, exclusion of the bathtub from evidence would not yield any appreciable deterrence.

*Widmer I.*

Widmer has failed to demonstrate that the Fourth Amendment decision by the Twelfth District is contrary to or an objectively unreasonable application of Supreme Court precedent.

**Objection 14: The Report and Recommendations as well as the state courts failed to address the due process aspect of Widmer's claim concerning the seizure of the bathtub and its admission into evidence.**

(Objections, ECF No. 37, PageID 10730.)

This Objection is unexplained and no record references are offered, even to where a due process claim was made regarding seizure of the bathtub. Ground Two for Relief speaks entirely in Fourth Amendment terms and does not so much as use the phrase "due process," nor do any of the subheads under the Second Ground in the Petition.

This Objection does not meet the specificity requirement of Fed. R. Civ. P. 72(b)(2) and should be overruled on that basis.

**Objection 15: The Report and Recommendations incorrectly concludes that Ground 11 (regarding the disclosure of grand jury testimony) is based on state law issues. Widmer cited and discussed relevant Supreme Court precedent, demonstrated a particularized need for the grand jury proceedings in question, and specifically related them to his constitutional rights at stake.**

(Objections, ECF No. 37, PageID 10731.)

This Objection relates to the Report's treatment of Ground for Relief 11 which reads as follows:

> The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent by denying Widmer access to the grand jury testimony of Braley and Uptegrove, or at a minimum an in camera inspection of said testimony, when Widmer demonstrated a

particularized need for access to the testimony for a review of: (1) whether Braley made any false statements to the grand jury which would support his *Brady, Kyles,* and *Napue* claims; and (2) whether the testimony of either witness reveals what information, or the extent to which, Braley supplied information about the case to Uptegrove that he considered in his determination that Sarah Widmer drowned as a result of homicide. This error occurred in violation of Widmer's procedural and substantive due process rights under the U.S. Constitution including meaningful access to the courts.

(Petition, ECF No. 1-1, PageID 155.)

When he filed his petition for post-conviction relief in October 2011, Widmer also filed a motion to compel disclosure of the grand jury testimony of Lt. Braley and Dr. Russell Uptegrove. The trial court denied the motion and Widmer claims this denial was an arbitrary and unreasonable abuse of discretion which violated his procedural and substantive due process rights, his Confrontation Clause rights, and his right of access to the courts. *Id.* at PageID 155-56. Later in pleading this Ground for Relief in this Court, Widmer asserts that not allowing access to the grand jury testimony prevented him from presenting his *Kyles v. Whitley* defense in violation of *Chambers v. Mississippi*, *supra*. *Id.* at PageID 161.

The Report noted that this claim had been raised on appeal from denial of post-conviction relief and quoted the Twelfth District's decision in full (Report, ECF No. 35, PageID 10636-39). The Report characterized Widmer's constitutional argument as "superficial" and analyzed his cited federal authority as not addressing due process or confrontation rights nor indeed as involving any constitutional analysis. *Id.* at PageID 10639-40. Concluding that the Eleventh Ground for Relief involved only a state law claim, the Report rejected it as non-cognizable in habeas. *Id.* at PageID 10640.

In Objection 16, Widmer claims he cited and discussed *United States v. Proctor & Gamble*, 356 U.S. 677 (1958). That is an accurate representation; the citation to and discussion

42

of *Proctor & Gamble* occurs in the Petition (ECF No. 1-1, PageID 156-57). That misses the Report's point that *Proctor & Gamble* is not a constitutional precedent. Rather, the Court was interpreting the "good cause" requirement of Fed. R. Civ. P. 34[11] as it applied to grand jury testimony. As the Petition notes, Justice Douglas recognized five major policy rationales for grand jury secrecy. *Proctor & Gamble*, 356 U.S. at 682, n. 6, *quoting United States v. Rose*, 215 F.2d 617 (3rd Cir. 1954). The holding of *Procter & Gamble* is

> We only hold that no compelling necessity has been shown for the *wholesale* discovery and production of a grand jury transcript under Rule 34. We hold that a much more particularized, more discrete showing of need is necessary to establish "good cause." The court made no such particularized finding of need in case of any one witness.

*Id.* at 683. Thus *Procter & Gamble* is an interpretation of Fed. R. Civ. P. 34 in light of the rationales for grand jury secrecy. It does not recognize any constitutional right to grand jury testimony upon a showing of particularized need.

The Petition also notes the citation of *Procter & Gamble* by the Ohio Supreme Court in *State v. Greer*, 66 Ohio St. 2d 139 (1981). The Ohio Supreme Court recognized that *Procter & Gamble* had introduced the doctrine of particularized need. 66 Ohio St. 2d at 145. It also noted that the United States Supreme Court had held

> that any disclosure of grand jury minutes was covered by Fed. R. Crim. P. 6(e) which is declaratory of the pre-existing rule recognizing the basic secrecy of grand jury minutes and that disclosure is not a right of the defendant but is committed to the discretion of the trial court.

*Greer* at 145, *citing Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395 (1959). Having reviewed the relevant Ohio case law, the *Greer* court interpreted Ohio R. Crim. P. 16(B)(1) as requiring trial judges to exercise sound discretion in deciding upon the release of grand jury

---

[11] As adopted in 1938, Rule 34 required a showing of good cause to obtain production of documents by an opposing litigant. The good cause requirement was repealed December 1, 1970.

testimony.

Objection 16 notes (ECF No. 37, PageID 10731) that the *Greer* Court also cited to *United States v. Socony-Vacuum Oil, Co.*, 310 U.S. 150 (1940), and *Dennis v. United States*, 384 U.S. 855 (1966). However, the *Greer* Court did not read either of those Supreme Court decisions as recognizing any constitutional right to grand jury testimony and neither does this Court.

Ultimately, Widmer argues "the *Brady*, *Kyles*, and *Napue* doctrines apply universally to state and federal trials." (Objections, ECF No. 37, PageID 10732.) While that is true, Widmer has not shown that the Supreme Court has ever applied those cases to find, under any constitutional theory, that there is a constitutional right to grand jury testimony upon a showing of particularized need.

Widmer presented this claim to the Twelfth District as his Fourth Assignment of Error, reading as follows:

> The trial court abused its discretion by denying Widmer access to the grand jury testimony of Braley and Uptegrove, or at a minimum conducting an in camera inspection of said testimony, when Widmer demonstrated a particularized need for access to the testimony for a review of; (I) whether Braley made any false statements to the grand jury which would support his *Brady, Kyles*, and *Napue* claims; and (2) whether the testimony of either witness reveals what information, or the extent to which, Braley supplied information about the case to Uptegrove that he considered in his determination that Sarah Widmer drovmed as a result of homicide. This error occurred in violation of Widmer's proceduraJ and substantive due process rights under the U.S. Constitution and their related counterparts in the Ohio constitution, including meaningful access to the courts.

(Appellants' Brief, State Court Record, ECF No. 201-1, PageID 2348.) The only United States Supreme Court cases cited to support this Assignment of Error are *Procter & Gamble*, *supra*, and *Butterworth v. Smith*, 494 U.S. 624 (1990). *Id.* at PageID 2349. The Twelfth District read this Assignment of Error as raising "due process of law and his right to access the courts."

*Widmer II* at ¶ 150.  The Twelfth District noted that "[t]he existence of a particularized need is a fact question to be determined by the trial judge, and ultimate decision rests within the sound discretion of the court." *Id.* at ¶ 154, *citing Greer.*  Ultimately it concluded "Widmer has failed to set forth a particularized need for the disclosure of Braley's or Uptegrove's grand jury testimony.  Thus we find that the trial court did not abuse its discretion in denying Widmer's request for the production of the grand jury transcripts, or an in camera inspection thereof." *Id.* at PageID 158.

The Twelfth District recognized that Widmer was presenting constitutional claims of due process and right of access to the courts.  That court's denial of the Fourth Assignment of Error must therefore be read as a decision on the merits of those claims. *Harrington v. Richter*, *supra*.  As to those claims, Widmer has failed to show the Twelfth's District's decision is contrary to or an objectively unreasonable application of any United States Supreme Court precedent.

As to any other constitutional claims purportedly presented in the Eleventh Ground for Relief (e.g., Confrontation Clause rights and the right to present a defense), Widmer has procedurally defaulted on them by failing to fairly present them to the state courts.

To the extent Widmer is claiming, as he plainly did before the Twelfth District, that denial of access was an abuse of discretion, that claim is not cognizable in habeas corpus. *Sinistaj v. Burt*, 66 F.3d 804 (6th Cir. 1995).

Widmer's Fifteenth Objection should therefore be overruled.


**Objection 16: The Report and Recommendations incorrectly concluded that Ground 4 (the insufficient evidence claim) is based on state law issues. Widmer explained why his conviction is based on insufficient evidence and why his trial was fundamentally unfair in violation of his due process rights as a result.**

(Objections, ECF No. 37, PageID 10734.)

Ground Four reads:

45

> Widmer's conviction is based on insufficient evidence in violation
> of his constitutional rights to due process and a fair trial. At most,
> the state presented sufficient evidence to sustain a conviction of
> involuntary manslaughter or reckless homicide. The state courts
> unreasonably determined the facts and ruled contrary to or
> unreasonably applied clearly established Supreme Court precedent
> in finding that the state presented sufficient evidence to prove
> Widmer guilty of murder beyond a reasonable doubt.

(Petition, ECF No. 1-1, PageID 95.)

The Twelfth District noted that Widmer had raised both insufficiency and manifest weight claims and noted that a finding of manifest weight would subsume a sufficiency finding. *Widmer I* at ¶ 98.

The Report noted that there was a paucity of federal authority cited in support of the Fourth Ground for Relief, but nevertheless went on to consider it under the federal standard embodied in *Jackson v. Virginia*, 443 U.S. 307 (1979)(ECF No. 35, PageID 10556-61).  Thus on its face Objection 16 is wrong.  The Report has extensive discussion of how *Jackson* was satisfied.


**Objection 17: The Report and Recommendations is incorrect to suggest Widmer's positions are unreasonable and that reasonable jurists could not agree with Widmer on the issues such that an appeal would be objectively frivolous.**

(Objections, ECF No. 37, PageID 10736.)

At its conclusion, the Report recommended dismissal with prejudice and that "[b]ecause reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth Circuit that any appeal would be objectively frivolous and therefore should not be permitted to proceed *in forma pauperis*." (ECF No. 35, PageID 10642.)

Widmer's Objection17 is completely conclusory.  The logic seems to be that since

Widmer's counsel has made colorable arguments on "each of the procedural and substantive issues involved in the case," Widmer is entitled to a certificate of appealability on all his issues. But the question is not whether a habeas petitioner has made reasonable arguments, but whether reasonable jurists could disagree with this Court's disposition of those arguments. Surely the most obvious way to show that reasonable jurists could disagree is to show that they have disagreed on one or more of the issues sought to be appealed. Widmer has not done that. He has not shown that any other judge, state or federal, agrees with the position he has taken on any of his Grounds for Relief.

**Conclusion**

Except to the extent stated above, Widmer's Objections are without merit and should be OVERRULED. The Magistrate Judge again respectfully recommends the Petition be DISMISSED WITH PREJUDICE, that Widmer be denied a certificate of appealability, and that this Court certify any appeal would be objectively frivolous.

June 29, 2017.

s/ *Michael R. Merz*
United States Magistrate Judge

# NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).