## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| RYAN WIDMER, | : | Case No. 1:14-cv-303 |
| | : | |
| Petitioner, | : | District Judge Timothy S. Black |
| | : | Magistrate Judge Michael R. Merz |
| vs. | : | |
| | : | |
| WARDEN, CORRECTIONAL | : | |
| RECEPTION CENTER, | : | |
| | : | |
| Respondent. | : | |

## DECISION AND ENTRY:
## (1) **ADOPTING THE REPORTS AND RECOMMENDATIONS OF THE UNITED STATES MAGISTRATE JUDGE (Docs. 35, 40); and**
## (2) **DENYING WRIT OF HABEAS CORPUS**

This case is before the Court on Ryan K. Widmer's petition for a writ of habeas corpus. (Doc. 1). Pursuant to this Court's Order of General Reference, this case was referred to United States Magistrate Judge Michael R. Merz. The Magistrate Judge reviewed the pleadings, including Widmer's Petition, Respondent Warden's Return of Writ, and Widmer's reply. (Docs. 1, 22, 25). The Magistrate Judge also held oral arguments. (Doc. 31).

On February 2, 2017, the Magistrate Judge submitted a Report and Recommendations to this District Judge, recommending that Widmer's petition for a writ of habeas corpus be denied with prejudice. (Doc. 35). Widmer filed extensive objections to the Report and Recommendations on April 17, 2017. (Doc. 37). The Warden filed a response to those objections. (Doc. 39). This District Judge issued an Order of

Recommittal to the Magistrate Judge with instructions to file a supplemental report, analyzing the objections and making recommendations based on that analysis.  (Doc. 38).

On June 29, 2017, the Magistrate Judge submitted a Supplemental Report and Recommendations, again recommending that Widmer's petition be denied with prejudice.  (Doc. 40).  Widmer filed additional objections to the Supplemental Report and Recommendations on July 13, 2017.  (Doc. 41).  The Warden filed a response to those supplemental objections on August 16, 2017.  (Doc. 44).[1]

## I.  BACKGROUND

The factual and procedural background of this case spans multiple trials and appeals.  Widmer asserts twelve grounds for relief in this habeas petition, each with a

---

[1] This Judge acknowledges that it has taken a long time to resolve this case in this Court. The history of Widmer's case is anything but simple.  Widmer was arrested on August 13, 2008 and he was indicted two days later.  (Doc. 17-1, Ex. 3).  His state court proceedings lasted over five years, culminating in the Supreme Court of the United States denying Widmer's second petition for writ of certiorari on October 24, 2013.  (Doc. 20-1, Ex. 174).  The state court proceedings consisted of three separate jury trials (totaling over 45 days of pretrial, post-trial, and trial transcripts (Docs. 21-1–21-18, PageID# 2785–10050)), three appeals (one with a cross-appeal), and over 174 filings and state court orders and decisions (Docs. 17-1, 18-1, 19-1, 20-1, PageID# 226–2782).  Widmer then filed the instant habeas corpus action, asserting twelve grounds for relief, resulting in extensive briefing, an oral argument, a Report and Recommendations, a Supplemental Report and Recommendations, lengthy objections and supplemental objections, and responses to each set of objections.  The habeas briefing, oral argument, and collateral briefing alone totaled nearly 1,100 pages on the docket.  And the state court record, as presented to this Court by the Respondent, totaled over 7,200 pages, none of which are appropriately bookmarked or indexed, and the vast majority of which are not even text searchable.  This District Court took no part in any of the state court proceedings. Therefore, the Court was required to undertake an exhaustive review of Widmer's state court record, before beginning its analysis and consideration of Widmer's habeas petition.  Having conducted fulsome review, and upon thorough consideration, the Court concludes Widmer is not entitled to habeas relief and his conviction must stand.

nuanced factual and procedural history. With this in mind, and for ease of the reader, the Court provides additional factual background when addressing the grounds for relief, as necessary. To set the scene, the following is a short summary:[2]

On August 11, 2008, Petitioner Ryan Widmer called 9-1-1 for emergency assistance. (Doc. 17-1, Ex. 2 at ¶ 2). Widmer stated that his wife, Sarah, had fallen asleep in the bathtub at their home and he thought she was dead. (*Id.*). Widmer then drained the bathtub, pulled Sarah out, and attempted CPR. (*Id.* at ¶ 3). Paramedics and emergency medical technicians were called to the scene. (*Id.* at ¶ 5). First responders tried to resuscitate Sarah, including five separate and unsuccessful intubation attempts. (*Id.* at ¶¶ 5–7). While at the scene, Widmer admitted to law enforcement he had been drinking. (*Id.* at ¶ 7).

Sarah was taken to the hospital and the treating room physician successfully intubated Sarah and continued treatment. (*Id.* at ¶ 8). At the hospital, Widmer also told a nurse that he had found Sarah in the bathtub, face-up, and not breathing. (*Id.*). After 20 minutes of treatment in the emergency room, and about one hour after Widmer first called 9-1-1, Sarah was pronounced dead. (*Id.* at ¶ 9).

---

[2] The Report and Recommendations provides a thorough recitation of the facts and procedural posture of this case, citing the Ohio Court of Appeals for the Twelfth District's description of facts and circumstances leading to Widmer's indictment, trials, conviction, and sentencing during his direct appeal. (Doc. 35 at 2–12). (*See also*, Doc. 17-1, Ex. 2, *State v. Widmer*, 2012-Ohio-4342, at ¶¶ 2–38 (Ohio Ct. App. Sept. 24, 2012)). When answering the Petition, the Warden relies on the same facts. (Doc. 22 at 2–11). Widmer's Petition also provides a detailed statement of facts, including facts that came to light after his trials. (Doc. 1-1 at 31–56). The Court references these facts throughout this Decision and Entry.

At the hospital, Widmer consented to a search of his home. (*Id*. at ¶ 10). Detective Lieutenant Jeff Braley with the Hamilton Township Police Department led the initial search of the scene and collection of evidence. (*Id*. at ¶¶ 11–14).

Widmer was arrested on charges of aggravated murder on August 13, 2008, a little over a day after Sarah died. (*Id*. at ¶ 18). That same day, a warrant was issued to search the Widmer residence. (*Id*.). Pursuant to that warrant, the bathtub where Sarah was found was seized and taken to a crime lab. (*Id*.).

Widmer's first trial occurred in March 2009. (*Id*. at ¶ 22). He was found guilty of murder and sentenced to 15 years to life. (*Id*.). After the trial, it was discovered that jury members engaged in improper discussions of personal and external matters, and a new trial was granted. (*Id*.).

Widmer's second trial in May 2010 resulted in a mistrial. (*Id*.). Before the second trial, Widmer issued subpoenas for employment records of the State's lead investigator, Lt. Braley, contending Braley's application with Hamilton Township contained false information. (*Id*. at ¶¶ 117–27). Widmer argued that the false information was relevant to Braley's qualifications and credibility. The trial court quashed the subpoenas. (*Id*. at ¶ 127). Widmer also moved to suppress the bathtub and related evidence, contending the bathtub was seized in violation of his Fourth Amendment rights. (*Id*. at ¶ 42). The trial court denied the motion as untimely. (*Id*.).

Widmer's third trial – the operative trial for this habeas petition – occurred in January 2011. (*Id*. at ¶ 27). After four weeks and testimony from more than 40

witnesses, the jury found Widmer guilty of murder.  (*Id*. at ¶¶ 27, 38).  He was sentenced to 15 years to life in prison.  (*Id*. at ¶ 38).

After the third trial, Widmer moved for a new trial and for judgment of acquittal, which were denied after a hearing.  (Doc. 19-1, Ex. 133).  Widmer filed a direct appeal on multiple grounds, many at issue in this petition.[3]  (Doc. 19-1, Exs. 138–39).  The Ohio Court of Appeals for the Twelfth District affirmed Widmer's conviction.  (*See* Doc. 17-1, Ex. 2, *State v. Widmer*, 2012-Ohio-4342, 2012 WL 4350275 (Ohio Ct. App. Sept. 24, 2012)).  Both the Supreme Court of Ohio and the Supreme Court of the United States declined review.  (Doc. 19-1, Ex. 146; Doc. 20-1, Ex. 149).

During the pendency of the direct appeal, Widmer also moved the trial court for postconviction relief, a new trial, and an evidentiary hearing, based on the discovery of new evidence about lead investigator Braley's background.  Widmer also sought to test Sarah's DNA and to compel production of the grand jury testimony of lead investigator Braley and Deputy Coroner Russell Uptegrove.  (Doc. 20-1, Exs. 150–53).  The trial court denied Widmer's requests.  (*Id*. at Ex. 159).  Widmer appealed these postconviction decisions as well, and the postconviction appellate court affirmed.  (*See id*. at Ex. 167, *State v. Widmer*, 2013-Ohio-62, 2013 WL 142041 (Ohio Ct. App. Jan. 14, 2013)).  Both the Supreme Court of Ohio and the Supreme Court of the United States declined review. (*Id*. at Exs. 171, 174).

---

[3] Widmer also filed a motion to preserve biological samples and materials obtained from Sarah Widmer and physical evidence collected at the scene, which was granted by the trial court. (Doc. 19-1, Exs. 134, 137).

On February 20, 2014, Widmer commenced this federal case by filing a petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, and presenting twelve grounds for relief.  (Doc. 1).

## II.    STANDARD OF REVIEW

### A.    District Court's Review of the Reports and Recommendations

Pursuant to 28 U.S.C. § 636(b), the District Court may refer dispositive motions, including motions of postconviction relief, to a United States Magistrate Judge.  Upon such reference, the Magistrate Judge must submit a Report and Recommendations, providing a recommended disposition of the motion, as well as proposed findings of fact.  *Id*.; Fed. R. Civ. P. 72(b).  Upon service of a Magistrate Judge's Report and Recommendations, the parties may serve and file <u>specific</u> written objections to the Report and Recommendations for the District Judge's consideration.  *Id*.

If objections are filed, the District Judge "must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to…[and] may accept, reject, or modify the recommended disposition…."  Fed. R. Civ. P. 72(b)(3).  Thus, the District Judge is not required to review *de novo* every issue raised in the original motion or habeas petition, but only those matters from the Report and Recommendations that received proper objections.  *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).

### B.    Federal Habeas Corpus Review

For the federal courts to consider a petition for writ of habeas corpus, the petitioner must be subject to a state court judgment that is alleged to be "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The

petitioner must also have exhausted any available state court remedies, such as the state appeals process. 28 U.S.C. § 2254(b).

In reviewing a habeas petition, the federal court must presume that the state court's determination of the facts is correct, unless the petitioner shows otherwise by clear and convincing evidence. 28 U.S.C. § 2254(e). Additionally, the federal court cannot overturn a state criminal conviction unless: (1) the state court unreasonably applied United States Supreme Court precedent; or (2) the conviction turned on unreasonable factual findings. *Stewart v. Trierweiler*, 867 F.3d 633, 636 (6th Cir. 2017) (citing 28 U.S.C. § 2554(d)).

In other words, federal law specifically limits this Court's authority to grant relief in a habeas case unless the state court's judgment:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts considering the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). Apart from these two exceptions, "[b]y its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

If, however, the claim set forth in the habeas petition has not been adjudicated by the state court, "on the merits," then a more plenary standard of review applies. *Cone v. Bell*, 556 U.S. 449, 472 (2009). As set forth in *Marion*, the district court must review

questions of law under a *de novo* standard and questions of fact under a clear error standard. *Marion v. Woods*, 663 F. App'x 378, 381 (6th Cir. 2016) (citing *Robinson v. Howes*, 663 F.3d 819, 823 (6th Cir. 2011)).[4]

Moreover, it is "well settled that the fact that constitutional error occurred in the proceedings that led to a state-court conviction may not alone be sufficient reason for concluding that a [petitioner] is entitled to the remedy of habeas." *Williams v. Taylor*, 529 U.S. 362, 375 (2000) (collecting cases). However, "errors that undermine confidence in the fundamental fairness of the state adjudication certainly justify the issuance of the federal writ." *Id*.

## III.    ANALYSIS[5]

This Court has before it the United States Magistrate Judge's Initial and Supplemental Reports and Recommendations.

---

[4] It is unnecessary for this Court to use a plenary standard of review in this decision. All Widmer's grounds for relief were either: (1) precluded or not cognizable in habeas, so no standard of review applies; or (2) adjudicated on the merits by the direct appellate court or postconviction appellate court. Thus, in this case, the AEDPA's highly deferential standard applies.

[5] Citations to the record in this case are complicated by the sheer volume of the record, the lack of clear identifiers on the docket, the inconsistent page numbering, and the lack of any clear indexing or search functionality (particularly as it pertains to the transcripts). To offer some clarity, the Court will include a footnote at the beginning of each analysis subsection, identifying the most pertinent and frequently cited documents for purposes of that particular ground for relief, and will provide a full record citation to pinpoint the locations of each document in the following format: (Doc. [#], [Ex. #] at [document page #]; [PageID #]). The Court will use paragraph numbers in lieu of page numbers when citing to Ohio state court decisions, given that Ohio state courts use paragraph numbers. The Court will then use shorter citations in the body of the Order.

This District Judge's role is now to review those Reports and Recommendations, and, specifically, to review *de novo* all objections properly raised by Widmer and to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 72(b)(3).

The Court will address Widmer's proper objections when addressing the related ground for relief, providing background facts and procedural history as necessary. As discussed, *infra*, after an extensive review of the pleadings, state court record, Magistrate Judge's recommendations, and Widmer's objections, this Court finds that Widmer is not entitled habeas relief.

## A. Ground 1 – Body Mark Testimony[6]

> The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent concerning Widmer's constitutional rights to due process, a fair trial, and confrontation by permitting the admission of impermissible expert opinion testimony that: (1) reached beyond the expert's purported expertise; (2) lacked scientific foundation; and (3) was based on a methodology that has been proven unreliable.

(Doc. 1-1 at 40).

---

[6] The following are full citations to frequently cited entries in the Court's analysis of Ground 1:

**Petition** (Doc. 1-1 at 41–60; PageID# 57–76); **Report and Recommendation** (Doc. 35 at 30–48; PageID# 10512–30); **Petitioner's Objections** (Doc. 37 at 3–26; PageID# 10658–81); **Supplemental Report and Recommendation** (Doc. 40 at 3–18; PageID# 10774–89); **Petitioner's Supplemental Objections** (Doc. 41 at 4–24; PageID# 10831–51); **Widmer Direct Appellate Court Decision** (Doc. 17-1, Ex. 2 at ¶¶ 62-78, PageID# 270–78); **Third Trial - Testimony of City of Cincinnati Senior Criminalist William Hillard** (Doc. 21-17 at 111-53; PageID# 8943–85); **Third Trial - State's Closing** (Doc. 21-17 at 1045–1161; PageID# 9877–95).

In Ground 1, Widmer argues that his constitutional rights were violated when the trial court allowed improper expert testimony related to body mark impressions found in the Widmer's bathtub.  (*Id*. at 40–60).  The direct appellate court concluded Widmer's Confrontation Clause and due process rights were not violated when the jury heard this evidence.  (Doc. 17-1, Ex. 2 at ¶¶ 75–77).

The Magistrate Judge recommends denying relief on this ground.  (Doc. 35 at 30–48; Doc. 40 at 3–18).  Widmer asserts one proper objection to Ground 1: Objection 1.  (Doc. 37 at 3–18).[7]  Accordingly, this Court conducted a *de novo* review of this ground, and, for the foregoing reasons, Widmer is not entitled to relief under Ground 1.

### 1.  Factual Background

When initially searching the Widmer residence, Lt. Braley tested the bathtub for prints.  (Doc. 17-1, Ex. 2 at ¶ 18).  Braley saw marks he believed to be made by human hands, so he contacted the Miami Valley Crime Lab.  (*Id*.).  The crime lab tested the bathtub at the scene, but was unable to visualize any latent fingerprints of value.  (*Id*.).  The bathtub was subsequently seized from the Widmer residence.  (*Id*.).  The crime lab again tested the bathtub for prints, but was unable to visualize or identify any latent prints of value.  (*Id*.).

---

[7] Objections 2 and 3 also relate to Ground 1.  (Doc. 37 at 18–23).  The Magistrate Judge withdrew the conclusions for the basis of Objection 2; thus, Objection 2 is overruled as moot.  (Doc. 40 at 15).  For Objection 3, Widmer asserts the Magistrate Judge independently concluded that Hillard was an expert.  The Magistrate Judge did not make this finding, but merely interpreted the direct appellate court's decision.  (Doc. 35 at 42).  Objection 3 is not well-taken.

Months later, criminalist Bill Hillard was called to test the bathtub. (*Id*. at ¶ 19). Hillard, like the crime lab, also did not visualize any latent fingerprints of value. (*Id*.). Hillard, however, found marks along the top of the tub that indicated it had been wiped down. (*Id*.). Hilliard also found two separate sets of body mark impressions: (1) a forearm impression, which impression Hillard believed was a male forearm based on the presence of hair follicles, and which impression Hillard concluded was "overlaying," or made, after circular impressions of bath product bottles; and (2) fingertip streaks made in a downward position and made by a person of small stature, like a child, female, or a small male. (*Id*. at ¶¶ 19, 62).

Prior to the third trial, Widmer filed a motion *in limine* to preclude Hillard from testifying about the size and sex of the individuals who made the forearm or fingertip impressions. (*Id*. at ¶ 63). The trial court did not rule on the motion prior to trial, and it was presumed denied. (*Id*.).

During the third trial, Hillard was offered as an expert in the areas of crime scene analysis, fingerprint analysis, and crime scene photography, based on his thirty years of experience as a criminalist. (*Id*.). Widmer did not object to Hillard's qualifications as an expert; however, Widmer objected to the content of Hillard's body impression testimony, which objections were overruled. (*Id*.).

Hillard testified as an expert witness to the various markings. (*See* Doc. 21-17 at 111–53). He testified that there is no scientific methodology to identifying body mark impressions, but that his findings were based on his thirty years as a criminalist. (Doc. 17-1, Ex. 2 at ¶ 70–71). Hilliard did not specifically name Widmer as the source of the

11

forearm nor Sarah as the source of the fingertips. (*Id*. at ¶ 71). During closing, the State used Hillard's testimony to create a narrative that Widmer violently killed Sarah in the bathtub – leading to the fingertip impressions – and then tried to clean up his mess and stage Sarah's death as an accident – leading to the forearm impression made after bottle marks around the bathtub. (*See* Doc. 21-17 at 1055–56).

### 2. Last Explained State Court Decision

On direct appeal, Widmer argued that the trial court improperly permitted Hillard's "expert" testimony because it was based on unreliable methodology, violating his due process rights and running afoul to the Confrontation Clause. (Doc. 17-1, Ex. 2 at ¶ 62). The direct appellate court denied this error. First, the direct appellate court analyzed Hillard's testimony under Ohio Evid. R. 702 (expert testimony), and concluded that the trial court did not abuse its discretion by permitting Hillard to testify as an expert on the body mark impressions because: (1) his testimony was based on his thirty years of experience as a criminalist; (2) he never testified that he relied on any scientific methodology when reaching his conclusions, only his experience; and (3) he was "explicit in stating that he could not identify the specific individual who made the markings, that person's gender, or when the markings had been left on the bathtub." (*Id*. at ¶¶ 63–74).

Second, the direct appellate court discussed Widmer's constitutional arguments, finding "that the admission of Hillard's testimony did not violate Widmer's due process rights or his constitutional rights under the Sixth Amendment." (*Id*. at ¶ 75). The direct appellate court reached this conclusion because Hillard's "testimony about the forearm

impression and fingertip markings he found on the bathtub were subject to cross-examination by Widmer.  [Moreover,] Widmer was given the express opportunity to challenge and cast doubt on Hillard's conclusions about the forearm impression and the fingertip marks." (*Id*. at ¶ 77).

In this habeas petition, Widmer properly brings the same constitutional issues.

### 3.  Confrontation Clause and Due Process

The Court starts with Widmer's Confrontation Clause claim.  The Supreme Court articulates the Confrontation Clause as follows:

> The Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), provides that "[i]n all criminal prosecutions, the accused shall enjoy the right…to be confronted with the witnesses against him."  In *Crawford*, after reviewing the Clause's historical underpinnings, we held that it guarantees a defendant's right to confront those "who 'bear testimony'" against him.  541 U.S., at 51, 124 S.Ct. 1354.  A witness's testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination.  *Id*., at 54, 124 S.Ct. 1354.

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009).

At trial, Widmer was able to cross-examine Hillard and confront Hillard about the reliability of his testimony.  Thus, the direct appellate court's analysis regarding the Confrontation Clause was not unreasonable or contrary to Supreme Court precedent.

Turning to Widmer's due process challenge, which is a challenge to the trial court's evidentiary ruling admitting Hillard's testimony pursuant to Ohio Evid. R. 702.

"A federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984).   A trial court's alleged evidentiary error "is thus not cognizable on federal habeas review unless the state court's ruling was so fundamentally unfair that it amounted to a due process violation." *Roby v. Burt*, No. 17-2043, 2018 WL 1176512, at *2 (6th Cir. Feb. 14, 2018) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012)).  *See also Marshall v. Lonberger*, 459 U.S. 422, 438, n.6 (1983) (reaffirming *Spencer v. Texas*, 385 U.S. 554 (1967)) ("Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules.").

"[D]ue process is violated, and thus habeas relief warranted, only if an evidentiary ruling is 'so egregious that it results in a denial of fundamental fairness.'" *Ege v. Yukins*, 485 F.3d 364, 375 (6th Cir. 2007) (quoting *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir. 2003)).  "These principles have their roots in the Supreme Court decision of *Chambers v. Mississippi,* which held that trial errors cannot 'defeat the ends of justice' or otherwise deprive a defendant of h[is] right to a fair trial." *Id*. (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302–03 (1973)).  The ultimate question is whether the evidentiary ruling "so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72 (quotation omitted).

The crux of Widmer's federal arguments and objections on his due process claim is that due process rights are violated when a conviction is based on unreliable scientific evidence, *i.e.*, testimony like Hillard's body mark impression testimony.  As the Magistrate Judge correctly recognized, there is no Supreme Court case that clearly

14

establishes that due process is violated when unreliable evidence is admitted.[8]  (Doc. 40

at 12).  Rather, the question is whether, assuming Hillard's testimony was unreliable and

should not have been admitted, admitting the testimony so infected the entire trial that

Widmer's conviction violated due process.  *Estelle*, 502 U.S. at 72 (quotation omitted).

The direct appellate court said no, instead finding that the trial court did not abuse

its discretion by admitting the testimony.  And this Court cannot say that the direct

appellate court's conclusion was contrary to or an unreasonable application of Supreme

Court precedent.[9]  Even taking Hillard's testimony as unreliable, Widmer's counsel had

the opportunity to, and did in fact, cross-examine Hillard about his methodology and

observations.  (Doc. 21-17 at 133–49, 152–5).  Moreover, Hillard's testimony was but

one aspect of the state's presentation.  As the Magistrate Judge described when

---

[8] Widmer cites *Han Tak Lee v. Houtzdale SCI*, 798 F.3d 159, 163 (3d Cir. 2015) for the proposition that a conviction based on unreliable scientific evidence is a due process violation. (*E.g.*, Doc. 37 at 16-17).  First, *Han Tak Lee* is not binding; this Court must consider whether the direct appellate court unreasonably applied Supreme Court precedent, not Third Circuit precedent.  Second (and interestingly), the Third Circuit's decision does not cite a single Supreme Court case when affirming the District Court's grant of habeas relief based on unreliable evidence.  *Id.* at 166-168.  And finally, *Han Tak Lee* does not explicitly hold that a conviction based on unreliable scientific evidence is a due process violation.  Rather, *Han Tak Lee* asked whether the admission of unreliable evidence, in the form of unreliable expert testimony, "undermined the fundamental fairness of the entire trial."  *Id.* at 162.

[9] In Objection 4, Widmer argues that his due process claim should be reviewed *de novo* and without AEDPA deference because the direct appellate court did not address the claim.  As noted by the Magistrate Judge, although the direct appellate court did not expressly address the claim, it was nevertheless addressed along with Widmer's Confrontation Clause claim, warranting deference.  (Doc. 40 at 16–17).  *See also Johnson v. Williams*, 568 U.S. 289, 301 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted.")).  Indeed, a reasonable interpretation of the direct appellate court's decision is that Widmer's due process rights were not violated because there was no error when admitting the testimony.  Thus, Objection 4 is not well-taken.

discussing Widmer's insufficient evidence arguments (*see* Grounds 4 and 5, *infra*), the state introduced the testimony of many other witnesses to support its conclusion that Widmer murdered Sarah.  (Doc. 35 at 76–77).  Thus, even if Hillard's testimony was unreliable, Widmer has not demonstrated that the trial court's evidentiary ruling was so egregious as to deny fundamental fairness.[10]

Accordingly, Objection 1 is overruled, and the Magistrate Judge's recommendations are adopted on this ground.  Ground 1 is rejected.

## B.  Ground 2 – The Bathtub: Unreasonable Search and Seizure[11]

> The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent concerning Widmer's constitutional rights to be free from unlawful and unreasonably [sic] seizures of his real property by permitting the State to seize the bathtub from his house pursuant to a general "evidence or instrumentality of the crime" or "latent fingerprint" provision of a search warrant when the tub's significance was known to law enforcement at the time the search warrant is obtained and executed, yet the tub was not particularly described in the search warrant as an item to be seized. Seizure of real property

---

[10] Moreover, the Court finds that Widmer has not shown that the direct appellate court's conclusion resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Contrary to Widmer's assertion, the direct appellate court did not uphold the trial court "based on the false premise that Hillard provided testimony rooted in the same verified, established methodology as latent fingerprint analysis." (Doc. 41 at 16).  Rather, the direct appellate court quoted Hillard's testimony, noted that Hillard never claimed that there was a recognized scientific process for identifying the impressions, and found that Hillard's testimony was based on his experience, not science.  (Doc. 17-1, Ex. 2 at ¶¶ 70–74).

[11] The following are full citations to frequently cited entries in the Court's analysis of Ground 2:

**Petition** (Doc. 1-1 at 61–74; PageID# 77–90); **Report and Recommendation** (Doc. 35 at 48–55; PageID# 10530–37); **Petitioner's Objections** (Doc. 37 at 56–76; PageID# 10711–31); **Widmer Direct Appellate Court Decision** (Doc. 17-1, Ex. 2 at ¶¶ 42–57; PageID# 261–69).

> is unreasonable under the Fourth Amendment without particularized, court-sanctioned authority.

(Doc. 1-1 at 60).

In Ground 2, Widmer asserts that his Fourth Amendment rights were violated when the bathtub was seized from his home.[12] (*Id.* at 60–74).[13] The Magistrate Judge recommends rejecting this ground because it is precluded under *Stone v. Powell*, 428 U.S. 465 (1976). (Doc. 35 at 48–55).

The Supreme Court in *Stone* held: "In sum, we conclude that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment Claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone*, 428 U.S. at 494.

In Objection 13, Widmer disagrees with the Magistrate Judge's recommendation, suggesting that *Stone* stands for the proposition that a habeas corpus petition based on a violation of Fourth Amendment rights is not precluded "when the integrity of the evidence and judicial proceedings are at stake, and/or when the petitioner's personal

---

[12] The facts underlying Grounds 2 and 3 are the same, but are unnecessary for resolution of Ground 2. Accordingly, the relevant facts are set forth in the Court's analysis of Ground 3, *infra*.

[13] In Objection 14, Widmer generally contends that Grounds 2 and 3 are also due process challenges and the Magistrate Judge should have reviewed his due process claim *de novo*. (Doc. 37 at 75). Widmer does not articulate how this is a due process violation or cite case law to support this point. This objection is not well-taken. The Court will consider Ground 2 and 3 as a Fourth Amendment challenge and ineffective assistance of counsel challenge, respectively.

constitutional rights are at stake." (Doc. 37 at 58–75 (citing *Good v. Berghuis*, 729 F.3d 636 (6th Cir. 2013) (interpreting *Stone*))). This is an erroneous reading of *Stone*.

*Stone* is clear that a habeas claim is precluded when the petitioner had a full and fair opportunity to litigate a Fourth Amendment claim. As explained by the Sixth Circuit in *Good*, this is for two reasons. First, the "key purpose" of habeas corpus is to free innocent prisoners, and a Fourth Amendment violation "has no veering on whether a defendant is guilty." *Good*, 729 F.3d at 637 (citing *Stone*, 428 U.S. at 490). Second, the purpose of excluding evidence for Fourth Amendment violations at the trial or appellate level is for deterrence. "Any deterrence produced by an additional layer of habeas review is small," given its distance from the actual violation, "but the cost of undoing final convictions is great." *Id*. (citing *Stone*, 428 U.S. at 493).

Thus, the "'opportunity for full and fair consideration' [under *Stone*] means an available avenue for the prisoner to present his claim to the state courts, <u>not</u> an inquiry into the adequacy of the procedure actually used to resolve that particular claim." *Good*, 729 F.3d at 639 (emphasis added). In other words, "[o]ur approach, and the majority rule, asks a more basic and readily administrable question: Did the state courts permit the defendant to raise the claim or not?" *Id*. at 640.

Here, the answer is yes. The procedural history indicates Widmer raised the bathtub issue before the second trial through a motion to suppress and renewed those same arguments when objecting to the bathtub's admission into evidence at the third trial. (Doc. 17-1, Ex. 2 at ¶ 42). The direct appellate court also fully considered the merits of the bathtub seizure. (*Id*. at ¶¶ 39–59).

Therefore, under *Stone*, Widmer's Fourth Amendment claim is precluded because Widmer was provided the opportunity for a full and fair litigation of the claim. However, it bears noting that this Court considers the merits of the bathtub seizure under Ground 3, *infra*, and concludes that there is no merit to Widmer's Fourth Amendment seizure claim.

Accordingly, the Magistrate Judge's recommendations are adopted on this ground. Ground 2 is rejected.

### C.  Ground 3 – The Bathtub: Ineffective Assistance of Counsel[14]

> Trial counsel provided ineffective assistance by failing to timely prosecute what would have been a successful motion to suppress the bathtub and all related evidence about said tub discovered following its unconstitutional seizure (including Bill Hillard's "body part impression" analysis and testimony). In finding otherwise, the state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent concerning the effective assistance of counsel and the Fourth Amendment's "particularity" and "reasonableness" requirements.

(Doc. 1-1 at 74).

In Ground 3, Widmer contends that his trial counsel was ineffective for failing to move to suppress the bathtub. (*Id*. at 74–79). The direct appellate court concluded there was no ineffective assistance of counsel because the Fourth Amendment did not require suppression of the bathtub, thus, any motion to suppress would have been futile. (Doc.

---

[14] The following are full citations to frequently cited entries in the Court's analysis of Ground 3:

**Petition** (Doc. 1-1 at 74–79; PageID# 90–95); Answer (Doc. 22 at 59–70; PageID# 10109–20); **Report and Recommendation** (Doc. 35 at 55–66; PageID# 10537–48); **Petitioner's Objections** (Doc. 37 at 56–58, 75–76; PageID# 10711–14, 10730–31); **Supplemental Report and Recommendation** (Doc. 40 at 29–41; PageID# 10800–12); **Petitioner's Supplemental Objections** (Doc. 41 at 38–49; PageID# 10866–76); **Widmer Direct Appellate Court Decision** (Doc. 17-1, Ex. 2 at ¶¶ 39–59; PageID# 261–69).

17-1, Ex. 2 at ¶¶ 45–57). The Magistrate Judge recommends rejecting this ground because the direct appellate court's decision was not based on an unreasonable application of Supreme Court precedent. (Doc. 35 at 64–66). To this, Widmer asserts three proper objections to Ground 3: Objections 12, 13, and 28. (Doc. 37 at 56–75; Doc. 41 at 39). Having reviewed Ground 3 *de novo*, the Court finds these objections are not well-taken. The Court expands on the Magistrate Judge's reasoning as discussed, *infra*.

### 1. Factual Background

After Sarah's death, investigators came to Widmer's house in search of evidence. (Doc. 17-1, Ex. 2 at ¶¶ 11–15). On August 13, 2008, the same day as Widmer's arrest, a warrant was issued, authorizing police to search for the following:

> Goods, chattels, or articles, and to retrieve any evidence of criminal activity which may be found, to wit: the wallet of Sarah A. Widmer (Deceased); calendars; computers; computer perherials [sic], including external hard drive(s), modums [sic], mediums for the electronic storage of data; calendar ID(s); safe(s) and/or lock box(es); video and/or audio recording device(s); financial records, including credit card statements, certificate of deposit(s), checking account record(s), saving account record(s); birth control devices including pills and condoms; and latent fingerprints.

(*Id*. at ¶ 46 (emphasis added)). A first responding officer, Officer Short, submitted an affidavit in support of the warrant, describing his knowledge of Widmer finding Sarah in the bathtub and the preliminary cause of death as drowning. (*Id*.). Officer Short also described how injuries on Sarah's body and inconsistent statements made by Widmer led him to believe a crime had occurred and that evidence would be found at the home. (*Id*.).

Officers, led by Lt. Braley, searched Widmer's house, including the master bedroom and bathroom, where Widmer had found Sarah in the bathtub. (*Id*. at ¶ 18). Braley dusted the bathtub for fingerprints and found streaks he thought were made by human hands. (*Id*.). Braley contacted the Miami Valley Crime Lab. (*Id*.). The crime lab tested the bathtub at the scene and observed fingermarks and smear marks. (*Id*.). However, the crime lab could not visualize any latent fingerprints of value. (*Id*.).

The bathtub was then seized from the Widmer residence and sent to the crime lab for further testing. (*Id*.). With further testing, the crime lab found fragmented prints. (*Id*.). However, the prints lacked identifying characteristics and were deemed of no value. (*Id*.). Months later, Hillard tested the bathtub, finding the body mark impressions as discussed in Ground 1, *supra*. (*Id*. at ¶ 19).

Widmer did not move to suppress the bathtub before his first trial. (*Id*. at ¶ 42). Before the second trial, Widmer's counsel moved to suppress the bathtub. (*Id*.). The trial court denied the motion to suppress, finding the motion was untimely. (*Id*.). Counsel did not move to suppress the bathtub before the third trial. (*Id*.). Rather, during the third trial, counsel objected to the admission of the bathtub as evidence, "preserving [Widmer's] objection on the motion to suppress the tub." (*Id*.). The objection was overruled, and the bathtub admitted into evidence. (*Id*.).

### 2. Last Explained State Court Decision

On direct appeal, Widmer argued his counsel was ineffective for failing to prosecute a meritorious motion to suppress the bathtub. (*Id*. at ¶ 40). When considering

his ineffective assistance of counsel claim, the direct appellate court discussed the merits of the bathtub seizure. (*Id*. at ¶¶ 45–57).

On the merits of the seizure, the direct appellate court concluded the seizure was constitutional for three reasons. (*Id*.). First, the bathtub was within the scope of the warrant under the "latent fingerprints" provision. (*Id*. at ¶¶ 48–50). Second, the bathtub was properly seized as an instrumentality of the crime. (*Id*. at ¶¶ 51–54). Third, the exclusionary rule did not apply because there was no evidence the police seized the bathtub in bad faith. (*Id*. at ¶¶ 55–57). Thus, the direct appellate court concluded that, because the seizure was not unconstitutional, trial counsel was not ineffective for failing to bring a meritless motion to suppress. (*Id*. at ¶ 58).

In his petition, Widmer asserts the same ineffective assistance of counsel claim.

### 3. Ineffective Assistance of Counsel

Ineffective assistance of counsel claims are governed by the two-pronged *Strickland* test, which requires defendants to show that: (1) counsel's representation fell below an objective level of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. (quotation omitted). Thus, a federal court considering an ineffective assistance of

22

counsel claim must "use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013).

Ground 3 for ineffective assistance of counsel rests on the merits of the bathtub seizure.[15] Therefore, if the bathtub was unconstitutionally seized and a motion to suppress meritorious, there is a reasonable probability that the result of the proceeding would have been different, because the jury would not have heard the Hillard testimony nor would the State have been able to rely on that testimony to illustrate its theory of the offense. Conversely, if the bathtub seizure was constitutional, there is no ineffective assistance because any motion to suppress would have been meritless.

### 4. Merits of the Bathtub Seizure

As mentioned, the direct appellate court found the bathtub properly seized for a number of reasons: (1) the bathtub was within the scope of the warrant issued; (2) the bathtub was properly seized as the instrumentality of the crime; and (3) the exclusionary rule did not apply. (Doc. 17-1, Ex. 2 at ¶¶ 48–57).

The Magistrate Judge focused on the first reason, agreeing that the warrant was sufficiently specific and that the police properly seized the bathtub under the warrant's

---

[15] At points throughout this petition, the parties disputed whether habeas counsel was also trial co-counsel; thus, habeas counsel was essentially arguing her own ineffective assistance at trial. In Objection 11, Widmer argues that the Magistrate Judge incorrectly concluded that habeas counsel and trial counsel were the same. (Doc. 35 at 54–56). In the Supplemental Report, the Magistrate Judge corrected this error. (Doc. 40 at 29). Accordingly, Objection 11 is moot.

authorization to search for "latent fingerprints."[16] (Doc. 35 at 64–66). In Objection 12, Widmer argues this is an erroneous conclusion because the warrant was too general and no latent prints were visualized at the scene. (Doc. 37 at 56–58). Overall, this objection is not well-taken.

> General warrants are prohibited by the Fourth Amendment. *Andresen v. Maryland*, 427 U.S. 463, 479, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). "The Fourth Amendment requires warrants to 'particularly describ[e] the place to be searched, and the persons or things to be seized.'" *United States v. Blakeney*, 942 F.2d 1001, 1026 (6th Cir. 1991) (citing U.S. Const. amend. IV). "A general order to explore and rummage through a person's belonging is not permitted," rather "[t]he warrant must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." *Id.* (citations and quotations omitted). "The degree of specificity required depends on the crime involved and the types of items sought." *Id.*

*United States v. Gardiner*, 463 F.3d 445, 471 (6th Cir. 2006). The direct appellate court cited *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) for the same propositions and found that the body mark impressions observed in the bathtub warranted the seizure as "latent fingerprints." (Doc. 17-1, Ex. 2 at ¶ 58).

As the Magistrate Judge correctly concluded, the direct appellate court's application of the Fourth Amendment and related precedent was not unreasonable. Although officers could not visualize latent fingerprints at the scene, officers noticed

---

[16] In Objection 12, Widmer first objects to the Magistrate Judge's statement that: "Widmer does not dispute that during the execution of the search warrant, officers dusted the bathtub and found what appeared to be handprints inside of the tub." (Doc. 37 at 56–58). The Court finds this part of his objection well-taken because Widmer has disputed whether prints were found in the tub. However, this does not change outcome of Ground 3. The remainder of Objection 12 is not well-taken, as discussed *infra*.

smear and streak marks. Particularly given the location of the markings (*i.e.*, in the bathtub) and the nature of the investigation (*i.e.*, an alleged bathtub drowning), this Court cannot conclude that it was unreasonable or outside the scope of the warrant for the officers to seize the bathtub to determine if, with further testing, latent fingerprints could be identified.

However, <u>even if</u> the warrant was too general, the direct appellate court's conclusion that the bathtub seizure was proper as an instrumentality of the crime was not unreasonable. (*Id*. at ¶ 51–52 (citing *United States v. Wright*, 343 F.3d 849, 863 (6th Cir. 2003) (holding "evidence not described in a search warrant may be seized if it is reasonably related to the offense which formed the basis for the search"))). Here, the suspected offense was an alleged homicide by drowning in the bathtub. The search warrant specifically authorized the officers "to <u>retrieve any evidence of criminal activity</u> which may be found…." (*Id*. at ¶ 46). It was not unreasonable for officers to consider the bathtub, in a suspected bathtub drowning case, to be an instrument of the crime and thereby constitute "evidence of criminal activity."

Finally, <u>even if</u> the warrant was too general and <u>even if</u> the bathtub was not an instrument of the crime, the direct appellate court did not unreasonably apply Supreme Court precedent when determining that the exclusionary rule did not apply because of the *Leon* good faith exception. (*Id*. at ¶¶ 55–57 (citing *United States v. Leon*, 468 U.S. 897 (1984))).

"The exclusionary rule prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment, as well as

derivative evidence acquired as a result of an unlawful search." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963)). The purpose of the exclusionary rule is to deter law enforcement from obtaining evidence through unconstitutional means. *Nix v. Williams*, 467 U.S. 431, 442–43 (1984).

However, "[t]he fact that a Fourth Amendment violation occurred—*i.e.*, that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009). Indeed, "[t]he Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands…." *Leon*, 468 U.S. at 906. The Supreme Court has "repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation." *Herring*, 555 U.S. at 141 (noting that "exclusion 'has always been our last resort, not our first impulse'") (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). Thus, "courts could reject suppression motions posing no important Fourth Amendment questions by turning immediately to a consideration of the officers' good faith." *Leon*, 468 U.S. at 925.

The direct appellate court considered these rules and concluded there was no evidence of bad faith on the part of the officers, nor was there evidence that police "acted with deliberate, reckless, or grossly negligent disregard of Widmer's Fourth Amendment rights by seizing the tub." (Doc. 17-1, Ex. 2 at ¶ 57). In response to this conclusion, Widmer argues that no "reasonably well-trained officer" could have believed that that the

bathtub either constituted "latent fingerprints" or was an instrumentality of the crime. (Doc. 1-1 at 88–89).

The Court is not persuaded by Widmer's general assertion. As the direct appellate court recognized, there was nothing in the record to indicate bad faith on the part of the officers. If anything, common sense dictated seizing the bathtub after: (1) visualizing the unidentifiable marks, which markings might have contained usable fingerprints upon further inspection; and (2) recognizing this was an alleged drowning case that occurred in the bathtub at issue. The direct appellate court's application of the *Leon* good faith exception was not unreasonable.

Consequently, the Court now turns back to Widmer's ineffective assistance of counsel claim related to the bathtub. In this instance, because the bathtub seizure was not unreasonable, any motion to suppress the bathtub would have been futile. (Doc. 17-1, Ex. 2 at ¶ 58). Therefore, the direct appellate court did not unreasonably apply Supreme Court precedent by concluding that Widmer's trial counsel was not ineffective for failing to file a futile motion. (*Id.*).[17]

Accordingly, in addition to the Court's conclusions *supra*, the Court adopts the Magistrate Judge's recommendations on Ground 3. Ground 3 is rejected.

---

[17] In Objection 28, Widmer argues that the Magistrate Judge erred when "adopting" the direct appellate court's ineffective assistance of counsel conclusion because the motion to suppress was futile. (Doc. 41 at 39). For the reasons explained, *supra*, this Court independently concludes that the motion would have been futile, and Objection 28 is overruled.

**D.      Ground 4 – Insufficient Evidence[18]**

> Widmer's conviction is based on insufficient evidence in
> violation of his constitutional rights to due process and a fair
> trial.  At most, the state presented sufficient evidence to sustain
> a conviction of involuntary manslaughter or reckless homicide.
> The state courts unreasonably determined the facts and ruled
> contrary to or unreasonably applied clearly established
> Supreme Court precedent in finding that the state presented
> sufficient evidence to prove Widmer guilty of murder beyond
> a reasonable doubt.

(Doc. 1-1 at 79).

The crux of Widmer's argument for Ground 4 is that, based on all the evidence

presented at his trial, no rational juror could have found that the State proved murder

under Ohio law.  (*Id*. at 79–82).  At most, Widmer concedes, the State proved involuntary

manslaughter or reckless homicide.

For an insufficient evidence claim, the Court is required to view all the evidence

presented at trial in the light most favorable to the prosecution and, based on that

evidence, must determine whether *any* rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt.  *See, e.g., Jackson v. Virginia*, 443 U.S.

307, 319 (1979).

The Magistrate Judge recommends rejecting this ground because, when viewing

the evidence presented at trial in favor of the prosecution, a rational trier of fact could

---

[18] The following are full citations to cited entries in the Court's analysis of Ground 4:
**Petition** (Doc. 1-1 at 79–82; PageID# 95–98); **Report and Recommendation** (Doc. 35 at 66–
80; PageID# 10548–62); Petitioner's Objections (Doc. 37 at 79–80; PageID# 10734–35);
**Supplemental Report and Recommendation** (Doc. 40 at 45–46; PageID# 10816–17);
**Petitioner's Supplemental Objections** (Doc. 41 at 51; PageID# 10878).

find the essential elements of murder under Ohio law.  (Doc. 35 at 74–79).  In reaching this conclusion, the Magistrate Judge provided a detailed description of the evidence both the State and Widmer presented at trial.  (*Id.*).

Widmer raises two objections to this recommendation: Objections 16 and 31. (Doc. 37 at 79–80; Doc. 41 at 51).  First, he argues that the Magistrate Judge failed to consider Ground 4 under federal law.  This is simply not true.  (Doc. 35 at 75–79). Second, Widmer merely restates his prior arguments and offers a blanket rejection of the Magistrate Judge's recommendation.  This is an improper objection.  *See, e.g., Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) (a general statement that the magistrate judge erred "has the same effect as would a failure to object").

As Widmer has failed to raise any proper objection, the Court adopts the Magistrate Judge's recommendation on Ground 4.  Ground 4 is rejected.

### E.    Ground 5 – Manifest Weight of Evidence[19]

> Widmer's conviction is against the manifest weight of evidence. The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent in finding that the jury properly weighed the evidence and resolved conflicts in the evidence such that the State proved Widmer guilty of murder beyond a reasonable doubt.

(Doc. 1-1 at 99).

---

[19] The following are full citations to cited entries in the Court's analysis of Ground 5:

**Petition** (Doc. 1-1 at 83; PageID# 99); **Report and Recommendation** (Doc. 35 at 66–80; PageID# 10548–62).

In Ground 5, Widmer asserts that his conviction was against the manifest weight of the evidence. (*Id.* at 99). The Magistrate Judge recommends rejecting this ground because "manifest weight of evidence" is solely a state law issue and not a cognizable habeas corpus claim. (Doc. 35 at 80). Widmer did not object. Accordingly, the Court adopts in its entirety the Magistrate Judge's recommendations and rejects Ground 5.

### F. Grounds 6 and 7 – Braley Evidence[20]

**GROUND 6**

> The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent by concluding: (1) that the State had no knowledge of material information that it withheld from the defense; and (2) that the withheld evidence pertained to a collateral matter about which Braley never testified falsely, thus even if disclosed, it would not have created prejudice or affected the outcome of Widmer's trial.

(Doc. 1-1 at 84).

**GROUND 7**

> The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established

---

[20] Because Grounds 6 and 7 rely on the same background, the Court will provide a single recitation of all pertinent facts and then address the merits of the two claims in separate subsections, *infra*. The following are full citations to frequently cited entries in the Court's analysis of Grounds 6 and 7:

**Petition** (Doc. 1-1 at 84–121; PageID# 100–137); **Report and Recommendation** (Doc. 35 at 80–132; PageID# 10562–614); **Petitioner's Objections** (Doc. 37 at 26–42; PageID# 10681–97); **Supplemental Report and Recommendation** (Doc. 40 at 18–22; PageID# 10789–93); **Petitioner's Supplemental Objections** (Doc. 41 at 25–37; PageID# 10858–64); **Widmer Direct Appellate Court Decision** (Doc. 17-1, Ex. 2 at ¶¶ 111–38, PageID# 289–300); **Widmer Postconviction Appellate Court Decision** (Doc. 20-6, Ex. 167 at ¶¶ 4–106; PageID# 2551–84); **May 5th Pretrial Hearing Transcript** (Doc. 21-6 at 1–218; PageID# 4045–262); **DD&M Report** (Doc. 30-2 at 1–18; PageID# 10349–66); **Third Trial Testimony of Jeff Braley** (Doc. 21-17 at 155–217; PageID# 8987–9049).

>Supreme Court precedent by: (1) concluding that Widmer's postconviction petition failed to point out material information known to the State that was withheld from the defense prior to or during trial; and (2) denying Widmer's due process and confrontation claims wherein he contends that, due to the State's failure to disclose the information about Braley contained in the DD&M Report, he was denied the ability to raise a *Kyles v. Whitley* defense at trial challenging the integrity of the State's investigation and confronting Braley about the information contained in the DD&M Report.

(*Id.* at 114).

In Grounds 6 and 7, Widmer contends that his constitutional rights were violated when the State obtained a conviction using Braley's pretrial, perjured testimony (Ground 6), and when the State failed to disclose evidence regarding Braley's past (Ground 7). (*Id.* at 84–121).

The Magistrate Judge recommends denying both grounds. (Doc. 35 at 80–132). Widmer asserts four proper objections: Objections 5, 6, 7, and 24. (Doc. 37 at 26–42; Doc. 41 at 25–36). Accordingly, this Court has conducted a *de novo* review and, for the foregoing reasons, adopts the Magistrate Judge's recommendations, overrules the objections, and rejects these grounds.

### 1.  Factual Background

Former Detective Lieutenant Jeff Braley was the lead investigator of Sarah's death, called to the scene on the night of her death. (Doc. 17-1, Ex. 2 at ¶ 11). Sarah's death was Braley's first case as the lead investigator of a death ruled homicide. (Doc. 21-17 at 199). As the lead investigator in charge of Sarah's case, Braley maintained a

constant presence and some level of control in all aspects of the investigation, from beginning to end.  (*E.g.*, Doc. 17-1, Ex. 2 at ¶¶ 11–18).

Before the second trial, Widmer's counsel obtained copies of Braley's 1996 employment application with Hamilton Township.  (*Id.* at ¶ 117).  This 1996 application related to Braley's first position with Hamilton Township as a volunteer chaplain.  (Doc. 21-6 at 165).  Braley was subsequently promoted to human resources in 2000, before eventually becoming a police officer.  (*Id.*).

Based on the employment application, Widmer's counsel issued subpoenas to Braley's current and former employers, believing there were inconsistencies with Braley's credentials.  (*Id.* at ¶ 118).  Braley and the State moved to quash the subpoenas and the trial court held a hearing ("the May 5th Hearing").  (*Id.*; *see also* Doc. 21-6).

At the May 5th Hearing, held one week before the opening arguments of Widmer's second trial, Braley testified about his 1996 employment application.  (Doc. 21-6).  Specifically, Braley testified that he did not hold a master's degree or attend college in Florida, despite this information appearing in the application.  (Doc. 17-1, Ex. 2 at ¶ 124).  Rather, Braley testified that he did not recall filling out the application, or any application when he applied with Hamilton Township, and that most of the information on the application about him was inaccurate.  (*Id.* at ¶ 123).  The trial court granted the motion to quash, finding that the authenticity of the employment application was questionable and that allowing further information at trial regarding Braley's employment records would mislead the jury.  (*Id.* at ¶¶ 123–27).

Before the third trial, Widmer obtained a copy of a forensic report of Braley's 1996 employment application which concluded that, based on handwriting analysis, Braley's handwriting and the handwriting on the application matched. (*Id*. at ¶ 131). Widmer filed a motion to confront the lead investigator, seeking to use the 1996 employment application as a specific instance of conduct demonstrating Braley's character for untruthfulness. (*Id*.). The trial court denied the motion, concluding that any probative value related to such questioning was outweighed by the danger of misleading the jury or causing confusion of the issues.[21] (*Id*. at ¶ 132).

The day after Widmer's conviction, the Hamilton Township Trustees hired a law firm to investigate Braley and memorialize its findings in a written report (the "DD&M Report").[22] (Doc. 20-1, Ex. 167 at ¶ 16). The DD&M Report concluded that Braley freely admitted that the information in the 1996 employment application contained false information, that Braley was the author of the application, and that the application was dated from when Braley first applied to work for Hamilton Township. (Doc. 30-2).

The DD&M Report also found that Braley repeatedly lied to colleagues about serving in the Special Forces in the military. (Doc. 20-1, Ex. 167 at ¶ 18). The DD&M Report found that those in the police department understood that Braley's touted (and

---

[21] After his conviction and on direct appeal, Widmer argued that his due process and Sixth Amendment rights were violated when the trial court quashed his subpoenas and denied his motion to confront Braley. The direct appellate court found no error, concluding that under Ohio law, the trial court did not abuse its discretion by precluding Widmer from questioning Braley about the 1996 employment application. (*See* Doc. 17-1, Ex. 2 at ¶¶ 135–37). It is unnecessary for this Court to analyze that decision because it is not the last explained state court decision.

[22] DD&M stands for the law firm hired to investigate Braley: Donnellon, Donnellon, & Miller. A copy of the report is included in the record. (Doc. 30-2).

now confirmed to be false) military background earned him a lead position in the township's THOR Unit (the swat team), as a civilian and prior to being commissioned as a police officer.  (*Id.*).  During the DD&M investigation, Braley denied having ever told others that he was in Special Forces, contrary to the recollection of numerous individuals. (*Id.*).  The DD&M Report concluded that, although Braley's false application and statements about his background did not have a particular impact on the Township and never subjected the Township to liability, his conduct provided enough "evidence for the Township to move forward with a pre-disciplinary hearing."  (*Id.* at ¶ 19).[23]

### 2.    Last Explained State Court Decision

The last explained state court decision on the Braley evidence and related to these grounds comes from Widmer's postconviction appeal.  (*Id.* at ¶¶ 38–103).  During his postconviction appeal, Widmer argued that the State violated his due process rights by attaining a conviction through the use of Braley's perjured May 5th Hearing testimony, violating *Napue v. Illinois*. 360 U.S. 264 (1959), as well as failing to turn over evidence related to Braley and favorable to the defense, violating *Brady v. Maryland*, 373 U.S. 83 (1963).  The postconviction appellate court denied both claims.  (*Id.*).

On the *Napue* claim, the postconviction appellate court determined that Braley's statements at the May 5th Hearing were not actually false, but at most mere

---

[23] In his postconviction petition, Widmer obtained a police practices expert, Dennis Waller, who concluded Braley lacked qualifications and asserted undue influence over the Widmer investigation.  (Doc. 30-3).  The postconviction appellate court declined to consider the affidavit, finding it merely restated the information in the DD&M Report in a manner more favorable to Widmer.  (Doc. 20-1, Ex. 167 at ¶ 52).  This Court does not rely on the Waller affidavit to reach its conclusions.

inconsistencies or lack of memory, and, even if his statements were false, the statements made at the May 5th Hearing were not material to the judgement of the jury at the third trial. (*Id*. at ¶¶ 41, 77, 85).

When the postconviction appellate court considered Widmer's *Brady* claim, the court concluded that: (1) the evidence related to Braley's background was not exculpatory, or had too little impeachment value to be material; (2) the prosecution did not suppress any evidence because the DD&M report was produced after the third trial; and (3) the evidence was not material because Widmer had the opportunity to cross Braley. (*Id*. at ¶¶ 93, 96, 101–2).

In this habeas petition, Widmer asserts the same constitutional arguments.

### 3. *Napue* Claim (Ground 6)

Widmer argues he is entitled to relief under the Supreme Court's decision in *Napue*. (Doc. 1-1 at 84). Widmer contends that Braley's testimony at the May 5th Hearing was false, thus, the prosecution violated *Napue* because it knew the testimony was false, did not correct it, and attained a conviction through the use of Braley's perjured testimony.

Under *Napue*, due process is violated when the government attains a conviction using perjured or false testimony. Explained further by the Supreme Court:

> As long ago as *Mooney v. Holohan* (1935), this Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice. … In *Napue*, we said, the same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. Thereafter *Brady* held that suppression of material evidence

35

justifies a new trial irrespective of the good faith or bad faith of the prosecution. When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule. We do not, however, automatically require a new trial whenever a combing of the prosecutor's files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. A finding of materiality of the evidence is required under *Brady*. A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury.

*Giglio v. United States*, 405 U.S. 150, 153–54 (1972) (quotations and citations omitted).

With these principles in mind, the Sixth Circuit has outlined a three-part test that a petitioner must satisfy to demonstrate his conviction was attained through the use of false testimony: "(1) 'the statement was material;' (2) 'the statement was actually false'; and (3) 'the prosecution knew it was false.'" *Woods v. Booker*, 450 F. App'x 480, 486 (6th Cir. 2011) (quoting *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998)).

The postconviction appellate court applied this test, finding: (1) Braley's statements at the May 5th Hearing were not actually false, but at most mere inconsistencies; and (2) even if his statements were false, the statements made at the May 5th Hearing were not material to the judgement of the jury at the third trial. (Doc. 20-1, Ex. 167 at ¶¶ 41, 77, 85). The postconviction appellate court did not determine whether knowledge of Braley's statements could be imputed on the State, finding the other two elements unsatisfied, but had "serious doubts" of imputed knowledge. *Id*. at ¶ 86.

After review, the Court cannot conclude that the postconviction appellate court unreasonably applied *Napue* or that Widmer has shown that the *Napue* finding was the result of an unreasonable determination of the facts in light of the evidence presented in

the state court proceedings.  Even taking Braley's testimony at the May 5th Hearing as false—which Widmer argues is the reasonable determination of facts—there is no evidence that the prosecution attained a conviction using that false testimony at trial.  The jury was not presented with the May 5th Hearing testimony, nor any false testimony regarding Braley's background.[24]  Therefore, it cannot be said that the State used Braley's perjured testimony to attain a conviction.

Accordingly, Ground 6 is rejected.

### 4.  *Brady* Claim (Ground 7)

Next, Widmer argues that the postconviction appellate court erred when concluding that the State's failure to disclose the Braley evidence did not amount to a violation of *Brady*, leading to a violation of Widmer's due process or Confrontation Clause rights.  (Doc. 1-1 at 114).

"Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness," which includes the defendant's right to a "meaningful opportunity to present a complete defense."  *California v. Trombetta*, 467 U.S. 479, 485 (1984).  To safeguard that right, the Supreme Court has developed "what might loosely be called the area of

---

[24] The Court would be remiss if it did not point out the prosecution's seemingly sharp tactics to avoid a *Napue* violation.  Specifically, the prosecution effectively omitted any discussion of Braley's background, asking him a total of three background questions and shutting the door on Braley's perjured testimony.  (Doc. 21-17 at 155).  Indeed, these three questions were outstandingly minimal compared to background questions elicited from other officers.  (*E.g.*, Doc. 21-16 at 81–82, 333–36, 1067–68).  And, although this Court does not condone such tactics, the Court cannot conclude that such tactics give rise to a *Napue* violation.

constitutionally guaranteed access to evidence." *Id*. (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)). "Taken together, this group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system." *Id*.

Within this context, the Supreme Court held in *Brady* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Disclosure of impeachment evidence, as well as exculpatory evidence, is required under *Brady*. *United States v. Bagley*, 473 U.S. 667, 676 (1985). Indeed, the Supreme Court has held that "suppression of material evidence justifies a new trial irrespective of the good faith or bad faith of the prosecution.' … When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." *Giglio*, 405 U.S. at 153–54 (citations omitted).

Additionally, the Supreme Court has held that the duty to disclose "encompasses evidence 'known only to police investigators and not to the prosecutor.'" *Strickler v. Greene*, 527 U.S. 263, 280–81 (1999) (quoting *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)). Therefore, to comply with *Brady*, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf including the police." *Id*. at 281 (quoting *Kyles*, 514 U.S. at 437) (emphasis added).

However, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109 (1976). Evidence is "material" within the meaning of *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. Therefore, if "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," the evidence is material and thus satisfies *Brady*. *Strickler*, 527 U.S. at 290 (quoting *Kyles*, 514 U.S. at 435).

Through extensive arguments and objections, the Court summarizes Widmer's *Brady* claim as follows: Had Widmer possessed and been able to use evidence related to Braley's dishonest background, memorialized by the DD&M report, there is a reasonable probability that the outcome of Widmer's trial would have been different because Widmer would have been able to mount what he terms a "*Kyles* defense," *i.e.*, he would have been able to sully the credibility of Braley as the lead investigator, casting doubt on the reliability of the entire police investigation, and leading to a different outcome. (*E.g.*, Doc. 1-1 at 114-15; Doc. 37 at 38-42).

The postconviction appellate court discussed this argument when analyzing Widmer's *Brady* claim. (Doc. 20-1, Ex. 167 at ¶¶ 99–102). Specifically, assuming that

the Braley evidence was both favorable and suppressed, the postconviction appellate

court determined that, "even if the allegedly suppressed evidence in the DD&M report

could have helped the defense cast some doubt on the police investigation under *Kyles*, it

[was] not enough to establish materiality" because, "even without this information,

Widmer had the opportunity to cross-examine Braley and the numerous other witnesses

about the investigation from start to finish." (*Id.* at ¶ 101). According to the

postconviction appellate court, "it [was] simply untenable to believe that the suppression

was the reason for Widmer's scant questioning on this matter, or that disclosing Braley's

alleged misconduct would have cast sufficient doubt in the jury's mind about the

investigation so as to generate a reasonable probability of a different result." (*Id.*) And

similarly, to the extent the Braley evidence was "severely impeaching," "there [was] no

reasonable probability that impeaching Braley would have resulted in a different

outcome," given all the other evidence and witnesses in the case. (*Id.* at ¶ 102).

> The postconviction appellate court concluded:

> In sum, even if we assume that the information on Braley
> should have been disclosed, when we review the record as a
> whole, we cannot conclude that our confidence in the verdict
> has been undermined. *See Bagley*, 473 U.S. at 682. In other
> words, there is not a reasonable probability that the outcome of
> Widmer's trial would have been different, had the evidence in
> the DD&M report been disclosed. *Id.*

(*Id.* at ¶ 103).

> Given the foregoing, this Court cannot say that the postconviction appellate

court's adjudication of this claim was contrary to or an unreasonable application of

Supreme Court precedent. Moreover, to the extent Widmer makes a factual argument, he

has not shown that the postconviction appellate court's adjudication of the claim resulted in a decision based on an unreasonable determination the facts in light of the evidence presented in the state court proceedings.  Indeed, the postconviction appellate court made numerous factual assumptions in Widmer's favor when reaching its *Brady*, including assuming that the evidence was favorable and that the prosecution suppressed it.

Accordingly, the Court adopts the Magistrate Judge's recommendations on Ground 7.  Ground 7 is rejected.

### G.    Ground 8 – Braley Evidence, Ineffective Assistance of Counsel[25]

> The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent by concluding that no prejudice to Widmer resulted from the newly discovered evidence about Braley from the DD&M Report, and thus that the trial counsel provided constitutionally effective assistance despite failing to raise at trial the new evidence about Braley (**if in fact such evidence was disclosed to counsel prior to or during trial**).

(Doc. 1-1 at 122) (emphasis added).

Ground 8 poses a hypothetical – *if*, prior to the third trial, Widmer's trial counsel was provided with all of the evidence regarding Braley's background (*i.e.*, the information subsequently memorialized in the DD&M report), then trial counsel was ineffective for failing to act on the Braley evidence.  (*Id.*).

---

[25] The following are full citations to cited entries in the Court's analysis of Ground 8:

**Petition** (Doc. 1-1 at 122; PageID# 138); **Report and Recommendation** (Doc. 35 at 133–34; PageID# 10615–16).

The Magistrate Judge recommends rejecting this ground. (Doc. 35 at 133–34). Widmer did not object. Accordingly, given Widmer's failure to object and because Ground 8 is posed as a hypothetical, the Court concurs with the Magistrate Judge's recommendations. Ground 8 is rejected.

### H. Grounds 9 – Postconviction DNA Testing[26]

> The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent by denying Widmer's postconviction request for genetic DNA testing of Sarah Widmer's biological remains to determine if she suffered from a genetic disorder, particularly when testing was necessary to fairly adjudicate Widmer's state  postconviction claim of ineffective assistance of trial counsel for failure to pursue testing. Additionally, the state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent by concluding that genetic DNA test results suggesting that Sarah suffered from a genetic disorder that may have caused her to drown in the bathtub would not establish a reasonable probability of a different outcome at trial.

(Doc. 1-1 at 123).

In Ground 9, Widmer argues that his due process and equal protection rights were violated when the trial court denied his postconviction request to test Sarah's DNA,

---

[26] The following are full citations to frequently cited entries in the Court's analysis of Ground 9:

**Petition** (Doc. 1-1 at 123–38; PageID# 139–154); **Report and Recommendation** (Doc. 35 at 134–54; PageID# 10616–36); Petitioner's Objections (Doc. 37 at 43–54; PageID# 10698–709); **Supplemental Report and Recommendation** (Doc. 40 at 22–29; PageID# 10793–800); **Petitioner's Supplemental Objections** (Doc. 41 at 37; PageID# 10864); **Widmer Postconviction Appellate Court Decision** (Doc. 20-1, Ex. 167 at ¶¶ 110–47, PageID# 2585–96).

which decision the postconviction appellate court affirmed. (*Id.* at 123–35). The Magistrate Judge recommends rejecting this ground. (Doc. 35 at 146–52).

Widmer asserts two proper objections: Objections 8 and 9. (Doc. 37 at 43–54). Having reviewed the argument *de novo*, the Court agrees with the Magistrate Judge's conclusion and finds that the postconviction appellate court's decision was not an unreasonable application of federal law. The Court expands on the Magistrate Judge's reasoning, *infra*.

### 1. Factual Background

At trial, Widmer presented testimony from friends and family that Sarah had a history of constantly being tired, falling asleep often, and taking naps throughout the day. (Doc. 17-1, Ex. 2 at ¶ 28). Sarah also suffered from a heart murmur and a cleft pallet as a child. (*Id.* at ¶ 32). Widmer contends that this medical background, coupled with Sarah's narcolepsy-like symptoms, suggests that Sarah suffered from a genetic syndrome called Long QT. (Doc. 1-1 at 124).

Before trial, Sarah's DNA was not tested for Long QT. (Doc. 20-1, Ex. 167 at ¶ 112). Widmer's counsel did, however, elicit testimony from multiple experts about Long QT at the third trial. Specifically, the experts testified that Sarah's symptoms *could* indicate that she suffered from Long QT. (*Id.* at ¶ 135; Doc. 35 at 152–53). Additionally, the experts testified that individuals with Long QT may be more susceptible to sudden cardiac arrest and death. (Doc. 20-1, Ex. 167 at ¶ 135, fn. 13).

Postconviction, the trial court granted Widmer's motion to preserve Sarah's DNA, pursuant to Ohio Rev. Code § 2933.82. (*Id.* at ¶ 112). At this stage, Widmer provided

the affidavit of an expert who opined that there is a high association between accidental drowning and Long QT. (Doc. 20-1, Ex. 152 at 23). However, the trial court denied Widmer's postconviction request to test Sarah's DNA for Long QT. (*Id.*).

### 2. Last Explained State Court Decision

In his postconviction appeal, Widmer challenged the constitutionality of Ohio's postconviction DNA testing statutory framework. (*Id.* at ¶ 137). Specifically, Ohio's postconviction statutory scheme permits offenders to apply for postconviction DNA testing, in order to compare genetic material found at the crime scene, with the offenders' own DNA. Ohio Rev. Code § 2953.71–.81. Thus, under Ohio's statute, the parent sample of the DNA collected from the scene must be compared <u>to the eligible offender</u>. *Id.* at § 2954.74(C).

An Ohio state court may only accept an eligible offender's application for postconviction testing if either: (1) the DNA test result would have been outcome determinative <u>and</u> DNA testing was not generally accepted, available, or admissible at the time of the trial; or (2) the DNA was tested but the prior result was not definitive at the time of trial <u>and</u> the new test result would be outcome determinative. *Id.* at § 2953.74(B). An "outcome determinative" result means that, had the DNA test been conducted and had the results been admitted at trial, there is a "strong probability that no reasonable factfinder would have found the offender guilty." *Id.* at § 2953.71(L).

Ohio's postconviction DNA statutory testing scheme also recognizes that the application process described in § 2953.71 through § 2953.81 is not the "exclusive means by which an inmate may obtain postconviction testing." *Id.* § 2953.84. Although this

section provides no alternatives, nor examples of other means to be granted testing,
Widmer argued that his postconviction request for victim DNA testing could fall under
this catch-all.

Interpreting Ohio's collective DNA testing statutes, the postconviction appellate
court first considered whether Widmer fell under the application procedure set forth
under § 2953.71 through § 2953.81. (Doc. 20-1, Ex. 167 at ¶¶ 114–36). The court
answered "no" because those sections do not provide for postconviction testing of a
*victim's* DNA, but only tests to compare the DNA of the *eligible offender* to evidence
from the scene, in order to prove the offender did not commit the crime.

The postconviction appellate court also concluded that Widmer did not qualify for
testing under § 2953.84, finding his request was asking for the broadest possible reading
of the statutory scheme. (*Id.* at ¶¶ 128–31). The court stated further that Ohio's statutes
did not embrace victim DNA testing, that Widmer's suggested interpretation would
disrupt the entire postconviction DNA testing framework, and that any changes to the
reading should be left to the General Assembly. (*Id.*).

The postconviction appellate court also considered Widmer's argument that
Ohio's postconviction DNA testing statutes violated due process or equal protection. (*Id.*
at ¶¶ 137–47). First, the court concluded there was no substantive due process violation
because the Supreme Court does not recognize a substantive due process right to
postconviction DNA testing. (*Id.* at ¶ 140 (citing *Dist. Attorney's Office for Third Judicial
Dist. v. Osborne*, 557 U.S. 52, 68 (2009)). Second, the postconviction appellate court
concluded there was no procedural due process deprivation because, under Ohio's

postconviction DNA testing statute, Widmer had no liberty or property interest in postconviction victim DNA testing. (*Id*. at ¶¶ 141–42 (citing *Olim v. Wakinekona*, 461 U.S. 238 (1983)). Finally, the postconviction appellate court concluded there was no equal protection violation because Widmer was not similarly situated to the eligible offenders who can test DNA postconviction under Ohio statute. (*Id*. at ¶¶ 144–45).

Widmer presents these same constitutional challenges in his habeas petition.

### 3. Constitutional Rights

The crux of Widmer's federal arguments and objections is that he should be entitled to postconviction DNA testing of a victim's DNA, because such a test would vindicate his substantive right to prove himself innocent. (Doc. 1-1 at 123–35; Doc. 37 at 43–50). He argues that Ohio's postconviction statutory scheme, as described above, does not afford him due process or equal protection under the law despite the fact that he, like eligible offenders under § 2953.71 through § 2953.81, is seeking postconviction testing which has a strong probability of being outcome determinative and changing the result of his trial. (*Id*.). In essence, he argues that his reasoning to test a victim's DNA falls under the spirit of the statute, and he should therefore be allowed to test Sarah's DNA for Long QT. (*Id*.).

Widmer's arguments and objections are not well-taken.

To comport with due process, the Supreme Court in *Osborne* stated that: "Federal courts may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided." 557 U.S. at 69 (emphasis added). When considering whether the postconviction procedure is fundamentally

inadequate, "the question is whether consideration of [the petitioner]'s claim within the framework of the State's procedures for postconviction relief 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses any recognized principle of fundamental fairness in operation.'" *Id*. at 69 (quoting *Medina v. California*, 505 U.S. 437, 446 (1992)).

Under *Osborne*, if Widmer were actually able to prove himself innocent with the postconviction testing of Sarah's DNA, but was denied access to postconviction DNA testing due to Ohio's statutory limitations, Widmer would be entitled to relief. That is – Ohio's postconviction relief procedure would be fundamentally inadequate to vindicate Widmer's substantive right to prove his actual innocence.[27]

However, the problem with Widmer's argument, and why this ground will be rejected, is that Widmer's request would not actually prove innocence. Thus, his proposed postconviction DNA test would not vindicate a substantive right, and the postconviction appellate court's decision was not an unreasonable application of Supreme Court precedent.

---

[27] The Court notes that if the evidence proved innocence, Widmer may have been able to seek other postconviction relief. *See, e.g.,* Ohio Rev. Code § 2951.21 (petition for postconviction relief when showing actual innocence and allowing reasonable discovery in postconviction petition); Ohio Crim. R. 33 (grounds for new trial, including newly discovered evidence). *Compare Osborne*, 557 U.S. at 69–70 ("We see nothing inadequate about the procedures Alaska has provided to vindicate its state right to postconviction relief in general, and nothing inadequate about how those procedures apply to those who seek access to DNA evidence. Alaska provides a substantive right to be released on a sufficiently compelling showing of new evidence that establishes innocence. It exempts such claims from otherwise applicable time limits. The State provides for discovery in postconviction proceedings and has—through judicial decision—specified that this discovery procedure is available to those seeking access to DNA evidence.").

In other words, what Widmer seeks is not evidence that conclusively shows that he did not commit the crime. What Widmer seeks is not newly discovered evidence, unavailable or unknown at trial, that tends to prove innocence. Instead, Widmer seeks to determine whether Sarah *might* have suffered from a health condition at the time of her death, which in turn could *possibly* provide another explanation for her death. However, even assuming the DNA test proved that Sarah had Long QT, there is still no definitive evidence that Long QT actually caused her death. In other words, a diagnosis of Long QT would not, in any way, preclude Sarah from having been murdered, nor would it preclude a finding that Widmer was responsible. The Court cannot upset Ohio's postconviction DNA testing statutory scheme, or the postconviction appellate court's interpretation of the statutes and reasonable application of Supreme Court precedent, for a possible alternative theory on a victim's cause of death.

Moreover, Widmer is not similarly situated to statutorily eligible offenders. In Objection 10, Widmer disagrees with this conclusion, arguing there is no difference between a wrongfully convicted offender comparing his own DNA to evidence at the scene to prove he is actually innocent of the crime, versus a wrongfully convicted offender using a victim's DNA test to prove that no crime actually occurred. (Doc. 37 at 50–54). Alternatively, Widmer argues there is no legitimate state interest when drawing a line between the two groups because both are trying to prove actual innocence. (*Id*.).

The Court agrees with Widmer's overarching argument – these two groups are similarly situated in proving actual innocence, and there would be no legitimate interest in drawing a distinction between offenders proving that another person committed the

crime, versus offenders proving that no actual crime occurred. However, contrary to Widmer's assertion, he does not fall into the latter camp. As the Court just explained, Widmer intends to use the postconviction testing to determine ***if*** Sarah suffered from an underlying condition that ***might*** provide a ***possible*** alternative explanation for her cause of death. Thus, Widmer's proposed postconviction DNA testing would not prove that no crime occurred, nor would it prove Widmer's actual innocence.

Therefore, this Court finds that Ohio's postconviction DNA processes are not fundamentally inadequate to vindicate Widmer's substantive rights, and the postconviction appellate court's rejection of Widmer's due process and equal protection claims was not an unreasonable application of Supreme Court precedent.

Accordingly, Ground 9 is rejected.

### I.    Ground 10 – DNA Testing and Ineffective Assistance of Counsel

> The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent in Strickland, Wiggins, and Chambers by concluding that trial counsel rendered constitutionally effective assistance, despite failing to pursue genetic DNA testing, because, according to the state courts, test results suggesting that Sarah suffered from a genetic disorder that caused her to drown in the bathtub would not establish a reasonable probability of a different outcome at trial as necessary to establish prejudice under Strickland.

(Doc. 1-1 at 135).[28]

---

[28] The facts and background underlying Ground 10 are the same as Ground 9. The parties and the Magistrate Judge also treat Grounds 9 and 10 together. The relevant facts and pertinent record cites are set forth in the Court's analysis of Ground 9, *supra*.

In essence, Ground 10 argues that Widmer's trial counsel was ineffective for failing to seek testing of Sarah's DNA before the third trial. (*Id*. at 135–38). The postconviction appellate court determined that Widmer's trial counsel was not constitutionally ineffective, because counsel elicited testimony about Long QT from experts at the third trial. (Doc. 20-1, Ex. 167 at ¶¶ 132–36). Thus, the postconviction appellate court reasoned that there was no ineffective assistance of counsel because the jury heard evidence of Long QT and was simply unpersuaded by it. (*Id*. at ¶ 135).

The Magistrate Judge concluded that the postconviction appellate court's decision was not an unreasonable application of Supreme Court precedent. The Magistrate Judge therefore recommends rejecting Ground 10, because counsel was not ineffective for pursuing a trial strategy that alluded to the genetic syndrome as an alternate cause of death, but did not offer a positive (or negative) test result. (Doc. 35 at 152–54).

In Objection 9, Widmer argues that the recommendation reaches an incorrect conclusion because counsel's decision to <u>not</u> test Sarah's DNA before trial amounts to prejudice under *Strickland*, 466 U.S. at 694. (Doc. 37 at 50–54). This objection is not well-taken.

As previously set forth, *supra*, the Court must apply the *Strickland* standard to a claim of ineffective assistance of counsel. And the Court reemphasizes that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption

that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation omitted).

Here, trial counsel elicited testimony about Long QT from three different medical doctors. (Doc. 35 at 152–53). Thus, Widmer's counsel did not fail to pursue an evidentiary lead – counsel was well-aware of Long QT and elicited testimony about it.

Nevertheless, Widmer contends that counsel was ineffective for failing to test for Long QT prior to trial, because a positive Long QT test would necessarily be material and would have changed the outcome of the trial.

The flaw in Widmer's argument is that he assumes the test result would have been positive – but, what if it wasn't? Had counsel conducted the test pretrial, and if it the test definitively proved that Sarah did not suffer from Long QT, counsel would have been precluded from eliciting **any** testimony of Long QT. Thus, by not obtaining the test results pretrial, Widmer's counsel was able to present the jury with an alternative theory for Sarah's death.

Given the strong presumption in favor of the reasonableness of counsel's assistance, the Court cannot say that foregoing a pretrial DNA test was counsel's error, as opposed to sound trial strategy.

Accordingly, the Court adopts the Magistrate Judge's recommendations on Ground 10. Ground 10 is rejected.

J.    **Ground 11 – Access to Grand Jury Testimony[29]**

> The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent by denying Widmer access to the grand jury testimony of Braley and Uptegrove, or at a minimum an in camera inspection of said testimony, when Widmer demonstrated a particularized need for access to the testimony for a review of: (1) whether Braley made any false statements to the grand jury which would support his *Brady*, *Kyles*, and *Napue* claims; and (2) whether the testimony of either witness reveals what information, or the extent to which, Braley supplied information about the case to Uptegrove that he considered in his determination that Sarah Widmer drowned as a result of homicide. This error occurred in violation of Widmer's procedural and substantive due process rights under the U.S. Constitution including meaningful access to the courts.

(Doc. 1-1 at 139).

In Ground 11, Widmer contends that the postconviction appellate court violated his due process rights and his rights under the Confrontation Clause when the court affirmed the trial court's denial of his postconviction request for the grand jury testimony of Braley and Dr. Uptegrove (the State's coroner). (*Id*. at 139–45). Widmer argues that Braley and Dr. Uptegrove's grand jury testimony further his *Brady*/*Napue* claims (Grounds 6, 7) because the testimony would continue to show Braley's dishonesty and influence on the investigation.

---

[29] The following are full citations to frequently cited entries in the Court's analysis of Ground 11:

**Petition** (Doc. 1-1 at 139–50; PageID# 155–62); **Report and Recommendation** (Doc. 35 at 154–58; PageID# 10636–40); **Petitioner's Objections** (Doc. 37 at 76–78; PageID# 10731–33); **Supplemental Report and Recommendation** (Doc. 40 at 41–45; PageID# 10812–16); **Petitioner's Supplemental Objections** (Doc. 41 at 49–50; PageID# 10876–77); **Widmer Postconviction Appellate Court Decision** (Doc. 20-1, Ex. 167 at ¶¶ 150–59, PageID# 2596–99).

The Magistrate Judge recommends denying this ground. (Doc. 35 at 154–58). Widmer asserts two proper objections: Objections 15 and 30. (Doc. 37 at 76–78; Doc. 41 at 49–50). Having reviewed this ground *de novo*, the Court agrees with the conclusions reached by the Magistrate Judge. However, the Court expands on the Magistrate Judge's reasoning as discussed, *infra*.

### 1. Factual Background

At the postconviction stage, Widmer moved to compel the grand jury testimony of Braley and Dr. Uptegrove following the revelation of Braley's dishonest job history, discussed *supra*. (Doc. 20-1, Ex. 167 at ¶ 151). Braley was, of course, the lead investigator in the case against Widmer. Dr. Uptegrove, the Warren County Coroner who testified at the grand jury proceeding, performed Sarah's autopsy for the State. (Doc. 17-1, Ex. 2 at ¶ 16). Dr. Uptegrove determined cause of death as drowning and that bruises on Sarah's body were inconsistent with aggressive resuscitation efforts. (*Id*.). Thus, he concluded Sarah's death was a homicide. (*Id*.)

Braley was also present during the autopsy. (*Id*.). And, at trial, Braley testified that before beginning the investigation he already thought "something bad, really bad" happened at the Widmer residence. (Doc. 1-1 at 144). Widmer contends that Braley brought this mindset to Dr. Uptegrove before the autopsy and findings were complete, thereby improperly influencing Dr. Uptegrove's homicide conclusion. (*Id*.).

Accordingly, following the full revelations in the DD&M Report of Braley's background, Widmer moved to compel the grand jury testimony of Braley and Dr.

Uptegrove <u>after trial</u>, arguing that he had a particularized need for the testimony to further evidence his *Brady*/*Napue* claim. (Doc. 20-1, Ex. 167 at ¶¶ 150–59).[30]

### 2. Last Explained State Court Decision

In his postconviction appeal, Widmer argued that the trial court violated his due process rights and his right to access the courts. (*Id*. at ¶ 150).[31] The postconviction appellate court overruled Widmer's assignment of error under Ohio Crim. R. 6(e), determining Widmer had not shown a particularized need for the grand jury testimony that outweighed the need to maintain secrecy. (*Id*. at ¶¶ 150–59). The postconviction appellate court also determined that Widmer had not explained how the trial court's failure to compel production, or to conduct an *in camera* review of the grand jury testimony, deprived him of a fair adjudication. (*Id*. at ¶ 156).

In this habeas petition, Widmer argues the same constitutional issues and further argues that denying his access to the grand jury testimony postconviction deprived him of his rights under the Confrontation Clause.

### 3. Access to Grand Jury Testimony

The Magistrate Judge recommends rejecting this ground as a state law claim, inappropriate for a habeas petition. (Doc. 35 at 157). Alternatively, even if the ground is

---

[30] After extensive review of the record, this Court found no evidence that Widmer requested the grand jury testimony before the third trial or during the third trial, the operative trial in this habeas petition.

[31] The trial court did not specifically overrule Widmer's postconviction request for grand jury testimony; accordingly, the postconviction appellate court presumed the request denied. (*Id*. at ¶ 150).

a federal constitutional claim, Widmer has not demonstrated an unreasonable application of Supreme Court precedent. (*Id*. at 158; Doc. 40 at 42–45).

In Objections 15 and 30, Widmer argues the Magistrate Judge's conclusion is incorrect because the Supreme Court has established a constitutional right to grand jury testimony upon either: (1) a showing of particularized need, under *United States v. Proctor & Gamble*, 356 U.S. 677 (1958); or (2) when the ends, such as showing a *Brady* violation and mounting a *Kyles* defense, justify the means, under *Dennis v. United States*, 384 U.S. 855 (1966). (Doc. 37 at 76–78; Doc. 41 at 49–50). Thus, Widmer contends, the postconviction appellate court unreasonably applied Supreme Court precedent when denying his request for Braley and Dr. Uptegrove's grand jury testimony, violating his due process and Confrontation Clause rights.

These objections are not well-taken. The problem with Widmer's due process and Confrontation Clause argument is that Widmer is seeking Braley and Dr. Uptegrove's grand jury testimony **post**-conviction.

Widmer did not request the testimony before or during the third trial. Had that request been made, and had the trial court denied that request, Widmer may have been able to present a successful due process and Confrontation Clause claim. Widmer could have then, for example, argued that the trial court's evidentiary ruling was an error so egregious as to give rise to a due process violation, or that he was denied the ability to adequately confront Braley and Dr. Uptegrove on cross-examination.

However, because Widmer did not seek the grand jury transcripts in advance of or during his third trial, he is not arguing that the trial court erred in depriving him of a fair

trial nor that the trial court unreasonably denied him the means to mount his defense. Rather, Widmer's request essentially assumes that he is headed to a fourth trial, and he asks this Court to issue an effectively advisory opinion, finding that he should have been given Braley and Dr. Uptegrove's testimony as *Brady* material, after his conviction, but in anticipation of his future needs.

Accordingly, the Court agrees with the Magistrate Judge that Widmer is asserting a state law claim, not cognizable in habeas, and rejects Ground 11.

### K. Ground 12 – Denying Post-Conviction Hearing[32]

> The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent by denying Widmer's October 12, 2011 postconviction petition without a hearing because the petition and material appended to it demonstrated a prima facie case of constitutional violations, thus warranting a hearing. This error occurred in violation of Widmer's procedural and substantive due process rights under U.S. Constitution including meaningful access to the courts.

(Doc. 1-1 at 146).

Ground 12 argues that the trial court erred by denying his postconviction petition on the Braley evidence and DNA testing without a hearing.  (*Id*. at 146–49).  The Magistrate Judge recommends rejecting this ground because a "ground for relief that challenged the correctness of a state judicial proceeding and does not dispute the detention itself is not cognizable in habeas."  (Doc. 35 at 158–59 (citing *Kirby v. Dutton*,

---

[32] The following are full citations to cited entries in the Court's analysis of Ground 12:

**Petition** (Doc. 1-1 at 146–49; PageID# 162–65); **Report and Recommendation** (Doc. 35 at 158–59; PageID# 10640–59).

974 F.2d 245, 247 (6th Cir. 1986)). Widmer did not object. Accordingly, the Court adopts the Magistrate Judge's recommendations and Ground 12 is rejected.

## L.    Certificate of Appealability

After concluding that Widmer is not entitled to relief on any ground, the Magistrate Judge recommends denying Widmer a certificate of appealability because any appeal would be objectively frivolous. (Doc. 35 at 160; Doc. 40 at 47). In Objections 17 and 32, Widmer argues that, if relief is denied, the Court should issue a certificate of appealability on all grounds because reasonable jurists could disagree with the Court's conclusions on all grounds. (Doc. 37 at 81; Doc. 41 at 51–54). Widmer suggests that reasonable jurists could disagree because Supreme Court of Ohio justices dissented when denying certiorari of the direct and postconviction appellate court decisions.[33]

Widmer has demonstrated that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473 (2000)). Accordingly, Objections 17 and 32 are sustained in part and a certificate of appealability shall issue as to Grounds 1, 2, 3, 6, 7, 9, and 10. The Court denies issuance for Grounds

---

[33] When the Supreme Court of Ohio denied certiorari of the direct appellate court's decision, then-Chief Justice O'Connor dissented as to denying review of Proposition of Law Nos. I (argued as Ground 2 in the Petition) and III (argued as Ground 1 in the Petition), Judge Kennedy dissented as to Proposition of Law No. III, and Judge Pfiefer dissented. *State v. Widmer*, 2013-Ohio-553, 983 N.E.2d 368 (Ohio 2013) (table). When the Supreme Court of Ohio denied certiorari of the postconviction appellate court's decision, Judges Lazinger and O'Neill dissented. *State v. Widmer*, 2013-Ohio-2062, 987 N.E.2d 703 (Ohio 2013) (table).

4, 5, 8, 11, and 12 because Widmer did not object when the Magistrate Judge

recommended rejecting those grounds and/or those grounds are not cognizable in habeas.

### M.    Remaining Objections

A few objections remain to be resolved.  Specifically, Widmer asserts extensive

objections that reassert his previous arguments, fail to point to specific errors of the

Magistrate Judge's Report and Recommendations or Supplemental Report and

Recommendations, and/or simply respectfully disagree with the Magistrate Judge.  (*See*

Objections 18-23, 25-27, 29, and 31, Doc. 41-1 at 4–24, 37–48, 59).  These are improper

objections and not well-taken.  *See, e.g., Bradley v. United States*, No. 18-1444, 2018 WL

5084806, at *3 (6th Cir. Sept. 17, 2018) (quoting *Miller v. Currie*, 50 F.3d 373, 380 (6th

Cir. 1995)) ("A party's objections are not sufficiently specific if they merely restate the

claims made in the initial petition, 'disput[e] the correctness' of a report and

recommendation without specifying the findings purportedly in error, or simply 'object[]

to the report and recommendation and refer[ ] to several of the issues in the case.'").

### IV.    CONCLUSION

As required by 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b), the Court has

reviewed the comprehensive findings of the Magistrate Judge and considered *de novo* all

of the filings in this matter.  Upon consideration of the foregoing:

1.    The Initial and Supplemental Reports and Recommendations (Docs. 35, 40) are **ADOPTED**, except for the recommendations regarding a certificate of appealability and leave to appeal *in forma pauperis*.

2.    Objections 17 and 32 are **SUSTAINED in part**.  Petitioner's Objections (Docs. 37, 43) are otherwise **OVERRULED**.

3.      The Petition is **DISMISSED with prejudice**.

4.      Pursuant to 28 U.S.C. § 2253, the Court **ISSUES** a certificate of appealability as to Grounds 1, 2, 3, 6, 7, 9, and 10.

5.      The Court **GRANTS** Petitioner leave to appeal *in forma pauperis*.  28 U.S.C. § 1915(a)(3).

6.      The Clerk shall enter judgment accordingly, whereupon this case is **TERMINATED** upon the docket of this Court.

**IT IS SO ORDERED.**

Date:  12/29/2023                                    */s Timothy S. Black*

                                                        Timothy S. Black
                                                        United States District Judge