# UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

Kelly L. Stephens
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  May 19, 2025

Ms. Michele Laura Berry
Law Office
3584 Mooney Avenue
Cincinnati, OH 45208

Ms. Katherine Elizabeth Mullin
Office of the Attorney General
of Ohio
30 E. Broad Street
23rd Floor
Columbus, OH 43215

Re:  Case No. 24-3054, *Ryan Widmer v. Jossette Okereke*
Originating Case No. : 1:14-cv-00303

Dear Counsel,

The Court issued the enclosed opinion today in this case.

Enclosed are the court's unpublished opinion and judgment, entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Sincerely yours,

s/Cathryn Lovely
Opinions Deputy

cc:  Mr. Richard W. Nagel

Enclosures

Mandate to issue

NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0258n.06

No. 24-3054

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

<table>
<tr><td>RYAN K. WIDMER,</td><td>)</td><td rowspan="6"></td></tr>
</table>

RYAN K. WIDMER,                 )

      Plaintiff-Appellee,     )

                         )

v.                              )

                         )

JOSSETTE OKEREKE, Warden    )

      Defendant-Appellant.    )

                         )

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

OPINION

**FILED**
May 19, 2025
KELLY L. STEPHENS, Clerk

Before: MOORE, CLAY, and THAPAR, Circuit Judges.

**CLAY, Circuit Judge.** Petitioner Ryan Widmer appeals the district court's order denying his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. For the reasons set forth below, we **AFFIRM** the district court's denial of habeas relief.

## I. BACKGROUND

### A. Sarah Widmer's Death and Ryan Widmer's Trials

In February 2011, after three trials, Ryan Widmer was convicted of murdering his wife, Sarah Widmer ("Sarah"). We recount the details of Sarah's death and Widmer's trials, and then recount additional information relevant to Widmer's petition for a writ of habeas corpus.

On the night of August 11, 2008, Sarah drowned in the bathtub at her residence in Hamilton Township, Ohio. Her husband, Petitioner Ryan Widmer, called 9-1-1 to report the drowning. Widmer stated that he believed that Sarah had fallen asleep in the bathtub and was dead.

No. 24-3054, *Widmer v. Okereke*

Deputy Steve Bishop with the Warren County, Ohio Sheriff's Office was the first to arrive on the scene. Bishop observed Sarah lying naked on the floor of the Widmers' bedroom. Sarah was unresponsive, she was not breathing, and she had no pulse, but she was warm to the touch. Bishop observed that Sarah's hair was damp, but her body was dry.

Widmer was in the bedroom as well, dressed only in boxer shorts. Bishop did not observe any injuries on Widmer's body. Other responding officers also testified that Widmer had no marks on him.

Hamilton Township Emergency Medical Services ("EMS") arrived, and Bishop assisted an emergency medical technician ("EMT") in administering chest compressions. Bishop and other officers that arrived on the scene noticed a pink, frothy discharge emanating from Sarah's mouth and nose, and that the volume of the discharge increased with the chest compressions. But emergency personnel—both police officers and EMTs—observed no obvious signs of trauma on Sarah's body.

EMTs attempted to resuscitate Sarah in the Widmer house, including through intubation. After two attempts at intubation were unsuccessful, the medics removed Sarah to an ambulance. There, an EMT attempted to establish an intravenous line in Sarah's neck, eventually starting a line in her jugular vein. Another EMT made two additional, unsuccessful attempts to intubate Sarah in the ambulance. After the unsuccessful intubations, the EMTs decided to take Sarah to the hospital. Widmer rode with Sarah to the hospital. EMTs attempted to intubate Sarah a fifth time while en route to the hospital, this attempt was also unsuccessful.

Sarah was pronounced dead about thirty minutes after her arrival at the hospital emergency room, despite the treating physician quickly performing a successful intubation. While at the hospital, Widmer told the charting nurse that he found Sarah in the bathtub, not breathing, face up.

2

No. 24-3054, *Widmer v. Okereke*

Warren County Coroner's Investigator Doyle Burke responded to the emergency room. He observed Sarah's body and noted no obvious signs of trauma. But Sarah's body appeared dry, though her hair was damp, and Burke was suspicious that there was no pruning on her fingers or extremities. Burke bagged Sarah's hands to preserve evidence from under her fingernails. And he spoke with Widmer, who relayed that he was watching football downstairs when Sarah went upstairs to take a bath. Widmer stated he was afraid that Sarah would fall asleep in the tub. About an hour after Sarah went upstairs, Widmer went into the bathroom and found the tub full, and Sarah unresponsive, face down in the water underneath the faucet.

As Sarah was removed to the hospital, Lieutenant Detective Jeff Braley, the lead detective in Hamilton Township, arrived to process the scene. On a preliminary tour of the home, Braley noticed that the bathroom floor and items on it were dry. The floor of the bedroom was also dry, but there were two "pinkish-red" stains on the carpet. Trial Tr., R. 21-17, Page ID #8989–90. And the tub was mostly dry, save for a few water droplets around the drain. While Braley was at the scene, Widmer gave consent for a search of his home, relayed through Burke. After consent to search was given, Braley packaged and processed evidence, including water samples, bath products, a used Lysol wipe, dry towels and rugs from the bathroom, and a carpet sample from where Sarah had been laying. The water samples and Lysol wipe tested negative for blood and semen, and the carpet sample tested positive for blood and fecal matter. The Miami Valley Crime Laboratory also tested samples taken from Sarah's fingernails for DNA, and found the samples contained only Sarah's DNA and that of an unknown female contributor.

The next day, August 12, 2008, Burke and Braley attended an autopsy performed by Dr. Russell Uptegrove, the Warren County Coroner. At the time, Braley had already determined Sarah's death was "suspicious." *Id.* at Page ID #9016. Uptegrove told Braley on August 12 that

3

No. 24-3054, *Widmer v. Okereke*

he believed Sarah had drowned, and that her death was a homicide, though his determination was not yet final at autopsy. Uptegrove observed external bruising on Sarah's face and neck, deep muscle hemorrhaging in her neck, and contusions to her scalp. At Widmer's third trial, Uptegrove testified to his final conclusion that Sarah died by homicide. He based this conclusion in part on his determination that Sarah was dead when she started receiving CPR, and therefore that her injuries were not caused by resuscitation efforts. Another testifying medical expert, a pathologist, agreed with Uptegrove that Sarah's death was a homicide, and that her injuries were unexplained by CPR or resuscitation efforts.

Two days after Uptegrove's autopsy, Dr. Werner Spitz was retained by the defense to perform a second autopsy.[1] He agreed with Uptegrove that Sarah's cause of death was drowning but disagreed that her injuries—many of which he observed consistently with Uptegrove's observations—could not be explained by rigorous CPR or other means. Therefore, Spitz would have ruled Sarah's cause of death as undetermined, rather than as homicide.

At trial, Widmer called a second pathology expert, Dr. Michael Balko, who concurred with Spitz's findings. Balko further testified, along with an emergency medicine expert, that the injuries Sarah sustained were consistent with resuscitation efforts. Balko additionally posited that Sarah's drowning could have been caused by a sudden cardiac event or seizure and was possibly linked to an underlying medical condition. He specifically cited Long QT Syndrome ("LQTS"), a genetic cardiac abnormality, as a possible cause of Sarah's drowning. Friends of the Widmers testified that Sarah had a habit of falling asleep at odd times and places, and that she had headaches. And

---

[1] Spitz did not testify in person at the third trial, but his testimony from the second trial was read aloud.

4

No. 24-3054, *Widmer v. Okereke*

Sarah's mother testified that she had a cleft palate and heart murmur as a small child.  Balko testified that Sarah's sleep issues, cleft palette, and headaches were associated with LQTS.

Widmer was arrested on a charge of aggravated murder on August 13, 2008.  Immediately prior to Widmer's arrest, Braley executed a search warrant on the Widmers' home.  Braley conducted a more thorough search of the home than he had on August 11, 2008, and, most significantly, dusted the Widmers' bathtub for fingerprints.  Upon dusting the bathtub, Braley observed streak marks that he "believed to be made by human hands," resulting in him making a call to the Miami Valley Crime Lab to transport and further test the tub.  Trial Tr., R. 21-17, Page ID #9002–03.  Danny Harness, a fingerprint examiner for Miami Valley, twice processed the tub for prints—once at the scene using a superglue fuming process and ultraviolet imaging, and again in a laboratory applying additional fingerprint powder—but was unable to recover any prints of comparison value.

Three months later, William Hillard, a senior criminalist with the City of Cincinnati, was called to examine the tub as it sat in the basement of the Hamilton Township Police Department.  Hillard did not apply any additional treatments to the tub.  But he testified that, from the fingerprint powder already applied, he was able to identify fingerprint and forearm impressions on the tub.  Specifically, he identified fingerprints "in a downward position" made by a person of "small stature," like a female adult.  Trial Tr., R. 21-17, Page ID #8954, 8956.  Hillard also identified a forearm impression made by an adult male, which he opined overlaid circular marks made on the bathtub, likely by bottles.  Hillard further identified that there were wipe marks in the tub indicating that someone had attempted to clean it.  However, Hillard could not tell when any impressions were made or when the tub was wiped.

No. 24-3054, *Widmer v. Okereke*

Widmer's first trial started in March 2009. He was initially convicted of murder, a lesser included offense to aggravated murder, in April 2009. But he successfully moved for a new trial based on juror misconduct. He was granted a new trial in July 2009, and a second trial took place in May 2010. The second trial resulted in a mistrial when the jury was unable to return a verdict.

Before Widmer's third trial in January 2011, the State developed a new witness. Jennifer Crew contacted the Warren County Prosecutor's Office between the second and third trials and alleged that in October 2009, Widmer confessed to Sarah's murder. At the third trial, Crew testified to the confession. Crew met Widmer through his "Free Ryan Widmer" support site after the first trial. They began communicating regularly, and Crew claimed that on October 26, 2009, at 11:06 P.M., Widmer called her crying and said "I did it. I killed Sarah." Trial Tr., R. 21-16, Page ID #8686–91. Widmer relayed the details of the killing, telling Crew that he had murdered Sarah in a physical altercation after Sarah confronted him about cheating on her, using pornography, drinking, and smoking. Widmer confronted Sarah in the bathroom and hit her, causing her to bang her head. Then he blacked out and came to at the side of the bathtub. He saw Sarah was not breathing, but her hair was wet. So, according to Crew, he attempted to cover up the death, including by "cleaning up the water." *Id.* at Page ID #8697. Crew's testimony was contradicted by another supporter of Widmer's, Melissa Waller, who testified that she had a two-hour phone call with Widmer on the night of the alleged confession that ended at 11:00 P.M., and that Widmer did not seem emotionally distraught or upset on their call.

After a four-week long trial, the jury returned a guilty verdict on February 15, 2011. Widmer was convicted of murder in violation of Ohio Rev. Code § 2903.02(A). The trial court sentenced Widmer to 15 years to life in prison.

No. 24-3054, *Widmer v. Okereke*

### B. Investigation of Braley's Background

Additionally relevant to our assessment of Widmer's petition for a writ of habeas corpus is information pertaining to Widmer's claims that Braley, the lead investigator of Sarah's death, fabricated aspects of his background to obtain employment with the Hamilton Township Police Department.

Before the start of Widmer's second trial, Widmer's defense attorneys obtained the employment application Braley submitted to Hamilton Township on June 25, 1996, before he was hired as a volunteer chaplain for the fire department in 1997. The application contained information about Braley's prior employment and education. Based on irregularities in the application, the defense contended that Braley was lying about his background and began subpoenaing records from employers listed in the application to verify the information. The state and Braley moved to quash the subpoenas. On May 5, 2010, the trial court held a hearing on the motion to quash at which Braley testified. Braley acknowledged that there was inaccurate information in the employment application, including that he had a master's degree, and had attended a college in Florida. Further, information about Braley's past employment was false or exaggerated. For example, the application listed that he was a United States Postal Inspector for two years, but Braley testified that he only worked as a clerk at a local post office for "a few weeks." Hr'g Tr., R. 21-6, Page ID #4220.

However, Braley testified that he did not fabricate the information in the application; rather, he insinuated that the application itself was fabricated. When first presented with the application, Braley stated that he did not recall filling out the application. Later in the hearing, he testified that he never filled out the application in question and never filled out an application to work for the Township. The court granted the motions to quash, preventing Widmer from further investigating

7

No. 24-3054, *Widmer v. Okereke*

the employment application.  The court found that any probative value in introducing questions about the fabrications in the application would be outweighed by undue prejudice and likely to mislead the jury given that the application was remote in time to the events of the case, and there were questions about its veracity.

Before Widmer's third trial, on November 15, 2010, the Ohio Bureau of Criminal Identification and Investigation ("BCI") issued a forensic analysis report stating that the handwriting on the 1996 employment application belonged to Braley, contrary to his testimony. The BCI report further stated that analysis failed to reveal any evidence of alteration in the application.

Following the BCI report, Widmer moved for the right to cross-examine Braley with the false statements in the application at his third trial, and to present as a defense that Braley's dishonesty impacted the investigation of Sarah's murder.  The trial court denied the motion, finding the authenticity of the application to still be contested, and the issue of whether Braley lied on the application to be collateral to the issues in the trial.

The day after Widmer's conviction, on February 16, 2011, the Hamilton Township Trustees hired the law firm of Donnellon, Donnellon & Miller ("DD&M") to perform an independent investigation of Braley based on the questions about his background that arose during Widmer's trials.  The firm issued a written report to the trustees on June 1, 2011, authored by lawyer R. Douglas Miller.

Miller investigated the authenticity of and information in Braley's 1996 employment application and an undated "Resume Letter" that Braley sent to former Hamilton Township Chief

No. 24-3054, *Widmer v. Okereke*

of Police Eugene Duvelius.[2]  Miller concluded that there was "misinformation" about Braley's background in both documents, which Braley "freely admit[ted]."  DD&M Report, R. 30-2, Page ID #10350.  Miller also concluded that the documents were likely authentic and created by Braley in the 1990s.  Despite their likely authenticity, Miller concluded that the documents never led to Braley's hiring or promotion.

Miller also uncovered information that Braley had falsely told "numerous" members of the Township Police Department "that he was a member of the Special Forces in the military, namely the parajumpers or pararescue jumpers while in the Air Force."  *Id.* at Page ID #10351.  When interviewed for the DD&M investigation, Braley denied ever being in the Special Forces, and denied telling anyone that he was in the Special Forces, though he served in the military.  However, "it was everyone's understanding" that Braley's false Special Forces military background "was the reason [] Braley was put in charge of the Township's THOR unit."  *Id.* at Page ID #10351.  The THOR unit was established around 2002 or 2003 as a tactical team that conducted police raids. **(*Id.*).**  When Braley was put in charge of the unit, he was the Human Resources Officer at the Township and did not have a police commission.  He earned his police commission after his appointment as the leader of the THOR team and "prior to [its] eventual demise."  *Id.* at Page ID #10352.

Nevertheless, Miller concluded that Braley's lies had no "particular impact on the Township."  *Id.*  Miller did, however, recommend that the trustees conduct a pre-disciplinary hearing regarding Braley's misconduct.

---

[2] Widmer's arguments focus on the employment application, rather than the Resume Letter. But at the May 2010 hearing concerning the motion to quash, Braley also denied composing and submitting the Resume Letter, of which he said that there was "nothing true" contained in it.  Hr'g Tr., R. 21-6, Page ID #4254.

9

No. 24-3054, *Widmer v. Okereke*

### C. Widmer's Appeals and Postconviction Proceedings

Widmer directly appealed his conviction to the Ohio Court of Appeals. As he maintains in his petition for a writ of habeas corpus, Widmer argued in his direct appeal that the trial court erred in allowing Hillard to testify about body part impressions found on the bathtub. *State v. Widmer (Widmer I)*, No. CA2011-03-027, 2012 WL 4350275, at *14 (Ohio Ct. App. Sept. 24, 2012). The Ohio Court of Appeals for the Twelfth District affirmed Widmer's conviction, *id.* at *33, and the Ohio Supreme Court denied review, *State v. Widmer,* 983 N.E.2d 368 (Ohio 2013) (table). The Supreme Court of the United States denied certiorari. *Widmer v. Ohio*, 571 U.S. 846 (2013).

While his direct appeal was pending in 2011, Widmer moved the state trial court for postconviction relief, a new trial, and an evidentiary hearing based on the discovery of new evidence about Braley's background, citing the conclusions in the DD&M report. Relevant to our review, Widmer argued that (1) Braley's May 5, 2010 hearing testimony about the 1996 employment application constituted the state's knowing use of perjury, violating Widmer's due process rights under the standard established by *Napue v. Illinois*, 360 U.S. 264 (1959), and (2) the state knowingly suppressed information that Braley had falsified or lied about his credentials, violating Widmer's due process rights under the standard established by *Brady v. Maryland*, 373 U.S. 83 (1963).

In support of his motion, Widmer filed an affidavit written by a retained police practices expert, Dennis Waller. Waller opined that Braley would not have risen to the rank of Detective Lieutenant in the Hamilton Township Police Department without falsifying his background and experience. Waller further concluded that Braley influenced Uptegrove in determining the manner of death as homicide. Waller based this conclusion solely on Braley's and Uptegrove's testimony: Uptegrove testified that he "might consider" "[t]he scene investigation" and "statements or

10

No. 24-3054, *Widmer v. Okereke*

historical information" from individuals involved with the case in making determinations as to the cause of death. Trial Tr., R. 21-16, Page ID #8101. Braley testified that he was present at Uptegrove's autopsy, and Uptegrove "had information" from both Braley and coroner's investigator Doyle Burke when he performed the autopsy. *Id.* at Page ID #9010. Specifically, Braley told Uptegrove that "something didn't seem right" with the scene at the Widmers' house. *Id.* at Page ID #9010–11.

Widmer also moved for postconviction relief based on the theory that his trial counsel was ineffective for failing to seek genetic DNA testing of Sarah's remains to determine if Sarah suffered from LQTS. In an earlier motion, Widmer successfully moved the trial court to preserve Sarah's biological remains and all physical evidence collected from the investigation of her death. Widmer sought DNA testing of Sarah's preserved remains for LQTS to prove his ineffective assistance claim. In support of his argument, Widmer submitted an affidavit from Balko. Balko attested that "Sarah Widmer may have had some of the key traits associated with" Anderson-Tawil Syndrome ("ATS"), a form of LQTS, and that "a curious association exists between drowning and the Long QT Syndrome, in general, and ATS in particular." Balko Aff., R. 30-4, Page ID #10376. LQTS and ATS can be diagnosed only through DNA testing, not autopsy. Balko recommended testing be conducted.

The state trial court denied postconviction relief, and denied Widmer's motions for a new trial, DNA testing, and an evidentiary hearing. The Ohio Court of Appeals for the Twelfth District affirmed. *State v. Widmer (Widmer II)*, 2013-Ohio-62, 2013 WL 142041, at *1 (Ohio Ct. App. Jan. 14, 2013). The Ohio Supreme Court denied review. *State v. Widmer*, 987 N.E.2d 703 (Ohio 2013) (table). The United States Supreme Court denied certiorari. *Widmer v. Ohio*, 571 U.S. 977 (2013).

11

No. 24-3054, *Widmer v. Okereke*

Widmer petitioned the United States District Court for the Southern District of Ohio for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He raised twelve grounds for relief. The district court adopted a magistrate judge's reports and recommendations to deny Widmer's petition with prejudice. Contrary to the magistrate's recommendation, the district court granted Widmer a Certificate of Appealability ("COA") on seven claims: Claim One, alleging a violation of his constitutional rights when the trial court permitted Hillard's expert testimony on body mark impressions; Claim Two, asserting his Fourth Amendment rights were violated when police seized the bathtub from his home; Claim Three, contending that trial counsel was ineffective for failing to move to suppress the bathtub; Claim Six, alleging a violation of his constitutional rights when the state obtained his conviction using Braley's perjured testimony about the employment application; Claim Seven, alleging a violation of his constitutional rights when the state failed to disclose information about Braley contained in the DD&M Report; Claim Nine, alleging a violation of his due process and equal protection rights when the trial court denied his postconviction request to test Sarah's DNA; and Claim Ten, alleging ineffective assistance of counsel for trial counsel's failure to pursue genetic testing. Widmer timely appealed the district court's ruling. On appeal to this court, he pursues Claims One, Six, Seven, Nine, and Ten. He makes no argument in support of Claims Two and Three, and therefore forfeits the claims. *See Puckett v. Lexington-Fayette Urb. Cnty. Gov't*, 833 F.3d 590, 610–11 (6th Cir. 2016).

## II. DISCUSSION

### A. Standard of Review

We review the district court's legal conclusions in habeas proceedings *de novo* and its factual findings for clear error. *Braxton v. Gansheimer*, 561 F.3d 453, 457 (6th Cir. 2009).

12

No. 24-3054, *Widmer v. Okereke*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), governs this Court's review of the underlying state court judgments.

AEDPA bars federal courts from granting habeas relief to a petitioner on a claim that was "adjudicated on the merits in [s]tate court" unless the decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d). AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court," requiring that "a state prisoner . . . show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *Burt v. Titlow*, 571 U.S. 12, 19–20 (2013).

A state-court decision is "contrary to" clearly established law if the court "applie[d] a rule that contradicts the governing law" set forth by the Supreme Court or the state court confronted facts that were "materially indistinguishable" from Supreme Court precedent but arrived at a different result. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). To meet the "unreasonable application" standard, "a prisoner must show far more than that the state court's decision was merely wrong or even clear error." *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (internal quotation marks omitted).

A federal habeas court must defer to a state court's determination of the facts unless the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d)(2). This Court must give state courts "substantial deference" under § 2254(d)(2). *Brumfield v. Cain*, 576 U.S. 305, 314 (2015). "We may not characterize . . . state-court factual determinations as unreasonable merely

13

No. 24-3054, *Widmer v. Okereke*

because we would have reached a different conclusion in the first instance." *Id.* at 313–14 (alteration adopted) (internal quotation marks omitted).

On each of a petitioner's claimed bases for relief, this Court reviews "the last state-court adjudication on the merits." *See Greene v. Fisher*, 565 U.S. 34, 40 (2011). "When a federal claim has been presented to a state court and the state court has denied relief," this Court presumes "the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

### B.  Analysis

#### 1.  Widmer's *Napue* and *Brady* Claims

In accordance with the district court's certificate of appealability, Widmer raises interrelated claims under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Brady v. Maryland*, 373 U.S. 83 (1963), and argues that "the state appellate court unreasonably determined the facts and ruled contrary to or unreasonably applied" Supreme Court precedent when it denied his due process claims under these precedents. Pet'r's Br., ECF No. 15, at 18. We address these claims together, as the district court did.

*Napue* established that the Due Process Clause is violated when the state knowingly uses perjured testimony to obtain a conviction. 360 U.S. at 269. To succeed on a *Napue* claim, a petitioner must show that (1) there was a statement that was actually false; (2) the statement was material; and (3) the prosecution knew it was false. *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998). False testimony is material under *Napue* if it "could in any reasonable likelihood have affected the judgment of the jury." *McNeill v. Bagley*, 10 F.4th 588, 604 (6th Cir. 2021) (internal quotation marks omitted).

14

No. 24-3054, *Widmer v. Okereke*

In *Brady*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In *United States v. Bagley*, 473 U.S. 667 (1985), the Supreme Court held that "impeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule." *Id.* at 676. Thus, to establish a *Brady* violation, a petitioner must demonstrate that: (1) the evidence at issue is favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence was suppressed by the state, either willfully or inadvertently; and (3) the evidence in question was material. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Though materiality standards under *Napue* and *Brady* previously differed, *see Rosencrantz v. Lafler*, 568 F.3d 577, 584, 587 (6th Cir. 2009), the Supreme Court recently held that withheld evidence is material under *Brady* "when there is any reasonable likelihood it could have affected the judgment of the jury," *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (cleaned up), mirroring the materiality standard applied to knowingly presented false testimony under *Napue*. Under this standard, the petitioner need not establish that he would "more likely than not have received a different verdict with the evidence." *Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995). Rather, the touchstone of the materiality inquiry is whether, in the absence of suppressed evidence, the petitioner "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434. "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* (quoting *Bagley*, 473 U.S. 667, 678 (1985)). "In applying this standard, we consider the withheld material in light of the evidence available for trial that supports the petitioner's conviction." *McNeill*, 10 F.4th at 601 (internal quotation marks omitted).

15

No. 24-3054, *Widmer v. Okereke*

As to his *Napue* claim, Widmer argues that his due process rights were violated because Braley falsely testified at the May 5, 2010, hearing that he did not fabricate the 1996 employment application, preventing the defense from pursuing its desired strategy of impeaching the investigation into Sarah's death based on Braley's dishonesty. As to his *Brady* claim, Widmer argues that his due process rights were violated when the state failed to disclose the evidence of Braley's lies contained in the DD&M report. Though the DD&M report was not created, and therefore not in the state's possession, until after the third trial, Widmer argues that the state was aware of the content the report would uncover before it was written, specifically "Braley's lack of qualifications and extensive history of fabrications." Pet'r's Br., ECF No. 15, at 34. According to Widmer, because the report uncovered lies Braley told, that information was known to Braley. And because Braley is a police officer, information within his knowledge is imputed to the state. *See Strickler*, 527 U.S. at 280–81 (stating that the duty to disclose material evidence "encompasses evidence known only to police investigators and not to the prosecutor" (internal quotation marks omitted)). We need not reach this imputation issue because, as discussed below, the state court's decision on the materiality of the allegedly suppressed evidence is dispositive to Widmer's *Napue* and *Brady* claims.

In the last-reasoned state court decision on this issue, the Ohio Court of Appeals, on postconviction review, concluded that Widmer could not succeed on his *Napue* or *Brady* claims. As to Widmer's *Napue* claim, the court concluded that even if Braley's testimony at the May 5, 2010, hearing could be construed as perjury, Widmer "fail[ed] to demonstrate that the perjury was 'material'" under *Napue*, dooming the claim. *Widmer II*, 2013 WL 142041, at *8. The court stated that "[t]here [was] no reasonable likelihood that knowledge by the jury that Braley lied about various credentials and whether he filled out the 1996 employment application could have affected

16

No. 24-3054, *Widmer v. Okereke*

its decision on the ultimate issue of whether Widmer was guilty of murdering Sarah." *Id.* at *15. The court reached a similar ruling on Widmer's *Brady* claim, denying the claim because of Widmer's failure to show a reasonable probability that the result of his third trial would have been different if Braley's lies about his background had been disclosed. *Id.* at *19.

These rulings were not unreasonable, and thus Widmer is not entitled to relief on his *Napue* and *Brady* claims. Though disclosure of Braley's alleged fabrications would have impeached his credibility, the disclosures would not have so impacted the ultimate question of Widmer's guilt or innocence as to render the state court's lack of materiality determination unreasonable. And, crucially, "[m]ateriality pertains to the issue of guilt or innocence. . . ." *United States v. Bencs*, 28 F.3d 555, 560 (6th Cir. 1994).

Even if we assume that Braley testified falsely about the employment application and lied about his military service to gain promotion in the Hamilton Township police force, these lies were collateral and remote in time to the Widmer investigation. Assuming Braley's dishonesty impacted his seemingly ill-advised promotion to the THOR unit in 2003, by the time of Sarah Widmer's death in 2008, Braley attended the police academy, became a Hamilton Township patrol officer, and received a promotion to lieutenant. He had been serving as a lieutenant in the department for four years prior to the Widmer investigation. At trial, he testified honestly to his experience—or lack of experience—as a detective, admitting to a dearth of training in evidence collection, death investigation, and crime scene processing, and stating that he had only worked one other homicide case.

Therefore, in this case, the absence of evidence of Braley's dishonesty fails to "undermine confidence" in the jury's guilty verdict. *See Kyles*, 514 U.S. at 435 (1995). That Braley lied about his background early in his employment at Hamilton Township had little impact on issues that

17

No. 24-3054, *Widmer v. Okereke*

affected the jury's determination of Widmer's guilt for Sarah's murder.  Further, "the fact that any use of the evidence would be limited to impeachment mitigates the potential exculpatory impact of the evidence," *Hutchison v. Bell*, 303 F.3d 720, 743 (6th Cir. 2002), and we have deemed perjured testimony or impeachment evidence immaterial when it has a far closer connection to proceedings in the instant case.  Where impeachment evidence relates only to "tangential issues" or "overall credib[ility]," but does not bear directly on the material issue of guilt, it is not unreasonable to find that evidence immaterial.  *See Beuke v. Houk*, 537 F.3d 618, 635 (6th Cir. 2008).

Nevertheless, Widmer attempts to attribute materiality to Braley's dishonesty by connecting it to alleged misconduct or pitfalls in the investigation of Sarah's death.  Widmer argues that:  (1) Braley was the key witness who claimed that the carpet under Sarah Widmer was dry, and the jury learning of Braley's misconduct would have impeached this testimony; (2) Braley influenced Uptegrove to rule Sarah's death a homicide, and the jury would have viewed Uptegrove's testimony with skepticism had they known of Braley's lack of qualifications; (3) Braley molded his investigation to fit the notion that a homicide occurred, and evidence of Braley's dishonesty would have cast the investigation in a different light; and (4) evidence that Braley was a liar would have allowed the defense to raise the idea that the bathtub was tampered with, casting doubt on Hillard's testimony.

These arguments fail to establish that the state court unreasonably applied federal law in concluding that evidence of Braley's dishonesty, if suppressed, was not material.  To the extent that Braley supplied important information at trial, it was corroborated.  Therefore, even if evidence of Braley's dishonesty "tarnished [his] credibility beyond repair," it would not negate the

No. 24-3054, *Widmer v. Okereke*

evidence Braley provided as to Widmer's guilt. *Beuke*, 537 F.3d at 637. And Widmer's other theories of how Braley influenced the investigation and the jury fall flat.

First, Braley was not the only law-enforcement witness who testified to the dryness of the Widmers' bathroom, bedroom carpet, or Sarah's body. True, the state used the evidence of dryness to argue that Widmer forcibly drowned Sarah and staged the scene long before help arrived. But the presentation of this evidence did not hinge on Braley's credibility. Each testifying law enforcement officer who reported to the Widmers' home on the night of Sarah's death stated, consistently with Braley's observations, that the Widmers' bathroom was dry, save for a small amount of water in the tub. These witnesses stated that the Widmers' bedroom carpet was dry as well, save for the areas where Sarah's body had emitted pink discharge. All law enforcement witnesses also stated that Sarah's body was unexpectedly dry. So, contrary to Widmer's arguments, evidence of Braley's dishonesty would not have significantly undermined testimony in the third trial that the crime scene was suspiciously dry, or that Sarah's death was otherwise suspicious. Braley's testimony was not "the central piece of evidence" holding together the dryness theory but was cumulative of other witness's observations. *Id.*

Further, there is no evidence that, as Widmer claims, Braley molded the investigation into Sarah's death to suit his own suspicions. Several law enforcement witnesses besides Braley testified that they believed Sarah's death to be suspicious, or the condition of the scene unusual, based on observations from the night of her death, including the lack of water in the bedroom and bathroom; the dry condition of Sarah's body; and Widmer's statements and reactions. So, the investigation did not hinge on Braley's outsider theory. Widmer argues that the suppression of evidence of Braley's lies prohibited him from presenting a defense following the principles asserted in *Kyles v. Whitley*, 514 U.S. 419 (1995), and asserting that Braley's lack of credibility

19

No. 24-3054, *Widmer v. Okereke*

impacted the entire investigation into Sarah's death. But this case is unlike *Kyles*. In *Kyles*, the government withheld impeachment evidence as to key eyewitnesses, including that the witnesses' statements evolved over time. *Id.* at 443. The Supreme Court held that the non-disclosure of this evidence was material, and that the disclosure of prior "statements would have raised opportunities to attack not only the probative value of crucial physical evidence and the circumstances in which it was found, but the thoroughness and even the good faith of the investigation, as well." *Id.* at 445. The ability of the defense in *Kyles* to attack the "thoroughness" and "good faith" of the investigation relied on the centrality of the suppressed information to the case. *Id.* at 447–50. On the contrary, evidence of Braley's fabrications does not bear on his involvement in the Widmer investigation.

Second, there is no evidence from the trial testimony that Braley unduly influenced Uptegrove to rule Sarah's death a homicide. Uptegrove provided significant testimony as to why he believed Sarah's death was a homicide based on his medical conclusions, specifically that Sarah's body showed evidence of blunt-force injuries unexplained by drowning or resuscitation efforts. Though Uptegrove testified that he "might consider" "[t]he scene investigation" and "statements or historical information" from individuals involved with the case in making determinations as to the cause of death, he did not identify Braley's suspicions as the source of his homicide determination. Trial Tr., R. 21-16, Page ID #8101. Rather, Uptegrove supported his determination in medical observations from the autopsy. Further, it was Warren County Coroner's Office Chief Investigator Burke, not Braley, who first suggested to Uptegrove that Sarah's death was unusual and indicated that her body should be autopsied. Therefore, evidence impeaching Braley would not have significantly undermined Uptegrove's testimony.

20

No. 24-3054, *Widmer v. Okereke*

Third, Widmer's argument that evidence of Braley's dishonesty would have allowed the defense to raise the argument that the bathtub was tampered with, undercutting Hillard's testimony, is also unavailing. The defense was able to raise the specter of evidence tampering without the allegedly suppressed evidence of Braley's lies. Hillard testified that there was no way to know if the tub had been contaminated between the time of Sarah's death and his examination, because it had remained in the Widmers' house after the crime scene was released. The information that Braley told lies about his background would not have furthered the contamination narrative, particularly because Braley was not the last person to handle the bathtub: After dusting it for prints, he passed the tub off to the Miami Valley Crime Lab. Eventually, the tub returned to the Hamilton Township Police Department, and someone else called Hillard to investigate it. Widmer argues that evidence of Braley's dishonesty would raise the inference that in the time between the Miami Valley Crime Lab's handling of the tub and Hillard's examination, Braley tampered with the evidence. But Widmer provides no support for this argument. And any testimony Braley gave about the processing and handling of evidence in Sarah's case was consistent with the testimony of a Hamilton Township evidence technician, Quillan Short, who accompanied Braley on his initial "walk through" and subsequent search of the Widmers' home. Thus, even if Braley was impeached by evidence of his earlier fabrications, this would not have significantly impacted the jury's view of evidence handling in Widmer's case.

Moreover, several officers participated in the investigation, most with more years of law enforcement experience than Braley, and they all testified to the same observations and conclusions. Therefore, discrediting Braley would not have raised a reasonable likelihood that Widmer would have been acquitted. We thus cannot say it was an unreasonable application of federal law for the state court to deny Widmer's *Brady* and *Napue* claims. Rather, a fairminded

21

No. 24-3054, *Widmer v. Okereke*

jurist could easily reach the same conclusion as to materiality as the state postconviction court. *See Burt*, 571 U.S. at 19–20.

Because it was not an unreasonable application of federal law to conclude that Braley's dishonesty was immaterial under *Napue* and *Brady*, we also cannot say that it was an unreasonable application of federal law for the state court to decline to address Widmer's related *Brady* arguments. Specifically, Widmer argues that (1) the state violated *Brady* by purposefully delaying the ordering of the DD&M report until after Widmer's conviction to avoid learning information that may have undermined the prosecution's case and (2) the state had knowledge of, and concealed, a separate internal investigation of Braley conducted by the Hamilton Township Trustees in July 2010, before Widmer's third trial. The state court declined to rule on whether the DD&M report was purposefully delayed, and whether that delay was imputable to the state, because "Widmer still [could not] establish materiality," as to the delay, meaning he could not advance a *Brady* claim on this ground. *Widmer II*, 2013 WL 142041, at *18 n.9(b). This ruling was not unreasonable. It is true that *Brady* imposes a duty on the state to learn of favorable evidence and disclose that evidence "known to [] others acting on the government's behalf." *See Strickler*, 527 U.S. at 280–81 (internal quotation marks omitted). But this obligation applies only to material evidence. *Bencs*, 28 F.3d at 560. Because it was not unreasonable for the state postconviction court to conclude that the evidence contained in the DD&M report was immaterial, it was also not unreasonable for the state court to deny Widmer's *Brady* claim based on delay in the DD&M investigation.

Likewise, it was not an unreasonable application of federal law for the state postconviction court to determine that Widmer could not succeed on a *Brady* claim based on the nondisclosure of the Hamilton Township Trustees' 2010 investigation. Widmer has never received the findings of

22

No. 24-3054, *Widmer v. Okereke*

that investigation, but he alleges that the trustees have a report on their internal investigation that contains information about Braley's dishonesty that is "identical" to the DD&M report. Pet'r's Br., ECF No. 15, at 37. The state court determined that "because it is clear . . . that *Brady* was not violated because of the lack of materiality" it "need not address Widmer's contention that the state 'suppressed' the trustees' report." *Widmer II*, 2013 WL 142041, at *18 n.9(a). Per the materiality analysis above, this was not unreasonable. Again, under *Brady*, the failure to disclose the alleged trustees' report would be a violation of due process only if the information therein was material. Because Widmer alleges that the information in the Trustees' report was identical to the information that the state court, not unreasonably, deemed immaterial in the DD&M report, it was also not unreasonable for the state court to deny Widmer's claims based on the nondisclosure of the trustees' report. Accordingly, Widmer cannot obtain habeas relief on his *Brady* subclaims.

### 2. Widmer's Due Process Claim as to the Admission of Hillard's Testimony

In accordance with the district court's certificate of appealability, Widmer next asserts that he was deprived of his due process right to a fair trial "as a result of . . . unreliable body part impression testimony." Pet'r's Br., ECF No. 15, at 40.

As an initial matter, Widmer argues that we should review his due process claim *de novo*, without exercising deference under AEDPA to the last-reasoned state court opinion on this claim. But to review Widmer's due process claim *de novo*, there must be no state court opinion to which to defer. And there is a state court opinion to which to defer. The last state court adjudication of Widmer's due process claim regarding the admission of Hillard's testimony was the Ohio Court of Appeals' ruling on Widmer's direct appeal. *Widmer I*, 2012 WL 4350275, at *19; *see also Harrington*, 562 U.S. at 99. In this opinion, the state court ruled that the admission of Hillard's testimony did not violate Widmer's due process rights. *Widmer I*, 2012 WL 4350275, at *19.

23

No. 24-3054, *Widmer v. Okereke*

Despite this ruling, Widmer argues that the state court overlooked the distinct due process claim he raises now, that Hillard's testimony violated the due process clause of the Fifth Amendment because its admission rendered his trial fundamentally unfair. Instead, "the state courts were confused and conflated Widmer's due process claim as merely an assertion that the Confrontation Clause applies to the states through 14th Amendment Due Process Clause's 'incorporation doctrine.'" Pet'r's Br., ECF No. 15, at 41. But to obtain *de novo* review of his claim in this Court, Widmer must overcome the "strong but rebuttable presumption" that "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits." *Johnson v. Williams*, 568 U.S. 289, 301 (2013). Widmer does not contest that the state court disposed of his due process claim. The only way, then, that Widmer can get *de novo* review is in the "limited circumstances" in which the presumption that the claim was adjudicated on the merits can be rebutted. *Id.* Those limited circumstances are "[w]hen the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court." *Id.* at 303.

Widmer cannot rebut the presumption that his claim was adjudicated on the merits. To be sure, the *Widmer I* court did not separately address in its analysis whether Hillard's testimony rendered Widmer's trial fundamentally unfair in violation of Widmer's due process rights. But this claim was addressed along with Widmer's arguments that Hillard's testimony violated Ohio Rule of Evidence 702 and the Confrontation Clause of the Sixth Amendment. The state court acknowledged Widmer's argument that "Hillard's testimony runs afoul of due process and the Confrontation Clause" because Hillard was able to testify beyond his area of expertise, and to give testimony that was not scientifically valid. *Widmer I*, 2012 WL 4350275, at *14. And the court discussed Hillard's expertise and the foundation of his testimony, issues relevant to the testimony's

24

No. 24-3054, *Widmer v. Okereke*

reliability, in its discussion of Ohio Rule of Evidence 702.  The court concluded that Hillard's testimony was within the scope of his experience, and "was relevant, reliable, and permissible." *Id.* at *15–18.  It is a fair reading of the state court's opinion that Widmer's due process rights were not violated because there was no error in admitting the testimony.  Therefore, Widmer is not entitled to *de novo* review of his claim that the admission of Hillard's expert testimony violated due process.  We now turn to review whether the admission of Hillard's testimony violated Widmer's due process rights, with deference to the state court's decision denying Widmer's claim of error.

In this Court, Widmer argues that the admission of Hillard's testimony, irrespective of whether it was properly admitted under evidentiary rules, was so unreliable and prejudicial that its admission violated due process.  On federal habeas review, our review of the admission of Hillard's testimony is extremely limited, as Widmer acknowledges.  *See Giles v. Schotten*, 449 F.3d 698, 704 (6th Cir. 2006).  "Federal habeas corpus relief does not lie for errors of state law."  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  Thus, "[s]tate court evidentiary rulings do not rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Giles*, 449 F.3d at 704 (cleaned up).  This Court "may only grant habeas relief" regarding the admission of Hillard's testimony "if the trial court's evidentiary ruling was so egregious that it resulted in a denial of fundamental fairness."  *Id.*

We have no doubt that Hillard's testimony was unreliable, as Widmer contends.  Ohio Evidence Rule 702, which governs the admission of expert testimony in Ohio courts, requires that expert testimony be "based on reliable scientific, technical, or other specialized information and the expert's opinion reflects a reliable application of the principles and methods to the facts of the

No. 24-3054, *Widmer v. Okereke*

case."  To admit expert testimony, Ohio trial courts are obligated to assess "the reliability of the expert's methodology."  *State Farm Mut. Ins. Co. v. Anders*, 965 N.E.2d 1056, 1068 (Ohio Ct. App. 2012).  The test of reliability is flexible.  *Id.* at 1069.  But it was not met here.  Hillard entirely failed to explain how he determined that the impressions on the Widmers' bathtub were forearm marks and fingerprints, and he failed to adequately explain how he determined those marks were made by an adult male or small-statured person.  Indeed, Hillard admitted that his identifications were unscientific, and not based in research.  Therefore, there was no way for the trial court to assess whether Hillard reliably applied principles and methods to identify the marks in the Widmers' bathtub—he identified no principles underlying his testimony.  True, an expert's personal knowledge or experience may provide a reliable basis for their testimony.  *See id.* at 1070. But in this case, Hillard's experience did not provide that basis.  When an expert relies on her own experience, the court may not simply take her "word for it."  *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005) (internal quotation marks omitted) (interpreting the admissibility of expert testimony under Federal Rule of Evidence 702, which is analogous to Ohio Evidence Rule 702).  If an expert witness "rel[ies] solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached . . . and how that experience is reliably applied to the facts."  *Id.*  Hillard failed to connect his experience in observing body part impressions to his conclusions about the formation of the impressions on the Widmers' bathtub.  Therefore, he provided no reliable basis for his testimony.

Although Hillard's testimony was unreliable, its admission rendered Widmer's trial fundamentally unfair only if the testimony was prejudicial and "material" to the jury's determination of Widmer's guilt "in the sense of a crucial, critical highly significant factor."  *Ege*

26

No. 24-3054, *Widmer v. Okereke*

*v. Yukins*, 485 F.3d 364, 375–76 (6th Cir. 2007) (quoting *Brown v. O'Dea*, 277 F.3d 642, 645 (6th Cir. 2000)).

In *Ege*, we ruled that expert testimony on bite mark evidence satisfied this standard when an expert testified, without foundation, that the defendant's teeth were a 3.5-million-to-1 match for a mark found on the murder victim, and that evidence was the only physical evidence connecting the defendant to the scene. *Id.* at 368, 375–78.

In contrast, Hillard's testimony was not so material to a "crucial, critical highly significant factor" in Widmer's trial as to render its admission fundamentally unfair. Hillard identified body part impressions—a male forearm impression and possible female finger impressions—on the bathtub in which Sarah drowned. And he stated that it looked like there were "wipe marks" on the tub, indicating that someone had attempted to clean it. Trial Tr., R. 21-17, Page ID #8956, 8963. The government invoked Hillard's testimony in support of its theory that Widmer and Sarah had struggled in the bathtub, and that Widmer had cleaned the scene.

But Hillard's unreliable testimony was not so impactful that its admission rendered Widmer's trial fundamentally unfair. *See Ege*, 485 F.3d at 375–76 (6th Cir. 2007). Hillard's testimony was vague, indefinite, and unreliable as to a contested point in Widmer's trial—whether Widmer and Sarah struggled in the bathroom on the night of Sarah's death. Although Hillard suggested that a male and a female—presumably Widmer and Sarah—were the source of the impressions he observed, Hillard acknowledged that there was no way to age any of marks in the tub, meaning his testimony failed to place the couple in the bathtub at the relevant time. Even if Hillard could have dated the marks, there was no dispute that Sarah and Widmer both were in the bathroom the night Sarah drowned—indeed, there was already an inference that Widmer had touched the bathtub, because he stated that he removed Sarah from the tub to perform CPR. And

27

No. 24-3054, *Widmer v. Okereke*

Hillard failed to opine that the body part impressions on the tub were indicative of a struggle; he testified only to the position of the marks.  So, in contrast to the expert testimony in *Ege*, which we said was prejudicial, in part, because it served to "immediately place [the defendant] at the scene of [the victim's] violent murder," 485 F.3d at 370, 376, Hillard's testimony was not critical evidence that Widmer forcibly drowned Sarah.

Moreover, we find it relevant that defense counsel was able to thoroughly cross-examine Hillard.  Through cross-examination, the defense exposed that Hillard had no formal training in identifying body mark impressions, and that the identification of body mark impressions is not an established science.  The defense also raised the inference that the bathtub was contaminated when it was left unattended in the Widmers' home after the crime scene was released.  This cross-examination exposed to the jury the exact unreliability in Hillard's testimony that Widmer seeks to challenge on appeal.

Considering the vagueness of Hillard's testimony, the defense's cross-examination, and the evidence against Widmer, we cannot say that the admission of Hillard's unreliable testimony concerning body part impressions in the Widmers' tub was so substantially prejudicial as to render Widmer's trial fundamentally unfair.  Therefore, the state court did not err in denying Widmer's due process claim on direct appeal.  Accordingly, Widmer is not entitled to relief for his claim that the admission of Hillard's testimony violated his due process rights.

### 3.  Widmer's Constitutional Claims as to Denial of DNA Testing

The district court also issued Widmer a certificate of appealability on the issue of whether "[t]he state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent by denying Widmer's postconviction request for genetic DNA testing of Sarah Widmer's biological remains to determine if she suffered from a

28

No. 24-3054, *Widmer v. Okereke*

genetic disorder." Dec. & Entry, R. 45, Page ID #10940, 10957. Accordingly, Widmer claims that he is entitled to a writ of habeas corpus because the Ohio Court of Appeals ruled contrary to or unreasonably applied *District Attorney's Office v. Osborne*, 557 U.S. 52 (2009), and *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985), in denying his request to test Sarah's DNA for LQTS. In state postconviction proceedings, Widmer challenged the denial of DNA testing as violative of his due process and equal protection rights under the Fifth and Fourteenth Amendments of the United States Constitution. The state court rejected Widmer's challenges, ruling that he had "no substantive due process right to obtain evidence for DNA testing in a postconviction setting," under *Osborne*, 557 U.S. at 68, and no liberty interest in the postconviction DNA testing of a victim's biological remains. *Widmer II*, 2013 WL 142041, at *26–27. Further, Widmer's equal protection claim failed for "the fundamental reason" that equal protection analysis relies on the comparison of similarly situated groups, and he was not similarly situated to offenders entitled to DNA testing under Ohio's statutory scheme. *Id.* at *27.

We review with deference the state court's rulings denying Widmer's constitutional right to DNA testing, beginning with Widmer's due process claims. To evaluate these claims, we briefly describe Ohio's statutory scheme governing post-conviction DNA testing.

Ohio law mandates the preservation of evidence in felony cases such as Widmer's for the duration of a convict's incarceration or thirty years, whichever is earlier. Ohio Rev. Code § 2933.82(B)(1)(c). And it requires that the evidence be preserved "in the amount and manner sufficient to develop a DNA record from the biological material contained in or included on the evidence." *Id.* § 2933.82(B)(1), (4). Sarah's DNA was preserved under this statute on Widmer's motion.

No. 24-3054, *Widmer v. Okereke*

Sections 2953.71 to 2953.81 of the Ohio Revised Code create a scheme through which convicted offenders may apply for postconviction DNA testing of biological material from a victim or crime scene for the purpose of comparing it to the offender's DNA. Ohio Rev. Code §§ 2953.73(10); 2953.74(B), (C). The trial court in which the offender was convicted evaluates the application for DNA testing. *Id.* § 2953.73(B)(2). The court can approve an application for DNA testing under Sections 2953.71 to 2953.81 only if, among other criteria, the test would have resulted in an "outcome determinative" exclusion at the trial stage of the offender's case. *Id.* § 2953.74(B). This means that the DNA test, if conducted, could "scientifically preclude[] or foreclose[] the subject offender as a contributor of biological material recovered from the crime scene or victim in question," and if the preclusive results had been admitted, "there is a strong probability that no reasonable factfinder would have found the offender guilty of th[e] offense." *Id.* § 2953.71(G), (L).

Widmer acknowledges that his request for DNA testing does not fall squarely within the confines of Ohio's DNA testing scheme. Nevertheless, he argues that testing Sarah's DNA for LQTS would have been "outcome determinative," and therefore that the state court unreasonably applied federal law by ruling that his constitutional rights were not violated when he was denied testing under Ohio's statutory scheme. Pet'r's Br., ECF No. 15, at 51–54. However, the fact that an LQTS diagnosis may have made a difference in Widmer's case does not entitle him to DNA test Sarah's remains, nor render the denial of testing a constitutional violation. Widmer cannot prove a substantive or procedural due process right to such testing under federal law.

As an initial matter, the state court correctly applied *Osborne* to rule that Widmer has "no substantive due process right to obtain evidence for DNA testing in a postconviction setting." *Widmer II*, 2013 WL 142041, at *26. The Supreme Court ruled in *Osborne* that convicted prisoners

30

No. 24-3054, *Widmer v. Okereke*

have no "freestanding right to DNA evidence untethered from . . . liberty interests" and declined to recognize a substantive due process right in such testing. *Osborne*, 557 U.S. at 72–74. However, in so ruling, *Osborne* left open the possibility that prisoners may have procedural due process rights in obtaining such testing, depending on the vagaries of liberty interests created by state law. *See id.* at 68.

To establish that the denial of DNA testing violated his procedural due process rights, Widmer must first establish that he had a liberty interest in obtaining the testing. *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011). This liberty interest can come from the federal Constitution, or from state law or policy. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Postconviction relief premised on DNA testing is the province of state legislatures. *See Osborne*, 557 U.S. at 62. In this case, the state court ruled that Widmer had no liberty interest in obtaining DNA testing because Ohio law failed to recognize "the existence of a liberty interest in the postconviction DNA testing of a victim's biological remains," and therefore that Widmer was not entitled to test Sarah's remains for LQTS. *Widmer II*, 2013 WL 142041, at *27. This determination was not unreasonable.

In *Osborne*, a convicted prisoner sought access to evidence held by the State of Alaska for DNA testing, relying on Alaska statutes providing for postconviction relief. *Osborne*, 557 U.S. at 64. Under those provisions, the parties agreed that "a defendant is entitled to post-conviction relief if the defendant presents newly discovered evidence that establishes by clear and convincing evidence that the defendant is innocent." *Id.* (internal quotation marks omitted). Thus, the Court identified that the plaintiff, Osborne, had a liberty interest in "demonstrating his innocence with new evidence under state law." *Id.* at 68. However, Osborne was not entitled to the DNA evidence he sought because Alaska's procedures for postconviction relief adequately vindicated his

31

No. 24-3054, *Widmer v. Okereke*

interests, and "[f]ederal courts may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided." *Id.* at 69. Alaska's postconviction procedures were sufficient because they "provid[ed] a substantive right to be released on a sufficiently compelling showing of new evidence that establishes innocence" and provided for discovery, including the discovery of DNA evidence, in postconviction proceedings. *Id.* at 70. Alaska was entitled to place limitations on these procedures, including that DNA evidence sought must be newly available, diligently pursued, and sufficiently material. *Id.*

Under *Osborne*, Widmer cannot demonstrate that he has a liberty interest in obtaining DNA testing of Sarah's remains. Section 2953.21 of the Ohio Revised Code, which governs petitions for postconviction relief, allows a convicted person to obtain relief if he falls into one of four categories. These categories include persons who "claim[] that there was a denial or infringement of the person's rights under either [the state or federal] Constitutions that creates a reasonable probability of an altered verdict," and those who obtain DNA testing under Sections 2953.71 to 2953.81 of the Ohio Revised Code and present "results that establish, by clear and convincing evidence, actual innocence of that felony offense" of conviction. Ohio Rev. Code § 2953.21(A)(1)(a)(i), (iii). While Widmer may have a liberty interest in demonstrating that his constitutional rights were violated, as in *Osborne*, he cannot show an entitlement to DNA testing to vindicate this interest. As the state court concluded, the Ohio statutes at issue in this case do not provide for genetic testing of a victim's DNA, but only for testing in which a sample of the defendant's DNA is compared for exclusion purposes. *Widmer II*, 2013 WL 142041, at *27; Ohio Rev. Code §§ 2953.73(10); 2953.74(B), (C). Therefore, the statutory scheme does not create a liberty interest on which Widmer can hinge his due process claims. And Ohio's postconviction relief procedures do not offend due process. As with Alaska's postconviction procedures, Ohio's

No. 24-3054, *Widmer v. Okereke*

procedures limiting DNA testing, in most cases, to exclusionary testing are not inadequate to vindicate Widmer's interest in postconviction relief. Ohio's scheme fails to "transgress[] any recognized principle of fundamental fairness." *Osborne*, 557 U.S. at 69 (quoting *Medina v. California*, 505 U.S. 437, 446, 448 (1992)). Notably, Ohio law provides that "[S]ections 2953.71 to 2953.81 of the Revised Code . . . are not the exclusive means by which an offender may obtain postconviction DNA testing, and the provisions of those sections do not limit or affect any other means by which an offender may obtain postconviction DNA testing." Ohio Rev. Code § 2953.84. Section 2953.21 further allows courts to authorize "any . . . form of discovery as in a civil action that the court in its discretion permits" pursuant to petitions for postconviction relief. *Id.* § 2953.21(A)(1)(e). These statutes provide a similar process to that vindicated in *Osborne*, in which Alaska "provide[d] for discovery in postconviction proceedings" and "specified that this discovery procedure is available to those seeking access to DNA evidence." 557 U.S. at 70. Where like process is available, it was not an unreasonable application of *Osborne* for the state court to conclude that the statutory limitations imposed on Widmer's request for DNA testing failed to violate his due process rights.

Further, Widmer has not shown that state court's denial of his request for DNA testing on equal protection grounds was unreasonable. Widmer argues that the DNA testing scheme in Ohio Revised Code Sections 2953.71 to 2953.81 violates the Equal Protection Clause because it makes an arbitrary distinction between two groups: (1) convicted felons who seek exclusionary DNA testing as defined under the statute and (2) convicted felons who, like Widmer, do not seek exclusionary DNA testing but nevertheless seek DNA testing that would raise reasonable doubt in their cases. The state court denied Widmer's equal protection claim, reasoning that the claim failed because Widmer was not similarly situated to the convicted persons entitled to exclusionary DNA

No. 24-3054, *Widmer v. Okereke*

testing under Ohio's statutory scheme. *Widmer II*, 2013 WL 142041, at \*27. Rather, the defendants entitled to DNA testing by statute "seek to compare their own DNA against that of an unidentified prospective perpetrator," while Widmer fell into a category of defendants who might "wish to test a victim's DNA for, perhaps, an interminable array of ailments in the hopes of discovering some mitigating evidence." *Id.*

This was not an unreasonable determination. Widmer argues the state court's ruling contravenes *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985). But *Cleburne* establishes only that legislation that distinguishes between classes of persons "must be rationally related to a legitimate governmental purpose" to withstand equal protection review. *Id.* at 446. Classifications are unconstitutional only when their relationship to a governmental interest is "so attenuated as to render the distinction arbitrary or irrational." *Id.* This is because "[t]he Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

Widmer argues that he is similarly situated to defendants who seek exclusionary testing under Ohio's statutory scheme, and that the Ohio statutes arbitrarily or irrationally distinguish between defendants like himself, who seek non-exclusionary DNA testing that would nevertheless aid their cases, and defendants who seek exclusionary testing. But Widmer fails to adequately explain why this distinction is irrational or arbitrary. Rather, providing only for exclusionary testing furthers legitimate state interests, as the Equal Protection Clause requires. *See Nordlinger*, 505 U.S. at 10. Ohio courts can more quickly evaluate whether applications for exclusionary DNA testing are outcome determinative, and exclusionary testing is more likely to be outcome

34

No. 24-3054, *Widmer v. Okereke*

determinative and probative of a defendant's innocence. Therefore, postconviction procedures aimed at exclusionary DNA testing vindicate legitimate state interests in judicial efficiency.

It was therefore not unreasonable for the state court to deny Widmer's equal protection claim. Accordingly, Widmer is not entitled to relief on his claims that the denial of DNA testing violated his constitutional rights.

### 4. Widmer's Ineffective Assistance of Counsel Claim

Related to his claims about the constitutionality of Ohio's DNA testing scheme, *Widmer* also argues that the state court unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), in concluding that he was not prejudiced by trial counsel's failure to pursue genetic testing for LQTS on Sarah's remains. The district court granted a certificate of appealability on this issue.

To succeed on a claim for ineffective assistance of counsel under *Strickland*, a petitioner must "prove both that his counsel was objectively deficient and that he was prejudiced by his counsel's deficient performance." *Van Tran v. Colson*, 764 F.3d 594, 624 (6th Cir. 2014). "Under the deferential review standards of AEDPA, the already deferential *Strickland* standard becomes doubly deferential: the question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* (cleaned up). Widmer is "not entitled to relief if we find that the postconviction review court was not unreasonable in its determination regarding just one of the prongs." *Id.*

The state postconviction appellate court, the last state court to issue a reasoned decision on this claim, denied Widmer's ineffective assistance of counsel claim based on the prejudice prong of the *Strickland* test. It first concluded that that it was not necessary for the court to determine definitively whether Sarah suffered from LQTS to evaluate the prejudice prong of *Strickland*. *Widmer II*, 2013 WL 142041, at *26. It then denied Widmer's claim under *Strickland*, ruling that

35

No. 24-3054, *Widmer v. Okereke*

Widmer failed to demonstrate that trial counsel's failure to pursue genetic testing prejudiced him, because the "jury heard, and presumably considered, expert testimony as to the possibility that Sarah suffered from a sudden cardiac event, including Long QT Syndrome." *Id.* Widmer could not show that a definitive diagnosis would alter the jury's consideration of his guilt, and therefore could not show that he was deprived "of a trial whose result is reliable." *Id.* (quoting *Strickland*, 466 U.S. at 687).

The state postconviction court's determination that Widmer suffered no prejudice was not an unreasonable application of the prejudice prong of the *Strickland* test. As the state court recognized, to prevail on the prejudice prong of an ineffective assistance of counsel claim, Widmer must show that his counsel's failure to pursue genetic testing deprived him "of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. Widmer cannot make this showing. Even without a definitive diagnosis, the possibility that Sarah suffered from LQTS, and that it may have caused her sudden death, was raised at trial. Four medical professionals, including Balko, addressed LQTS in some capacity. Balko testified specifically to a correlation between Sarah's features, including her childhood cleft palette and short stature, and ATS, to suggest that that she may have had the disorder. In addition, the defense consistently raised the possibility that Sarah had a seizure or cardiac event that precipitated her drowning, and the numerous medical experts who testified at trial could not rule out the possibility that such an event occurred. Further, genetic testing, even if it established that Sarah had LQTS, would not definitively establish that LQTS was the cause of her drowning. Balko, in his affidavit, noted only "a curious association" between LQTS and sudden drowning, mostly in "reports of swimming-triggered aborted sudden cardiac death in ATS patients." Balko Aff., R. 30-4, Page ID #10375–76. This hardly establishes that

No. 24-3054, *Widmer v. Okereke*

Sarah, even if suffering from LQTS, would be prone to drowning in a bathtub.  It could only make it more likely that this was the case.

So, where the jury already heard, and evidently rejected, considerable evidence that Sarah's drowning could have been caused by a cardiac event, we cannot say that there was "a reasonable probability that, but for" Widmer's counsel's failure to pursue genetic testing, "the result of [his trial] would have been different." *Strickland*, 466 U.S. at 694.  The state court's decision was therefore consistent with *Strickland*. Accordingly, Widmer is not entitled to relief for his claim of ineffective assistance of counsel.

### III.    CONCLUSION

For the reasons set forth above, we **AFFIRM** the decision of the district court denying Petitioner a writ of habeas corpus.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 24-3054

RYAN K. WIDMER,

     Petitioner - Appellant,

     v.

JOSSETTE OKEREKE, Warden,

     Respondent - Appellee.

```
┌─────────────────────────────────┐
│            FILED                │
│         May 19, 2025            │
│   KELLY L. STEPHENS, Clerk      │
└─────────────────────────────────┘
```

Before:  MOORE, CLAY, and THAPAR, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's denial of Ryan K. Widmer's petition for a writ of habeas corpus is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_Kelly L. Stephens_

_____

Kelly L. Stephens, Clerk